# EXHIBIT 1

Verified Complaint, Motion for Preliminary Injunction, Amended
Verified Complaint, and Summons

# EXHIBIT 1

Verified Complaint, Motion for Preliminary Injunction, Amended
Verified Complaint, and Summons

F I L E D
Electronically
CV19-01900
2019-09-30 03:30:12 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511638 : csulezic

1 | Code $1425
LUKE A. BUSBY, ESQ
2 | Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
3 | 316 California Ave.
Reno, Nevada 89509
4 | 775-453-0112
luke@lukeandrewbusbyltd.com
5 | *Attorney for the Plaintiff*

6

7 | **IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

8 | **IN AND FOR THE COUNTY OF WASHOE**

9 | * * *

10

11 | TRINA OLSEN,

| Plaintiff,                          Case No.:
12 | vs.
                                       Dept. No.:
13 | WASHOE COUNTY SCHOOL
14 | DISTRICT, a political subdivision of the
State of Nevada; Washoe County School
District Superintendent TRACI DAVIS;     **ARBITRATON EXEMPTION**
15 | and DOES 1 through 10 inclusive;        **REQUESTED – INJUNCTIVE AND**
                                            **DECLARATORY RELIEF SOUGHT**
16 |                   Defendants.           **AND PROBABLE JURY AWARD IN**
    | _____/       **EXCESS OF $50,000.**
17

18

19 | **VERIFIED COMPLAINT**

20 |         COMES NOW, TRINA OLSEN, ("Olsen" or "Plaintiff"), by and through the

21

22 | undersigned counsel, and files the following verified complaint seeking redress

23 | for the violation by of Olsen's Due Process rights under the Fourteenth

24 | Amendment to the United States Constitution and for various pendent state law

25

26 | claims against WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of

27 | the State of Nevada ("WCSD"); and WCSD Superintendent TRACI DAVIS

28 | ("Davis") (collectively "the Defendants"); and JOHN DOES I through X, inclusive.

## Arbitration Exemption

1.      As set forth more fully hereinbelow, Plaintiff's claims have a probable jury award in excess of fifty thousand dollars ($50,000.00); further, contemporaneous with this motion, the Plaintiff is filing a Motion for Preliminary Injunction and seeks declaratory relief in this Verified Complaint, and, therefore, this dispute should be excluded from mandatory court-annexed arbitration program under the provisions of NAR 3(A).

## Jurisdiction and Venue

2.      The above-captioned Court has subject matter jurisdiction pursuant to NRS 3.221 and NRS 4.370, as the amount in controversy exceeds fifteen thousand dollars ($15,000.00).

3.      Venue is properly in the above-captioned Court because: (a) the Plaintiff is located in and the Defendant is a subdivision of the State of Nevada located in Washoe County; (b) it has personal jurisdiction over the Plaintiffs in this action; (c) it has personal jurisdiction over the Defendants; and (d) Plaintiff was employed by the Defendant WCSD in Washoe County.

## Parties

4.      Ms. Olsen is currently an assistant principal at Wooster High School in Reno, Nevada, and currently resides, and at all times relevant hereto resided, in Reno, Nevada.

5.      WCSD is the school district that serves Washoe County and is a political subdivision of the State of Nevada.

2

6.     Ms. Davis was employed by WCSD as Superintendent at the times relevant to this Complaint until her termination from WCSD on July 1, 2019.

7.     Ms. Davis was at all times relevant herein acting under color of state law as described below.

8.     Ms. Davis is sued in her individual capacity.

9.     Ms. Davis, as superintendent of WCSD, was the officer with final policymaking authority over personnel matters within the WCSD during her tenure at WCSD.

**Allegations of Fact**

10.     Olsen has been an employee of WSCD since 1992.  Olsen worked in various position as a certificated teacher and then Dean of Students.

11.     For the 2016-2017 school year, Olsen was promoted to the position of Assistant Principal at Hug High School, where she reported to and were supervised by Hug High Principal Lauren Ford ("Ford").

12.     At Hug High, Olsen was responsible for supervising Multi-Tiered Systems of Support (MTSS) and Special Education, among her general duties as Assistant Principal.  Olsen also worked on the Hug Credit Attainment Program, a school-wide effort to help students complete courses and obtain credits toward graduation, as well as acting as the testing coordinator for Hug High.  Olsen was also responsible, along with other staff members and administration, for school safety and student discipline at Hug High.

13.     Ford conducted numerous evaluations, called formal observations, of Olsen at Hug High, including a 40th Day Observation of Olsen on September 27, 2016, in which Ford deemed Olsen to be "effective." Ford conducted an 80th Day Observation on November 8, 2016 during a Professional Development program Olsen had organized, and Ford again rated Olsen "effective," and commended her efforts while providing recommendations for improvement.  Ford conducted a 120th Day Observation of Olsen on January 31, 2017 and signed off on it on April 15, 2017.  Ford completed Olsen's yearly Performance Evaluation on or about April 21, 2017, and rated Olsen as overall effective. Thus, before the events described below, Ford herself indicated that Olsen was effective at doing her job.

14.     On or about May 8, 2017, Hug High teacher and department leader Patrick Rossi told Olsen that another teacher had told him that Dean of Students at Hug High Jessica Wilson had given drugs back to a student.  Patrick Rossi indicated to Olsen that he learned this information from Hug High teacher Sabrina Cellucci.

15.     Olsen was informed that Sabrina Cellucci brought Wilson a wallet that belonged to a student which contained marijuana.  Cellucci brought Wilson the wallet because Wilson was in charge of discipline of students at Hug High. Wilson then confronted the student about the wallet and the marijuana and when the student asked for the wallet, Wilson asked her if she knew what was in the wallet. The student told Wilson that the marijuana belonged to her boyfriend and

that she didn't smoke marijuana because she gets drug tested for work and in anticipation of taking college courses.  Wilson then gave the wallet with the marijuana back to the student.

16.     On May 8, 2017 Olsen went to Wilson's office to talk to Wilson about the allegation that she had given marijuana back to a student. Olsen asked Wilson if she had handed drugs back to a student.  Wilson admitted that she had given the drugs back to the student because she had seen Lauren Ford do the same thing, which Olsen understood to mean that Wilson had: (1) given marijuana back to a student, and (2) that Olsen's boss, Ford, had done the same thing in the past.

17.     Olsen knew that providing illegal drugs such as marijuana to a student was a criminal offense and a clear violation of WCSD policy, and as such she took the allegations that Wilson and Ford had done this very seriously.

18.     On May 25, 2017, Olsen notified Roger Gonzalez, who was at that time WCSD Area Superintendent, that she wanted to report an incident involving marijuana on the Hug High campus.  Despite Olsen's pleas to a meeting to discuss the matter, Gonzalez refused to meet with Olsen regarding the matter, and instead provided Olsen with the formal staff complaint form.

19.     On June 4, 2017, Olsen filed the staff complaint form against Lauren Ford by sending the form to Roger Gonzalez. Olsen's complaint stated that:

> Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was true, and she replied, 'yes, But I only did it because I saw Lauren (Ford) do it not too long ago.

20.     However, rather than investigate Wilson and Ford regarding allegations that they gave drugs to students, Gonzalez and other WCSD employees began a campaign of character assassination and retaliation against Olsen.  In other words, despite having an excellent track record as a WCSD employee for a number of years, after discovering allegations that Wilson and Ford had given marijuana to a student and investigating and reporting the matter to Roger Gonzalez, Olsen has been subject to a barrage of false accusations and allegations of misconduct by WCSD officials.

21.     On June 28, 2018, Roger Gonzalez authored a letter to Ms. Olsen, copied to Ms. Davis and other WCSD employees, which recommended that Olsen be dismissed from WCSD. Among the allegations against Olsen detailed by Mr. Gonzalez in the letter, were that Olsen had made false accusations against Ford related to the marijuana incident described above.

22.     On July 6, 2018, Olsen filed a request to arbitrate the matter of the recommendation of her firing by Roger Gonzalez and Traci Davis according to the provisions of NRS 391.824.

23.     On July 23, 2018 Olsen was informed by WCSD employee Selene Lewis that Olsen was no longer being paid by WCSD because her status was, "recommended for dismissal."

24.     On July 27, 2018, Olsen was notified by Traci Davis by mail that she was discharged effective June 5, 2018, despite the fact that Davis, by the very

terms of the July 27, 2018 letter, was aware that Olsen had elected to arbitrate the matter and that arbitration proceedings were ongoing.

25.    Ms. Olsen's unlawful termination was the subject of arbitration proceedings conducted before Arbitrator Andrea L. Dooley in Case No. LA-627-2018 on November 1, 2, and 28 of 2018, conducted in Reno, Nevada.  Ms. Dooley issued a Decision and Award on the latter dated December 13, 2018. Among the relevant findings of fact and conclusions of law in the Decision and Award are:

a.    WCSD violated NRS 391.822 when Traci Davis terminated Ms. Olsen on July 5, 2018 without waiting for the final report from the Arbitrator;

b.    WCSD did not meet their burden of proof that the alleged actions of Ms. Olsen constituted misconduct, as alleged;

c.    WCSD took disciplinary measures against Olsen that were retaliatory; and

d.    WCSD's dismissal of Ms. Olsen was arbitrary and capricious.

26.    The arbitrator's Decision and Award recommended that WCSD, "…must reinstate Ms. Olsen and make her whole back to July 5, 2018, the superintendent will then follow the provisions of 391.824(6)."

27.    Although WCSD reinstated Olsen and provided back pay and benefits from July 5, 2018, it has not made Ms. Olsen whole as required by the Arbitrator's Decision and Award.  To date, almost nine months after the Decisions and Award from Ms. Dooley, WCSD has still not complied with the provisions of

NRS 391.824(6) by sending the required letter indicating that dismissal of Ms. Olsen will not be recommended to the board and that no further action will be taken against Ms. Olsen.  Contemporaneous with this Complaint, Olsen is filing a Motion for Preliminary Injunction requesting that the Court prohibit WCSD from taking any adverse action against Olsen without prior consent of this Court until this case is finally resolved.

28.   Ms. Olsen's firing at the hands of Ms. Davis occurred in blatant violation of NRS 391.824(1): "If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee…"

29.   By the above-described malicious acts, and as a direct result, Defendant caused Olsen to lose the benefit of gainful employment at her chosen occupation for a period of six-months, and Olsen suffered damages in excess of $15,000.

30.   The Plaintiff has suffered damages as a result of the disregard for her Constitutional rights by the Defendants, including but not limited to emotional distress, humiliation, personal indignity as well as loss of reputation or status caused by Olsen's unlawful discharge from employment and violation of her Constitutional rights described herein.

///

## CLAIMS FOR RELIEF

## 42 U.S.C. 1983 - VIOLATION OF DUE PROCESS

## (PROTECTED PROPERTY INTEREST)

### (Against Defendant Davis)

31.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

32.     By their conduct, as described herein, Defendant is liable to the Plaintiff under 42 U.S.C. § 1983 for the violation, under color of state law, of the constitutional right to be free from any deprivation of property without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

33.     Davis violated numerous provisions of Nevada Revised Statutes ("NRS") 391.822 *et seq* governing the rights of employees in the State of Nevada, including the Plaintiff, which rules secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff, including but not limited to the prohibition of dismissal of an employee if such dismissal violates the legal rights of the probationary employee provided by federal law or Nevada law or is arbitrary or capricious as contained in NRS 391.824(2) and (3).

34.     The provisions of Nevada Revised Statutes ("NRS") 391.822 *et seq* create a property interest that is protected by the Due Process Clause of the 5th and 14th Amendments to the Constitution, the violation of which caused damages to the Plaintiff.

35.     The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award of punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

36.     In addition to the relief requested above, the Plaintiff requests relief as described in the prayer for relief below.

## 42 USC 1983 - MONELL CLAIM

## (Against WCSD)

37.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

38.     At all relevant times herein, Defendant WCSD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to the Plaintiff's due process rights which caused the violation of such rights by Ms. Davis as described herein.

39.     All actions described herein by Davis are a policy or custom of WCSD.  (*See Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.)  Davis, as superintendent of WCSD, was the officer with final policymaking authority over personnel matters within the WCSD, including over the decision to fire Olsen.

40.     Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive the Plaintiff of her constitutional rights under the

Fifth and Fourteenth Amendments to the U.S. Constitution without due process of law.

41.     The constitutional abuses and violations by WCSD through the actions of Ms. Davis were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by WCSD, including its practice and policy of unlawfully terminating the employment of WCSD employees who report allegations of unlawful activity of other WCSD employees.

42.     Upon information and belief, Defendant WCSD has developed, implemented, enforced, encouraged and sanctioned a de facto policy, practice, and/or custom of unlawfully terminating the employment of WCSD employees who report allegations of unlawful activity of other WCSD employees.

43.     Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiff of her constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award of punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

44.     Defendants have acted with deliberate indifference to the constitutional rights of the Plaintiff.  As a direct and proximate result of the acts as stated herein by each of the Defendants the Plaintiff's constitutional rights have

been violated which has caused her to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

## TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY

### (Against All Defendants)

45.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

46.     Plaintiff, acting in good faith, reported the unlawful activity of her fellow employees, not to her immediate supervisor Lauren Ford, but to WCSD Area Superintendent and public official Dr. Roger Gonzalez.

47.     WCSD superintendent Traci Davis fired the Plaintiff, despite knowing that the Plaintiff has sought arbitration under the provisions of NRS 391.822.

48.     WCSD is vicariously liable for damages resulting from their agents, servants, partners and/or employees, including but not limited to Defendant Traci Davis.

49.     The Defendant's decision to fire the Plaintiff was proximately caused by the Plaintiff's lawful actions and was in derogation of the public policy of the State of Nevada, i.e. the reporting of illegal activities to the appropriate authorities. *Allum v. Valley Bank of Nevada*, 114 Nev. 1313, 1316, 970 P.2d 1062, 1064 (1998) and *Buchanan v. Watkins & Letofsky, LLP.*, 2019 WL 3848785, at *6 (D. Nev. Aug. 15, 2019)

50.     As a direct and proximate result of Defendant's tortious constructive discharge Plaintiff suffered damages in excess of $15,000.

12

WHEREFORE, the Plaintiff requests that this Court:

a. Enter a declaratory judgment pursuant to NRS 30.030 that the actions complained of herein are unlawful and violate the United States Constitution and Nevada law.

b. Order Defendant to pay the compensation denied or lost to Plaintiff to date by reason of Defendant's unlawful actions, in amounts to be proven at trial;

c. Order Defendant to pay compensatory damages for the Plaintiff's lost property and emotional pain and suffering, in an amount to be proven at trial;

d. Order Defendant to pay exemplary and punitive damages *Smith v. Wade*, 461 U.S. 30 (1983), and/or NRS 42.005;

e. Order Defendant to pay attorneys' fees and costs of the action pursuant to 42 U.S.C. 1988;

f. Order Defendant to pay interest at the legal rate on such damages as appropriate; and

g. Grant any further relief that the Court deems just and proper.

## NRS 239B.030(4) AFFIRMATION

Pursuant to NRS 239B.030 as well as Rule 10 of the Washoe District Court Rules, the undersigned hereby affirms that this document does not contain the social security number of any person.

///

///

**(signature on following page)**

1

**DATED** this Monday, September 30, 2019:

2

3
By:_____
LUKE BUSBY, ESQ.

4
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE.

5
RENO, NV 89509

6
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM

7
ATTORNEY FOR PLAINTIFF

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**VERIFICATION**

I, Trina Olsen, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

That I am the Plaintiff in the forgoing action.  That I have read the foregoing VERIFIED COMPLAINT and knows the contents thereof.  That Allegations of Fact in the VERIFIED COMPLAINT are true and correct to the best of my knowledge, information and belief, and as to those matters I believes them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____9/30/19_____ in Reno, Nevada.

_____
Trina Olsen

15

F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

Code 2490
LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF WASHOE**

* * *

TRINA OLSEN,

                 Plaintiff,          Case No.:

vs.

WASHOE COUNTY SCHOOL        Dept. No:
DISTRICT, a political subdivision of the
State of Nevada; Washoe County School
District Superintendent TRACI DAVIS;
and DOES 1 through 10 inclusive;

                 Defendants.
_____/

**MOTION FOR PRELIMINARY INJUNCTION**

       COMES NOW, TRINA OLSEN, ("Olsen" or "Plaintiff"), by and through the

undersigned counsel, and files the following Motion for Preliminary Injunction

against WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of the

State of Nevada ("WCSD"), seeking that the Court issue an Order precluding

WCSD from taking any further adverse employment action against Olsen without

prior consent of this Court until this case is resolved.

1

This Motion is made and based upon all the pleadings and records on file for this proceeding together with every exhibit that is mentioned herein or attached hereto (each of which is incorporated by this reference as though it were set forth here in haec verba), if any there be, as well as the points and authorities set forth directly hereinafter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Issue**

This Motion is filed contemporaneously with the Verified Complaint in this matter.  The underlying facts describing the dispute in this case are attested to by Olsen and described at length in the Verified Complaint, which facts incorporated herein and included herein by reference.

The most salient facts related to this Motion and the underlying request for relief are as follows.

Olsen has been an employee of WSCD since 1992.  Olsen worked in various position as a certificated teacher and then Dean of Students.  For the 2016-2017 school year, Olsen was promoted to the position of Assistant Principal at Hug High School, where she reported to and were supervised by Hug High Principal Lauren Ford ("Ford").

In May of 2017, Olsen was informed of allegations that illegal drugs may have been provided to students by Jessica Wilson, Dean of Students at Hug High, and by Ford.  Olsen then reported these allegations to WCSD Area Superintendent Roger Gonzalez.

However, rather than investigate Wilson and Ford regarding allegations that they gave drugs to students, Gonzalez and other WCSD employees began a campaign of character assassination and retaliation against Olsen.  In other words, despite having an excellent track record as a WCSD employee for a number of years, after discovering allegations that Wilson and Ford had given marijuana to a student and investigating and reporting the matter to Roger Gonzalez, Olsen has been subject to a barrage of false accusations and allegations of misconduct by WCSD officials.

On June 28, 2018, Roger Gonzalez authored a letter to Ms. Olsen, copied to Ms. Davis and other WCSD employees, which recommended that Olsen be dismissed from WCSD. Among the allegations against Olsen detailed by Mr. Gonzalez in the letter, were that Olsen had made false accusations against Ford related to the marijuana incident described above. Mr. Gonzalez's letter is attached hereto as Exhibit 1.

On July 6, 2018, Olsen filed a Request to Arbitrate the matter of the recommendation of her firing by Roger Gonzalez according to the provisions of NRS 391.824.  See Exhibit 2.

On July 27, 2018, Olsen was notified by Traci Davis by mail that she was discharged effective July 5, 2018, despite the fact that Davis, by the very terms of the July 27, 2018 letter, was aware that Olsen had elected to arbitrate the matter and that arbitration proceedings were ongoing.  See Exhibit 3.  NRS 391.824(1) plainly provides that:

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

Ms. Olsen's unlawful termination was the subject of arbitration proceedings conducted before Arbitrator Andrea L. Dooley in Case No. LA-627-2018 on November 1, 2, and 28 of 2018, conducted in Reno, Nevada.  Ms. Dooley issued a Decision and Award on the latter dated December 13, 2018 attached hereto as Exhibit 4.  Among the relevant findings of fact and conclusions of law in the Decision and Award are:

> a. WCSD violated NRS 391.822 when Traci Davis terminated Ms. Olsen on July 5, 2018 without waiting for the final report from the Arbitrator; *Id.* at 36.
>
> b. WCSD did not meet their burden of proof that the alleged actions of Ms. Olsen constituted misconduct, as alleged; *Id.* at 34.
>
> c. WCSD took disciplinary measures against Ms. Olsen were retaliatory; *Id.* at 32, and
>
> d. WCSD's dismissal of Ms. Olsen was arbitrary and capricious. *Id.* at 38.

The arbitrator's Decision and Award recommended that WCSD, "…must reinstate Ms. Olsen and make her whole back to July 5, 2018, the superintendent will then follow the provisions of 391.824(6)." *Id.*

To date, some nine months after the Decisions and Award from Ms. Dooley, WCSD has not complied with the provisions of NRS 391.824(6) by

sending the required certified letter indicating that dismissal of Ms. Olsen will not

be recommended to the board and that no further action will be taken against

Ms. Olsen, nor has WSCD made Ms. Olsen whole as required by the Arbitrator's

Decision and Award.

After the Decision and Award, Ms. Olsen rehired and was given as

position as assistant principal at Wooster High School in Reno, Nevada.

However, despite the Decision and Award, Olsen is still at risk for further

retaliatory action by WCSD officials because the directive from the Arbitrator in

the Decision and Award that Olsen receive notice that dismissal of Ms. Olsen will

not be recommended to the board and that no further action will be taken

against Ms. Olsen, as required by NRS 391.824(6), has not been complied with

by WCSD.  Further, based on WCSD's past conduct as described by the

Arbitrator in the decision and award, Olsen reasonably fears that further

retaliatory actions may be taken against Olsen as a result of her instituting this

action.

Olsen is only seeking injunctive relief herein against WCSD because

Olsen is informed that around Jul 1, 2019, Traci Davis as terminated from her

employment at WCSD.

**Rule**

NRS 33.010 states that an injunction may be granted by the Court where it

appears by the complaint that: (1) the plaintiff is entitled to the relief demanded, i.e.

likelihood of success on the merits; (2) irreparable injury if the injunction in not

granted; and (3) the defendant is doing some act in violation of the plaintiff's rights respecting the subject of the action.

**Analysis**

**a. Likelihood of Success on the Merits**

Olsen has plead three causes of action: a 14th Amendment Due Process Claim against Defendant Traci Davis, a 42 U.S.C. *Monell* Claim against WCSD, and a Tortious Discharge claim against Davis and WCSD.  *See* Verified Complaint.

As described above, the facts underlying the dispute between Ms. Olsen and WCSD have already been subject to formal proceedings and a Decision and Award by an Arbitrator, in which the Arbitrator concluded that WCSD took retaliatory action against Olsen and that WCSD's firing of Olsen was "arbitrary and capricious." *See* Exhibit 4.  Thus, Olsen has already in essence prevailed in showing that WCSD terminated Olsen in violation of her Due Process rights conferred by NRS 391.822 et seq.

While 42 U.S.C. 1983 creates no substantive rights, it creates a vehicle for enforcing existing federal rights.  Due process rights only exist when an employee has a property interest in his or her employment, or a reasonable expectation of continued employment.  Property interests related to employment are created and defined by existing rules, such as state law, that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Due Process rights are, "…conferred, not by legislative grace, but by constitutional guarantee." *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974).  While the legislature may elect not to confer a property interest, it may

6

not deprive a granted property interest without appropriate procedural safeguards. *Id.*

The facts described herein and in the Complaint show that Davis violated numerous provisions of Nevada Revised Statutes governing the rights of employees in the State of Nevada that secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff, including but not limited to the prohibition of dismissal of an employee such as Olsen if such dismissal violates the legal rights of the probationary employee provided by federal law or Nevada law or is arbitrary or capricious as contained in NRS 391.824(2) and (3). "[T]he existence of a right violated is a prerequisite to the granting of an injunction." *State Farm Mut. Auto. Ins. Co. v. Jafbros Inc*., 109 Nev. 926, 928, 860 P.2d 176, 178, 1993 WL 385119 (1993) quoting 43 C.J.S. § 18 Injunctions (1978).

If the Court determines a likelihood of success on Olsen's Due Process claim, her *Monell* claim against WCSD should succeed as well because all actions of Davis are a policy or custom of WCSD.  (See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.)  Local governments are liable for underlying 42 U.S.C. 1893 claims if the deprivation is the result of the agency's custom, policy, or practice. *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  Davis, as superintendent of

WCSD, was the officer with final policymaking authority over personnel matters within the WCSD, including over the decision to fire Olsen.

Olsen's Tortious Discharge claim should succeed as well, because the facts indicate Olsen was fired for reporting the alleged illegal conduct of her co-workers. (See Exhibit 1, where one of the allegations against Olsen that led to her dismissal was that she was guilty of: "Gross Misconduct; making false accusations toward your immediate supervisor."  As determined in the Decision and Award in Exhibit 4, the Defendant's decision to fire the Olsen was caused by Olsen's lawful and appropriate action of reporting the alleged illegal conduct of co-workers and, as such, her firing was in derogation of the public policy of the State of Nevada, i.e. the right to report of illegal activities of others to the appropriate authorities without fear of retaliation.  *Allum v. Valley Bank of Nevada*, 114 Nev. 1313, 1316, 970 P.2d 1062, 1064 (1998) and *Buchanan v. Watkins & Letofsky*, LLP., 2019 WL 3848785, at *6 (D. Nev. Aug. 15, 2019).

**b. Irreparable Harm**

For a preliminary injunction to issue, the moving party must show that the nonmoving party's conduct, should it continue, would cause irreparable harm for which there is no adequate remedy at law.  *Dep't. of Conservation & Natural Res. v. Foley*, 121 Nev. 77, 80, 109 P.3d 760, 762 (2005).

Olson will suffer irreparable harm is she is again dismissed by WCSD as described in her Declaration, attached hereto as Exhibit 5.  Ms. Olsen relies on the income from her position at WCSD to pay for her home, her car, and for the general welfare of her family.  For example, the first time that Olsen was terminated by

Davis, Olsen lost riders on her health insurance policy for which she was grandfathered in.  These health insurance riders now cost twice as much because the riders were not paid during the time Olsen was terminated.

Further, because Olsen has already exercised her rights to arbitrate the dispute with WCSD as described in the Decision and Order, if WCSD takes further adverse action she will have no further administrative recourse under NRS 391.822 *et seq* to have the matter heard again.

Further, Olsen has suffered irreparable harm to her professional reputation and standing by being accused of misconduct, by being vindicated by the Arbitrator's Decision and Award, and then having WCSD ignore the provisions of the award that would compel it to admit that it was WCSD and not Olsen who violated the law when WCSD fired Olsen for reporting the alleged misconduct of other WCSD employees.

Also, Olsen would have been eligible to apply to become a principal three years after being appointed assistant principal at any school in WCSD.  Because Olsen missed a year and a half of work as an assistant principal, she has suffered a delay in her eligibility to apply to become a principal.  Further adverse action by WCSD would, de facto, exacerbate the harms described above.

**c. Acts in Violation of Olsen's Rights**

Olson has a Due Process right to be free from arbitrary and capricious dismissal from her position at WCSD as provided in NRS 391.824(2) and (3). Subsequent to the arbitration process described in the statutory scheme in NRS

9

391.822 et seq, an employee is putatively to be "let off the hook." i.e. they are supposed to be affirmatively informed by their employer that, "that dismissal of the employee will not be recommended to the board and that no further action will be taken against the employee."  See NRS 391.824(6)(b).  For unknown reasons, this has no occurred and Olsen is still, "on the hook" for at least some of the allegations leveled against her in the Notice of Recommended Dismissal in Exhibit 1.  As described above, despite the clear decision of the Arbitrator in the Decision and Award, WCSD refuses to abide by the Decision and Award and has not complied with the provisions of NRS 391.824(6)(b), but rather, keeps Olsen in a continuous state of limbo where she may face further adverse action as a result of the circumstances that have already been addressed by the Arbitrator in the Decision and Award.

No bond should be required in this matter for the issuance of the requested injunction because issuance of the injunction will not result in any costs to WCSD.

**Conclusion**

Based on WCSD's demonstrated lack of compliance with its own rules and regulations, and it past retaliatory actions against Olsen, the Court should issue a preliminary injunction to maintain the *status quo* and prevent WCSD from taking any further adverse employment action against Olsen without prior approval of this Court.

WHEREFORE, Olsen requests that the Court provide the following relief:

(1) Schedule a hearing if the Court deems necessary; and

(2) Issue a preliminary injunction against WCSD prohibiting WCSD from taking any adverse action against Olsen without prior consent of this Court until this case is finally resolved.

### NRS 239B.030(4) AFFIRMATION

Pursuant to NRS 239B.030 as well as Rule 10 of the Washoe District Court Rules, the undersigned hereby affirms that this document does not contain the social security number of any person.

**DATED** this Monday, September 30, 2019:

By:_____

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE.
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

**Exhibit List**

1.  June 28, 2018 Notice of Recommended Dismissal

2.  July 6, 2018 Request to Arbitrate

3.  July 27, 2018 Termination Letter

4.  December 13, 2018 Decision and Award

5.  Declaration of Trina Olsen

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that on Monday, September 30, 2019, I caused service to be completed by:

_____   personally delivering;

___X__   delivery via Reno/Carson Messenger Service;

_____   sending via Federal Express (or other overnight delivery service);

_____ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

_____   delivery via electronic means (fax, eflex, NEF, etc.)

 a true and correct copy of the foregoing pleading addressed to:

To: Washoe County School District
Office of General Counsel
Christopher B. Reich, Esq.
P.O. Box 30425
Reno, NV 89520-3425
creich@washoeschools.net

Traci Davis
c/o William E. Peterson
SNELL AND WILMER
50 W. Liberty St. Suite 50
Reno, Nevada 89501
wpeterson@swlaw.com

By: _____

F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

# Exhibit 1

# Exhibit 1

**Washoe County School District**
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees:  Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk *
Debra Feemster * Veronica Frenkel * Scott Kelley * Angela Taylor * Traci Davis, Superintendent

June 28, 2018

**USMAIL/CERTIFIED #70151660000006352091**

Trina Olsen
1400 Belford Rd.
Reno, NV 89509

RE:     **Notice of Recommended Dismissal**

Dear Ms. Olsen:

Be advised that pursuant to NRS 391.317 and the delegation of authority to the Superintendent to make all employee separation decisions from the Board of Trustees on February 14, 2006, I intend to recommend to the Superintendent that you be dismissed. The basis for this action is found in NRS 391.750, specifically:

(d) Insubordination; (c) Unprofessional Conduct; (k) failure to comply with such reasonable requirements as a board may prescribe; (p) Dishonesty; (u) Gross Misconduct; making false accusations toward your immediate supervisor; and Administrative Regulation 4425.

On July 26, 2017, an Investigatory/Due Process (IDP) meeting was held with you to hear your responses to allegations.  With you and me at the meeting was Richard Swanberg, Area Superintendent and Alyson Kendrick, WSPA President. After investigating this matter, including hearing your responses, my findings are as follows:

It is alleged that you filed written false claims against your immediate supervisor, Principal Lauren Ford. You were asked specifically if you filed the staff complaint because you believed Principal Ford had returned drugs to a student. You indicated that you were reporting what was reported to you by the Dean of Students. On 6/29/17 when I met with you to discuss the staff complaint you indicated that the Dean said "The only reason I did it was because I saw Lauren do the same thing a while ago".  I asked to clarify this meaning and you stated, "returning drugs to a student."  In reality, you knew that the dean had returned the wallet to the student but most importantly had not issued a consequence/suspension.  The Dean was concerned that this student, three weeks away from graduating, would not graduate.  The Dean was referring to issuing a consequence to the student.  What the Dean had observed was Principal Ford not issuing a consequence to another student who possessed marijuana as that student had served as an informant and had provided the school with the name of the student who was dealing the drugs on the campus.

In another complaint, you claimed that your immediate supervisor, Principal Lauren Ford, does not have the ability to evaluate an employee following WCSD administrative procedures.  You indicated that you did not have a pre-observation meeting, a scheduled observation and no evaluation meeting or



discussions leading up to your final evaluation narrative. Additionally, you claim you did not have an opportunity for rebuttal of your evaluation.  However, there are dates, observation notes and sign offs for the 40th, 80th and 120th observation cycles. You had the opportunity to discuss your evaluation with your supervisor on April 17, 2017, and following a three-hour meeting on April 21, 2017, both you and your supervisor signed off on your evaluation. You did not exercise your right to provide a response to the evaluation until after filing a staff complaint in June, 2017.

You were directed to not discuss the pending investigative due process meeting with any staff members at Hug HS when you were temporarily reassigned to Traner MS.  On July 26, 2017 at the IDP meeting, I asked if you had any conversations with Hug High School staff members about the pending investigation. You indicated that you had spoken with Ryley Coker, but not about the investigation. On July 17, 2017 in a written statement from Ryley Coker, teacher at Hug HS, he indicated that you shared with him that the reason you were no longer at Hug HS was due to a testing violation mistake. Additionally, you told him that you were given more duties as an assistant principal than any other assistant principal in the District.  You also told him that should the District demote you, that you had an attorney on retainer. During the IDP, you indicated that you did not recall sharing anything with Ryley Coker, when in fact you had discussed the investigation with him.

In addition, shortly after the IDP meeting on July 26, 2017 you contacted Ryley Coker, again, and made very threatening and unprofessional comments to him about his loyalty and that you were always defending him with Principal Ford.

I find your responses to be less than credible and dishonest and your continued lack of leadership to use best practices with your subordinates and to follow well accepted management techniques is unacceptable for a person in your position.

I find that your conduct and actions above violates:
NRS 391.750, specifically: (d) Insubordination; (c) Unprofessional Conduct; (k) failure to comply with such reasonable requirements as a board may prescribe; (p) Dishonesty; (u) Gross Misconduct; making false accusations towards your immediate supervisor; and Administrative Regulation 4425.

Additionally, on July 19, 2017 you were issued a Letter of Admonition for the following specific causes:

It is alleged that you sent an email to all Hug staff on May, 11, 2017 that included secure testing materials, and student identifying information. During the IDP, you stated that "Yes it is true. It slipped my mind...I forgot I had sensitive items in the document."  After further investigation, it was confirmed that you sent the email to all Hug staff with secure testing information included.

It is alleged that you were dishonest with your supervisor about meeting with the department leaders to vet the testing schedule.  After further investigation, nine (9) department leaders stated that there was not a department lead meeting to discuss the testing schedule. Three (3) department leaders and one (1) other staff member indicated attending a meeting where a schedule was shown to them and no input was taken from them. Further investigation concludes that you were dishonest during the IDP meeting and with your supervisor about holding a department leader meeting to vet the testing schedule.

It is alleged that on Thursday, May 11, 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams explaining that you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017. After further investigation, it is evident that you did not show the Test administrator test security NDE spring 2017 video and you did not verify that staff watched the video by having them complete the required form verifying that they had watched the video.

It is alleged that on the evening of Tuesday, May 16, 2017 you sent a text to Rhonda Clark and Brad Bodine stating, "I have been paper-thin for a while, at least I'll get some rest tonight. I really feel bad they won't let me finish it." After further investigation it was determined that you did send a text to Rhonda and Brad with the above statement. It is also evident by your statements, that you were relieved to be removed from testing. This further demonstrates your willful neglect or failure to observe and carry out the requirements of this title.

On July 19, 2017, you were issued a second Letter of Admonition for the following specific causes:

It is alleged that on Friday, April 7, 2017 you sent an email to Wendy Labon, Patrick Rossi and Patricia Newbrough giving a directive to issue a final and change a grade for the 14-15 school year violating administrative procedure 5504 and 5502. After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval. You even stated in the IDP meeting you understood the protocol.

It is alleged that you gave Sharon Black a notification of credit form to use to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502. After further investigation, regarding your argument that you were directed to see teachers in order to change grades, statements revealed that the directive given to everyone was that no student would receive credit. Principal Ford provided the forms to Brad Bodine with the directive that no student would receive credit. Further investigation as to your statement that you never signed approval for grade changes and only the principal could do so, Ms. Ford found eight such approvals signed by you.

It is alleged that you failed to get your supervisor's approval prior to putting in Lorrie Foley's evaluation that you recommended her to be placed on a Focused Assistance Plan (FAP). After reviewing the narrative, you sent Ms. Ford an email on April 8th, regarding the FAP. In person and subsequent to your email, Ms. Ford stated that Lorrie Foley could not be placed on an FAP. In an email received on April 20th and in the meeting held on April 27th with Lorrie Foley, Elaine Lancaster, WEA Representative and your supervisor you stated that Laura Pincollini gave you guidance and you followed it, to include the FAP. Further investigation revealed that when your supervisor stated, "you do not have enough evidence to do an FAP." you assumed that this response was not a no to the FAP but questioning your evidence. Further investigation also indicates that you signed and finalized the evaluation for Lorrie Foley on April 12, 2017 without your supervisor's approval and prior to your email correspondence with Laura Pincollini.

It is alleged that you failed to supervise staff under your required supervision as demonstrated by: the list of students that Wendy Labon sent to Rise.  After further investigation of your correspondence with Rise, your supervisor was not copied on any of the emails you or Wendy sent to Rise. Your email to Victor on April 7, 2017 indicates that the students listed were, "struggling and either failing all of their classes right now or have vanished." You did not indicate to the Rise principal that students were signing up by choice. It was further alleged your lack of attendance at Special Education teacher meetings and at Senior Special Education Action Committee (SSAC) meetings. You allegedly canceled  meetings with the SPED department leaders from February 14th to the end of the school year because of the 3 weeks of testing.

I find that the violations above and your continued demonstration of dishonesty and your actions that fall within the definition of Gross Misconduct (pursuant to NRS 391.750) warrant the recommendation that you be dismissed from service with the District.

My recommendation to the Superintendent is that you be dismissed from service with the District effective **July 5, 2018.**  If you wish to appeal this action, you will need to follow NRS 391.822 (attached document).

Sincerely,

Dr. Roger J. Gonzalez
Area Superintendent

cc:     Emily Ellison, Chief Human Resources Officer
        Virginia R. Doran, Director of Labor Relations
        Chris Reich, Deputy General Counsel
        Michael Langton, Esquire
        Selene Lewis, Human Resources Technician

**NRS 391.822   Written notice of intent to dismiss probationary employee required; contents of notice.**

1.   If the superintendent intends to recommend the dismissal of a probationary employee to the board before the end of a contract year, the superintendent must provide written notice to the employee, by registered or certified mail, not less than 15 business days before making the recommendation to the board.

2.   The written notice required pursuant to subsection 1 must:

(a)  Include a statement of the reasons for the recommendation to dismiss the probationary employee;

(b)  Inform the probationary employee that he or she may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization, by filing a written request with the superintendent not later than 10 business days after receiving notice from the superintendent pursuant to subsection 1; and

(c)  Include notice of the laws which govern the employment of a probationary employee of a school district which are contained in this chapter.

3.   If a written request for an expedited hearing is not filed by the probationary employee pursuant to subsection 2, the superintendent may recommend the dismissal of the probationary employee to the board.

(Added to NRS by 2017, 1190)

F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

# Exhibit 2

# Exhibit 2

*Law Offices of*
# MICHAEL E. LANGTON
Attorney at Law
801 Riverside Drive
Reno, Nevada 89503

Michael E. Langton
E-Mail: mlangton@sbcglobal.net

(775) 329-7557
Fax  (775) 329-7447

July 6, 2018

Traci Davis, Superintendent
Washoe County School District
425 E. 9th Street
P.O. Box 30425
Reno, Nevada 89520-3425

  ***Re: Trina Olsen***

Dear Superintendent Davis:

  Please be advised I represent Trina Olsen, and in said capacity hereby file a request for an expedited hearing pursuant to the expedited labor arbitration procedures established by the American Arbitration Association.

  This request is filed because former Area Superintendent Gonzales stated in his letter dated June 28, 2018: "If you wish to appeal this action, you will need to follow NRS 391.822 (attached document)." This request for hearing is made with full reservation of rights of Mrs. Olsen with regard to the collective bargaining agreement covering her position as well as the right to challenge the fact that she is a probationary employee subject to the requirements of NRS 391.822. This request is further made with full reservation of rights to challenge the action of notice of recommended dismissal by Mr. Gonzales, including but not limited to, failure of the representatives of the School District to comply with the requirements of NRS 391 and the requirements of the collective bargaining agreement.

July 6, 2018
Page 2
Traci Davis

---

Please have the appropriate representative of the School District contact me to make arrangements for the hearing.

Very Truly Yours,

Michael E. Langton, Esq.

MEL: mek
cc:  Trina Olsen

Chris Reich, Deputy General Counsel
WCSD

Virginia R. Doran, Director
Labor Relations
WCSD

Emily Ellison, Chief Human Resources Officer
WCSD

Selene Lewis, Human Resources Technician
WCSD

F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

**Exhibit 3**

**Exhibit 3**

**Washoe County School District**

425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees:  Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk *
Debra Feemster * Veronica Frenkel * Scott Kelley * Angela Taylor * Traci Davis, Superintendent

July 27, 2018

Trina Olsen
1400 Belford Road
Reno, Nevada 89509

Dear Ms. Olsen:

As you are aware, on June 28, 2018, you were sent a letter from Dr. Roger Gonzalez recommending to me, as Superintendent, that you be dismissed from service with the Washoe County School District.  In that letter, it was explained to you that should you desire to appeal this dismissal, you were required to submit your request in writing to me. Your attorney, Michael Langton, sent a letter appealing this recommendation of dismissal. It is my understanding that Mr. Langton and the Department of Labor Relations are in the process of establishing an arbitration hearing on this issue.

For clarification, it is my decision to uphold the recommendation of your dismissal from the Washoe County School District, effective July 5, 2018.

Sincerely,

*Traci Davis*

Traci Davis
Superintendent WCSD

Cc:      Michael Langton, Esquire
         Emily Ellison, Chief Human Resources Officer
         Virginia R. Doran, Director of Labor Relations





**Washoe County School District**
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees:  Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk *
Debra Feemster * Veronica Frenkel * Scott Kelley * Angela Taylor * Traci Davis, Superintendent

July 26, 2018

Trina Olsen
1400 Belford Road
Reno, Nevada 89509

Dear Ms. Olsen:

As you are aware, on June 28, 2018, you were sent a letter from Dr. Roger Gonzalez recommending to me, as Superintendent, that you be dismissed from service with the Washoe County School District.  In that letter, it was explained to you that should you desire to appeal this dismissal, you were required to submit your request in writing to me. Your attorney, Michael Langton, sent a letter appealing this recommendation of dismissal. It is my understanding that Mr. Langton and the Department of Labor Relations are in the process of establishing an arbitration hearing on this issue.

For clarification, it is my decision to uphold the recommendation of your dismissal from the Washoe County School District, effective July 6, 2018.

Sincerely,

*Traci Davis*

Traci Davis
Superintendent WCSD

Cc:     Michael Langton, Esquire
        Emily Ellison, Chief Human Resources Officer
        Virginia R. Doran, Director of Labor Relations



F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

# Exhibit 4

# Exhibit 4

Andrea L. Dooley, Arbitrator
5111 Telegraph Avenue #273
Oakland, CA 94609
(510) 719-3089
andrealdooley@gmail.com

## IN THE ARBITRATION PROCEEDINGS

### BETWEEN THE PARTIES

| | |
|---|---|
| TRINA OLSEN, | Case No.: LA-627-2018 |
| Employee, | |
| and | DECISION AND AWARD |
| WASHOE COUNTY SCHOOL DISTRICT, | |
| Employer. | |
| (Letters of Admonition and Termination) | |

## INTRODUCTION

This dispute involves the grievance of probationary Assistant Principal Trina Olsen ("Employee" or "Olsen") pursuant to Nevada Revised Statutes 391.822 and 391.824. Pursuant to an agreement between the parties, the parties selected the undersigned Arbitrator to serve as the neutral decision-maker in this case. The matter came for hearing in Reno, Nevada, on November 1, 2 and 28, 2018. The parties submitted this matter to the Arbitrator after presentation of evidence and closing written briefs.

## APPEARANCES

For the Employee:      Michael Langton, Esq.
                       801 Riverside Drive
                       Reno, NV, 89503

For the Employer:      Virginia R. Doran
                       Director of Labor Relations

DECISION AND AWARD - 1

Washoe County School District
425 E. Ninth Street
PO Box 30425
Reno, NV 89520

## ISSUE

The parties have agreed to the following statement of issues:

1. Did the District have just cause to issue two Letters of Admonition to the Grievant? If not, what is the remedy?

2. Did the District have just cause to terminate the Grievant? If not, what is the remedy?

In addition, the Employee raises the following issues:

1. What effect does NRS 391.660 have in this case? Specifically, how does NRS 391.660 affect NRS 391.800, 391.820, 391.822 and 391.824?

2. Did the School District, by and through Superintendent Davis violate NRS 391.824 when she terminated Grievant before receiving a written report from the Arbitrator? If so, what shall the remedy be?

3. Is Trina Olsen entitled to final and binding arbitration and not advisory arbitration?

4. Did the District comply with the requirements of the collective bargaining agreement when it alleged that there was just cause to terminate Grievant? If not, what shall the remedy be?

## RELEVANT LAW

**NRS 391.820 - Probationary employment: Term; notice of reemployment; school district required to offer probationary administrator contract as teacher under certain circumstances; request for expedited hearing if dismissed before completion of current school year.**
Except as otherwise provided in NRS 391.825:
    1. A probationary employee is employed on a contract basis for three 1-year periods and has no right to employment after any of the three probationary contract years.

DECISION AND AWARD - 2

2. The board shall notify each probationary employee in writing during the first, second and third school years of the employee's probationary period whether the employee is to be reemployed for the second or third year of the probationary period or for the fourth school year as a post probationary employee. Such notice must be provided:

(a) On or before May 1; or

(b) On or before May 15 of an odd-numbered year so long as the board notifies the employee of the extension by April 1.

3. Failure of the board to notify the probationary employee in writing on or before May 1 or May 15, as applicable, in the first or second year of the probationary period does not entitle the employee to post probationary status.

. . .

8. A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section.**[1] If:

(a) A post probationary teacher who is an administrator is not reemployed as an administrator after any year of his or her probationary period; and

(b) There is a position as a teacher available for the ensuing school year in the school district in which the person is employed,

(c) the board of trustees of the school district shall, on or before May 1 or May 15, as applicable, offer the person a contract as a teacher for the ensuing school year. The person may accept the contract in writing on or before May 10 or May 25, as applicable. If the person fails to accept the contract as a teacher, the person shall be deemed to have rejected the offer of a contract as a teacher.

**NRS 391.822   Written notice of intent to dismiss probationary employee required; contents of notice.**

1.   If the superintendent intends to recommend the dismissal of a probationary employee to the board before the end of a contract year, the superintendent must provide written notice to the employee, by registered or certified mail, not less than 15 business days before making the recommendation to the board.

2.   The written notice required pursuant to subsection 1 must:

(a) Include a statement of the reasons for the recommendation to dismiss the probationary employee;

(b) Inform the probationary employee that he or she may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the

_____

[1] Emphasis added.

DECISION AND AWARD - 3

American Arbitration Association or its successor organization, by filing a written request with the superintendent not later than 10 business days after receiving notice from the superintendent pursuant to subsection 1; and

(c)  Include notice of the laws which govern the employment of a probationary employee of a school district which are contained in this chapter.

3.   If a written request for an expedited hearing is not filed by the probationary employee pursuant to subsection 2, the superintendent may recommend the dismissal of the probationary employee to the board.

**NRS 391.824   Request and procedures for expedited hearing concerning dismissal of probationary employee; actions of superintendent upon receipt of report from arbitrator.**

1.   If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

2.   An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The only issues the arbitrator may consider are whether the dismissal of the probationary employee would:

(a)  Violate the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b)  Be arbitrary or capricious.

3.   At the expedited hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee, which must include, without limitation, at least one reason provided in the written notice required pursuant to paragraph (a) of subsection 2 of NRS 391.822. To rebut such evidence, the probationary employee must prove that each reason:

(a)  Violates the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b)  Is arbitrary or capricious.

4.   The written report filed by the arbitrator pursuant to subsection 2 is not binding upon the superintendent or the board.

5.   The provisions of NRS 38.206 to 38.248, inclusive, do not apply to an expedited hearing, the written report of an arbitrator or any other portion of an arbitration conducted pursuant to this section.

6.   Not later than 5 business days after the superintendent receives the written report from the arbitrator pursuant to subsection 2, the superintendent shall:

(a) If the superintendent intends to recommend the dismissal of the probationary employee, file with the board the report and a written recommendation to dismiss, and provide to the employee, by registered or certified mail, written notice of the filing of the recommendation and the date, time and location of the

DECISION AND AWARD - 4

next regularly scheduled meeting of the board at which the recommendation to dismiss the employee will be considered; or

(b) If the superintendent does not intend to recommend the dismissal of the probationary employee, provide to the employee, by registered or certified mail, written notice that dismissal of the employee will not be recommended to the board and that no further action will be taken against the employee.

## RELEVANT CONTRACT PROVISIONS

## ARTICLE 1          DEFINITIONS

1.2     The term "unit member" or "member" as used in this Agreement, shall refer to Principals, Assistant Principals, Specialist, Directors and Assistant Directors, Coordinators 1 and 2, Lead Psychologist, Program Administrator, Site Administrators, Turning Point Administrator and other people who hold administrative credentials and serve in that capacity in WCSD. The exception will be those Administrators who are excluded by NRS 288.

## ARTICLE 18          DISMISSAL AND DISCIPLINARY PROCEDURES INCLUDING GRIEVANCE AND BINDING ARBITRATION

18.1    Disciplinary action, including but not limited to, demotion, suspension, dismissal, and non-renewal actions taken against post-probationary unit members (in accordance with NRS 391), shall be progressive in nature and related to the nature of the infraction. Unit members shall be given reasonable opportunity for improvement.

The school district shall not be discharged, demote, suspend or take any other disciplinary action against a post probationary bargaining unit member of this unit without just cause.

## STATEMENT OF THE FACTS

Trina Olsen has been an employee of the Washoe County School District since 1992.[2]

After many years as a certificated teacher and then Dean of Students, Olsen became a

probationary Assistant Principal at Hug High School for the 2016-2017 school year, where she

reported to Principal Lauren Ford during the relevant time period. Olsen's area of oversight

_____

[2] The hearings were conducted without a court reporter. Facts which have not been attributed to documents admitted into evidence have been summarized or quoted from the Arbitrator's notes, written at the time of the hearing.

DECISION AND AWARD - 5

including Multi-Tiered Systems of Support (MTSS) and Special Education. As a part of her responsibilities, Olsen also worked on the Hug Credit Attainment Program, a school-wide effort to help students complete courses and obtain credits toward graduation, as well as acting as the testing coordinator for Hug.[3]

On December 7, 2016, Olsen witnessed a student draw out two knives and begin attacking other students. Olsen used her walkie-talkie radio to call the police, including the School Resource Officer, and to call a Code Red alarm. She worked to evacuate students from the area as the School Resource Officer responded to the incident. During this incident, Olsen witnessed the officer shoot the student with his gun, killing the student.

Hug Credit Attainment Plan

Hug uses several on-line programs, including the A+ on-line program, to provide curriculum to students. The A+ Program includes the ABC Curriculum, which is a supplemental curriculum that can be used within a course if a student needs remedial assistance but does not qualify for course credit. Brad Bodine, another Assistant Principal, is the Curriculum vice principal who oversees credit questions.

A+ courses can qualify for credit towards graduation. However, during the winter break in 2016, Ford learned from the District that there were problems in issuing credits for A+ courses, because Hug was incorrectly providing students with credit for the ABC Curriculum. When Ford raised the issue to the assistant principals, including Olsen and Bodine, Olsen said she would take care of it.[4]

_____

[3] District Exhibit 13. Hereafter, District Exhibit will be abbreviated DX.
[4] DX 19, email from Bodine to Ford.

DECISION AND AWARD - 6

Patty Newbrough, an A+ teacher, proposed that they develop a program for students who were failing courses and who were missing blocks of time from school. Per Ford, Newbrough thought the school was under-utilizing the A+ credit recovery program. After meeting with Ford and the Assistant Principals, Olsen took the lead on the pilot program called Hugs Credit Attainment Program. With the permission of the District, the pilot would apply only to the prior semester. The intent of the program was to give students assignments in A+ to recover grades from classes they had failed the prior semester. This program was separate from the other on-line learning programs OLA and AE-OLA.[5]

In the spring of 2017, Bodine reported to Ford that there was a problem with the pilot program. Newbrough worked in the same classroom as teacher Wendy Labon. Bodine had explained the difference between the pilot program, OLA and EA-OLA to both teachers, but both teachers kept using the ABC curriculum to give credit to students. When Ford brought the problem to Olsen's attention, Olsen told Ford that she didn't know what OLA or EA-OLA is. Ford believed that either Olsen had directed Wendy to give the credit inappropriately or that Wendy was lying to Olson about the matter.

Sometime in the 2016-2017 school year, Sharon Black, a Hug English teacher, reported to Ford that Olsen had directed Black to "give out credits I shouldn't hand out."[6] Specifically, Black alleged that Olsen had told her to give credit for "ABC curriculum" that a student had completed two years earlier. Black notified Ford that she did not sign the forms assigning the credit.

---

[5] Testimony of L. Ford.
[6] Testimony of L. Ford.

DECISION AND AWARD - 7

Bodine testified that he spoke with teachers about how far back they could go to recover credit for students, and that he spoke to one teacher who had talked to Olsen and wanted to make sure he was doing it right. Bodine reported, "(the teacher) didn't say Trina told him to change it."

Performance Evaluations

Ford conducted a 40th Day Observation of Olsen on September 27, 2016 and deemed Olsen to be "Level 3 effective."[7] Ford conducted an 80th Day Observation on November 8, 2016 during a Professional Development program Olsen had organized.[8] Ford rated Olsen "effective," and commended her efforts while providing recommendations for improvement.[9] Ford conducted a 120th Day Observation of Olsen on January 31, 2017 and signed off on it on April 15, 2017.[10] Ford completed Olsen's Performance Evaluation on or about April 21, 2017, and rated Olsen as Effective.[11] As a result of the shooting, District Administrator Mike Paul extended the deadline for completing evaluations. Ford cut and pasted Olsen's comments into Olsen's evaluation document, which Ford later removed at the direction of Mike Paul.

According to Ford, all new administrators have training on the evaluation process, and that all teachers who have been identified as "minimally effective" need to be reported to the Area Superintendent. Those teachers are entitled to notice of their rating in February so that they can have two more evaluations before the April final evaluation. Teachers who are rated "minimally effective" are placed on a Focused Assistance Program (FAP).

_____

[7] DX 9.
[8] DX 10.
[9] Id.
[10] DX 11.
[11] DX 12.

DECISION AND AWARD - 8

Olsen was responsible for evaluating teachers, including Lorrie Foley. It was Olsen's opinion that Foley be placed on an FAP. Olsen notified Ford on March 5, March 7, April 8, April 17 and April 20 that she wanted to discuss Foley's performance.[12] Olsen testified that she was not able to consult with Ford during that time because of Ford's absences from the high school.

Olsen discussed Foley's performance with Laura Pincollini, a teacher-mentor, who told Olsen that "the decision to do a FAP rests only with the principal."[13] Olsen was not able to observe Foley because she had changed classrooms several times. Ultimately, Foley's evaluation was rated "effective," and in Ford's opinion, Olsen had waited too long to request a FAP and therefore needed to wait until the next year. There is no evidence that Olsen knew the deadline for notifying Roger Gonzalez about "minimally effective" teachers or that Ford ever discussed a plan with Olsen for managing Foley's evaluation process. When Olsen submitted an FAP for Foley, Mike Paul told her she could not do so.[14] Olsen again asked Ford for direction about Foley's evaluation on May 1, 2017, but there's no evidence she received a response.[15] Ford's recollection is that she repeatedly told Olsen not to put Foley on an FAP.

RISE Field Trip

In March and April 2017, Olsen arranged for students from two different programs to attend a field trip at RISE, the District's adult education program. Olsen notified Ford on March 6, 2017 that the SPED Action Team and the Senior MTSS team were collaborating to take

---

[12] EX 62, 63, 66-68
[13] DX 68.
[14] EX 70.
[15] DX 71.

DECISION AND AWARD - 9

students on a field trip to introduce them to RISE. The trip was approved by Tristan McElhaney, another Assistant Principal, as well as Victor at RISE.

Ford felt that she did not have clarity about why the students were taking the field trip or how students had been chosen to attend. At a Saturday retreat for the administration team, Ford asked Olsen how kids got on the list.

According to Ford, Olsen responded, "The Committee worked hard to do a good job."

In her testimony, Ford reported that she responded, "You don't fucking get it. How did the names get on this list?" and that she "lost (her) cool."

<u>Marijuana Incident</u>

On or about May 8 or 9, 2017, teacher Patrick Rossi told Olsen that another teacher had told him that Dean of Students Jessica Wilson had given drugs back to a student.[16] Patrick Rossi learned this information from Sabrina Cellucci.

Jessica Wilson wrote a statement about the incident and testified about it at the hearing. According to Wilson, Sabrina Cellucci brought her a wallet that belonged to a student which had marijuana in it. When the student asked for the wallet, Wilson asked her if she knew what was in the wallet. The student told Wilson that it belonged to her boyfriend and that she didn't smoke because she gets drug tested for work and in anticipation of taking college courses. Wilson "tossed the marijuana and told her that I never wanted to see it on campus again."[17] Wilson elected not to discipline the student at that time.

---

[16] EX 57.
[17] EX 9.
DECISION AND AWARD - 10

Upon learning the story third hand from Rossi, Olsen conferred with her mentor Dave Murdock, who said she should reach out to Wilson about the matter.

On May 8, Olsen went to Wilson's office to talk to Wilson about the allegation that she had given marijuana back to a student. Olsen asked Wilson, "if I had handed drugs back to a student on Friday."[18] According to Olsen, Wilson admitted that she had given the wallet back to the student because she had seen Lauren Ford do the same thing." Wilson reported "I explained the situation" in her written statement but did not describe what she meant by "the situation" in her written statement.

While Wilson testified that she meant that she had seen Laura give a student no discipline in a similar situation, her comment at the time she spoke to Olsen was vague as to what "same thing" meant. Ford later documented that Wilson told her "that she could see that Trina mis-interpreted the comment" and that Trina did not ask any clarifying questions.[19]

Wilson said that Olsen told her, "I needed to protect myself and suspend the student." After that time, Wilson contacted the student and suspended the student for three days. The student did not return to school ever again.

Olsen also conferred with Brad Bodine, who related in a June 2, 2017, statement to Ford that, "On Monday May 8 Trina Olsen came into my office to speak with me regarding" Jessica Wilson and said, "(Olsen) asked Ms. Wilson if she did return the wallet with drugs in it. Ms. Olsen said that Jessica said, 'yes and Lauren has done the same thing.'"[20] In his statement,

---

[18] EX 9.
[19] EX 14.
[20] EX 61.

DECISION AND AWARD - 11

Bodine says that he told Olsen to tell Ford about the incident. Olsen recalled that Bodine told her to talk to Wilson about the incident.

On May 10, Olsen again reached out to Wilson, still concerned about the incident. Olsen "strongly suggested (Wilson) tell Ms. Ford about the situation."[21] On May 11, Wilson reported the incident to Ms. Ford.[22]

Ford believed that Olsen should have notified her of the allegations that Wilson gave drugs to a student rather than talking to Wilson about it. On a prior occasion, Ford had, for the safety of a student and to aid an ongoing investigation, returned a quantity of drugs to a student rather than take disciplinary action. That decision was made in concert with the campus police officer.

No other employees, including AP Brad Bodine, Dean of Students Jessica Wilson and teachers Patrick Rossi and Sabrina Cellucci, were disciplined for failing to report the incident to Ford.

Testing Issues

Olsen was the designated test coordinator for Hug High School. District trainings for test coordinators were conducted in the fall 2016 and spring 2017. Training coordinators at each school train the staff who will be handling the test materials and administering the tests.

On May 4, 2017, Olsen told Ford, "I'm dropping the ball with my workload . . .With everything I have over the next 7 days, can you help me prioritize my duties? . . . I don't know

---

[21] Testimony of J. Wilson.
[22] Id.

DECISION AND AWARD - 12

what else to do, I need your help."[23] Ford responded that "testing is our priority" but did not address Olsen's overall organizational difficulties at that time.[24]

On or about May 15, 2017, Sandy Aird, District Director of Assessment, notified Ford that she had received a tip about a test discrepancy or irregularity at Hug. Specifically, Olsen had sent out confidential information to the entire Hug staff by forwarding a spreadsheet that contained user IDs and passwords in "hidden" columns. Olsen had created the spreadsheet with the assistance of staff in the District office by downloading the information from the District platform. She "hid" the confidential columns before distributing the material. Ford had not been able to open the document when she approved its distribution, but Olsen was responsible for the distribution.[25] Aird directed Ford to remove Olsen as the test administrator. Aird admitted that the ability to keep confidential information in the spreadsheet was "a learning on our part."

Ford and two other Assistant Principals took over test coordination. In the course of taking over, Ford determined that Olsen did not have verification that every proctor had watched a video that was required by the State of Nevada Department of Education. As a result of the Testing Irregularity, the District notified Ford that Olsen could not be involved with testing, near test materials, have computer access or schedules. None of the tests were invalidated.

On May 17, 2017, Olsen was reassigned to Traner Middle School.[26]

On May 23, 2017, Olsen notified Roger Gonzalez that she wanted to file a complaint against Ford for changing her performance evaluation.[27] On May 24, 2017, Olsen received a

---

[23] EX 7.
[24] Id.
[25] EX 74.
[26] EX 83.
[27] EX 11.

DECISION AND AWARD - 13

notice of IDP for alleged misconduct in the period of April 7-May 15.[28] On May 25, Olsen

notified Gonzalez that she wanted to report an incident involving marijuana on campus.[29]

Gonzalez provided Olsen with the formal staff complaint form.[30]

On May 31, 2017, Olsen attended an Investigatory Due Process meeting with Ford and

Labor Relations Manager Virginia Doran to discuss allegations of misconduct that had occurred

during the 2016-17 school year.

On June 4, 2017, Olsen filed a Staff Complaint Form against Lauren Ford, reporting that,

"Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back

marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was

true, and she replied, 'yes, But I only did it because I saw Lauren (Ford) do it not too long

ago."[31]

On or about June 19, 2017, but dated June 8, 2017, Olsen filed another Staff Complaint

Form about Ford on the basis that Ford had not correctly conducted Olsen's evaluation and had

changed the narrative portion of the evaluation in violation of District policy.[32]

Ford conducted an investigation into the allegations discussed in the IPD meeting and on

July 19, 2017, issued a Letter of Admonition ("the First LOA") about the following alleged

misconduct[33]:

_____

[28] EX 12.
[29] EX 13.
[30] EX 15.
[31] EX 16.
[32] EX 23.
[33] DX 4.

DECISION AND AWARD - 14

1. That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.

2. That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.

3. That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's performance evaluation without permission to do so and did so at the direction of teacher-mentor Laura Pincollini, who did not have the authority to direct Olsen to do so.

4. That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.

5. That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.

In the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal.

On July 19, 2017, Olsen received a second Letter of Admonition ("the Second LOA") about the following alleged misconduct[34]:

1. That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

_____

[34] DX 5.

DECISION AND AWARD - 15

2. That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.

3. That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.

4. That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.

5. That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."

6. That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School.

On July 19, 2017, Dr. Roger Gonzalez, Area Superintendent, directed Olsen to participate in an Investigatory/Due Process meeting on July 26, 2017 to discuss the following allegations:

1. That Olsen brought false claims and allegations against Lauren Ford when she reported a case involving marijuana on Hug's campus, when she said that "Jessica Wilson had returned marijuana to a student because she had seen Lauren Ford do the same thing."

2. That Olsen brought false claims and allegations against Ford regarding the supervision timeline.

DECISION AND AWARD - 16

3.  That Olsen discussed personnel matters with Hug staff members against the direction of management.[35]

After meeting with Gonzalez as directed on July 26, 2017, Gonzalez issued a Notice of Recommended Dismissal on June 28, 2018.[36] The recommended dismissal was based on the first and second Letters of Admonition, the allegations in the July 19 IDP Letter, and the allegation that after the IDP Meeting, Olsen contacted Ryley Coker and "made very threatening and unprofessional comments to him about his loyalty."[37]

Olsen was notified that she was discharged effective July 5, 2018.[38]

### POSITIONS OF THE PARTIES

DISTRICT'S POSITION

Trina Olsen was a probationary employee who is only entitled to the protections afforded by NRS 391.824 and is not entitled to final and binding arbitration under the Negotiated Agreement between the District and Washoe School Principals' Association.[39] Even if the terms of the agreement do apply, the Nevada Supreme Court recently held in *Washoe County School District v. White*, 133 Nev. Advance Opinion 43, (2017) that "Article 18.1 serves to preclude the District from choosing disciplinary actions that are clearly disproportionate to the proscribed conduct, while permitting the District to impose more severe penalties for repeated infractions."

Based on this standard, the District contends that the manifest weight of the evidence demonstrates that the two Letters of Admonition and the Discharge were warranted under the

---

[35] DX 7.
[36] DX 8.
[37] Id.
[38] EX 28.
[39] DX 1.

DECISION AND AWARD - 17

circumstances. Olsen engaged in dishonesty by making false allegations against her Principal and discussed her personnel actions with other District employees in contravention of a direct order.

For these reasons, the District asks the Arbitrator to deny the grievance and to recommend upholding the Recommended Discipline and Discharge.

EMPLOYEE'S POSITION

Trina Olsen was a 21-year veteran of the District, and therefore not a "probationary employee" subject to NRS 391.822 or 391.824. She should be afforded the protections of progressive discipline and binding arbitration contained in the Agreement between the District and the Washoe School Principals' Association. Under that standard, the District did not demonstrate just cause for the Letters of Admonition and the Discharge effective July 5, 2018.[40]

According to Olsen, if she is subject to the provisions of NRS 391.822 and 391.824, then the discharge is not final until the arbitrator's recommendations (if they uphold discharge) are adopted by the District and at a minimum, Olsen is entitled to back pay and benefits if and until the district superintendent recommends discharge to the School Board.

The District also withheld notes taken by Gonzalez and Ford during the course of their investigations. Olsen is entitled to review these notes, and they should be presumed to be adverse to the District's position because Olsen was denied her due process right to review the documents.

_____

[40] EX 28.

DECISION AND AWARD - 18

The District has engaged in disparate treatment for disciplining Olsen for her failure to report the marijuana incident but not disciplining other employees for engaging in the same alleged misconduct.

Regardless of what standard the Arbitrator applies, the District has failed to provide evidence that they had just cause to terminate Olsen.  For these reasons, Olson asks the Arbitrator assert contractual jurisdiction over this case, sustain the grievance and reinstate Ms. Olson with a make whole remedy.

## DISCUSSION

Regardless of whether this case is properly subject to NRS 391.822 and 391.824 or is subject to the Negotiated Agreement's binding arbitration procedure, the parties agree that the Employer bears the burden to demonstrate that just cause exists for the discipline imposed on the grievant, Trina Olsen. The District has presented evidence about three disciplinary matters, and each will be considered in turn.

The just cause standard typically requires progressive discipline when appropriate, and it is expected that discipline will be corrective in nature as well, if the circumstances warrant it. An employer need not impose progressive discipline where the conduct is more serious. However, when a serious charge is made against an employee, it should be narrowly construed, because of the long-lasting effects of such an accusation on an employee's career.[41]

---

[41] Bornstein, Labor and Employment Arbitration (2011), §20.01

DECISION AND AWARD - 19

# I.     DOES THE EMPLOYER HAVE JUST CAUSE FOR DISCIPLINE?

**First Letter of Admonition**

The First Letter of Admonition (LOA 1) contained five allegations about which the parties provided evidence.

Allegation 1: That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen had directed other teachers via email to change a student's grade.[42] The First LOA references an email, but no email was provided at the hearing to the Arbitrator, and there is no directive email in the record. The First LOA instead states: "After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval."[43]

This statement is undisputed by Olsen. Olson, Ford and Bodine each repeatedly testified that "the teacher owns the gradebook" and would be responsible for changes which would be approved by the AP for Curriculum (Bodine) and Ford. While Olsen had some confusion about whether she was permitted to sign off on a grade change, she was informally counseled on that issue, and never changed any grades or directed others to change grades without the express agreement of Ford. There was no evidence that Olsen ever directed via email or in person that the three teachers change a grade outside the three-week grading period.

---

[42] EX 12.
[43] DX 4.

DECISION AND AWARD - 20

Olsen was responsible for the Hug Credit Attainment Plan, a pilot program expressly created at the direction of Principal Ford for the purpose of finding permissible ways for students to complete classes and repair grades in order to graduate. That Ms. Olsen would be disciplined beyond the counseling she received is contrary to the goals of the program, which was to encourage teachers to support students to graduate.

The only relevant evidence provided was an email dated April 4, 2017, from Olsen to Labon, Rossi and Newbrough which stated, "The teacher owns the grade book and the principal can approve the grade change at any time. If Sharon can get Wendy the final to administer the test or if she wants to do it on her own, (student) will get the credit as soon as Sharon submits the grade change form. It's definitely a procedure that Lauren fully supports."[44] This email corroborates Olsen's defense that she was only informing teachers of the process of recovering credit, not directing grade changes.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

<u>Allegation 2: That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.</u>

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen gave Sharon Black a notification of credit form to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502.[45] In the First LOA, Ford expands on a larger issue related to grade change forms which Olsen took responsibility for handling, but which Ford did not believe were

---

[44] EX 85.
[45] EX 12.

DECISION AND AWARD - 21

handled correctly.[46] The grade change forms issue arose in March 2017 after Olsen had started implementation of the Hug Credit Attainment Program. Despite accusations that Olsen had mishandled grade change forms, there was no evidence at hearing that any grade change forms were improperly handled, or that any discrepancies occurred at Olsen's direction.

Specifically, Ford did not provide the email from Sharon Black that she claimed demonstrated that Olsen had given a directive. If the email is the same one referenced above (EX 85), it is clear that Olsen was explaining the process, not directing any policy violation. It was also not clear, prior to receiving notification from the District, that there was a problem with the way that A+ course credit was being handled. Once Hug administration was notified of the problem, they seemed to work diligently to fix it while still focusing on supporting students to graduation.

This allegation occurred early in the school year, and there was ample time to counsel Olsen about problems relating to the Hug Credit Attainment Plan, yet Ford did not issue an IDP until late May and did not raise the issue in Olsen's performance evaluation. The confusion and delay around this issue, in addition to the lack of clear evidence of misconduct, suggest that the Employer was adding the issue to the LOA in order to bolster the discipline, and not because it was supported by just cause.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

---

[46] DX 4.

DECISION AND AWARD - 22

<u>Allegation 3: That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's performance evaluation without permission to do so and did so at the direction of teacher-mentor Laura Pincollini, who did not have the authority to direct Olsen to do so.</u>

It is undisputed that Olsen wanted to place Lorrie Foley on a Focused Assistance Plan and made repeated efforts to get Ford's support and direction to do so. On at least five occasions in March and April 2017, Olsen emailed Ford to initiate a discussion about putting Foley on an FAP. It is Ford's recollection that she told Olsen that it was too late to do so, because the deadline for notifying Roger Gonzalez that a FAP was needed had passed. There is no evidence when that deadline was, or whether Olsen was ever notified about that deadline. Despite Ford's testimony, it is clear that Olsen did not feel like she had received clear or timely advice from her principal and sought advice elsewhere.

Ford contends that Olsen inappropriately took direction from Pincollini, who is a teacher-mentor and not an administrator. It is the case that Olsen discussed Lorrie Foley with Laura Pincollini, but the evidence indicates that Olsen was doing just that: discussing the matter. Olsen consulted a veteran teacher-mentor with questions about how to handle what she perceived as a low-performing teacher situation because she was not getting a response from Ford. Pincollini did not direct Olsen's actions; she gave her advice as a long-time, experienced teacher familiar with the performance evaluation process.[47]

Olsen proceeded to put Foley on a FAP without Ford's permission, which she knew or should have known was not correct, since she would have needed Ford's permission to do so. However, Ford's lack of responsiveness to Olsen's requests for help, coupled with Ford's own

---

[47] EX 86.

DECISION AND AWARD - 23

failure to follow performance evaluation timelines (see EX 5) strongly suggest that the District does not typically consider this to be a discipline-worthy offense. It constitutes a form of disparate treatment to discipline Olsen for this issue when Ford shares responsibility for evaluation timeline issues. To the extent that any just cause might exist for discipline in this case, it warrants, at most, a verbal warning.

Allegation 4: That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.

It is undisputed that Olsen did not report the "marijuana incident" involving Wilson to Principal Ford, and instead directed Wilson to report it Ford herself. However, Cellucci, Rossi and Bodine also failed to report the incident to Ford or the District, and Wilson only reported the matter to Ford after being directed to do so by Olsen. This is a glaring example of disparate treatment, in that one employee is being disciplined for an action that four other people engaged in and were not disciplined for.

In reality, the decision to handle the matter as they did was one in which both Wilson and Olsen likely had the discretion to handle in a manner best suited to the student's needs. The real tragedy of this incident is that a young woman who was very close to graduation never returned to school because of Olsen's reaction. Wilson made the well-considered decision to let the "marijuana flakes" slide because she knew the student had a precarious living situation and a strong need to stay in school. Olsen disrupted that by substituting her judgment and failing to ask follow-up questions about Wilson's decision. At the same time, drugs in school is a serious issue about which reasonable minds can disagree, and while Olsen may bear responsibility for the student outcome related to the marijuana incident by telling Wilson she had to suspend the

DECISION AND AWARD - 24

student, failing to report it to Ford is not a reasonable cause for discipline, given that no one else reported it either.

<u>Allegation 5: That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.</u>

The evidence in the record is clear on this issue: Olsen and two other Assistant Principals organized a field trip for students from at least two separate programs to visit RISE, the adult learning academy in the District, in collaboration with one another and the RISE leadership. Olsen notified Ford of this field trip and got appropriate sign-off from RISE and from Tristan McElhaney for transportation.

For some reason, Ford questioned which students had been selected to attend the field trip. It's unclear why she wanted to know, and why Olsen's explanation that students from both programs were included was unsatisfactory. By Ford's own admission, she "lost her cool" and swore at Olsen about this matter. Based on the evidence, it's very hard to understand how this supports just cause for discipline against Olsen. The trip was authorized and appropriate and focused on students who would benefit from the visit. To discipline Olsen for not answering her question in the manner Ford wanted is unnecessarily punitive.

**\*\*\***

Finally, in the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal. Olsen was on leave and not given an opportunity to meet these performance expectations. **In summary, based on the evidence, the Arbitrator cannot conclude that the District had just cause to impose the First LOA on Olsen, and does not believe that the District did so with the intent of correcting Olsen's performance. The Arbitrator recommends that the First LOA be removed from Olsen's record.**

DECISION AND AWARD - 25

**Second Letter of Admonition**

The Second Letter of Admonition (LOA 2) contained six allegations about which the parties provided evidence.[48]

Allegation 1: That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

This allegation is undisputed. Olsen admits that, as the testing coordinator, she created a spreadsheet from District sources which contained both confidential and non-confidential information, that she "hid" the columns which had confidential information but did not secure them in any other way (such as in a new book or using password protection), and then distributed the spreadsheet to every faculty and staff email address at Hug High School. This breach of confidentiality was discovered by a District employee, who reported it to the Director of Assessment, who in turn reported it to the Nevada State Department of Education.

This breach of confidential information was a serious testing violation which resulted in the District and Hug administration taking active measures to remedy the breach and monitor the tests to ensure that no further violations occurred. Olsen was removed from her responsibilities as the testing coordinator and reassigned to Traner Middle School.

Olsen raised several defenses. First, the data was provided by the District, which had not taken measures to secure the data beyond telling test coordinators that the data was confidential. While this is true, and Aird admitted that this was "a learning" for the District, Olsen knew

_____

[48] DX 5.

DECISION AND AWARD - 26

enough about Excel documents to know that "hidden" data isn't really hidden, and she bears some responsibility for the breach.

Second, Olsen argues that she sent a copy of the message to Ford prior to distributing it to the Hug staff and faculty. Ford could not open the document but "trusted Olsen" and didn't double-check the document at any time. Again, Ford should bear some responsibility for her oversight, but it was also reasonable of her to expect that Olsen, as the designated test coordinator, had done the job correctly, and the message was time-sensitive.

Finally, Olsen claims that she was overwhelmed and stressed out at the time this occurred and that she didn't realize, in her hasty and upset state of mind, that the information was not truly secure from every recipient. This may be an accurate description of Olsen's mindset, but it isn't a defense to the allegation. Under the circumstances, the Employer has just cause to discipline Olsen for the distribution of confidential information to non-qualified recipients.

Allegation 2: That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.

This allegation seems to be related to the prior issue, where Ford alleges that she requested that Olsen provide her with information on May 4, but Olsen did not do so. However, the only May 4 correspondence in the record between Ford and Olsen is an email chain called "guidance" wherein Olsen states, "I'm dropping the ball with my workload . . . can you help me prioritize my duties. . . I don't know what else to do, I need your help."[49] Ford responded to this email by telling Olsen to prioritize testing; the only question she asks Olsen is, "Why and whose classes do you need to attend?" There's no other evidence in the record that supports that Ford

---

[49] EX 7.

DECISION AND AWARD - 27

requested information on May 4 that was not provided on May 10. Olsen did send the test coordinator email to Ford on May 11, 2017 at 6:34 a.m. and was promptly directed to send it to staff at 6:46 am. [50]

The evidence presented at the hearing does not support this allegation.

Allegation 3: That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.

Once Olsen was relieved of her test coordinator responsibilities, Hug and District administrators took over the tests. In that process, Aird determined that not every proctor had watched a video required by the state and completed an affidavit affirming that they'd watched it. Olsen was responsible for staff training and for ensuring that every proctor watched the video.

Olsen admitted that she did not show the video at her staff training, and that, to save time, she told people what was in the video and decided to send them the link to watch it on their own time. She claimed to be confused as to whether the video was required.

Olsen's testimony was, "I had a proctor training and was going to show the video, and I was gathering information from the NV website that I didn't actually have to show it, I could email it to them. I also showed during the IDP that during the training that we went through step by step and told them they would get the video. I also told them what was in the video. I was trying to get people to sign it. Running around like crazy to get the signatures. I said, 'you have to watch this.' I had every intention that they see it, but I hadn't gotten all the signatures. 'So overwhelmed. Couldn't keep my head above water.'"

---

[50] EX 8.

DECISION AND AWARD - 28

As with the breach of confidentiality, Olsen describes her mindset and believes it is a defense. Instead, it's an explanation that she was not doing her job duties as assigned and was creating testing irregularities that put Hug and District into a difficult position with the State Department of Education. The District demonstrated that there was just cause for discipline under these circumstances.

Allegation 4: That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.

In the Second LOA, Ford alleges that Olsen emailed Rhonda Clarke and Brad Bodine with statements concerning her removal as test coordinator. Those emails were not in evidence at the hearing. It is undisputed that Olsen texted her friend and co-worker Ryley Coker before being admonished not to discuss the matter with co-workers. Once Olson had been so admonished, she let Coker know she shouldn't have been discussing the matter with him.

It is unclear from the record whether Olsen knew that she was not permitted to discuss her removal at the time that she communicated with her friend.[51] In any case, the Employer did not demonstrate that there is just cause to discipline Olsen for this allegation.

Allegation 5: That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."

Olsen's description of "being relieved" is an extension of her self-assessment that she was overwhelmed and needed help, and not itself "willful neglect or failure to observe and carry out the requirements" of the test coordinator role. She had already been removed from the role

---

[51] It's also unclear whether the Employer can direct a public employee not to discuss their own personnel matters with a friend. While neither party raised the issue, it is questionable whether any employer can restrain employees from discussing their terms and conditions of employment with co-workers.

DECISION AND AWARD - 29

and she was only stating her feelings about the pressure of the position being removed from her. Since her statements were made after removal, and do not relate in any way to misconduct, this allegation, even if true, could not be the basis for discipline.

Allegation 6: That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.

This allegation is undisputed. Olsen was directed by email not to use her office. She entered her office for the purpose of retrieving her radio so that she could perform her other duties as an AP. She told Aird that she could not remain in the office and left promptly after getting the radio. This does not constitute "use" of the office and doesn't warrant discipline.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School. Olsen did not have an opportunity to meet these expectations because she was on paid administrative leave.[52] **In summary, based on the evidence, the Arbitrator concludes that the District had just cause to impose the Second LOA on Olsen because of Allegations 1 and 3 relating to test irregularities that occurred because she was testing coordinator.**

---

[52] EX 29.

DECISION AND AWARD - 30

**Discharge Letter**

On the same day that Ford sent Olsen the two LOAs (July 19, 2017), Area Superintendent Roger Gonzalez sent Olsen an IDP letter alleging three separate issues.[53] An IDP meeting was held on July 26, 2017. Thereafter, Gonzalez took a leave of absence and Olsen was placed on paid administrative leave. Gonzalez issued a Notice of Recommended Dismissal on June 28, 2018.[54]

<u>Allegation 1: That Olsen filed written false claims against Principal Lauren Ford regarding the incident where Wilson returned marijuana to a student because she had witnessed Ford "do the same thing a while ago."</u>

In her Staff Complaint, Olsen asserted that Wilson had told her that she had returned drugs to a student because she "saw Ford do the same thing a while ago." This was a hearsay statement by Wilson which Olsen believed should be investigated by Ford's superiors. In her view, if Ford had given drugs to a student, it was a serious matter which should be handled at the District level. Olsen did not weigh in on the truth of the statement, merely that the appropriate investigator was Ford's supervisor.

In Gonzalez's view, Olsen knew that the reference to "the same thing" meant Ford had not suspended a student, not that Ford had returned a student's drugs. Ford and Wilson testified about a separate incident where Ford declined to suspend a student after conferring with the school police officer because doing so would endanger the student and an ongoing investigation. However, there was no evidence that Olsen knew about that case, or knew what Wilson was

---

[53] DX 7.
[54] DX 8.

DECISION AND AWARD - 31

referring to when she heard "the same thing." Gonzalez did not say why he believed that Olsen was willfully lying.

Olsen's misunderstanding was mistaken but made in good faith. There's no evidence to support Gonzalez's conclusion that she was willfully dishonest with the intent to harm Ford. Rather, she was passing along to the District what would be a serious allegation if true and expecting a full and fair investigation.

Even if Olsen was being negligent in making the complaint (she could have asked Wilson to clarify the comment), taking disciplinary action against someone for making a complaint of alleged misconduct is retaliatory and has the effect of inhibiting people from coming forward with other allegations of misconduct. There is genuine uncertainty about what Wilson's statement meant. In the third hand account Olsen received, Wilson had found drugs in a student's wallet and then returned the drugs to the student. When asked about it, Wilson said that "Lauren had done the same thing." It's not unreasonable to find that statement shocking to hear about one's superior and to believe that the District should take steps to investigate the matter.

The evidence presented by the District did not support the allegation that Olsen made false allegations or was dishonest. Olsen reported a hearsay statement and expected a fair investigation, and instead was terminated. This discipline is retaliatory and overly punitive. The evidence on this allegation does not support discharge.

Allegation 2: That Olsen brought false claims and allegations against Ford regarding the supervision timeline and evaluation process.

Olsen filed a separate complaint against Ford alleging problems with the way Ford conducted Olsen's performance evaluation. There were several specific problems: that Ford hadn't followed the proper timeline, that Ford hadn't given her notice of her second observation,

DECISION AND AWARD - 32

that Ford had removed positive statements from Olsen's performance evaluation and that Olsen was not permitted to submit a rebuttal statement.

It is true that Ford did not follow the evaluation timeline. First, the December 7 school shooting was disruptive to operations and the District gave Hug extra time to complete certain paperwork because of that incident. Second, Ford, for reasons that she didn't explain, did not complete the evaluations of her subordinate staff on the schedule required by the District. Therefore, Olsen's 120th day observation and her evaluation were completed late by Ford.

After their April 21 evaluation meeting, Ford added Olsen's rebuttal comments into the narrative of the final performance evaluation. When Mike Paul notified Ford that the "artifact" should not be in the narrative, Ford removed it, as Olsen alleged, but was required to do so by the District and not in retaliation against Olsen.

At the point at which Olsen filed this Staff Complaint, she was very concerned that her performance evaluation would not be considered on its positive merits because of the testing irregularities issue. She had been reassigned to Traner and was very concerned that she was being disciplined for performance issues which she believed Ford had also committed and wanted to bring that to the District's attention.

Olsen's actions in filing this Complaint were "CYA" and self-protective, but they weren't false. Ford had not followed the timelines and had altered Olsen's evaluation, even if it was at Mike Paul's direction. Therefore, the facts do not support the allegation that Olsen filed a false claim against Ford for supervision and performance evaluation issues. The District does not have just cause to terminate Ms. Olsen on this basis.

<u>Allegation 3: That Olsen discussed personnel matters with Hug staff members against the direction of management.</u>

DECISION AND AWARD - 33

As with Allegation 5 in the Second LOA, it's unclear that Olsen was aware that she couldn't discuss her own personnel matters with people she believed were her friends after the IDP meeting. It's strains credibility that she would not be able to exercise her own judgment in sharing details about her own case with friends of her choosing, and the Arbitrator again questions whether the Employer even has the authority to restrain the speech of a public employee who wants to discuss the terms and conditions of their employment with their co-workers. Even if the Employer has the authority, the violation of this rule should not, under these circumstances, be the basis for discharge, where the Employer held open the case from June 2017 until July 2018. The evidence in the hearing does not demonstrate that the Employer has just cause to discipline for this allegation.

**For these reasons, the Arbitrator concludes that the Employer did not meet their burden of proof that the alleged actions constituted misconduct. The District does not have just cause for termination of Trina Olson.**

## II.    WHAT IS THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

As stated above, the District contends that this case is governed by NRS 391.822 and 391.824, the non-binding arbitration procedures which govern the dismissal of probationary employees. The Grievant contends that she should be afforded the binding arbitration process set forth in the Grievance Procedure in the Negotiated Agreement. The resolution of this question hinges on whether Olsen was a probationary employee at the time she was removed from her position as an Assistant Principal.

DECISION AND AWARD - 34

While Olsen is a long-time employee of the District, she was a probationary employee in the position of AP. It is undisputed that she was in a probationary period in the 2016-2017 school year, when all these issues arose.

NRS 391.820(8) states: "A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section**." This clearly defines the probationary status of a post-probationary teacher who is employed as an administrator. This section applied to Olsen, despite her many years of service.

Probationary employees are considered to be working in a trial period. "The purpose of a trial period is to afford an employee the opportunity to demonstrate that he has the ability for the job in question or can with some familiarization therewith achieve the necessary skills within a reasonable period of time to perform the job in an acceptable manner."[55]

Non-probationary APs are indisputably covered by the Negotiated Agreement, and by the clear language of the grievance procedure are protected by binding arbitration. By virtue of the fact that the term "non-probationary" is used repeatedly in that section, the reader of the contract

_____

[55] Elkouri & Elkouri, "How Arbitration Works," 6th edition, p. 892, citing *American Welding & Mfg. Co.*, 52 LA 889, 893 (Stouffer 1969).

DECISION AND AWARD - 35

can conclude that "probationary" employees are not covered by binding arbitration. The process

for removing probationary employees is governed by NRS 391.822 and 391.824.

The record is silent about what rights Ms. Olsen may have as a senior member of another

bargaining unit, such as a certificated teachers unit or a unit that covers Deans of Students. It is

clear that she was still in her trial period as a probationary AP pursuant to NRS 391.820(8) and is

therefore subject to the state law governing her removal.

## III.     HAS THE DISTRICT MET THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

NRS 391.824 defines the procedure for a hearing concerning dismissal of a probationary

employee. It says in pertinent part:

> (1)     If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

The District violated this section of NRS 391.822 when it terminated Olsen on July 5, 2018 without waiting for the final report from the Arbitrator. While an extensive amount of time had passed since the events in question, likely at great financial cost to the District, the delay was entirely due to the District's failure to follow up on the IDP meeting of July 26, 2017 in a timely fashion. The statute is clear that the superintendent must not take action until receipt of the written report of the arbitrator, and in this case, they acted prematurely by ending Ms. Olsen's employment before a hearing could be conducted.

The statute also states:

> (2)     An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The

DECISION AND AWARD - 36

only issues the arbitrator may consider are whether the dismissal of the probationary employee would:

      (a) violate the legal rights of the probationary employee provided by federal law or the laws of this State; or

      (b) be arbitrary or capricious.

      (3) At the evidentiary hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee.

At the hearing in this matter, the District stated three reasons for the dismissal of Ms. Olsen. As stated above, the evidence provided by the District did not support the conclusion that dismissal is warranted. Olsen did not knowingly file false claims against Principal Lauren Ford, and, if she did discuss her employment action with co-workers, it was not knowingly in violation of a rule, nor did it warrant dismissal. Because of the retaliatory nature of the recommendation of dismissal, the Employer's lack of just cause for discharge is arbitrary and capricious.

There are two other areas that warrant discussion. First of all, the December 7 shooting that was witnessed by Ms. Olsen was a significant event in the life of Hug High School, its community and Ms. Olsen in particular. There was no evidence that the trauma of this event was addressed. Ms. Olsen must have had great personal courage and a deep reserve of competence to respond in the way she did. The fact that she later felt like she was overwhelmed, under water and needed help seems like an obvious and unfortunate consequence of witnessing a knife attack on students and the subsequent shooting death of the student who initiated the attack.

Given that Ms. Olsen had a stellar track record as a teacher and Dean of Students, it was reasonable to expect that she would excel as an AP. Based on feedback from her peers and principal, it sounds as though she struggled in the role. While the shooting may not have been the cause of that, Ms. Olsen's bravery and trauma should have been handled in a more sensitive manner than her prolonged and painful dismissal suggests.

DECISION AND AWARD - 37

The second thing that warrants discussion springs from that issue. As a probationary employee who had completed one year but who had a testing irregularity did not need to be dismissed. NRS 391.750 lays out a number of options which would have addressed the issue in a less punitive fashion. For example, the District could have returned Olsen to a Dean of Students position, where she was last successful, or they could have decided to otherwise not reemploy her as an administrator and offered to return her to the classroom, per 391.820. The decision to move forward with dismissal seems to have prolonged the cost and pain to both Ms. Olsen and the District, which is particularly unfortunate, given that dismissal was not warranted.

## DECISION AND AWARD

For the foregoing reasons, the Arbitrator finds that the grievance is sustained in part and denied in part. The District has met their burden of showing there was just cause for the first and third allegations in the Second Letter of Admonition but has failed to show that there was just cause for the First Letter of Admonition and the Notice of Dismissal.

Because the Dismissal should not have been implemented until after receipt of this written report, the Employer must reinstate Ms. Olsen and make her whole back to July 5, 2018. Upon receipt of this written report, the superintendent will then follow the provisions of 391.824(6). It is the opinion of the Arbitrator that the District has been arbitrary and capricious in its decision to dismiss Ms. Olsen and recommend that the superintendent review Ms. Olsen's file to determine whether she is eligible for placement as an AP or for some other position.

Because the allegations concerning testing irregularities were the basis for the LOA, they can be considered as part of Ms. Olsen's job record but should not be the basis for dismissal, as

DECISION AND AWARD - 38

that would violate principles of double jeopardy which are commonly applied in labor arbitration

matters.

Dated: December 13, 2018.

Andrea L. Dooley, Arbitrator

F I L E D
Electronically
CV19-01900
2019-09-30 04:05:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7511797 : csulezic

# Exhibit 5

# Exhibit 5

# DECLARATION OF TRINA OLSEN

I, Trina Olsen, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1.     I am the Plaintiff in the lawsuit to be filed in the Second Judicial District Court entitled Trina Olsen v. Washoe County School District ("WCSD") and Traci Davis, former Superintendent at WCSD.

2.     Since 1992, I have worked in various positions at WCSD including as a certificated teacher and then Dean of Students.

3.     I am currently an Assistant Principal at Wooster High School in Reno.

4.     For the 2016-2017 school year, I was Assistant Principal at Hug High School, where I reported to and was supervised by Hug High Principal Lauren Ford ("Ford").

5.     In May of 2017, I was informed of allegations that illegal drugs may have been provided to students by Jessica Wilson, Dean of Students at Hug High, and by Ford.

6.     I then reported these allegations to WCSD Area Superintendent Roger Gonzalez.

7.     However, rather than investigate Wilson and Ford regarding allegations that they gave drugs to students, Gonzalez and other WCSD employees began a campaign of character assassination and retaliation against me, which led to my being fired in early July of 2018.

8.     Before I was fired, I requested that the dispute between WCSD and myself be subject to arbitration.

9.     Even though I prevailed in the Arbitration against the District, I still believe that I am at risk of being fired for reporting Ford and Wilson.

10.     Even though Traci Davis was also fired by the WCSD School Board around July 1, 2018, the same basic School Board and leadership at WCSD is still in place. For example, Lauren Ford was promoted to the position of Area Superintendent at WCSD three weeks after I made my complaint to Roger Gonzalez.

11.     I fear that further retaliatory actions may be taken against me by WCSD as a result of my instituting this case because in July of 2018 I was fired after reporting alleged illegal conduct and after I requested arbitration.

12.     If I am again dismissed from my job at WCSD, I will suffer the following harm:

a.     I will lose my income that I rely on for the necessities of life;

b.     I will lose my health insurance;

c.     I will suffer further irreparable harm to my professional reputation by being terminated a second time;

d.     I would lose credit toward retirement from PERS so I could not retire at the time and income level that I was promised by the system;

e.     I will not be able to avail myself of the arbitration process again; and

f.     I will suffer further delay in my ability to seek a position as a principal.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _____9/30/19_____ in Reno, Nevada.

By: _____

Trina Olsen

F I L E D
Electronically
CV19-01900
2019-10-01 04:46:00 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7514988 : csulezic

1  Code 1090
   LUKE A. BUSBY, ESQ
2  Nevada Bar No. 10319
   LUKE ANDREW BUSBY, LTD.
3  316 California Ave.
   Reno, Nevada 89509
4  775-453-0112
   luke@lukeandrewbusbyltd.com
5  *Attorney for the Plaintiff*

6

7  **IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

8  **IN AND FOR THE COUNTY OF WASHOE**

9  * * *

10

11 TRINA OLSEN,

                    Plaintiff,          Case No.: CV19-01900
12 vs.

13                                      Dept. No.:        1

   WASHOE COUNTY SCHOOL
14 DISTRICT, a political subdivision of the
   State of Nevada; Washoe County School   **ARBITRATON EXEMPTION**
   District Superintendent TRACI DAVIS;    **REQUESTED – INJUNCTIVE AND**
15 and DOES 1 through 10 inclusive;        **DECLARATORY RELIEF SOUGHT**
                                           **AND PROBABLE JURY AWARD IN**
16                    Defendants.          **EXCESS OF $50,000.**

17 _____/

18

19          **AMENDED VERIFIED COMPLAINT**

20          COMES NOW, TRINA OLSEN, ("Olsen" or "Plaintiff"), by and through the

21 undersigned counsel, and files the following verified complaint seeking redress

22 for the violation by of Olsen's Due Process rights under the Fourteenth

23 Amendment to the United States Constitution and for various pendent state law

24

25 claims against WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of

26 the State of Nevada ("WCSD"); and WCSD Superintendent TRACI DAVIS

27 ("Davis") (collectively "the Defendants"); and JOHN DOES I through X, inclusive.

28

                                      1

**Arbitration Exemption**

1.      As set forth more fully hereinbelow, Plaintiff's claims have a probable jury award in excess of fifty thousand dollars ($50,000.00); further, contemporaneous with this motion, the Plaintiff is filing a Motion for Preliminary Injunction and seeks declaratory relief in this Verified Complaint, and, therefore, this dispute should be excluded from mandatory court-annexed arbitration program under the provisions of NAR 3(A).

**Jurisdiction and Venue**

2.      The above-captioned Court has subject matter jurisdiction pursuant to NRS 3.221 and NRS 4.370, as the amount in controversy exceeds fifteen thousand dollars ($15,000.00).

3.      Venue is properly in the above-captioned Court because: (a) the Plaintiff is located in and the Defendant is a political subdivision of the State of Nevada located in Washoe County; (b) it has personal jurisdiction over the Plaintiffs in this action; (c) it has personal jurisdiction over the Defendants; and (d) Plaintiff was employed by the Defendant WCSD in Washoe County.

**Parties**

4.      Ms. Olsen is currently an assistant principal at Wooster High School in Reno, Nevada, and currently resides, and at all times relevant hereto resided, in Reno, Nevada.

5.      WCSD is the school district that serves Washoe County and is a political subdivision of the State of Nevada.

2

6.     Ms. Davis was employed by WCSD as Superintendent at the times relevant to this Complaint until her termination from WCSD on July 1, 2019.

7.     Ms. Davis was at all times relevant herein acting under color of state law as described below.

8.     Ms. Davis is sued in her individual capacity.

9.     Ms. Davis, as Superintendent of WCSD, was the officer with final policymaking authority over personnel matters within the WCSD during her tenure at WCSD.

**Allegations of Fact**

10.     Olsen has been an employee of WSCD since 1992.  Olsen worked in various position as a certificated teacher and then Dean of Students.

11.     For the 2016-2017 school year, Olsen was promoted to the position of Assistant Principal at Hug High School, where she reported to and were supervised by Hug High Principal Lauren Ford ("Ford").

12.     At Hug High, Olsen was responsible for supervising Multi-Tiered Systems of Support (MTSS) and Special Education, among her general duties as Assistant Principal.  Olsen also worked on the Hug Credit Attainment Program, a school-wide effort to help students complete courses and obtain credits toward graduation, as well as acting as the testing coordinator for Hug High.  Olsen was also responsible, along with other staff members and administration, for school safety and student discipline at Hug High.

13.     Ford conducted numerous evaluations, called formal observations, of Olsen at Hug High, including a 40th Day Observation of Olsen on September 27, 2016, in which Ford deemed Olsen to be "effective." Ford conducted an 80th Day Observation on November 8, 2016 during a Professional Development program Olsen had organized, and Ford again rated Olsen "effective," and commended her efforts while providing recommendations for improvement.  Ford conducted a 120th Day Observation of Olsen on January 31, 2017 and signed off on it on April 15, 2017.  Ford completed Olsen's yearly Performance Evaluation on or about April 21, 2017, and rated Olsen as overall effective. Thus, before the events described below, Ford herself indicated that Olsen was effective at doing her job.

14.     On or about May 8, 2017, Hug High teacher and department leader Patrick Rossi told Olsen that another teacher had told him that Dean of Students at Hug High Jessica Wilson had given drugs back to a student.  Patrick Rossi indicated to Olsen that he learned this information from Hug High teacher Sabrina Cellucci.

15.     Olsen was informed that Sabrina Cellucci brought Wilson a wallet that belonged to a student which contained marijuana.  Cellucci brought Wilson the wallet because Wilson was in charge of discipline of students at Hug High. Wilson then confronted the student about the wallet and the marijuana and when the student asked for the wallet, Wilson asked her if she knew what was in the wallet.  Wilson then gave the wallet with the marijuana back to the student.

4

16.     On May 8, 2017 Olsen went to Wilson's office to talk to Wilson about the allegation that she had given marijuana back to a student. Olsen asked Wilson if she had handed drugs back to a student.  Wilson admitted that she had given the drugs back to the student because she had seen Lauren Ford do the same thing, which Olsen understood to mean that Wilson had: (1) given marijuana back to a student, and (2) that Olsen's boss, Ford, had done the same thing in the past.

17.     Olsen knew that providing illegal drugs such as marijuana to a student was a criminal offense and a clear violation of WCSD policy, and as such she took the allegations that Wilson and Ford had done this very seriously.

18.     On May 25, 2017, Olsen notified Roger Gonzalez, who was at that time WCSD Area Superintendent, that she wanted to report an incident involving marijuana on the Hug High campus.  Despite Olsen's pleas to a meeting to discuss the matter, Gonzalez refused to meet with Olsen regarding the matter, and instead provided Olsen with the formal staff complaint form.

19.     On June 4, 2017, Olsen filed the staff complaint form against Lauren Ford by sending the form to Roger Gonzalez. Olsen's complaint stated that:

> Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was true, and she replied, 'yes, But I only did it because I saw Lauren (Ford) do it not too long ago.

20.     However, rather than investigate Wilson and Ford regarding allegations that they gave drugs to students, Gonzalez and other WCSD employees began a campaign of character assassination and retaliation against

Olsen.  In other words, despite having an excellent track record as a WCSD employee for a number of years, after discovering allegations that Wilson and Ford had given marijuana to a student and investigating and reporting the matter to Roger Gonzalez, Olsen has been subject to a barrage of false accusations and allegations of misconduct by WCSD officials.

21.     On June 28, 2018, Roger Gonzalez authored a letter to Ms. Olsen, copied to Ms. Davis and other WCSD employees, which recommended that Olsen be dismissed from WCSD. Among the allegations against Olsen detailed by Mr. Gonzalez in the letter, were that Olsen had made false accusations against Ford related to the marijuana incident described above.

22.     On July 6, 2018, Olsen filed a request to arbitrate the matter of the recommendation of her firing by Roger Gonzalez and Traci Davis according to the provisions of NRS 391.824.

23.     On July 23, 2018 Olsen was informed by WCSD employee Selene Lewis that Olsen was no longer being paid by WCSD because her status was, "recommended for dismissal."

24.     On July 27, 2018, Olsen was notified by Traci Davis by mail that she was discharged effective July 5, 2018, despite the fact that Davis, by the very terms of the July 27, 2018 letter, was aware that Olsen had elected to arbitrate the matter and that arbitration proceedings were ongoing.

25.     Ms. Olsen's unlawful termination was the subject of arbitration proceedings conducted before Arbitrator Andrea L. Dooley in Case No. LA-627-

2018 on November 1, 2, and 28 of 2018, conducted in Reno, Nevada.  Ms.

Dooley issued a Decision and Award on the latter dated December 13, 2018.

Among the relevant findings of fact and conclusions of law in the Decision and

Award are:

a.      WCSD violated NRS 391.822 when Traci Davis terminated Ms. Olsen

on July 5, 2018 without waiting for the final report from the Arbitrator;

b.      WCSD did not meet their burden of proof that the alleged actions of

Ms. Olsen constituted misconduct, as alleged;

c.      WCSD took disciplinary measures against Olsen that were

retaliatory; and

d.      WCSD's dismissal of Ms. Olsen was arbitrary and capricious.

26.     The arbitrator's Decision and Award recommended that WCSD,

"…must reinstate Ms. Olsen and make her whole back to July 5, 2018, the

superintendent will then follow the provisions of 391.824(6)." Exhibit 4 at 38.

27.     Although WCSD reinstated Olsen and provided back pay and

benefits from July 5, 2018, it has not made Ms. Olsen whole as required by the

Arbitrator's Decision and Award.  To date, almost nine months after the Decisions

and Award from Ms. Dooley, WCSD has still not complied with the provisions of

NRS 391.824(6) by sending the required letter indicating that dismissal of Ms.

Olsen will not be recommended to the board and that no further action will be

taken against Ms. Olsen.  Contemporaneous with this Complaint, Olsen is filing a

Motion for Preliminary Injunction requesting that the Court prohibit WCSD from

taking any adverse action against Olsen without prior consent of this Court until this case is finally resolved.

28.    Ms. Olsen's firing at the hands of Ms. Davis occurred in blatant violation of NRS 391.824(1): "If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee…"

29.    By the above-described malicious acts, and as a direct result, Defendant caused Olsen to lose the benefit of gainful employment at her chosen occupation for a period of six-months, and Olsen suffered damages in excess of $15,000.

30.    The Plaintiff has suffered damages as a result of the disregard for her Constitutional rights by the Defendants, including but not limited to emotional distress, humiliation, personal indignity as well as loss of reputation or status caused by Olsen's unlawful discharge from employment and violation of her Constitutional rights described herein.

**CLAIMS FOR RELIEF**

**42 U.S.C. 1983 - VIOLATION OF DUE PROCESS**

**(PROTECTED PROPERTY INTEREST)**

**(Against Defendant Davis)**

8

31.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

32.     By their conduct, as described herein, Defendant is liable to the Plaintiff under 42 U.S.C. § 1983 for the violation, under color of state law, of the constitutional right to be free from any deprivation of property without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

33.     Davis violated numerous provisions of Nevada Revised Statutes ("NRS") Chapter 391 and the applicable Collective Bargaining Agreement governing the rights of employees in the State of Nevada, including the Plaintiff, which rules secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff, including but not limited to the prohibition of dismissal of an employee if such dismissal violates the legal rights of the probationary employee provided by federal law or Nevada law or is arbitrary or capricious as contained in NRS 391.824(2) and (3).

34.     The provisions of Nevada Revised Statutes ("NRS") Chapter 391 and the applicable Collective Bargaining Agreement create a property interest that is protected by the Due Process Clause of the 5th and 14th Amendments to the Constitution, the violation of which by the Defendants caused damages to the Plaintiff.

35.     The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award of punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

36.     In addition to the relief requested above, the Plaintiff requests relief as described in the prayer for relief below.

## 42 USC 1983 - MONELL CLAIM

## (Against WCSD)

37.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

38.     At all relevant times herein, Defendant WCSD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to the Plaintiff's Due Process rights which caused the violation of such rights by Ms. Davis as described herein.

39.     All actions described herein by Davis are a policy or custom of WCSD. (*See Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.)  Davis, as superintendent of WCSD, was the officer with final policymaking authority over personnel matters within the WCSD, including over the decision to fire Olsen.

40.     Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive the Plaintiff of her constitutional rights under the

Fifth and Fourteenth Amendments to the U.S. Constitution without due process of law.

41.     The constitutional abuses and violations by WCSD through the actions of Ms. Davis were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by WCSD, including its practice and policy of unlawfully terminating the employment of WCSD employees who report allegations of unlawful activity of other WCSD employees.

42.     Upon information and belief, Defendant WCSD has developed, implemented, enforced, encouraged and sanctioned a de facto policy, practice, and/or custom of unlawfully terminating the employment of WCSD employees who report allegations of unlawful activity of other WCSD employees.

43.     Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiff of her constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award of punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

44.     Defendants have acted with deliberate indifference to the constitutional rights of the Plaintiff.  As a direct and proximate result of the acts as stated herein by each of the Defendants the Plaintiff's constitutional rights have

been violated which has caused her to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

## VIOLATION OF DUE PROCESS – NEVADA CONSTITUTION

### (Against All Defendants)

45.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

46.     Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice. *Summers v. Warden of Nev. State Prison*, 84 Nev. 326, 329, 440 P.2d 388, 390 (1968).

47.     Davis violated numerous provisions of Nevada Revised Statutes ("NRS") Chapter 391 and the applicable Collective Bargaining Agreement governing the rights of employees in the State of Nevada, including the Plaintiff, which rules secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff, including but not limited to the prohibition of dismissal of an employee if such dismissal violates the legal rights of the probationary employee provided by federal law or Nevada law or is arbitrary or capricious as contained in NRS 391.824(2) and (3).

48.     The provisions of Nevada Revised Statutes ("NRS") Chapter 391 and the applicable Collective Bargaining Agreement create a property interest that is

1   protected by the Due Process Clause of the Nevada Constitution, the violation of

2   which caused damages to the Plaintiff.

### TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY

### (Against All Defendants)

6   49.   Plaintiff repeats and realleges the allegations set forth in the

7   foregoing Paragraphs as though fully set forth herein.

50.   Plaintiff, acting in good faith, reported the unlawful activity of her

fellow employees, not to her immediate supervisor Lauren Ford, but to WCSD

Area Superintendent and public official Dr. Roger Gonzalez.

51.   WCSD superintendent Traci Davis fired the Plaintiff, despite knowing

that the Plaintiff has sought arbitration under the provisions of NRS 391.822.

52.   WCSD is vicariously liable for damages resulting from their agents,

servants, partners and/or employees, including but not limited to Defendant Traci

Davis.

53.   The Defendant's decision to fire the Plaintiff was proximately caused

by the Plaintiff's lawful actions and was in derogation of the public policy of the

State of Nevada, i.e. the reporting of illegal activities to the appropriate

authorities. *Allum v. Valley Bank of Nevada*, 114 Nev. 1313, 1316, 970 P.2d

1062, 1064 (1998) and *Buchanan v. Watkins & Letofsky, LLP.*, 2019 WL 3848785,

at *6 (D. Nev. Aug. 15, 2019)

54.   As a direct and proximate result of Defendant's tortious constructive

discharge Plaintiff suffered damages.

WHEREFORE, the Plaintiff requests that this Court:

a. Enter a declaratory judgment pursuant to NRS 30.030 that the actions complained of herein are unlawful and violate the United States Constitution and Nevada law.

b. Order Defendant to pay the compensation denied or lost to Plaintiff to date by reason of Defendant's unlawful actions, in amounts to be proven at trial;

c. Order Defendant to pay compensatory damages for the Plaintiff's lost property and emotional pain and suffering, in an amount to be proven at trial;

d. Order Defendant to pay exemplary and punitive damages *Smith v. Wade*, 461 U.S. 30 (1983), and/or NRS 42.005;

e. Order Defendant to pay attorneys' fees and costs of the action pursuant to 42 U.S.C. 1988;

f. Order Defendant to pay interest at the legal rate on such damages as appropriate; and

g. Grant any further relief that the Court deems just and proper.

**NRS 239B.030(4) AFFIRMATION**

Pursuant to NRS 239B.030 as well as Rule 10 of the Washoe District Court Rules, the undersigned hereby affirms that this document does not contain the social security number of any person.

/// 

/// 

/// 

14

1

**(signature on following page)**

2

**DATED** this Tuesday, October 1, 2019:

3

4
By: _____

5
LUKE BUSBY, ESQ.

6
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE.

7
RENO, NV 89509
775-453-0112

8
LUKE@LUKEANDREWBUSBYLTD.COM

9
*ATTORNEY FOR PLAINTIFF*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

1
2
3

**VERIFICATION**

4

5     I, Trina Olsen, declare that the assertions in this Declaration are true and correct,

6

7     based upon my personal knowledge, and that I am competent to testify to the facts

8     stated below:

9     That I am the Plaintiff in the forgoing action.  That I have read the foregoing

10    AMENDED VERIFIED COMPLAINT and knows the contents thereof.  That Allegations

11    of Fact in the AMENDED VERIFIED COMPLAINT are true and correct to the best of my

12    knowledge, information and belief, and as to those matters I believes them to be true.

13    I declare under penalty of perjury that the foregoing is true and correct.

14

15                    Executed on: _____10/1/19_____ in Reno, Nevada.

16

17                    _____

18                              Trina Olsen

19
20
21
22
23
24
25
26
27
28

16

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that on Tuesday, October 1, 2019, I caused service to be completed by:

_____    personally delivering;

\_\_\_\_X\_\_    delivery via Reno/Carson Messenger Service (**For Personal Service on the Defendants**);

_____    sending via Federal Express (or other overnight delivery service);

\_\_\_\_X\_  depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

_____    delivery via electronic means (fax, eflex, NEF, etc.)

a true and correct copy of the foregoing pleading addressed to:

To: Washoe County School District
Office of General Counsel
Christopher B. Reich, Esq.
P.O. Box 30425
Reno, NV 89520-3425
creich@washoeschools.net

Traci Davis
c/o William E. Peterson
SNELL AND WILMER
50 W. Liberty St. Suite 50
Reno, Nevada 89501
wpeterson@swlaw.com

By: _____

ORIGINAL

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

TRINA OLSEN_____ ,
        Plaintiff

                                          Case. No. 19-01900_____

, vs.
                                          Dept. No. 8_____

WASHOE CNTY SCHOOL DIST. et al. ,
        Defendant.

_____/

## SUMMONS

**TO THE DEFENDANT: YOU HAVE BEEN SUED.   THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU <u>RESPOND IN WRITING</u> WITHIN 20 CALENDAR DAYS.   READ THE INFORMATION BELOW VERY CAREFULLY.**
        A civil complaint or petition has been filed by the plaintiff(s) against you for the relief as set forth in that document (see complaint or petition).  When service is by publication, add a brief statement of the object of the action.                                      .
                42 U.S.C. 1983 Claims and Tortious Discharge Claim_____

1.  If you intend to defend this lawsuit, you must do the following within 20 calendar days after service of this summons, exclusive of the day of service:
    a.  File with the Clerk of the Court, whose address is shown below, **a formal written answer** to the complaint or petition, along with the appropriate filing fees, in accordance with the rules of the Court, and;
    b.  Serve a copy of your answer upon the attorney or plaintiff(s) whose name and address is shown below.
2.  Unless you respond, a default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the complaint or petition.

Dated this 1st day of October , 2019 .

Issued on behalf of Plaintiff(s):            JACQUELINE BRYANT
                                             CLERK OF THE COURT
Name: Luke Busby, Esq.                       By: _Anymora_____
Address: 316 California Ave.                       Deputy Clerk
Reno, NV 89509                               Second Judicial District Court
Phone Number: 775-453-0112                   75 Court Street
                                             Reno, Nevada 89501

1