# Exhibit 31

# Exhibit 31

```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF NEVADA

 3

 4

 5  TRINA OLSEN,                           )

 6           Plaintiff,                    )

 7      vs.                                ) Case No.: 3:19-cv-00665-MMD-WGC

 8  WASHOE COUNTY SCHOOL DISTRICT,         )

 9  a political subdivision of the State of )

10  Nevada; Washoe County School District  )

11  Superintendent TRACI DAVIS; and DOES   )

12  1 through 10, inclusive,               )

13           Defendants.                   )

14  _____)

15
]
16              RECORDED DEPOSITION OF TRACI DAVIS

17                  Taken on February 24, 2020

18                        At 10:27 a.m.

19                   9550 S. Eastern Avenue

20                   Las Vegas, Nevada 89123

21

22

23

24

25
```

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4

 5   TRINA OLSEN,                        )

 6           Plaintiff,                  )

 7       vs.                             ) Case No.: 3:19-cv-00665-MMD-WGC

 8   WASHOE COUNTY SCHOOL DISTRICT,      )

 9   a political subdivision of the State of )

10   Nevada; Washoe County School District )

11   Superintendent TRACI DAVIS; and DOES )

12   1 through 10, inclusive,            )

13           Defendants.                 )

14   _____)

15

16              RECORDED DEPOSITION OF TRACI DAVIS

17                 Taken on February 24, 2020

18                    At 10:27 a.m.

19                 9550 S. Eastern Avenue

20                 Las Vegas, Nevada 89123

21

22

23

24

25
```
]

**Page 2**

```
 1  APPEARANCES:
 2  For the Plaintiff:  LUKE BUSBY, ESQ.
 3                      LUKE ANDREW BUSBY, LTD
 4                      316 CALIFORNIA AVE.
 5                      RENO, NEVADA 89509
 6
 7  For the Defendants: JUSTIN C. VANCE, ESQ.
 8                      5355 RENO CORPORATE DR., SUITE 100
 9                      RENO, NEVADA 89511
10
11                      KATHERINE F. PARKS, ESQ.
12                      THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
13                      6590 S. MCCARRAN BLVD., SUITE B
14                      RENO, NEVADA 89509
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                      INDEX
 2  Witness              Direct      Cross     Redirect
 3  MS. DAVIS               5          64          75
 4
 5
 6                    EXHIBITS
 7  Number           Description                      Page
 8  Exhibit 1     Notice of Temporary Reassignment      11
 9  Exhibit 2   Notice of Investigatory/Due Process Meeting  13
10  Exhibit 3   Notice of Investigatory/Due Process Meeting  16
11  Exhibit 4   Notice of Investigatory/Due Process Meeting  18
12  Exhibit 5   Notice of Administrative Leave with Pay      26
13  Exhibit 6     Notice of Recommended Dismissal            34
14  Exhibit 7   Grievance Protesting Recommendation          35
15  Exhibit 8     Letter from Michael E. Langton             38
16  Exhibit 9       Email from Selene Lewis                  39
17  Exhibit 10      Letter from Traci Davis                  40
18  Exhibit 11   Staff Complaint Received July 19, 2018      43
19  Exhibit 12  Letter from Katy Simon Holland and Traci Davis  46
20  Exhibit 13      Letter from General Counsel              52
21
22
23
24
25
```

**Page 4**

```
 1          MS. FLETCHER:  We are now on the record in the
 2  matter of Trina Olsen v. Washoe County School District.  My name
 3  is Sally Fletcher.  I'm the videographer and deposition officer.
 4  I work for E-Depositions, LLC, located at 730 Sandhill Road, Suite
 5  105, Reno, Nevada 89521.  Today's date is February 24th, 2020, and
 6  the time is 10:27 a.m.  This deposition is being held at 9550
 7  South Eastern Avenue, Suite 253, Las Vegas, Nevada 89123.  This is
 8  recorded deposition of Traci Davis.  Ms. Davis, could you please
 9  raise your right hand?  Do you solemnly affirm that the testimony
10  you're about to give will be the truth, the whole truth, and
11  nothing but the truth?
12          MS. DAVIS:  I do.
13          MS. FLETCHER:  Thank you.  Can you please state
14  your full name with spelling.
15          MS. DAVIS:  Traci Marcia Davis.  T-R-A-C-I,
16  M-A-R-C-I-A, D-A-V-I-S.
17          MS. FLETCHER:  Thank you.  The electronic audio and
18  visual recording of this deposition will be the official record.
19  A transcript certified by the deposition officer will be created
20  from the audio and visual recording of this deposition by
21  E-Depositions, LLC.  Would all attorneys present, please identify
22  themselves, their firm, anybody with them, and the party they
23  represent beginning with the party noticing this proceeding.
24          MR. BUSBY:  Luke Busby appearing for plaintiff
25  Trina Olsen, who's with me here today.
```

**Page 5**

```
 1          MR. VANCE:  Justin Vance with Dotson Law on behalf
 2  of the Washoe County School District.
 3          MS. PARKS:  Katherine Parks, Thorndal Armstrong on
 4  behalf of Traci Davis.
 5          MS. FLETCHER:  Thank you.  You can go ahead.
 6                  DIRECT EXAMINATION
 7          BY: Mr. Busby
 8          MR. BUSBY:  All right.  Ms. Davis, once again, my
 9  name is Luke Busby.  I'm Trina Olsen's attorney, and I'll be
10  taking your deposition today.  And I just want to start off by
11  explaining a few ground rules for depositions.  I'll be asking you
12  questions, and we're going to record your answers.  And they're
13  given under oath, subject dependency of perjury, and the same as
14  if you're testifying in the courtroom.  Do you understand --
15          MS. DAVIS:  Okay.
16          MR. BUSBY:  -- that?
17          MS. DAVIS:  I do.
18          MR. BUSBY:  Okay.  And your testimony may be used
19  later in this proceeding and at trial as evidence.  Do you
20  understand that?
21          MS. DAVIS:  I do.
22          MR. BUSBY:  Okay.  If at any time today you don't
23  hear one of my questions, just let me know.  And I'll be glad to
24  rephrase it.  If you don't ask for a clarification, I'll take it
25  to mean you understood my question; fair enough?
```

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                          Pages 6..9

Page 6

1          MS. DAVIS:  Okay.
2          MR. BUSBY:  And for clarity of the record, I'm
3  going to do my best not to interrupt you.  And I'll ask that you
4  do the same for me.  It doesn't always work out that way.  I've
5  been pretty conversational style of taking depositions.  So I'll
6  do my best, and I just ask you to do that as well, okay?
7          MS. DAVIS:  Okay.
8      Q:  All right.  And where do you currently live?
9      A:  In Las Vegas, Nevada.
10     Q:  Okay.  And where are you currently employed?
11     A:  Clark County School District.
12     Q:  And how long have you been Clark County School
13 District?
14     A:  For overall, for point of clarification, or
15 recently?
16     Q:  Recently.
17     A:  Four months.
18     Q:  Okay.  And what are your job duties at Clark County
19 School District?
20     A:  I'm an interventionist.
21     Q:  Okay.  Can you explain what that means?
22     A:  An interventionist does pull out to help kids who
23 are struggling.
24     Q:  Okay.
25     A:  Yeah.

Page 7

1      Q:  What did you do before you worked at Clark County
2  School District?
3      A:  Um, I was superintendent.  I was a parental, and I
4  was a teacher, a deputy superintendent, academic manager.
5      Q:  Okay.  So one at a time, what did you like before
6  your current job at Clark --
7      A:  Superintendent.
8      Q:  -- County School District?  Okay.  Where?
9      A:  Washoe County School District.
10     Q:  And how long were you there?
11     A:  I think six years.
12     Q:  Okay.
13     A:  As superintendent.
14     Q:  As superintendent for --
15     A:  Yes.
16     Q:  -- six years.  Okay.  Do you recall when you left
17 exactly?
18     A:  July 1st, 2019.
19     Q:  Okay.  And do you recall when you started at that
20 job?
21     A:  As a superintendent?
22     Q:  Yes.
23     A:  So I was interim for a year, like it's wonky.  So --
24     Q:  Oh, yeah.
25     A:  -- let's go back to 2012, 2013.  Somewhere in 2013,

Page 8

1  interim and then full-time superintendent.
2      Q:  Okay.  So were you full-time superintendent for six
3  years?
4      A:  Approximately, or five.
5      Q:  Okay.  It's okay.
6      A:  Some were interim and superintendent.  They run
7  together, so --
8      Q:  Uh-huh.  But you were superintendent from 2016 until
9  you left --
10     A:  Yes.
11     Q:  -- in 2019, right?
12     A:  Yes.
13     Q:  Okay.  Have you ever been deposed before?
14     A:  No.
15     Q:  Okay.  And can you tell me what you did to get ready
16 for this deposition?
17     A:  Nothing really.  I met with Katherine yesterday --
18     Q:  Okay.
19     A:  -- but that's for location.
20     Q:  I'm not going to ask any questions about what you
21 and Katherine discussed.
22     A:  What do you mean "get ready"?
23     Q:  -- discussed?  Well, did you do anything to prepare
24 for the deposition?
25     A:  No.

Page 9

1      Q:  Okay.  And looking at any paperwork?
2      A:  No.
3      Q:  Okay.  Starting off kind of big picture, do you
4  understand the basis of Ms. Olsen's lawsuit against you?
5      A:  Um, a little bit.
6      Q:  Okay.  Can you tell me what your understanding is?
7      A:  That she thinks that I violated her constitutional
8  rights.
9      Q:  Okay.  Can you describe your understanding of how
10 she violated your constitutional rights as alleged?
11     A:  How I violated her constitutional --
12     Q:  Yeah.
13     A:  -- rights?  I'm not really sure how she thinks I
14 violated her constitutional rights.
15     Q:  Okay.  All right.  So you know Ms.Olsen here she's
16 sitting next to me, right?
17     A:  I only know Ms. Olsen because of her appearance is
18 at the boardroom.
19     Q:  Okay.  Have you ever spoken with her beyond that?
20     A:  Maybe on a school visit, but I don't actually recall
21 ever speaking to her on school visit because --
22     Q:  Okay.
23     A:  -- usually I'm with the principal.  But if the APs
24 are in the school, I'll talk to a lot of them.
25     Q:  Okay.  Are you aware of whether Ms. Olsen had an

Page 10

1  employment dispute with Washoe County School District when you
2  were a superintendent?
3         A:  I am aware that there was a dispute.
4         Q:  Okay.  And just in general, can you tell me what
5  your understanding of the dispute is?
6         A:  Um, there was allegations.  There was, uh,
7  investigation done.  I wasn't a part of the investigation.  I
8  don't know who had interviewed.  Um, but at some point, they
9  believed -- the deputy superintendent, higher superintendent
10 believed that she was in the wrong, and they confer with officer
11 general counsel.  I mean, like --
12        Q:  Okay.
13        A:  -- I don't -- I really don't have intimate details.
14        Q:  Okay.  Do you understand the substance of the
15 allegations that led to the disciplinary action against my client?
16        A:  Globally speaking, at a high level, I don't have
17 intricate like this, this, this and this.
18        Q:  Okay.  I'm just asking what's your understanding as
19 you sit here today?
20        A:  Um, uh, there is some issues around her performance
21 and things that she allegedly, I think, did not tell the truth
22 about.  But per se as exactness, uh, I just don't know.
23        Q:  Okay.  So any knowledge you have of Ms. Olsen's case
24 would be derived from what you were told from other people; is
25 that correct?

Page 11

1         A:  Right.
2         Q:  Okay.  Were you given advice on how to handle Ms.
3  Olsen's case?
4         A:  By the Office of General Counsel.
5         Q:  Okay.  I'm not going to ask you about that advice
6  either.  But I do want to ask you about some documents I have --
7         A:  Okay.
8         Q:  -- in front of me.  So let's start with what's
9  marked as Exhibit number 1.  All right.  I'm just going to ask you
10 to take a look at this document if you could.
11        A:  Okay.
12        Q:  Okay.  So I'll represent to you that this describes
13 that Ms. Olsen was being reassigned to train a middle school from
14 a high school; is that correct?
15        A:  Correct.
16        Q:  Okay.  And this happened in May of 2017?
17        A:  Correct.
18        Q:  All right.  Do you recall whether you were aware of
19 the situation with Ms. Olsen around the time this letter was
20 written?
21        A:  What I remember is there was copy that she would be
22 reassigned pending investigation around testing.  I couldn't tell
23 you what the testing violation was.
24        Q:  Okay.  Did you at this time hear any allegations
25 that Ms. Olsen had complained or discussed that anything involving

Page 12

1  giving marijuana to a student?
2         A:  I did not.
3         Q:  Okay.  At this time?
4         A:  At this time.
5         Q:  Okay.  All right.  So this was Roger Gonzalez's
6  decision to reassign her; is that correct?
7         A:  That would be his decision along with the deputy
8  superintendent, Kristen McNeill.
9         Q:  Kristen McNeill.  So Roger Gonzalez's and Kristen
10 McNeill made the decision to do this, right?
11        A:  Roger reports to Kirsten, and they would work with
12 the office of legal counsel determining the next dates.
13        Q:  Okay.  But around the time of this action was taken
14 against my client were you made aware of that?
15        A:  I received a copy that she was gonna be reassigned
16 due to some investigation, but I -- I thought it was a testing
17 violation.
18        Q:  Okay.
19        A:  I don't know anything about marijuana.
20        Q:  Okay.
21        A:  In this.
22        Q:  All right.  When you were first told about the
23 situation with Ms. Olsen, did you look into the facts and
24 circumstances surrounding her reassignment?
25        A:  To the testing?

Page 13

1         Q:  I'm just asking in general.
2         A:  I trust what the deputy -- deputy is in charge of
3  her side of a house.  She run the academics, and she run it
4  through legal.  So I did not do a deep source that would be not
5  consistent with what I would do with anyone.
6         Q:  Okay.  Does that something you remember
7  specifically, or is that just your general standard in practice?
8         A:  It's a general practice.  I don't -- we don't -- it
9  high level for me.
10        Q:  Okay.  So this hasn't risen to the level where you'd
11 become personally involved in the situation yet; is that fair?
12        A:  Right.  I wouldn't.  It's an FYI.
13        MR. BUSBY:  Okay.  All right.  So I'm going to show
14 you what's been marked as Exhibit number 2.
15        MS. DAVIS:  Do you want this back?
16        MR. BUSBY:  No.
17        MS. DAVIS:  Okay.
18        MR. BUSBY:  You can keep those.  Well, I'll ask you
19 to give those to the court reporter in the conclusion of the
20 deposition.
21        MS. DAVIS:  Okay.
22        MR. BUSBY:  Okay.  All right.  So let me make sure
23 June 20 -- May 24th.  It looks like I only printed three copies of
24 this guy.  Justin, do you have the May 24th --
25        MR. VANCE:  The IDP letter?

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                                    Pages 14..17

Page 14

1          MR. BUSBY:  Yeah.
2          MR. VANCE:  I do.
3          MR. BUSBY:  Okay.  I'll use this if you don't mind.
4          MR. VANCE:  Can I just make sure that we have the
5    same one because there were a couple of --
6          MR. BUSBY:  Sure.
7          MR. VANCE:  -- the one that at the very last
8    paragraph it says you allegedly failed to report?
9          MR. BUSBY:  Yeah.  Yeah.  Okay.  Okay.
10         MR. VANCE:  Thank you.
11         MR. BUSBY:  Sorry about that.
12         Q:  Ms. Davis, can you take a look at what's been marked
13   as Exhibit number 2?
14         A:  Okay.
15         Q:  Okay.  Have you seen this document before?
16         A:  Never.
17         Q:  Okay.  Do you know what it is based on your
18   experience of Washoe County School District?
19         A:  Yes.  A notice of investigatory.
20         Q:  Okay.  And who is this issued by?
21         A:  Based on the paperwork Lauren Ford.
22         Q:  Okay.  And you see where it says, "Cc, Dawn Huckaby,
23   Roger Gonzalez, and Virginia Doran," on page 2.
24         A:  Yep.
25         Q:  Okay.  So you weren't -- you're not copied on these

Page 15

1    when they're issued?
2          A:  There's 8000 employees.
3          Q:  Okay.
4          A:  I, uh, I would get those all day long.
5          Q:  Okay.
6          A:  I just don't get them.  I'm being honest.
7          Q:  All right.
8          A:  Yeah.
9          Q:  So do you see here where it's allege -- and then
10   there's a bunch of supposedly violations of school rules, "Ethical
11   standards, administrative procedure, grading, neglected duty,
12   insubordination, inefficiency."  Do you see all that?
13         A:  Yeah.
14         Q:  Okay.  And do you see at the bottom there, there's a
15   little -- next there and ask you to read that paragraph real
16   quick.
17         A:  "You allegedly failed to report to me an incident
18   registered to you on May 8th involving a student, staff member and
19   drugs.  On May 8th, you allegedly -- uh, on May 8th, Patrick Rossi
20   reported to you that he was told by Sabrina Cellucci that Jessica
21   Wilson gave drugs back to a student.  You stated to Jessica Wilson
22   and that you spoke with trusted mentor/confidant from another
23   school.  You did not state who that confidant's name."  You want me
24   to keep going?
25         Q:  No.  That's okay.  So are you -- or at the time of

Page 16

1    this letter in May of 2017, were you aware of any situation
2    involving my client and allegations of giving drugs back to a
3    student at Hug High?
4          A:  No.
5          Q:  Okay.  All right.  So at this point this -- this
6    isn't going to rise to the level where it's submitted to your
7    office; is that correct?
8          A:  Correct.
9          Q:  Okay.  All right.
10         MR. BUSBY:  Take a look at what's been marked as
11   Exhibit number 3.
12         Q:  Okay.  Ms. Davis, I'm going to ask you to take a
13   look at this exhibit as well when you're ready.  I'd like to ask
14   you some questions about it.
15         A:  Okay
16         Q:  Ready?
17         A:  Uh-huh.
18         Q:  Okay.  So this is another notice of investigatory
19   due process meeting letter to my client; is that correct?
20         A:  Correct.
21         Q:  Okay.  And it was issued by Lauren Ford at this
22   time, right?
23         A:  Correct.
24         Q:  Okay.  And it was cc'd to "Dawn Huckaby, Roger
25   Gonzalez, Virginia Doran, and Sandra Aird," I believe it is?

Page 17

1          A:  Correct.
2          Q:  Okay.  I'll just represent to you this further
3    allegations of misconduct by my client in the course of the duties
4    of principle at Hug High, right?
5          A:  Correct.
6          Q:  Okay.  So this is June 26 of 2017.  At this time,
7    were you aware of any allegations of misconduct against my client
8    by the district towards employees?
9          A:  Okay.  So this I'm not familiar with this document.
10   What typically happens is Roger reports to the deputy, Lauren
11   reports to Roger, and they would state they would have something
12   going on with the, uh, list of principals like we have specifics,
13   I wouldn't ever get.  Um, they would be very global.
14         Q:  Okay.  So you would receive like a briefing sheet
15   about issues with different principals of different schools or --
16         A:  Not as sheet.
17         Q:  Okay.  What do you get?
18         A:  Just like if the -- I met with the deputy, she says,
19   "We're handling these issues -- this issue."
20         Q:  Okay.
21         A:  But not into this type of detail.
22         Q:  Okay.  Would you get e-mails regarding specific
23   issues with principals or employees?
24         A:  Uh, uh, maybe a few just as something was happening,
25   but that -- that wouldn't be in my chain.

Page 18

1      Q:  Okay.  But there is no kind of established standard
2  of practice where you were provided notice of things like this?
3      A:  So we have -- typically, I meet with each chief.
4  Uh, there's a rotation if they have any issues or concerns global,
5  they will tell me.  And we'll talk about it, "Are you working with
6  legal?" Right?  Like, that's the process.
7      Q:  Okay.
8      A:  But they're not gonna send me an e-mail about every
9  issue with every principal, AP, or teacher.
10     Q:  Okay.
11     A:  This -- this doesn't happen.
12     Q:  All right.
13         MR. BUSBY:  So -- Exhibit 4.
14     Q:  All right.  Let me know when you are ready, Ms.
15  Davis.
16     A:  Okay.
17     Q:  Okay.  Do you recognize this document?
18     A:  Never I've seen it.
19     Q:  Okay.  So I'll represented it's July 19th, 2017
20  notice investigatory due process meeting and right to
21  representation; is that correct?
22     A:  Correct.
23     Q:  Okay.  And this alleges for further allegations of
24  misconduct by my client and the course of your duties was a
25  principal at Hug, right?

Page 19

1      A:  Correct.
2      Q:  Okay.
3      Q:  And in July -- on July 19, 2017, around that time,
4  were you aware of any allegations against my client?
5      A:  I think I was aware that there was issues with
6  disciplines.  Specifics, no.
7      Q:  Okay.
8      A:  I mean, like, uh -- they could -- there's a
9  possibility that the deputy said, "We're having some issues, and
10  we're working it out, working through legal."
11     Q:  Okay.
12     A:  But exact, no.
13     Q:  Okay.  And this was issued by Mr. Roger Gonzalez,
14  right?
15     A:  Right.
16     Q:  Okay.  So --
17     A:  Roger reports to Kristen.
18     Q:  Okay.  So around this time period, this still hasn't
19  risen to the level where it's kind of on your radar at the
20  district; is that correct?
21     A:  Correct.
22     Q:  Okay.  It's still Roger Gonzalez basically handling
23  the situation; is that fair?
24     A:  Correct.
25     Q:  And Kristen McNeill has made aware of it, and if

Page 20

1  necessary, she'll report it to you?
2      A:  Right.  And Roger on it -- and I assume Kristen is
3  working with Roger on it because she oversees all schools.
4      Q:  Oh, okay.  Just backing up for a minute, I want to
5  get an understanding of your relationship to other people in this
6  case.  Do you know Roger Gonzalez?
7      A:  I do know Roger.
8      Q:  How long have you known Roger?
9      A:  So I supervised Roger when he was a principal in
10  Clark County for a year, and then in Washoe.
11     Q:  Okay.  Were you involved in Roger Gonzalez being
12  hired by Washoe County School District?
13     A:  Absolutely not.
14     Q:  Okay.  How about Lauren Ford.  How do you know
15  Lauren Ford?
16     A:  Principal at Hug.
17     Q:  Okay.  Do you have -- do you know her personally?
18     A:  Like do I know where she lives, what her kid name
19  is?  Absolutely --
20     Q:  Yes.
21     A:  -- not.
22     Q:  All right.
23     A:  That -- that's subjective, like people that -- are
24  you friends with somebody?  What do you mean?
25     Q:  Yeah.  I --

Page 21

1      A:  Just like -- like, I don't know -- I know her as a
2  principal working for Hug.
3      Q:  Okay.  So you know her in a professional capacity,
4  not a personal thing?
5      A:  Exactly.
6      Q:  Okay.  And the same with Roger Gonzalez?
7      A:  Right.
8      Q:  All right.  How about Kristen McNeill?
9      A:  Same.
10     Q:  Okay.  So all these people are just --
11     A:  I think Kristen might be just a little more because
12  she's the deputy.  We work closer together.  Like, I know the --
13     Q:  Okay.
14     A:  -- name of -- I have to think about it, but I know
15  who her kid -- like if her kid walked through the door, I would
16  know it's her kid.  I wouldn't --
17     Q:  Okay.
18     A:  -- know with Lauren's kid.
19     Q:  Okay.  Fair enough.  That's a good example.  Okay.
20  And just backing up for a minute, big picture.  Teachers and
21  principals are subject to progressive discipline in Washoe County
22  School District, right?
23     A:  Yes.
24     Q:  Okay.  Meaning that --
25     A:  Depending on what the allegation is too, right?

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                                                    Pages 22..25

Page 22

1 Like there's progressive, but there are some things that are not.
2          Q:   Yeah.  So if it's a serious enough allegations,
3 threats to safety, or something like that.  A principal can get
4 fired for that, correct?
5          A:   Depending -- yes.  And whatever it is, they would
6 discuss that with legal.
7          Q:   Okay.  But generally, there's rules and regulations
8 about how teachers are discipline, they have to receive notice, et
9 cetera, right?
10         A:   Yeah, but there are some things that you can't.
11 Violation of testing, now, you can lose your teaching license,
12 right?  Or your --
13         Q:   Okay.
14         A:   -- like there are certain things just depending on
15 what they are.
16         Q:   Okay.  So even if that's -- there's an accusation
17 that there has to be some kind of investigation analysis of the
18 facts before you take a disciplinary action against a teacher or
19 principal who works for the district, right?
20         A:   Uh, if there's an accusation, we have to look into
21 it.
22         Q:   Okay.  All right.
23         A:   Across the board.
24         Q:   Okay.
25         A:   Whether you're --

Page 23

1          Q:   And --
2          A:   -- the maintenance guy or anybody.
3          Q:   Okay.  How familiar are you with the specific due
4 process requirements that Washoe County School District had in
5 place for people in my client's position during your --
6          A:   To be honest, I'm --
7              MS. PARKS:  I'm going to place an objection on the
8 grounds of relevance.  My client is not a 30(b)(6) witness.  She's
9 here as an individual to testify as to her knowledge of the facts
10 and circumstances in Ms. Olsen's case.
11             MR. BUSBY:  Okay.
12         A:   Ms. Davis, from time to time, your attorney might
13 object to some of the questions I ask.  And if she does -- if she
14 direct you not to answer, don't answer.  But if she doesn't direct
15 you not to answer, you just go ahead after she objects.
16         Q:   Uh, if -- can you repeat your question?
17         A:   Yeah.  I'm just wondering, what did you know about
18 the due process requirements that the district had in place for
19 people in my client's position when you were superintendent at
20 Washoe County School District?
21             MS. PARKS:  Same objection.  Go ahead.
22             MR. BUSBY:  Okay.
23         A:   At a high level, uh, uh, I would confer with the
24 Office of General Counsel and -- and human resources.
25         Q:   Okay.

Page 24

1          A:   I mean, I know there are steps we go through it,
2 like case-by-case if there was a question.
3          Q:   If you're like the CEO of the company and these are
4 kind of technical issues that you're -- you're not familiar with
5 the exact details, but you seek guidance from the district on what
6 to do?
7              MS. PARKS:  Objection.  Vague and ambiguous with
8 respect to the use of the term CEO.
9          A:   So as the superintendent, I hire chiefs.  Chiefs are
10 experts in all the areas and we work together as a team.
11         Q:   Okay.  So when it came to the issues involving my
12 client, which chief did you rely on?
13         A:   In her case, the deputy superintendent is over
14 schools.  And so anything that pertains to schools, whether it's
15 curriculum, discipline, it's under the deputy superintendent's
16 purview.
17         Q:   Okay.  And they would give you advice as to the
18 specific due process requirements --
19         A:   They would work with the Office of General Counsel
20 in HR.
21         Q:   Okay.  I'm sorry, I'm not trying to be difficult.
22         A:   That's okay.
23         Q:   I just --
24         A:   I'm good.
25         Q:   -- want the full picture --

Page 25

1          A:   Right.
2          Q:   -- of the situation because every organization is
3 different.
4          A:   Yes.  They don't work in isolation.
5          Q:   Okay.  And -- okay.  So just to answer my specific
6 question:  Your knowledge of the specific requirements that apply
7 to my client would be derived from the organization, the district
8 itself; is that fair?
9          A:   What the district would share based on the
10 information they gather where we work.
11         Q:   I'm sorry to interrupt.
12         A:   Yeah.
13         Q:   That would be the deputies and the Office of General
14 Counsel; is that correct?
15         A:   In this case, maybe the academic manager and the
16 principal.
17         Q:   Okay.  Do you recall in this case who advised you
18 about what was going on with my client?
19         A:   Okay.  So you said advised me, two different things.
20 Uh, at a high level, there's discipline, and it's not just your
21 employee.  It's we are having issues with these principals, and my
22 -- probably, "Are you working through HR and legal?  Yes.  Done."
23         Q:   Okay.  All right.  So --
24         A:   I mean -- I mean, that's what it is.
25         Q:   Okay.  Fair enough.  So it's fair to say that you

Page 26

1  were -- you know, you weren't doing this in a bubble.  You were
2  relying on other people you are working with at district to make
3  these decisions?
4        A:  I --
5            MS. PARKS:  I'm going to -- I'm just going to
6  oppose an objection here as to any decisions as to use of the term
7  my client making decisions.  It's -- it's vague.
8            MR. BUSBY:  Okay.
9        A:  And I'll answer it.  I didn't make any decisions.
10 That would have to happen at their level.  I don't watch Trina.  I
11 don't watch the teacher.  That decision for whatever has to be
12 made at the direct supervisors level.
13       Q:  Okay.  I'm going to go ahead and ask you to review
14 what's marked as Exhibit 5.  Ms. Davis, I'd ask that you do the
15 same thing with this.  Just take a look at it and let me know, and
16 we're going to ask you some questions about it.
17       A:  Okay.
18       Q:  All right.  So have you seen this document before?
19       A:  No.
20       Q:  Okay.  And is it fair to say it's July 27th, 2017,
21 notice of administrative leave without pay from Roger Gonzalez
22 directed to my client, Trina Olson?
23       A:  Yes.
24       Q:  So this basically says, she's being suspended from
25 her job, she's being sent home, but she's still getting paid,

Page 27

1  right?
2        A:  Correct.
3        Q:  Okay.  And so she's not allowed on district property
4  since her turnover her possessions, I mean, she's basically -- you
5  know, she's had to have nothing to do with the district until some
6  kind of decision's made as to her employment; is that right?
7        A:  As it appears.
8        Q:  Okay.  And do you see where it says, "You are
9  further directed not to discuss this pending investigation of
10 anyone except to her WSPA representative or legal counsel?
11       A:  Yes.
12       Q:  Okay.  Is that standard district practice?
13       A:  Yes.
14       Q:  Okay.  Why is that?
15       A:  I actually don't know.  I put the whole template as
16 standard district practice.
17       Q:  Okay.  Okay.  So --
18       A:  So it's not an isolation of one sentence.
19       Q:  All right.  I'm going to -- we just went over four
20 exhibits prior to this.  Were those standard district templates as
21 well?
22       A:  They look --
23       Q:  To your knowledge?
24       A:  -- like standard -- this -- they look like standard
25 templates that would work through with HR and -- who's on there?

Page 28

1  Uh, labor relations.
2        Q:  Okay.  All right.  So this is all stuff that you've
3  seen similar documents and similar cases before?
4        A:  As a principal, as a academic manager, as a deputy,
5  I've seen similar documents.
6        Q:  Okay.  As superintendent in the district, did you
7  see similar documents?
8        A:  Um, technically, I wouldn't get this document.
9        Q:  Okay.
10       A:  Like I might see it later on if there was something
11 going on, but I won't see the document.  Otherwise, I would see
12 stacks of documents all day.
13       Q:  Okay.  But based on your answer, it's fair to say
14 that this would be standard practice issuing a letter letter with
15 this --
16       A:  Yes.
17       Q:  Okay.  All right.  Do you know who drafts this
18 letter?  Is it Roger Gonzalez, or --
19       A:  I know Roger Gonzalez signed the letter.
20       Q:  Okay.  Based on your experience with the Washoe
21 County School District, would it be drafted by Roger Gonzalez?
22           MS. PARKS:  Objection.  Calls for speculation.
23       A:  Repeat the question.
24       Q:  I'm asking -- sorry, I'm trying to straighten things
25 together.  I apologize.  I'm just asking if you know whether or

Page 29

1  not Roger Gonzalez would have drafted this letter?
2        A:  I do not know that.
3        Q:  Okay.  And it looks like it was given to Dawn
4  Huckaby, Virginia Doran, and Zach Lewis, right?
5        A:  Correct.
6        Q:  But not you?
7        A:  Correct.
8        Q:  And so we're still below your level, right?
9        A:  Right.  I might know that she was going on at --
10 like in a discussion, you know, if -- "Would these people will be
11 on paid leave?"
12       Q:  Okay.
13           MS. PARKS:  And it's just what you recall?
14           MS. DAVIS:  Right.
15           MR. BUSBY:  Yeah.
16       Q:  Yeah.  And that's all I'm asking.  I'm not --
17       A:  Yeah.
18       Q:  -- asking you to speculate.
19       A:  But it wouldn't be details.
20       Q:  Okay.  So about this specific case, you don't
21 remember any details about my client being placed on leave without
22 pay at this time?
23       A:  Uh, what I recall was there was an investigation.
24       Q:  Okay.
25       A:  I can't tell you, uh -- there's tons of

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                        Pages 30..33

Page 30

1 investigations. I can't --
2        Q:  Okay.
3        A:  -- I can't recall the specifics, but --
4        Q:  Okay.
5        A:  -- if you worked in legal and the deputy, I assume.
6        Q:  Okay.  Do you recall specific investigation on my
7 client's case around this time period, July 27th of 2017?
8        A:  I recall a investigation.
9        Q:  Okay.  All right.  I know it's probably hard to --
10 you're managing a lot of people and not --
11        A:  Right.
12        Q:  -- just one.  But I'm just asking what you do
13 remember?
14        A:  Right.  If I recall, there was an investigation.
15 Absolutely.
16        Q:  Okay.
17        A:  I don't know what specifically.
18        Q:  Okay.  Let's move forward.  So I'm just going to ask
19 you to review this and when you're ready, I'd like to ask you some
20 questions about it.
21        A:  Okay.
22        Q:  Okay.  Have you seen this document before?
23        A:  No.
24        Q:  Okay.  And the file I represent to you, it's a June
25 28th, 2018, notice of recommend the dismissal of my client, Trina

Page 31

1 Olson.  Do you think that's a fair representation?
2        A:  Yes.
3        Q:  Okay.  And this was issued almost a year after she
4 was given the notice of administrative leave without pay.  Does
5 this seem accurate to you?
6        A:  Yes.
7        Q:  And this basically recommends that my client be
8 dismissed for various reasons, "Insubordination, unprofessional
9 conduct, failure to comply with such a reasonable requirements
10 that the board may prescribed, dishonesty, gross misconduct,
11 making false accusations towards your immediate supervisor in
12 Administrative Regulation 4425, " correct?
13        A:  Correct.
14        Q:  Okay.  I'd like you to take a look at the fourth
15 paragraph here and at the first sentence there.
16        A:  "In other ways that you file a written false claims
17 against your immediate supervisor, Principal Lauren Ford."
18        Q:  Okay.  How about the next sentence?
19        A:  "You were asked specifically if you filed a staff
20 complaint because you believe Principal Ford had returned drugs to
21 a student."
22        Q:  Okay.  All right.  So part of the allegations
23 against my client involve her reporting drugs being given to a
24 student by Lauren Ford, right?
25        A:  Based on this document.

Page 32

1        Q:  Okay.  Do you have any understanding of that
2 situation?
3        A:  Not at this point.
4        Q:  Okay.  So in June 28th of 2018, you didn't know
5 about this situation?
6        A:  I mean, I knew that she was going -- that -- that
7 there was going to be a recommendation for dismissal based on the
8 investigation.
9        Q:  Do you remember who told you that?
10        A:  Deputy Superintendent McNeill.
11        Q:  Okay.  So is it fair to say, around June 28th of
12 2018, that's kind of when this whole situation with my client
13 surfaced and got on your radar?
14        A:  Uh, to -- to the level where it's dismissal.
15        Q:  Okay.  Do you remember my client joined the school
16 board meetings and explain her situation, what was going on with
17 her at the district?
18        A:  In 2018?
19        Q:  Uh-huh.
20        A:  Maybe the end of 2018, perhaps.
21        Q:  Okay.  So and this document was signed by Roger
22 Gonzalez, correct?
23        A:  Correct.
24        Q:  Okay.  It says that, my recommendation -- I'm sorry,
25 the last paragraph here on the page that's marked number 8 at the

Page 33

1 end?
2        A:  Okay.
3        Q:  It says, "My recommendation as the superintendent is
4 that you be dismissed from service with the district effective
5 July 5th, 2018," right?
6        A:  Correct.
7        Q:  It says, "If you wish to appeal this action, you
8 will need to follow NRS 391.822," correct?
9        A:  Correct.
10        Q:  Okay.  So and this was authored by -- from Mr. Roger
11 Gonzalez, right?
12        A:  I don't know who authored it.  I know he signed it.
13        Q:  Okay.  All right.  Is this a form letter as well?
14 So like something you've seen for the districts?
15        A:  Um, the context might be different, but, uh, a
16 typical notice of recommendation, dismissal.
17        Q:  Okay.
18        A:  I don't know if it's a form letter.
19        Q:  Okay.  Do you -- to your knowledge, does the
20 district have form letters from these kinds of disciplinary
21 actions?
22        A:  I think there are letters that have specific things
23 by law that has to be put in them and then they have crafted
24 probably germane to whatever the situation is.
25        Q:  Okay.  So did you have an understanding of what a

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Pages 34..37

Page 34

1  "NRS 391.822" required at that time?

2        A:  Um, at that time, I don't recall.  But I'm sure
3  there was legal meeting to discuss why the decision was made to
4  move forward in a discussion with the deputy as they conducted the
5  investigation.

6        Q:  Okay.  Do you recall whether you were part of  these
7  discussions?

8        A:  The discussion around the legal piece was at --
9  about the investigation, like it's a high level, but are we
10  supported, are these facts, what's the recommendation because I
11  don't know.  I'm not in the -- they'll -- I didn't conduct the --
12  the -- I don't -- I don't know the pieces, the people who
13  conducted the investigation.

14        Q:  Okay.  But you received this recommendation?

15        A:  Yes.

16        Q:  Okay.

17           MS. PARKS:  Not Exhibit 5 or 6, excuse me, not the
18  letter, but -- you didn't receive the letter, I think, was your
19  testimony?

20           MS. DAVIS:  No.

21           MS. PARKS:  Okay.

22           MS. DAVIS:  I didn't receive --

23           MS. PARKS:  Okay.

24           MS. DAVIS:  -- the letter.

25           MR. BESBY:  Okay.

Page 35

1           MS. DAVIS:  There was a --

2           MS. PARKS:  Okay.

3           MS. DAVIS:  -- discussion that there was going --
4  so let's go back to I didn't brief.  There's a recommendation.  If
5  there's a recommendation to terminate, there's a discussion on --
6  with Office of General Counsel, the deputy, and all parties, like,
7  is this -- did we follow the guidelines, is this -- like, I asked
8  very global questions, "Is it supported?  Is it legally sound?
9  Blah, blah, blah, blah.

10        Q:  Okay.  And you would receive input and advice from
11  the employees at the district on those issues?

12        A:  I would have to.

13        Q:  Okay.  You're not just compacting in a vacuum,
14  right?

15        A:  I -- I didn't conduct the investigation.

16        Q:  Yeah.  All right.  All right.  Let's take a look at
17  the next.  It's been marked as Exhibit 8.

18           MR. VANCE:  Exhibit 8?

19           MR. BUSBY:  Yeah.

20           MS. FLETCHER:  It's Exhibit 7.

21           MR. BUSBY:  Oh, I'm sorry, 7, Exhibit 7.  My
22  apologies.

23        Q:  Ms. Davis, I'm going to ask you to do the same
24  thing, just -- you know, several questions.  Let me know when
25  you're ready to discuss that.

Page 36

1        A:  Okay.

2        Q:  All right.  So I'll go and represent to you, this is
3  a letter from my client's former attorney Michael Langton
4  addressed to you; is that correct?

5        A:  Correct.

6        Q:  Do you remember seeing this letter?

7        A:  Yes.

8        Q:  Okay.  And what's your understanding of what Mr.
9  Langton's communicating to you here?

10        A:  Um, this letter was, uh, telling that she had
11  representation in -- and -- and I actually read this letter and
12  took it straight to -- or somebody sent it to the Office of
13  General Counsel.  That's how --

14        Q:  Okay.

15        A:  -- and that would be normal protocol for any
16  letters.  So that's not because it was Trina.  If a lawyer sent me
17  a letter, it goes to the Office of General Counsel.

18        Q:  Okay.  Okay.  So did you understand why Mr. Langton
19  was filing a grievance protesting recommendation to discharge on
20  my client's behalf?

21        A:  Um, uh, because she felt that she was fired wrongly.
22  But like I said, this letter went to the Office of General Counsel
23  --

24        Q:  Okay.

25        A:  -- because he worked with, uh, the deputy and so --

Page 37

1        Q:  Okay.  But when this letter was sent, she wasn't yet
2  fired, right?

3        A:  Um --

4        Q:  Uh, what was her fire date?  I don't --

5           MS. PARKS:  If you know.  It's --

6           MS. DAVIS:  Okay.

7           MS. PARKS:  It's based on your --

8           MS. DAVIS:  Yeah.

9           MS. PARKS:  -- personal knowledge.

10        A:  I don't recall.

11        Q:  Oh, you don't recall?  Okay.  If we look at the
12  notice of recommendation for dismissal, it's dated "June 28,
13  2018," correct?

14        A:  Correct.

15        Q:  And can you take a look at the last page of Exhibit
16  6 if you could?

17        A:  Okay.

18        Q:  And I'd just like you to read to yourself the first
19  paragraph of NRS 391.822.

20        A:  Paragraph 2?  Am I looking --

21           MS. PARKS:  He's back on --

22        Q:  Paragraph 1.

23           MS. PARKS:  He's on the last page --

24           MR. BUSBY:  Yeah.

25           MS. PARKS:  -- of Exhibit 6.

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Pages 38..41

Page 38

1    MS. DAVIS:  Exhibit 6?
2    MS. PARKS:  Yeah.  He's on the --
3    MR. BUSBY:  Yeah.
4    MS. PARKS:  -- very last page --
5    MS. DAVIS:  Oh, okay.
6    MS. PARKS:  -- of the statute.
7    MR. BUSBY:  Yeah.  There you go.
8    MS. DAVIS:  Okay.
9    Q:  Can you take a look at that?
10   A:  Okay.
11   Q:  So based on this -- I mean -- well, the -- you
12  understand here, my client had the time to seek arbitration to
13  dispute the notice of recommendation of dismissal by Mr. Gonzalez?
14   A:  As I look at this, I actually, uh -- not sure.  What
15  I'll tell you is this document was provided to legal for guidance.
16   Q:  Okay.  Sorry.  I'm not trying --
17   A:  It's okay.
18   Q:  I'm not trying to be -- about this.
19   A:  I don't -- like, I'm okay.
20   Q:  Okay.  All right.  I'd like to show you what's been
21  marked as Exhibit 8 here.  All right.  And if you could
22  review it and let me know when you're ready, and I'll need to ask
23  you some questions about it.
24   A:  Okay.
25   Q:  So if I represent to you this the July 6, 2018,

Page 39

1   letter from my client's former attorney, Michael Langton,
2  requesting arbitration, you think that's a fair representation?
3   A:  Yes.
4   Q:  Okay.  And do you recall receiving this letter?
5   A:  I do not recall.  But I assume that I did, and it
6  went straight to legal.
7   Q:  Okay.  So --
8   A:  That's the truth.
9   Q:  So it's same situation as before with it.
10   A:  It is.
11   Q:  And off it goes.
12   A:  Yes.
13   Q:  Okay.  Fair enough.  So let's look at what's been
14  marked as Exhibit 9.
15   MS. PARKS:  Thanks.
16   A:  Okay.
17   Q:  Okay.  Do you know who Selene Lewis is?
18   A:  No.
19   Q:  Okay.
20   A:  An employee of the Washoe County School District.
21   Q:  All right.  And you can tell that based on her
22  e-mail address?
23   A:  Correct.
24   Q:  Okay.  And do you think it's fair to say that this
25  is a letter or e-mail sent to my client from Ms. Lewis saying her

Page 40

1   active pay status had ended and the final pay for the contract
2  year 2017-2018 was issued June 22nd, 2018?
3   A:  Based on the e-mail in front of me.
4   Q:  So it says, "At this time, since your status is
5  recommended for dismissal, your pay has been suspended."; is that
6  right?
7   A:  Based on the e-mail.
8   Q:  Okay.  All right.  Is it your understanding that my
9  client's pay was to be suspended based on the notice of
10  recommendation for dismissal from Mr. Gonzalez?
11   A:  Um, to be clear, uh, I've never seen this e-mail.
12  And they will work through legal counsel and HR.
13   Q:  Okay.  So you wouldn't be involved in the suspending
14  her pay; is that right?
15   A:  That goes through whatever decision they made.  And
16  I don't know the specifics.  I wasn't a part of, like, how they do
17  the payroll.
18   Q:  Okay.  That's below your radar.
19   A:  8000 employees.
20   Q:  Okay.  All right.
21   MR. BUSBY:  Thanks.
22   Q:  And I'd like you to --
23   MR. BUSBY:  Let's mark this as Exhibit 10.
24   Q:  Ms Davis, I'd just like to point out that there's
25  two documents in Exhibit 10.

Page 41

1   A:  Uh-huh.
2   Q:  I'll give you a chance to look at all the --
3   A:  Okay.
4   Q:  Okay.  Do you recognize this document?
5   A:  Yes.
6   Q:  Is that your signature on it?
7   A:  That is my signature.
8   Q:  Okay.  Can you describe what this document is?
9   A:  This is a -- a response that was crafted by the
10  Office of General Counsel and/or, uh -- I don't recall who crafted
11  the response to whatever was sent to me.  Um, but the response was
12  crafted based on the decision, and I signed it.
13   Q:  Okay.  It's based on Roger Gonzalez's decision?
14   A:  The team
15   Q:  Okay.  The team.
16   A:  Yeah.  I -- I can't tell you, like, if -- there's
17  numerous people involved in her investigation.  So -- but whatever
18  was sent to me, this is a response that was crafted that I signed
19  because we'd have to respond.
20   Q:  Okay.  At the time you issued this letter, were you
21  aware that there was an ongoing arbitration between my client and
22  the district involving the notice of recommendation to dismiss?
23   A:  I recall slightly that she -- it was going to an
24  arbitrator to decide.
25   Q:  Okay.  So were you advised that you had the

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                                    Pages 42..45

---

Page 42

1  authority to terminate her at that time?
2       A:  I was advised that it was okay that we terminated
3  her based on their investigation --
4       Q:  Okay.
5       A:  -- and their -- whatever they collected.
6       Q:  Is this another form letter from the district?
7       A:  I don't know if it's a form letter or this is a
8  response.
9       Q:  Okay.  What would it be --
10      A:  It will be hard for it to be a form letter because
11  it looks like a response.
12      Q:  Okay.  What would it be a response to?
13      A:  Clearly, she sent -- there had to be something sent
14  to me, for me to send her something back.  And it looks like it
15  was copied to Mr. Langton.  So it probably was a response to Mr.
16  Langton.
17      Q:  Okay.  Were you aware at the time that you issued
18  this letter that -- whether there was a law prohibiting the
19  district from firing my client until the arbitration proceedings
20  had been concluded?
21      A:  I don't recall.
22      Q:  Okay.  Do you recall if you were ever told anything
23  about that if anything?
24      A:  Uh, I wasn't told.
25      Q:  All right.  And just to point out for the record,

Page 43

1  there's two letters here.  They're similar except the date of
2  issuance and effective date are different, right?
3       A:  One's the 5th, one's the 6th.
4       Q:  Okay.
5       A:  Yeah.
6       Q:  All right.  That's the only difference that I've see
7  in the letters.  Is that what you see as well?
8       A:  It looks like one was sent on the 26th, one was sent
9  on the 27th.
10      MR. BUSBY:  Okay.  Thank you.  Okay.  There's more.
11      MS. PARKS:  Thanks.
12      Q:  This is Exhibit 11.  Ms Davis, if you could just
13  look over this a little bit.
14      A:  Okay.
15      Q:  Okay.  Do you recognize this document?
16      A:  I do recall it.
17      Q:  Okay.  Do you see on the second page it says you're
18  currently copied there?
19      A:  Yeah.
20      Q:  Okay.  And it's dated "July 30, 2018," correct?
21      A:  Correct.
22      Q:  And it's just a few days after you issued your
23  notice to terminate Ms --
24      A:  Correct.
25      Q:  Okay.  Olson.  Sorry.  So just the big picture, this

Page 44

1  looks like my client had filed a staff complaint on July 19th,
2  2018, right?
3       A:  Correct.
4       Q:  Okay.  And this says essentially, because she, you
5  know, was no longer a district employee, she was not eligible to
6  file staff complaint, right?
7       A:  Correct.
8       Q:  But at the time she filed this, she was a staff
9  member, right?
10      A:  I -- I don't recall.  I mean, I assume, but that's
11  what she says.
12      Q:  Okay.
13      MS. PARKS:  Just what you know.
14      A:  Yeah.
15      Q:  Yeah.  And who is Virginia Doran?
16      A:  Director of department of labor relations.
17      Q:  Okay.  Was she the director the entire time you were
18  at the district?
19      A:  I don't recall because she reported to HR then she
20  reported to legal.  So I don't remember --
21      Q:  Okay.
22      A:  -- the transition of -- I assume, yes.  But I don't
23  know if we did a title change.
24      Q:  Okay.  So she wasn't like a deputy.  She didn't
25  report directly to you.  She was kind of one step below in the

Page 45

1  Office of General Counsel; is that it?
2       A:  She either reported to the chief HR officer or the
3  Chief General Counsel.
4       Q:  Okay.  But you were made aware of her decision in
5  this case to deny my client's complaint because she'd been fired;
6  is that right?
7       A:  Um, uh, as best I recall, Trina sent me a letter.
8  And I shipped the letter off and said, "Here's the letter she sent
9  me."
10      Q:  Okay.
11      A:  "She needs a response."
12      Q:  Okay.  Did you review and approve this response
13  before it was sent by Ms. Doran?
14      A:  I did read the response.  And, um, -- and it -- it
15  came through legal.  So I'm assuming that it was accurate if it
16  came through the Office of General Counsel and department of labor
17  relations.
18      Q:  So do you think it's fair to say that the legal
19  department reviewed and approved it?
20      MS. PARKS:  Objection.
21      A:  I don't know that answer.
22      MS. PARKS:  And calls for speculation.
23      MR. BUSBY:  Okay.
24      Q:  If you don't know, that's okay.
25      A:  Yeah.  I don't know that.

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                                     Pages 46..49

Page 46

1   Q:  All right.  Okay.  All right.
2        MR. BUSBY:  What are we on?  Exhibit 12?
3        MS. FLETCHER:  Yes.
4   Q:  Do you recognize this document?
5   A:  I do recall this document.
6   Q:  Okay.  Right.  Now, I apologize I'm going to backup
7   here for a minute.  So you know my client requested the notice of
8   recommendation for dismissal be subject to arbitration?
9   A:  I don't recall.  I assume she worked through the
10  process.
11  Q:  Did you know that arbitration occurred?
12  A:  Yes.
13  Q:  Okay.  Do you know --
14  A:  I mean, I know it eventually happened, yes.
15  Q:  Okay.  Did you know the outcome of that arbitration
16  process?
17  A:  I did see the outcome.
18  Q:  Okay.  And what's your understanding of the outcome?
19  A:  The outcome -- and I do have to say I haven't seen
20  that since whenever it was sent in the day I read it.  The arbi --
21  there was -- it was long.  And basically it said that Washoe
22  violated a timeline law, and it said lots of things about the
23  superintendent.  Um --
24  Q:  Did you participate in that arbitration?
25  A:  I did not.

Page 47

1   Q:  Do you know who did?
2   A:  Like I -- no.  I mean, I could give you ideas.  I
3   assume Virginia.
4        MS. PARKS:  You don't have to guess.  It's just --
5   A:  Okay.  I don't -- I mean, I don't know what whole
6   team.  I don't know.  That's about --
7   Q:  All right.
8   A:  Like, I don't know.
9   Q:  Okay.  Do you know who was the liaison for that
10  arbitration for my client that's --
11  A:  I don't recall.
12  Q:  Okay.  Do you remember who was involved at all?
13  A:  I believe Virginia Doran.  I -- I don't know what
14  team went.  Like, we have a department.  I can't tell you who
15  exactly.
16  Q:  Okay.  Do you know if Kristen McNeill was involved?
17  A:  I don't know that --
18  Q:  Okay.
19  A:  -- for sure.  But I assume anyone who was involved
20  in the case was involved in the arbitration --
21  Q:  Okay.
22  A:  -- who had firsthand knowledge.
23  Q:  All right.
24       MS. PARKS:  We just don't want you to assume.
25       MS. DAVIS:  Right.

Page 48

1        MS. PARKS:  So it's just --
2        MS. DAVIS:  Yeah, I don't --
3        MS. PARKS:  It's just what you know, that's what
4   Mr. Busby's --
5        MS. DAVIS:  Yeah.
6   A:  I don't -- well, you told me if I know that these
7   people will testify or that -- I don't know.
8   Q:  Okay.  All right.  Fair enough.  Okay.  But you're
9   aware that the decision the arbitrator was largely adverse to the
10  district?
11  A:  Yes.
12  Q:  You think that's fair?
13  A:  Based on the arbitrators.
14  Q:  Do you recall the arbitrator concluding that the
15  district's retaliated against my client?
16  A:  I don't recall that in specifics.
17  Q:  Okay.  Do you recall whether the arbitrator
18  determined that my client had been fired in violation of the
19  statutes?
20  A:  Not exactly.  I remember there's something about the
21  timeline with the district not following, breaking the law on a
22  timeline.
23  Q:  Okay.  Just another chain of command issue, is the
24  Officer for General Counsel within the school district the one
25  that's in charge of coordinating arbitrating like this on the

Page 49

1   issue --
2   A:  Yes.
3   Q:  Okay.  So it becomes kind of like a legal proceeding
4   at that point and then Office of General Counsel kind of takes
5   over; is that fair?
6   A:  Uh, I don't know if it's a legal proceeding.  The
7   arbitration is taken over by legal counsel and HR.
8   Q:  Okay.  Are you aware of whether you were advised how
9   Ms. Olsen was treated, prior to the arbitration was standard
10  practice for Washoe County School District?
11       MR. VANCE:  Objection.  Vague and ambiguous.
12  A:  Uh, I actually don't know what you mean.  So --
13  Q:  Okay.
14  A:  -- you need to be clear about how she was treated.
15  Q:  Sure.  Yeah.  Sorry, it was a bad question.  My
16  client was subject to discipline when she was at the district,
17  right?
18  A:  Correct.
19  Q:  Okay.  Was it your understanding that how she was
20  subject to discipline was within the scope of the standard
21  practices the district for how those situations are dealt with?
22       MS. PARKS:  I'm just going to object that the
23  question is vague and ambiguous.  This is not PMK 30(b)(6)
24  witness.  Calls for speculation as to treatment of other people.
25       MR. BUSBY:  Okay.

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                                                                          Pages 50..53

Page 50

1    A: I wasn't there, so I don't know how she was treated.
2    Q: Oh, okay.
3    A: I mean, if you're asking me, I don't know.
4    Q: Okay. So are you aware of whether there is anything
5    different about how my client was treated as opposed to any other
6    employees at the school district who is subject to discipline?
7    A: As far as process and coming to me, they were
8    consistent.
9    Q: Okay. So my client was treated the same way as
10   other similarly situated people at the district?
11   A: As it relates to what I knew about it.
12   Q: Okay. Fair enough. And that's all I'm asking.
13   Yeah. All right. I'd like to return to Exhibit 12.
14   A: Yes.
15   Q: Did you have a chance to look this over?
16   A: Yes.
17   Q: Okay. And do you recognize that?
18   A: I do.
19   Q: Okay. And do you see your signature on page 2 of
20   this document?
21   A: I do.
22   Q: Okay. So what is this letter?
23   A: Um, if I recall correctly, and I'm not exactly sure,
24   Ms. Olsen was sending barrages of e-mails to meet with me and the
25   board president --

Page 51

1    Q: Okay.
2    A: -- or the board president separately or me
3    separately. She wanted to meet with somebody.
4    Q: Okay. What was your understanding of why she wanted
5    to meet with you?
6    A: It was about her situation.
7    Q: Okay. And this was --
8    A: That was clear.
9    Q: And this was subsequent to the arbitration, right?
10   A: Um, I -- yes.
11   Q: Okay. So did you understand the specifics of why
12   she wanted to meet with you?
13   A: Um, I do not recall, but I assume based on her --
14   how her actions, it was about her case.
15   Q: Okay. What do you know if anything is specific
16   about the facts of her case that she wanted to meet with you
17   about?
18   A: Not specifically, I assume it was about the whole
19   case.
20   Q: Okay.
21   A: It's not our practice to me with employees --
22   Q: Okay.
23   A: -- on cases. That goes to the opposite general
24   counsel. This letter was constructed based on what, uh -- I -- I
25   would have to see the e-mail she sent to us, but she sent us an

Page 52

1    e-mail. Otherwise, we wouldn't sent her something. So she sent
2    something, and this was a response.
3    Q: Okay. All right. So my client went through
4    arbitration against the district and she prevailed --
5    A: Correct.
6    Q: -- right?
7    A: Correct.
8    Q: What was your understanding of what was supposed to
9    happen with her after she prevailed with arbitration?
10   A: That we had the choice to allow her to return or
11   not.
12   Q: Okay. And are you aware of the specific obligations
13   under the statute?
14   A: Not -- I mean, I -- no, I do not know that. I would
15   have to have the lawyer in front of me like we would normally do,
16   tell me x, y, and z --
17   Q: Okay.
18   A: -- what are our options.
19   Q: Right. All right. So I'd like to have you take a
20   look at Exhibit 13. We'll get back to 12 in a minute. I'm going
21   to ask you if recognize this one, Ms. Davis?
22   A: I recall it being sent.
23   Q: Okay. And do you see your name there at the bottom?
24   A: Yes.
25   Q: Okay. And what is this document?

Page 53

1    A: Looks like it was to resolve the employment issue.
2    Q: Okay. This was "January 9th, 2019," right?
3    A: Yep.
4    Q: And signed by Chris Reich?
5    A: Correct.
6    Q: Who's Chris Reich?
7    A: He is the deputy Chief General Counsel for the
8    Washoe County School District.
9    Q: Are you aware of whether he was the one managing the
10   case for Ms. Olsen?
11   A: I don't recall.
12   Q: Okay. Okay. All right. So this basically
13   describes, I'll represent to you and ask you if it's fair that Mr.
14   Reich discussed with Mr. Langton a resolution of the employment
15   issues between Washoe County and my client, right?
16   A: Correct.
17   Q: And there were certain actions that the district
18   said it was going to take, right?
19   A: Uh-huh.
20   Q: By hiring her, getting her back pay, et cetera --
21   A: Uh-huh.
22   Q: -- right? Okay. We -- did you have any
23   understanding about whether you were supposed to tell my client
24   that no further action will be taken against her as a result to
25   the arbitration?

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Pages 54..57

Page 54

1        MR. VANCE:  Objection.  Calls for a legal
2  conclusion.
3     A:  Uh, I actually have no idea.
4     Q:  Okay.  Do you remember this situation?
5     A:  Yeah, I remember though -- I mean, I remember this,
6  but I don't remember the question you just asked.  I am not aware
7  of me having to state that to her.
8     Q:  Okay.  Do you --
9     A:  You asked me, did I state that to her?
10    Q:  Yeah.
11    A:  Did not state that to her.
12    Q:  Okay.
13    A:  And I wouldn't state that to any employee.  That
14 would not be my role.
15    Q:  Okay.
16    A:  Like, I don't --
17    Q:  Okay.
18    A:  She would work through the process, whoever is the
19 chain of command for that.
20    Q:  All right.  So you didn't have an understanding
21 about whether you had an obligation in the statute to either
22 recommend dismissal of my client to the board or rehire, give her
23 back pay, and do no further action against her?
24        MS. PARKS:  Objection.  Calls for a legal
25 conclusion.

Page 55

1     A:  I'll tell you there probably was a meeting to talk
2  about as a result of what was found in arbitration, what are our
3  next steps and what we have to do.
4     Q:  Okay.  Did you understand if there was a timeline in
5  which you had to do something in Ms. Olsen's case after the
6  arbitrator issued her to work?
7     A:  If there was a timeline, Officer General Counsel
8  would have said we have a timeline.  So whatever it was --
9     Q:  So that wouldn't have been your --
10    A:  Absolutely not.
11    Q:  -- that General Counsel will be managing the
12 situation --
13    A:  Right.
14    Q:  -- at one point?  Okay.  Great.  Okay.  I'd like you
15 to return to Exhibit 12 if I could.  Sorry.
16    A:  Okay.
17    Q:  Got it out of order.  And this is January 24th, so
18 that's a few weeks after the January 9th letter, right?
19    A:  Yep.
20    Q:  Okay.  And it says on January 15th, my client was
21 showing up during public comment school district meetings, right?
22    A:  Correct.
23    Q:  And in response, she got this letter from you?
24    A:  No, I am pretty sure she sent a letter to us.
25    Q:  Okay.

Page 56

1     A:  She wouldn't get and we do not generally ever
2  respond to public response.
3     Q:  All right.
4     A:  She sent an e-mail, and this was the response to
5  probably an e-mail and a request to meet with us.
6     Q:  Okay.  Great.  All right.  So did you have any
7  understanding of any negotiations that were going on between your
8  attorneys and Ms. Olsen's attorneys regarding resolution of the
9  matter that led to the arbitration after the arbitration took
10 place?
11        MS. PARKS:  District counsel and her counsel.
12    A:  Uh, I knew they were working on -- but -- the
13 specifics until it came back to me here, what the choices are.
14    Q:  Okay.  Are you aware of whether or not the
15 district's general counsel requested that my client sign a
16 nondisclosure or nondisparagement clause against the district in
17 order to resolve her case?
18    A:  I do not recall.
19    Q:  Okay.  Okay.  There's also a statement involving
20 inquiries and allegations that the Washoe County School District
21 Police Department uses students as criminal informants in criminal
22 investigations.  So you see that --
23    A:  Yes.  So I don't actually know specifically what the
24 -- this is in response to whatever -- I need to see her e-mail.
25 Whatever she responded to, we responded back to her e-mail.

Page 57

1     Q:  Okay.
2     A:  Or a message was crafted.
3     Q:  Are you aware of the allegations that Lauren Ford --
4  actually was aware that a student on campus had drugs and didn't
5  take any discipline action against that -- disciplinary action
6  against that student?
7     A:  I am not aware of that.  I think a statement was
8  made in a public meeting about an administrator allegedly gave
9  drugs.  And I asked for that to be looked into --
10    Q:  Okay.
11    A:  -- specifically because it's a Hug High School, and
12 allegations are made on that school that are not true.  And the
13 kids deserve better.
14    Q:  Okay.  Are you aware of whether the district's ever
15 did an investigation into these allegations?
16    A:  The district was supposed to dig into that
17 allegation and figure out if that was a true allegation about
18 someone handing drugs back to a kid.
19    Q:  Are you aware of the outcome of that investigation?
20    A:  I am not.
21    Q:  Do you know who was hired to do that investigation?
22    A:  Hold on.  It'll come to me.
23    Q:  It's okay.  Is name Anthony Hall familiar?
24    A:  Yes, thank very much.  Anthony Hall.
25    Q:  Okay.  Do you know Mr. Hall?

Page 58

1    A: Okay.  What do you mean by "know"?

2    Q: Do you know him professionally?

3    A: I know that he's our lawyer and that he's used by

4 the Washoe County School District.

5    Q: So he's been used by the Washoe County School

6 District before this investigation.

7    A: Yes.

8    Q: Okay.  Do you know what he was -- what the Washoe

9 County School District hired him to do previous -- prior to the

10 investigations subject to this case?

11   A: Looking to a variety of cases, I don't mean --

12   Q: Okay.

13   A: -- legal decides who they hire for what cases.

14   Q: Okay.

15   A: I couldn't tell you all the stuff.

16   Q: So it wasn't your decision to hire him?

17   A: For the -- in a board meeting where she made

18 allegations that an administrator handed out drugs, I asked for

19 that to be investigated because that is a serious issue.

20   Q: Okay.  And are you aware of the outcome of that

21 investigation?

22        MS. PARKS: Objection.  Asked and answered.

23   Q: Sorry if I asked you before.

24   A: You did.

25   Q: Okay.  I'm just --

Page 59

1    A: And I'm not.

2    Q: Okay.  All right.  So you see here in Paragraph 2,

3 "However, drugs were never return to either of these students, and

4 the arbitrator's decision is even confused over this issue

5 contradicting itself in parts." right?

6    A: Okay.

7    Q: Okay.  Did you author that sentence?

8    A: I did not author that sentence.  And just for

9 correction, you say where I state this letter is signed by two

10 people.  So we state.

11   Q: Okay.

12   A: Just to be clear.

13   Q: But you're affirming the statements here by signing

14 it, right?

15   A: Right.

16   Q: Okay.  You believe that there were the truth when

17 you signed it?

18   A: Yes.

19   Q: Okay.  And Katy Simon Holland and she was the

20 president of the school board, right?

21   A: Correct.

22   Q: At that time?  Okay.  Did she write this letter?

23   A: I don't recall.

24   Q: Okay.  You don't recall whether you wrote it or she

25 wrote it?

Page 60

1    A: I know I did not write the letter.

2    Q: Okay.  Okay.  Do you see the second last paragraph

3 there or the last paragraph where it's underlined, "To be clear,

4 it will be defamation to state otherwise."?

5    A: Yes.

6    Q: Okay.  And do you know what was meant by that?

7    A: I didn't craft the letter, but I assume that if it's

8 defamation.

9    Q: I mean, are you saying my client was defaming the

10 school district?

11   A: I'm not saying anything.

12   Q: Okay.  Okay.

13   A: I didn't say that.

14   Q: Okay.  Turn to the second to last paragraph, the

15 last sentence, "These actions may lead the district to consider

16 exercising its rights to defend itself in public, if necessary,"

17 right?

18   A: Correct.  I see it.

19   Q: So what do you mean by "these actions"?  What

20 actions are you referring to in the letter?

21   A: As I stated, I didn't craft the letter.  But one of

22 the thing she said was that there was this, uh, an investigate --

23 uh, adult giving drugs back to a -- student.  And if that is

24 true, that we would look at that matter.

25   Q: Okay.

Page 61

1    A: The other pieces I'm not aware of.

2    Q: Okay.

3        MR. BUSBY: All right.  I'm just going to take a

4 quick break if that's okay?

5        MS. PARKS: Sure.

6        MS. DAVIS: I don't care.

7        MR. BUSBY: All right.

8        MS. PARKS: Okay.

9        MS. FLETCHER: We are going off the record, and the

10 time is 11:25 a.m.

11       MS. FLETCHER: We are back on the record, and the

12 time is 11:30 a.m.

13   Q: Ms. Davis, we had a discussion about my client

14 showing up at school board meeting and lodging complaints, right?

15   A: Correct.

16   Q: Do you remember the nature of her -- her complaints?

17   A: Um, what I recall is they were random and sporadic,

18 and different each time.  I couldn't isolate a specific.

19   Q: Okay.

20   A: Except for the one where -- with an allegation about

21 drugs.

22   Q: Okay.  Was she complaining about not being treated

23 fairly by the district vis-a-vis her employment dispute with them?

24   A: I do recall her complaining about the district, and

25 I do recall her specifically alleging that I was behind the whole

Page 62

1 coup.
2        Q: Okay. All right. Do you think that's a fair
3 representation?
4        A: Of what?
5        Q: That you were behind her being terminated?
6        A: It's incorrect.
7        Q: Okay. But you signed her termination letter, right?
8        A: I sign all the termination letters in the district,
9 regardless.
10       Q: All right. So it's a whole team of people behind
11 those decisions. It's not just you, right?
12       A: Right.
13       Q: So you're part of it, but it's not fair to say,
14 you're the only one; is that right?
15       A: I will say that it -- there are people who do the
16 work, and they do the investigations.
17       Q: Okay.
18       A: And based on their information, it is worked through
19 legal and advice is given based on that.
20       Q: Are you --
21       A: Honestly, if Trina doesn't show up to a board
22 meeting, I wouldn't know her from anybody else in America.
23       Q: Okay. Fair enough.
24       A: Not -- not to be rude, I just wouldn't.
25       Q: Do you believe that Trina was treated in accordance

Page 63

1 with the standards and practices in the Washoe County School
2 District?
3        A: I wasn't a part of how she was treated, so I can't
4 speak to how she was treated.
5        Q: Okay. Do you know where Roger Gonzales is now?
6        A: I don't.
7        Q: Okay. And just to be clear, do your relationship
8 with the district ended shortly after -- I should say before all
9 of this was resolved, before the investigation report came out,
10 right?
11       A: Right.
12       Q: Okay.
13       A: I haven't seen an investigation report on the drug
14 allegations.
15       Q: So you had nothing to do with the release of that
16 report publicly?
17           MS. PARKS: Objection. Lack of foundation.
18       Q: Are you aware of whether a report was issued by Mr.
19 Hall --
20       A: No.
21       Q: -- regarding my client's complaints? Okay. You
22 never heard about that report?
23       A: No.
24       Q: Okay. And you have no knowledge as to whether it
25 was released to the press?

Page 64

1        A: No.
2        Q: Okay. Or who released it?
3        A: I -- I -- , uh, nothing to do with Washoe County
4 School District.
5        Q: Okay. Yeah. It's a clean break, huh?
6        A: Pretty clean cut.
7           MR. BUSBY: All right. Well, thank you for your
8 time, Ms. Davis.
9           MS. DAVIS: Yep.
10          MR. VANCE: Ms. Davis, my name is Justin Vance. I
11 represent the Washoe County School District. Although I have a
12 lot of questions to ask you, your conversation with Mr. Busby has
13 shed a lot of light on what your role is and what your
14 understanding is of a lot of things. So I think this is going to
15 go pretty quick.
16          MS. DAVIS: Okay.
17          MR. VANCE: But there are a few things that I'd
18 like to follow up on and a few additional things I'd like to
19 confirm if that's okay. So I'm just going to kind of go through
20 my notes. It might be a little choppy, but we'll get through it
21 fairly quickly. Is that all right?
22          MS. DAVIS: Okay.
23                    CROSS EXAMINATION
24          BY: Mr. Vance
25       Q: I believe you testified earlier that you did not

Page 65

1 know Ms. Olsen prior to the incidents regarding her employment; is
2 that accurate?
3        A: Correct. Like I know she was -- worked for the
4 district, but I didn't know her.
5        Q: Right. Prior to the incidents which occurred in
6 2017, were you aware of any complaints being made about Ms. Olsen?
7        A: Not that I can recall.
8        Q: Were you aware of any complaints made by Ms. Olsen
9 prior to 2017?
10       A: Not that I can recall.
11       Q: Do you know -- and I've learned a lot just in the
12 course of this deposition about how big the district is, how many
13 different departments and how many different people there are
14 doing different things. So I might ask you some questions. Your
15 answer might be, "I don't know." And if you don't know, that's
16 perfectly acceptable. But do you know when a person such as Ms.
17 Olsen is hired as an assistant principal, if they are considered a
18 probationary employee at that point?
19          MR. BUSBY: Objection. Calls for legal conclusion.
20       A: I do know that once you are into a different
21 bargaining unit, you are probationary.
22       Q: And does going from the dean of the school to an
23 assistant principal, does that put you in a different bargaining
24 unit?
25          MR. BUSBY: Same objection.

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020                                              Pages 66..69

Page 66

1    A:  Yeah -- no, different -- uh, hold on because Clark
2  is different from here, so I -- a dean --
3    Q:  All right.
4    A:  -- is a teacher in Washoe.  So going to an
5  administrator, it's a new bargaining to me, okay?
6    Q:  Okay.
7    A:  I just have to get it right.
8    Q:  No.  And I appreciate that.  Please take your time
9  to make sure you do that.
10    A:  Yeah, because deans are not considered
11  administrators in Washoe.
12    Q:  Okay.  So they can to jump from the teacher to an
13  administrator.  Your understanding, at least, is that that would
14  put that person in a probationary status?
15    A:  Typically.
16    Q:  Okay.  Superintendent in 2017, I believe, you
17  indicated that you signed the alternation letters.  But you didn't
18  yourself make the decision necessarily terminate somebody; is that
19  accurate?
20    A:  The decision is more of a group decision based on
21  facts and who did the work and working with Office of General
22  Counsel based on facts and law.
23    Q:  Understood.  But did you have to ultimately make the
24  decision after conferring with the team?
25    A:  The recommendation was given by the person doing the

Page 67

1  case, what would -- what would they recommend.  And based on their
2  recommendation then consultation with the Office of General
3  Counsel.
4    Q:  Did you have a sort of veto power at all?  Say, for
5  example, the team came to you and said, "We think we have to
6  terminate this person.  Are there situations where you can say,
7  "No, I don't think we've got to terminate," or vice versa?
8    A:  I wouldn't say I had veto power.  I'm looking at
9  evidence they provide and then --
10    Q:  Understood.
11    A:  -- if they couldn't provide evidence if not -- it
12  wasn't a veto power type of deal.  It was based on the evidence
13  they provided.
14    Q:  But you want to make sure that the evidence was
15  there before signing the termination letter?
16    A:  Uh, based on -- uh, if they went through the process
17  and if legal concluded, based on the evidence.
18    Q:  Okay.  Do you have a general understanding of the
19  Washoe County School District policies and procedures in 2017 with
20  respect to discipline of an assistant principal?
21    MS. PARKS:  I'm going to object.  This witness is
22  not a 30(b)(6) witness.  She's an individual defendant here to
23  testify about her knowledge and understanding of Ms. Olsen's case.
24    MR. VANCE:  Understood.
25    A:  Repeat the question.

Page 68

1    Q:  Sure.  Are you aware in 2017 what the Washoe County
2  School District policies and procedures were with respect to the
3  discipline of an assistant principal?
4    MS. PARKS:  Same objection.
5    A:  Slightly aware, but I don't work through legal
6  through that process whenever each event occur, "What is the
7  process?  What are our ground?  What can we do?"  So it wasn't an
8  isolation, like this case whether it was on the academic side or
9  the operation side.
10    Q:  Understood.  That's not something that you -- that
11  wasn't specifically your department.  There was a deputy, I
12  believe, you called it, who would be overseeing those policies and
13  procedures; is that fair?
14    A:  The deputy doesn't oversee policies and procedures.
15    Q:  Okay.
16    A:  There's a whole department that writes policies and
17  procedures that everybody looks at.
18    Q:  And what department is that?
19    A:  I can't recall the department's name because there's
20  so many.  But Lisa Scurry was in charge of all policies, and all
21  those policies went to the board for approval.
22    Q:  Is Scurry spelled S-C-U-R-R-Y, if you know?
23    A:  I -- I think so, but I'm not sure.  But I don't
24  know.
25    Q:  Okay.  Mr. Busby ran through some exhibits with you,

Page 69

1  including the notices of IDP, I believe, those were exhibits 2,3,
2  and 4.  You already testified that you didn't have anything to do
3  with creating those documents; is that --
4    A:  No.
5    Q:  -- correct?
6    A:  I did not.
7    Q:  Did you ever attend any IDP meetings?
8    A:  I do not attend IDP meetings.
9    Q:  Okay.  Are you aware of the letters of admonition
10  that were sent to Ms. Olsen with respect to the allegations in
11  this case?
12    A:  I do know that she was receiving a letter
13  admonition.
14    Q:  Did you have anything to do with preparing those
15  letters?
16    A:  No.
17    Q:  Is it normal for, at least, in 2017 in the Washoe
18  County School District, is it your understanding that it was
19  normal for a principal to sign a letter of admonition for an
20  assistant principal?
21    A:  If they are -- if they are the -- the person issuing
22  the documentation based on the supervision scale, that would make
23  sense.  It's a direct supervisor.
24    Q:  Is it ever appropriate for an area superintendent to
25  issue a letter of admonition as well?

Page 70

1      A:   In some cases.

2      Q:   Can you describe for me generally what the role of
3  an area superintendent is or was in 2017 specifically?

4           MS. PARKS:   Again, I'm going to oppose an
5  objection. Ms. Davis is an individual defendant.  She has not
6  been noticed as a PMK 30(b)(6) witness for the district.

7      A:   Area superintendent supervise schools.

8      Q:   So there's a certain number of schools under each
9  area superintendents?

10          MS. PARKS:   Same objection.

11     A:   Yes.

12     Q:   Okay.  And are area superintendents over discipline
13 for the schools that they're over?

14     A:   It depends on who's being disciplined.

15     Q:   Okay.

16     A:   And what the role is.

17     Q:   Good point.  Are they -- is there a distinction
18 between staff and students?

19     A:   Yes.

20     Q:   With respect to staff or employees, are the area
21 superintendents over discipline?

22     A:   It depends.

23     Q:   Okay.  And what does it depend on?

24     A:   Um, because remember there is an operation side and
25 there's a academic side, depending on what it is and depending on

Page 71

1  the nature of the event would -- be determined who would oversee.
2  Typically, the principal oversee the discipline in the school, but
3  there are times where there could be other people depending on the
4  situation.

5      Q:   Okay.

6      A:   And that discussion is had at the district office
7  based on whatever information it is.

8      Q:   Okay.  Understood.  Now, if I asked you what happens
9  at an IDP meeting, it sounds like you wouldn't know because you
10 testified that you haven't gone to them; is that accurate?

11     A:   I haven't been to an IDP meeting as a
12 superintendent.

13     Q:   Okay.  But you have attended them in the past?

14     A:   I have attended an IDP meeting in a former role, but
15 not as the deputy not in Washoe.  I know what IDP is.  But not as
16 the deputy or any employment in Washoe County School District.

17     Q:   Okay.  So that's something that you were removed
18 from during your time at Washoe County?

19     A:   It wouldn't be in my lane.

20     Q:   Okay.  Mr. Busby asked you a question earlier about
21 whether the processes that were utilized -- and I may not be
22 quoting it exactly, but generally, whether the processes that were
23 utilized in the disciplinary proceedings of Ms. Olsen were
24 consistent with those used with respect to other employees.  Do
25 you recall that line of questioning?

Page 72

1      A:   Yes.

2      Q:   Is -- is there a general process that you're aware
3  of that's written out?

4      A:   I do not recall if it's written out, but there is a
5  process that's used.

6      Q:   Are you aware of any policy or procedure by the
7  Washoe County School District to disregard an employee's due
8  process rights?

9           MS. PARKS:   Objection.

10          MR. BUSBY:   Yeah.

11          MS. PARKS:   Relevance.  This is not a PMK 30(b)(6)
12 witness. Ms. Davis is here to testify.  She's an individual
13 defendant, about what she knows or doesn't know about Ms. Olsen's
14 case.  Otherwise, it's relevant.  And calls for her to speculate.

15          MR. BUSBY:   I'll join.

16     A:   I don't know.

17     Q:   You don't know?  Okay.  Are you aware of any policy
18 and procedure during 2017 of terminating or disciplining Washoe
19 County School District employees who reported unlawful activity?

20          MS. PARKS:   Same objections.  Go ahead.

21     A:   Can you repeat the question?

22     Q:   Sure.  Are you aware of a policy in effect in 2017
23 in Washoe County School District of disciplining or terminating
24 employees who reported allegedly unlawful activity?

25     A:   I don't recall the policy, but I'm sure there is a

Page 73

1  policy.  There are thousands of policies.

2      Q:   Okay.  And what I'm trying to get at --

3      A:   I'm just is --

4      Q:   -- is --

5      A:   I don't know all the policies.

6      Q:   No.  And what I'm trying to get at is, you're not
7  aware of a policy where through which a Washoe County School
8  District employee would be terminated because of whistleblowing?

9      A:   I don't know that, and I don't recall that.

10     Q:   Okay.

11     A:   And if that were the case, it would be -- it would
12 be brought to me in conjunction in a meeting with the Office of
13 General Counsel.

14     Q:   Understood.  Do you know Riley Cuoco?

15     A:   No.  Should I?

16          MS. PARKS:   Just what you know.

17     Q:   I don't know.  I'm just --

18     A:   No.

19     Q:   -- I'm just trying to find -- find out information.
20 And if you don't know, you don't know.

21     A:   I have no idea who that is.

22     Q:   Are you aware of any allegations that Ms. Olsen
23 intimidated Riley Cuoco or threatened him?

24     A:   I don't know.  And I don't even know who that is.

25     Q:   Okay.

Page 74

1        A:  That's the first time I've ever heard that name,
2  like, uh -- sorry.
3        Q:  No.  That's okay.  That's okay.  You can only
4  testify as to what you know.  I believe early on you were asked
5  about progressive discipline, and you indicated that there are
6  certain situations where the discipline wouldn't necessarily be
7  progressive.  And you mentioned testing violations.  Can you
8  describe what your understanding is with respect to testing
9  violations and the discipline that can occur?
10        A:  That's based on the law, like you need a license.
11  Like if you can -- like there some specific NR -- I can't quote
12  the specific NRS, but there is a level you have to sign off.
13  There are things you cannot do.  If you do those things, they are
14  testing violations.  They have to be reported in a timely manner.
15  I don't -- I can't tell you what they all are.  There's all these
16  irregulations if they happen.
17        Q:  Okay.
18        A:  And then it would go to some committee to determine
19  potential violation.
20        Q:  Okay.  But is it your understanding that testing
21  violation, depending on the severity and the nature, can be
22  grounds for immediate termination?
23        A:  Uh, definitely, if you lose your license.  You don't
24  have a license, you can't teach.  So you'd work it all out.
25        Q:  All right.  Do you know the nature of the alleged

Page 75

1  testing violations which occurred in Ms. Olsen's matter?
2        A:  Uh, uh, I don't recall specifics of what -- of what
3  the violation was.
4        Q:  Fair enough.  Were you privy to any conversations
5  between Michael Langton, who was Ms. Olsen's counsel, and Chris
6  Reich following the arbitration?
7        A:  Not that I can recall.
8        Q:  You weren't involved in any of those?
9        A:  No, I didn't sit in on any of those conversations.
10        Q:  Okay.  You don't know what agreements the two of
11  them may arrived at or stipulations that he may have arrived at?
12        A:  Not from the meeting.  And I talked to Neil
13  Lombardo.  Barely would I ever talk to Chris.  It would come via
14  Neil.
15        Q:  Okay.
16        MR. VANCE:  All right.  I think that's all the
17  questions I have.
18        MS. FLETCHER:  Any other questions?
19        MR. VANCE:  Thank you.  Oops.
20        MS. PARKS:  Do you have any follow up?
21        MR. BUSBY:  Just one based on the last question
22  that was asked.
23                     REDIRECT EXAMINATION
24                     BY: Mr. Busby
25        Q:  So was Neil Lombardo managing the case vis-a-vis in

Page 76

1  Ms. Olsen, to your knowledge?
2        A:  Um, to my knowledge, I don't know how they manage
3  upstairs.  Each chief has the flexibility to manage their cases,
4  but I direct -- chiefs directly reported to me.
5        Q:  And was Neil --
6        A:  Neil was the chief over the Office of General
7  Counsel.
8        Q:  Okay.
9        A:  Now, there are times that you might bring somebody
10  in, but generally speaking.
11        Q:  Okay.  So Neil was the guy you would talk to about
12  this situation, not Chris.
13        MS. PARKS:  Well, I'm going to object that that
14  lacks foundation and misstates her testimony to the extent that
15  she talked with Neil specifically about --
16        MS. DAVIS:  Yeah, I can't --
17        MS. PARKS:  -- recall specifically talking with Mr.
18  Lombardo --
19        MR. BUSBY:  Okay.
20        MS. PARKS:  -- about this.
21        A:  I -- I -- like I recall talking to Neil.  I -- there
22  could've been a time maybe Chris might have been in there, but I
23  don't -- I just don't recall him.
24        MR. BUSBY:  Okay.  Fair enough.  That's it.
25        MS. DAVIS:  Okay.

Page 77

1        MR. VANCE:  No further questions.  Thanks.
2        MS. FLETCHER:  Okay.  This concludes the recorded
3  deposition of Tracy Davis.  We are now going off the record, and
4  the time is 11:48 a.m.
5        MS. FLETCHER:  We are back on the record and the
6  time is 11:48 a.m.
7        MR. BUSBY:  Okay.  Ms. Davis, I apologize I left
8  out the last bit of the deposition, which is an explanation of
9  what happens next.  Within 30 days, you'll receive a copy of your
10  deposition, which we refer to as read and sign.  And you will be
11  able to review your deposition and make changes to your answers if
12  you so choose.  But just be advised that if you do make any
13  changes to your answers, we'll be able to comment on those in the
14  future.  Ms. Parks?
15        MS. DAVIS:  Okay.
16        MS. PARKS:  Uh-huh.  Yes.
17        MR. BUSBY:  All right.
18        MS. FLETCHER:  Okay.
19        MR. BUSBY:  Thank you very much.
20        MS. FLETCHER:  All right.  We are now going off the
21  record, and the time is 11:49 a.m.
22        (Deposition adjourned at 11:49 a.m.)
23
24
25

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Pages 78..81

Page 78

1                    CERTIFICATE OF RECORDER

2  STATE OF NEVADA      )

3                       )

4  COUNTY OF WASHOE     )

5

6  NAME OF CASE:  TRINA OLSEN, Plaintiff, vs.

7  WASHOE COUNTY SCHOOL DISTRICT, ET AL., Defendants.

8

9     I, Sally Fletcher, a duly commissioned Notary Public,

10 authorized to administer oaths or affirmations in the State of

11 Nevada, do hereby certify: That I recorded the foregoing

12 deposition of the witness, Traci Davis, on 2/24/2020.

13    That prior to being examined, the witness was duly sworn to

14 testify to the truth. That deposition was recorded via audio and

15 video pursuant to NRCP30(b)(3) and said deposition recording is a

16 complete, true, and accurate recording of deposition testimony.

17 A transcript was created by E-Depositions LLC to aid the audio video

18 recording. A review of the transcript [ ] was [X] was not

19 requested by the deponent and [X] was [ ] was not requested by a

20 party of the action. If a review was requested, any changes

21 communicated to me by the deponent during the period allowed are

22 appended hereto.

23    I further certify that I am not a relative or employee of

24 an attorney or counsel of any of the parties, nor a relative or

25 employee of an attorney or counsel involved in said action, nor

Page 79

1  a person financially interested in the action.

2     IN WITNESS WHEREOF, I have hereunto set my hand in the City

3  of Las Vegas.

4

5  _Sally Fletcher_

6

7  Sally Fletcher

8  Notary Public

9  Appointment No. 16-1551-1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 80

1  STATE OF NEVADA       )

2                        )SS

3  COUNTY OF WASHOE      )

4

5  Case Name: TRINA OLSEN, Plaintiff, VS.

6  WASHOE COUNTY SCHOOL DISTRICT, ET AL., Defendants

7

8

9

10 Case No. 3:19-cv-00665-MMD-WGC

11 Deposition Date: February 24, 2020

12 Deponent: TRACI DAVIS

13          DECLARATION UNDER PENALTY OF PERJURY

14     I declare under penalty of perjury under the laws

15 of the State of Nevada, that I have read the entire transcript

16 of my deposition taken in the above-captioned matter or the same

17 has been read to me, and the same is true and accurate, save and

18 except for the changes and/or corrections, if any, as indicated

19 by me on the ERRATA SHEET attached hereto and made part hereof,

20 with the understanding that I offer these changes as if still

21 under oath.

22     Executed on this_____ day of_____,

23 2020, at _____,

24                         _____

25                         TRACI DAVIS

Page 81

1                    ERRATA SHEET

2  Case Name:  KEITH HOLDEN, Plaintiff, vs.

3  PARK VISTA APARTMENTS LIMITED PARTNERSHIP, ET AL., Defendants

4

5

6

7  Deposition Date: February 24, 2020

8  Deponent: TRACI DAVIS

9  REASON CODES:  1. To clarify the record.

10                 2. To conform the facts.

11                 3. To correct transcription errors.

12 Page_____Line_____Reason_____

13 From_____to_____

14 Page_____Line_____Reason_____

15 From_____to_____

16 Page_____Line_____Reason_____

17 From_____to_____

18 Page_____Line_____Reason_____

19 From_____to_____

20 Page_____Line_____Reason_____

21 From_____to_____

22 Page_____Line_____Reason_____

23 From_____to_____

24 Page_____Line_____Reason_____

25                         TRACI DAVIS

Page 82

```
 1  Page_____Line_____Reason_____
 2  From_____to_____
 3  Page_____Line_____Reason_____
 4  From_____to_____
 5  Page_____Line_____Reason_____
 6  From_____to_____
 7  Page_____Line_____Reason_____
 8  From_____to_____
 9  Page_____Line_____Reason_____
10  From_____to_____
11  Page_____Line_____Reason_____
12  From_____to_____
13  Page_____Line_____Reason_____
14  From_____to_____
15  Page_____Line_____Reason_____
16  From_____to_____
17  Page_____Line_____Reason_____
18  From_____to_____
19  Page_____Line_____Reason_____
20  From_____to_____
21  Page_____Line_____Reason_____
22  From_____to_____
23  Page_____Line_____Reason_____
24  From_____to_____
25                            TRACI DAVIS
```

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: 1..addressed

**Exhibits**

**Exhibit 1** 3:8 11:9
**Exhibit 2** 3:9 13:14 14:13
**Exhibit 3** 3:10 16:11
**Exhibit 4** 3:11 18:13
**Exhibit 5** 3:12 26:14 34:17
**Exhibit 6** 3:13 37:15,16,25 38:1
**Exhibit 7** 3:14 35:20,21
**Exhibit 8** 3:15 35:17,18 38:21
**Exhibit 9** 3:16 39:14
**Exhibit 10** 3:17 40:23,25
**Exhibit 11** 3:18 43:12
**Exhibit 12** 3:19 46:2 50:13 55:15
**Exhibit 13** 3:20 52:20

---

**1**

**1** 11:9 37:22
**10** 40:23,25
**105** 4:5
**10:27** 4:6
**11** 43:12
**11:25** 61:10
**11:30** 61:12
**11:48** 77:4,6
**11:49** 77:21,22
**12** 46:2 50:13 52:20 55:15
**13** 52:20
**15th** 55:20
**19** 19:3
**19th** 18:19 44:1
**1st** 7:18

---

**2**

**2** 13:14 14:13,23 37:20 50:19 59:2
**2,3** 69:1

**20** 13:23
**2012** 7:25
**2013** 7:25
**2016** 8:8
**2017** 11:16 16:1 17:6 18:19 19:3
26:20 30:7 65:6,9 66:16 67:19 68:1
69:17 70:3 72:18,22
**2017-2018** 40:2
**2018** 30:25 32:4,12,18,20 33:5 37:13
38:25 40:2 43:20 44:2
**2019** 7:18 8:11 53:2
**2020** 4:5
**22nd** 40:2
**24th** 4:5 13:23,24 55:17
**253** 4:7
**26** 17:6
**26th** 43:8
**27th** 26:20 30:7 43:9
**28** 37:12
**28th** 30:25 32:4,11

---

**3**

**3** 16:11
**30** 43:20 77:9
**30(b)(6)** 23:8 49:23 67:22 70:6 72:11
**391.822** 33:8 34:1 37:19

---

**4**

**4** 18:13 69:2
**4425** 31:12

---

**5**

**5** 26:14 34:17
**5th** 33:5 43:3

---

**6**

**6** 34:17 37:16,25 38:1,25

**6th** 43:3

---

**7**

**7** 35:20,21
**730** 4:4

---

**8**

**8** 32:25 35:17,18 38:21
**8000** 15:2 40:19
**89123** 4:7
**89521** 4:5
**8th** 15:18,19

---

**9**

**9** 39:14
**9550** 4:6
**9th** 53:2 55:18

---

**A**

**a.m.** 4:6 61:10,12 77:4,6,21,22
**Absolutely** 20:13,19 30:15 55:10
**academic** 7:4 25:15 28:4 68:8 70:25
**academics** 13:3
**acceptable** 65:16
**accordance** 62:25
**accurate** 31:5 45:15 65:2 66:19 71:10
**accusation** 22:16,20
**accusations** 31:11
**action** 10:15 12:13 22:18 33:7 53:24
54:23 57:5
**actions** 33:21 51:14 53:17 60:15,19,
20
**active** 40:1
**activity** 72:19,24
**additional** 64:18
**address** 39:22
**addressed** 36:4

**adjourned** 77:22

**administrative** 15:11 26:21 31:4,12

**administrator** 57:8 58:18 66:5,13

**administrators** 66:11

**admonition** 69:9,13,19,25

**adult** 60:23

**adverse** 48:9

**advice** 11:2,5 24:17 35:10 62:19

**advised** 25:17,19 41:25 42:2 49:8 77:12

**affirm** 4:9

**affirming** 59:13

**agreements** 75:10

**ahead** 5:5 23:15,21 26:13 72:20

**Aird** 16:25

**allegation** 21:25 57:17 61:20

**allegations** 10:6,15 11:24 16:2 17:3, 7 18:23 19:4 22:2 31:22 56:20 57:3, 12,15 58:18 63:14 69:10 73:22

**allege** 15:9

**alleged** 9:10 74:25

**allegedly** 10:21 14:8 15:17,19 57:8 72:24

**alleges** 18:23

**alleging** 61:25

**allowed** 27:3

**alternation** 66:17

**ambiguous** 24:7 49:11,23

**America** 62:22

**analysis** 22:17

**and/or** 41:10

**answers** 5:12 77:11,13

**Anthony** 57:23,24

**AP** 18:9

**apologies** 35:22

**apologize** 28:25 46:6 77:7

**appeal** 33:7

**appearance** 9:17

**appearing** 4:24

**appears** 27:7

**apply** 25:6

**approval** 68:21

**approve** 45:12

**approved** 45:19

**Approximately** 8:4

**APS** 9:23

**arbi** 46:20

**arbitrating** 48:25

**arbitration** 38:12 39:2 41:21 42:19 46:8,11,15,24 47:10,20 49:7,9 51:9 52:4,9 53:25 55:2 56:9 75:6

**arbitrator** 41:24 48:9,14,17 55:6

**arbitrator's** 59:4

**arbitrators** 48:13

**area** 69:24 70:3,7,9,12,20

**areas** 24:10

**Armstrong** 5:3

**arrived** 75:11

**assistant** 65:17,23 67:20 68:3 69:20

**assume** 20:2 30:5 39:5 44:10,22 46:9 47:3,19,24 51:13,18 60:7

**assuming** 45:15

**attend** 69:7,8

**attended** 71:13,14

**attorney** 5:9 23:12 36:3 39:1

**attorneys** 4:21 56:8

**audio** 4:17,20

**author** 59:7,8

**authored** 33:10,12

**authority** 42:1

**Avenue** 4:7

**aware** 9:25 10:3 11:18 12:14 16:1 17:7 19:4,5,25 41:21 42:17 45:4 48:9 49:8 50:4 52:12 53:9 54:6 56:14 57:3, 4,7,14,19 58:20 61:1 63:18 65:6,8 68:1,5 69:9 72:2,6,17,22 73:7,22

**B**

**back** 7:25 13:15 15:21 16:2 35:4 37:21 42:14 52:20 53:20 54:23 56:13, 25 57:18 60:23 61:11 77:5

**backing** 20:4 21:20

**backup** 46:6

**bad** 49:15

**Barely** 75:13

**bargaining** 65:21,23 66:5

**barrages** 50:24

**based** 14:17,21 25:9 28:13,20 31:25 32:7 37:7 38:11 39:21 40:3,7,9 41:12, 13 42:3 48:13 51:13,24 62:18,19 66:20,22 67:1,12,16,17 69:22 71:7 74:10 75:21

**basically** 19:22 26:24 27:4 31:7 46:21 53:12

**basis** 9:4

**beginning** 4:23

**behalf** 5:1,4 36:20

**believed** 10:9,10

**BESBY** 34:25

**big** 9:3 21:20 43:25 65:12

**bit** 9:5 43:13 77:8

**blah** 35:9

**board** 22:23 31:10 32:16 50:25 51:2 54:22 58:17 59:20 61:14 62:21 68:21

**boardroom** 9:18

**bottom** 15:14 52:23

**break** 61:4 64:5

**breaking** 48:21

**briefing** 17:14

**bring** 76:9

**brought** 73:12

**bubble** 26:1

**bunch** 15:10

**Busby** 4:24 5:7,8,9,16,18,22 6:2 13:13,16,18,22 14:1,3,6,9,11 16:10 18:13 23:11,22 26:8 29:15 35:19,21 37:24 38:3,7 40:21,23 43:10 45:23

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: Busby's..created

46:2 49:25 61:3,7 64:7,12 65:19,25
68:25 71:20 72:10,15 75:21,24 76:19,
24 77:7,17,19

**Busby's** 48:4

---

## C

**called** 68:12

**calls** 28:22 45:22 49:24 54:1,24 65:19
72:14

**campus** 57:4

**capacity** 21:3

**care** 61:6

**case** 10:23 11:3 20:6 23:10 24:13
25:15,17 29:20 30:7 45:5 47:20 51:14,
16,19 53:10 55:5 56:17 58:10 67:1,23
68:8 69:11 72:14 73:11 75:25

**case-by-case** 24:2

**cases** 28:3 51:23 58:11,13 70:1 76:3

**cc'd** 16:24

**Cellucci** 15:20

**CEO** 24:3,8

**certified** 4:19

**cetera** 22:9 53:20

**chain** 17:25 48:23 54:19

**chance** 41:2 50:15

**change** 44:23

**charge** 13:2 48:25 68:20

**chief** 18:3 24:12 45:2,3 53:7 76:3,6

**chiefs** 24:9 76:4

**choice** 52:10

**choices** 56:13

**choose** 77:12

**choppy** 64:20

**Chris** 53:4,6 75:5,13 76:12,22

**circumstances** 12:24 23:10

**claims** 31:16

**clarification** 5:24 6:14

**clarity** 6:2

**Clark** 6:11,12,18 7:1,6 20:10 66:1

**clause** 56:16

**clean** 64:5,6

**clear** 40:11 49:14 51:8 59:12 60:3
63:7

**client** 10:15 12:14 16:2,19 17:3,7
18:24 19:4 23:8 24:12 25:7,18 26:7,22
29:21 30:25 31:7,23 32:12,15 38:12
39:25 41:21 42:19 44:1 46:7 47:10
48:15,18 49:16 50:5,9 52:3 53:15,23
54:22 55:20 56:15 60:9 61:13

**client's** 23:5,19 30:7 36:3,20 39:1
40:9 45:5 63:21

**closer** 21:12

**collected** 42:5

**command** 48:23 54:19

**comment** 55:21 77:13

**committee** 74:18

**communicating** 36:9

**compacting** 35:13

**company** 24:3

**complained** 11:25

**complaining** 61:22,24

**complaint** 31:20 44:1,6 45:5

**complaints** 61:14,16 63:21 65:6,8

**comply** 31:9

**concerns** 18:4

**concluded** 42:20 67:17

**concludes** 77:2

**concluding** 48:14

**conclusion** 13:19 54:2,25 65:19

**conduct** 31:9 34:11 35:15

**conducted** 34:4,13

**confer** 10:10 23:23

**conferring** 66:24

**confidant's** 15:23

**confirm** 64:19

**confused** 59:4

**conjunction** 73:12

**considered** 65:17 66:10

**consistent** 13:5 50:8 71:24

**constitutional** 9:7,10,11,14

**constructed** 51:24

**consultation** 67:2

**context** 33:15

**contract** 40:1

**contradicting** 59:5

**conversation** 64:12

**conversational** 6:5

**conversations** 75:4,9

**coordinating** 48:25

**copied** 14:25 42:15 43:18

**copies** 13:23

**copy** 11:21 12:15 77:9

**correct** 10:25 11:14,15,17 12:6 16:7,
8,19,20,23 17:1,5 18:21,22 19:1,20,
21,24 22:4 25:14 27:2 29:5,7 31:12,13
32:22,23 33:6,8,9 36:4,5 37:13,14
39:23 43:20,21,24 44:3,7 49:18 52:5,7
53:5,16 55:22 59:21 60:18 61:15 65:3
69:5

**correction** 59:9

**correctly** 50:23

**could've** 76:22

**counsel** 10:11 11:4 12:12 23:24
24:19 25:14 27:10 35:6 36:13,17,22
40:12 41:10 45:1,3,16 49:4,7 51:24
53:7 55:7,11 56:11,15 66:22 67:3
73:13 75:5 76:7

**County** 4:2 5:2 6:11,12,18 7:1,8,9
10:1 14:18 20:10,12 21:21 23:4,20
28:21 39:20 49:10 53:8,15 56:20 58:4,
5,9 63:1 64:3,11 67:19 68:1 69:18
71:16,18 72:7,19,23 73:7

**coup** 62:1

**couple** 14:5

**court** 13:19

**courtroom** 5:14

**craft** 60:7,21

**crafted** 33:23 41:9,10,12,18 57:2

**created** 4:19

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: creating..drugs

**creating** 69:3

**criminal** 56:21

**CROSS** 64:23

**Cuoco** 73:14,23

**current** 7:6

**curriculum** 24:15

**cut** 64:6

---

**D**

**D-A-V-I-S** 4:16

**date** 4:5 37:4 43:1,2

**dated** 37:12 43:20

**dates** 12:12

**Davis** 4:8,12,15 5:4,8,15,17,21 6:1,7 13:15,17,21 14:12 16:12 18:15 23:12 26:14 29:14 34:20,22,24 35:1,3,23 37:6,8 38:1,5,8 40:24 43:12 47:25 48:2,5 52:21 61:6,13 64:8,9,10,16,22 70:5 72:12 76:16,25 77:3,7,15

**Dawn** 14:22 16:24 29:3

**day** 15:4 28:12 46:20

**days** 43:22 77:9

**deal** 67:12

**dealt** 49:21

**dean** 65:22 66:2

**deans** 66:10

**decide** 41:24

**decides** 58:13

**decision** 12:6,7,10 26:11 34:3 40:15 41:12,13 45:4 48:9 58:16 59:4 66:18, 20,24

**decision's** 27:6

**decisions** 26:3,6,7,9 62:11

**deep** 13:4

**defamation** 60:4,8

**defaming** 60:9

**defend** 60:16

**defendant** 67:22 70:5 72:13

**deny** 45:5

**department** 44:16 45:16,19 47:14 56:21 68:11,16,18

**department's** 68:19

**departments** 65:13

**depend** 70:23

**dependency** 5:13

**depending** 21:25 22:5,14 70:25 71:3 74:21

**depends** 70:14,22

**deposed** 8:13

**deposition** 4:3,6,8,18,19,20 5:10 8:16,24 13:20 65:12 77:3,8,10,11,22

**depositions** 5:11 6:5

**deputies** 25:13

**deputy** 7:4 10:9 12:7 13:2 17:10,18 19:9 21:12 24:13,15 28:4 30:5 32:10 34:4 35:6 36:25 44:24 53:7 68:11,14 71:15,16

**derived** 10:24 25:7

**describe** 9:9 41:8 70:2 74:8

**describes** 11:12 53:13

**deserve** 57:13

**detail** 17:21

**details** 10:13 24:5 29:19,21

**determine** 74:18

**determined** 48:18 71:1

**determining** 12:12

**difference** 43:6

**difficult** 24:21

**dig** 57:16

**direct** 5:6 23:14 26:12 69:23 76:4

**directed** 26:22 27:9

**directly** 44:25 76:4

**director** 44:16,17

**discharge** 36:19

**disciplinary** 10:15 22:18 33:20 57:5 71:23

**discipline** 21:21 22:8 24:15 25:20 49:16,20 50:6 57:5 67:20 68:3 70:12, 21 71:2 74:5,6,9

**disciplined** 70:14

**disciplines** 19:6

**disciplining** 72:18,23

**discuss** 22:6 27:9 34:3 35:25

**discussed** 8:21,23 11:25 53:14

**discussion** 29:10 34:4,8 35:3,5 61:13 71:6

**discussions** 34:7

**dishonesty** 31:10

**dismiss** 41:22

**dismissal** 30:25 32:7,14 33:16 37:12 38:13 40:5,10 46:8 54:22

**dismissed** 31:8 33:4

**dispute** 10:1,3,5 38:13 61:23

**disregard** 72:7

**distinction** 70:17

**district** 4:2 5:2 6:11,13,19 7:2,8,9 10:1 14:18 17:8 19:20 20:12 21:22 22:19 23:4,18,20 24:5 25:7,9 26:2 27:3,5,12,16,20 28:6,21 32:17 33:4,20 35:11 39:20 41:22 42:6,19 44:5,18 48:10,21,24 49:10,16,21 50:6,10 52:4 53:8,17 55:21 56:11,16,20 57:16 58:4, 6,9 60:10,15 61:23,24 62:8 63:2,8 64:4,11 65:4,12 67:19 68:2 69:18 70:6 71:6,16 72:7,19,23 73:8

**district's** 48:15 56:15 57:14

**districts** 33:14

**document** 11:10 14:15 17:9 18:17 26:18 28:8,11 30:22 31:25 32:21 38:15 41:4,8 43:15 46:4,5 50:20 52:25

**documentation** 69:22

**documents** 11:6 28:3,5,7,12 40:25 69:3

**door** 21:15

**Doran** 14:23 16:25 29:4 44:15 45:13 47:13

**Dotson** 5:1

**drafted** 28:21 29:1

**drafts** 28:17

**drug** 63:13

**drugs** 15:19,21 16:2 31:20,23 57:4,9,

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: due..good

18 58:18 59:3 60:23 61:21

**due** 12:16 16:19 18:20 23:3,18 24:18 72:7

**duties** 6:18 17:3 18:24

**duty** 15:11

---

**E**

**E-DEPOSITIONS** 4:4,21

**e-mail** 18:8 39:22,25 40:3,7,11 51:25 52:1 56:4,5,24,25

**e-mails** 17:22 50:24

**earlier** 64:25 71:20

**early** 74:4

**Eastern** 4:7

**effect** 72:22

**effective** 33:4 43:2

**electronic** 4:17

**eligible** 44:5

**employed** 6:10

**employee** 25:21 39:20 44:5 54:13 65:18 73:8

**employee's** 72:7

**employees** 15:2 17:8,23 35:11 40:19 50:6 51:21 70:20 71:24 72:19,24

**employment** 10:1 27:6 53:1,14 61:23 65:1 71:16

**end** 32:20 33:1

**ended** 40:1 63:8

**entire** 44:17

**essentially** 44:4

**established** 18:1

**Ethical** 15:10

**event** 68:6 71:1

**eventually** 46:14

**evidence** 5:19 67:9,11,12,14,17

**exact** 19:12 24:5

**exactness** 10:22

**EXAMINATION** 5:6 64:23 75:23

**excuse** 34:17

**exercising** 60:16

**exhibit** 11:9 13:14 14:13 16:11,13 18:13 26:14 34:17 35:17,18,20,21 37:15,25 38:1,21 39:14 40:23,25 43:12 46:2 50:13 52:20 55:15

**exhibits** 27:20 68:25 69:1

**experience** 14:18 28:20

**experts** 24:10

**explain** 6:21 32:16

**explaining** 5:11

**explanation** 77:8

**extent** 76:14

---

**F**

**facts** 12:23 22:18 23:9 34:10 51:16 66:21,22

**failed** 14:8 15:17

**failure** 31:9

**fair** 5:25 13:11 19:23 21:19 25:8,25 26:20 28:13 31:1 32:11 39:2,13,24 45:18 48:8,12 49:5 50:12 53:13 62:2, 13,23 68:13 75:4 76:24

**fairly** 61:23 64:21

**false** 31:11,16

**familiar** 17:9 23:3 24:4 57:23

**February** 4:5

**felt** 36:21

**figure** 57:17

**file** 30:24 31:16 44:6

**filed** 31:19 44:1,8

**filing** 36:19

**final** 40:1

**find** 73:19

**fire** 37:4

**fired** 22:4 36:21 37:2 45:5 48:18

**firing** 42:19

**firm** 4:22

**firsthand** 47:22

**Fletcher** 4:1,3,13,17 5:5 35:20 46:3 61:9,11 75:18 77:2,5,18,20

**flexibility** 76:3

**follow** 33:8 35:7 64:18 75:20

**Ford** 14:21 16:21 20:14,15 31:17,20, 24 57:3

**form** 33:13,18,20 42:6,7,10

**forward** 30:18 34:4

**found** 55:2

**foundation** 63:17 76:14

**fourth** 31:14

**friends** 20:24

**front** 11:8 40:3 52:15

**full** 4:14 24:25

**full-time** 8:1,2

**future** 77:14

**FYI** 13:12

---

**G**

**gather** 25:10

**gave** 15:21 57:8

**general** 10:4,11 11:4 13:1,7,8 23:24 24:19 25:13 35:6 36:13,17,22 41:10 45:1,3,16 49:4 51:23 53:7 55:7,11 56:15 66:21 67:2,18 72:2 73:13 76:6

**General.counsel** 48:24

**generally** 22:7 56:1 70:2 71:22 76:10

**germane** 33:24

**give** 4:10 13:19 24:17 41:2 47:2 54:22

**giving** 12:1 16:2 60:23

**glad** 5:23

**global** 17:13 18:4 35:8

**Globally** 10:16

**Gonzales** 63:5

**Gonzalez** 14:23 16:25 19:13,22 20:6, 11 21:6 26:21 28:18,19,21 29:1 32:22 33:11 38:13 40:10

**Gonzalez's** 12:5,9 41:13

**good** 21:19 24:24 70:17

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: grading..kinds

**grading** 15:11

**Great** 55:14 56:6

**grievance** 36:19

**gross** 31:10

**ground** 5:11 68:7

**grounds** 23:8 74:22

**group** 66:20

**guess** 47:4

**guidance** 24:5 38:15

**guidelines** 35:7

**guy** 13:24 23:2 76:11

---

**H**

**Hall** 57:23,24,25 63:19

**hand** 4:9

**handed** 58:18

**handing** 57:18

**handle** 11:2

**handling** 17:19 19:22

**happen** 18:11 26:10 52:9 74:16

**happened** 11:16 46:14

**happening** 17:24

**hard** 30:9 42:10

**hear** 5:23 11:24

**heard** 63:22 74:1

**held** 4:6

**high** 10:16 11:14 13:9 16:3 17:4 23:23 25:20 34:9 57:11

**higher** 10:9

**hire** 24:9 58:13,16

**hired** 20:12 57:21 58:9 65:17

**hiring** 53:20

**hold** 57:22 66:1

**Holland** 59:19

**home** 26:25

**honest** 15:6 23:6

**Honestly** 62:21

**house** 13:3

**HR** 24:20 25:22 27:25 40:12 44:19 45:2 49:7

**Huckaby** 14:22 16:24 29:4

**Hug** 16:3 17:4 18:25 20:16 21:2 57:11

**human** 23:24

---

**I**

**idea** 54:3 73:21

**ideas** 47:2

**identify** 4:21

**IDP** 13:25 69:1,7,8 71:9,11,14,15

**incident** 15:17

**incidents** 65:1,5

**including** 69:1

**incorrect** 62:6

**individual** 23:9 67:22 70:5 72:12

**inefficiency** 15:12

**informants** 56:21

**information** 25:10 62:18 71:7 73:19

**input** 35:10

**inquiries** 56:20

**insubordination** 15:12 31:8

**interim** 7:23 8:1,6

**interrupt** 6:3 25:11

**interventionist** 6:20,22

**interviewed** 10:8

**intimate** 10:13

**intimidated** 73:23

**intricate** 10:17

**investigate** 60:22

**investigated** 58:19

**investigation** 10:7 11:22 12:16 22:17 27:9 29:23 30:6,8,14 32:8 34:5,9,13 35:15 41:17 42:3 57:15,19,21 58:6,21 63:9,13

**investigations** 30:1 56:22 58:10 62:16

**investigatory** 14:19 16:18 18:20

**involve** 31:23

**involved** 13:11 20:11 40:13 41:17 47:12,16,19,20 75:8

**involving** 11:25 15:18 16:2 24:11 41:22 56:19

**irregulations** 74:16

**isolate** 61:18

**isolation** 25:4 27:18 68:8

**issuance** 43:2

**issue** 17:19 18:9 48:23 49:1 53:1 58:19 59:4 69:25

**issued** 14:20 15:1 16:21 19:13 31:3 40:2 41:20 42:17 43:22 55:6 63:18

**issues** 10:20 17:15,19,23 18:4 19:5,9 24:4,11 25:21 35:11 53:15

**issuing** 28:14 69:21

---

**J**

**January** 53:2 55:17,18,20

**Jessica** 15:20,21

**job** 6:18 7:6,20 26:25

**join** 72:15

**joined** 32:15

**July** 7:18 18:19 19:3 26:20 30:7 33:5 38:25 43:20 44:1

**jump** 66:12

**June** 13:23 17:6 30:24 32:4,11 37:12 40:2

**Justin** 5:1 13:24 64:10

---

**K**

**Katherine** 5:3 8:17,21

**Katy** 59:19

**kid** 20:18 21:15,16,18 57:18

**kids** 6:22 57:13

**kind** 9:3 18:1 19:19 22:17 24:4 27:6 32:12 44:25 49:3,4 64:19

**kinds** 33:20

**Kirsten** 12:11

**knew** 32:6 50:11 56:12

**knowledge** 10:23 23:9 25:6 27:23 33:19 37:9 47:22 63:24 67:23 76:1,2

**Kristen** 12:8,9 19:17,25 20:2 21:8,11 47:16

## L

**labor** 28:1 44:16 45:16

**Lack** 63:17

**lacks** 76:14

**lane** 71:19

**Langton** 36:3,18 39:1 42:15,16 53:14 75:5

**Langton's** 36:9

**largely** 48:9

**Las** 4:7 6:9

**Lauren** 14:21 16:21 17:10 20:14,15 31:17,24 57:3

**Lauren's** 21:18

**law** 5:1 33:23 42:18 46:22 48:21 66:22 74:10

**lawsuit** 9:4

**lawyer** 36:16 52:15 58:3

**lead** 60:15

**learned** 65:11

**leave** 26:21 29:11,21 31:4

**led** 10:15 56:9

**left** 7:16 8:9 77:7

**legal** 12:12 13:4 18:6 19:10 22:6 25:22 27:10 30:5 34:3,8 38:15 39:6 40:12 44:20 45:15,18 49:3,6,7 54:1,24 58:13 62:19 65:19 67:17 68:5

**legally** 35:8

**letter** 11:19 13:25 16:1,19 28:14,18, 19 29:1 33:13,18 34:18,24 36:3,6,10, 11,17,22 37:1 39:1,4,25 41:20 42:6,7, 10,18 45:7,8 50:22 51:24 55:18,23,24 59:9,22 60:1,7,20,21 62:7 67:15 69:12,19,25

**letters** 33:20,22 36:16 43:1,7 62:8 66:17 69:9,15

**level** 10:16 13:9,10 16:6 19:19 23:23 25:20 26:10,12 29:8 32:14 34:9 74:12

**Lewis** 29:4 39:17,25

**liaison** 47:9

**license** 22:11 74:10,23,24

**light** 64:13

**Lisa** 68:20

**list** 17:12

**live** 6:8

**lives** 20:18

**LLC** 4:4,21

**located** 4:4

**location** 8:19

**lodging** 61:14

**Lombardo** 75:13,25 76:18

**long** 6:12 7:10 15:4 20:8 46:21

**longer** 44:5

**looked** 57:9

**lose** 22:11 74:23

**lot** 9:24 30:10 64:12,13,14 65:11

**lots** 46:22

**Luke** 4:24 5:9

## M

**M-A-R-C-I-A** 4:16

**made** 12:10,14 19:25 26:12 27:6 34:3 40:15 45:4 57:8,12 58:17 65:6,8

**maintenance** 23:2

**make** 13:22 14:4 26:2,9 66:9,18,23 67:14 69:22 77:11,12

**making** 26:7 31:11

**manage** 76:2,3

**manager** 7:4 25:15 28:4

**managing** 30:10 53:9 55:11 75:25

**manner** 74:14

**Marcia** 4:15

**marijuana** 12:1,19

**mark** 40:23

**marked** 11:9 13:14 14:12 16:10 26:14 32:25 35:17 38:21 39:14

**matter** 4:2 56:9 60:24 75:1

**Mcneill** 12:8,9,10 19:25 21:8 32:10 47:16

**Meaning** 21:24

**means** 6:21

**meant** 60:6

**meet** 18:3 50:24 51:3,5,12,16 56:5

**meeting** 16:19 18:20 34:3 55:1 57:8 58:17 61:14 62:22 71:9,11,14 73:12 75:12

**meetings** 32:16 55:21 69:7,8

**member** 15:18 44:9

**mentioned** 74:7

**mentor/confidant** 15:22

**message** 57:2

**met** 8:17 17:18

**Michael** 36:3 39:1 75:5

**middle** 11:13

**mind** 14:3

**minute** 20:4 21:20 46:7 52:20

**misconduct** 17:3,7 18:24 31:10

**misstates** 76:14

**months** 6:17

**move** 30:18 34:4

**Ms.olsen** 9:15

## N

**nature** 61:16 71:1 74:21,25

**necessarily** 66:18 74:6

**neglected** 15:11

**negotiations** 56:7

**Neil** 75:12,14,25 76:5,6,11,15,21

**Nevada** 4:5,7 6:9

**nondisclosure** 56:16

**nondisparagement** 56:16

**normal** 36:15 69:17,19

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: notes..principal

notes 64:20

notice 14:19 16:18 18:2,20 22:8 26:21 30:25 31:4 33:16 37:12 38:13 40:9 41:22 43:23 46:7

noticed 70:6

notices 69:1

noticing 4:23

NR 74:11

NRS 33:8 34:1 37:19 74:12

number 11:9 13:14 14:13 16:11 32:25 70:8

numerous 41:17

**O**

oath 5:13

object 23:13 49:22 67:21 76:13

objection 23:7,21 24:7 26:6 28:22 45:20 49:11 54:1,24 58:22 63:17 65:19,25 68:4 70:5,10 72:9

objections 72:20

objects 23:15

obligation 54:21

obligations 52:12

occur 68:6 74:9

occurred 46:11 65:5 75:1

office 11:4 12:12 16:7 23:24 24:19 25:13 35:6 36:12,17,22 41:10 45:1,16 49:4 66:21 67:2 71:6 73:12 76:6

officer 4:3,19 10:10 45:2 48:24 55:7

official 4:18

Olsen 4:2,25 9:17,25 11:13,19,25 12:23 49:9 50:24 53:10 65:1,6,8,17 69:10 71:23 73:22 76:1

Olsen's 5:9 9:4 10:23 11:3 23:10 55:5 56:8 67:23 72:13 75:1,5

Olson 26:22 31:1 43:25

one's 43:3

ongoing 41:21

Oops 75:19

operation 68:9 70:24

oppose 26:6 70:4

opposed 50:5

opposite 51:23

options 52:18

order 55:17 56:17

organization 25:2,7

outcome 46:15,17,18,19 57:19 58:20

oversee 68:14 71:1,2

overseeing 68:12

oversees 20:3

**P**

paid 26:25 29:11

paperwork 9:1 14:21

paragraph 14:8 15:15 31:15 32:25 37:19,20,22 59:2 60:2,3,14

parental 7:3

Parks 5:3 23:7,21 24:7 26:5 28:22 29:13 34:17,21,23 35:2 37:5,7,9,21, 23,25 38:2,4,6 39:15 43:11 44:13 45:20,22 47:4,24 48:1,3 49:22 54:24 56:11 58:22 61:5,8 63:17 67:21 68:4 70:4,10 72:9,11,20 73:16 75:20 76:13, 17,20 77:14,16

part 10:7 31:22 34:6 40:16 62:13 63:3

participate 46:24

parties 35:6

parts 59:5

party 4:22,23

past 71:13

Patrick 15:19

pay 26:21 29:22 31:4 40:1,5,9,14 53:20 54:23

payroll 40:17

pending 11:22 27:9

people 10:24 20:5,23 21:10 23:5,19 26:2 29:10 30:10 34:12 41:17 48:7 49:24 50:10 59:10 62:10,15 65:13 71:3

perfectly 65:16

performance 10:20

period 19:18 30:7

perjury 5:13

person 65:16 66:14,25 67:6 69:21

personal 21:4 37:9

personally 13:11 20:17

pertains 24:14

picture 9:3 21:20 24:25 43:25

piece 34:8

pieces 34:12 61:1

place 23:5,7,18 56:10

plaintiff 4:24

PMK 49:23 70:6 72:11

point 6:14 10:8 16:5 32:3 40:24 42:25 49:4 55:14 65:18 70:17

Police 56:21

policies 67:19 68:2,12,14,16,20,21 73:1,5

policy 72:6,17,22,25 73:1,7

position 23:5,19

possessions 27:4

possibility 19:9

potential 74:19

power 67:4,8,12

practice 13:7,8 18:2 27:12,16 28:14 49:10 51:21

practices 49:21 63:1

prepare 8:23

preparing 69:14

prescribed 31:10

present 4:21

president 50:25 51:2 59:20

press 63:25

pretty 6:5 55:24 64:6,15

prevailed 52:4,9

previous 58:9

principal 9:23 18:9,25 20:9,16 21:2 22:3,19 25:16 28:4 31:17,20 65:17,23 67:20 68:3 69:19,20 71:2

**principals** 17:12,15,23 21:21 25:21

**principle** 17:4

**printed** 13:23

**prior** 27:20 49:9 58:9 65:1,5,9

**privy** 75:4

**probationary** 65:18,21 66:14

**procedure** 15:11 72:6,18

**procedures** 67:19 68:2,13,14,17

**proceeding** 4:23 5:19 49:3,6

**proceedings** 42:19 71:23

**process** 16:19 18:6,20 23:4,18 24:18 46:10,16 50:7 54:18 67:16 68:6,7 72:2,5,8

**processes** 71:21,22

**professional** 21:3

**professionally** 58:2

**progressive** 21:21 22:1 74:5,7

**prohibiting** 42:18

**property** 27:3

**protesting** 36:19

**protocol** 36:15

**provide** 67:9,11

**provided** 18:2 38:15 67:13

**public** 55:21 56:2 57:8 60:16

**publicly** 63:16

**pull** 6:22

**purview** 24:16

**put** 27:15 33:23 65:23 66:14

**Q**

**question** 5:25 23:16 24:2 25:6 28:23 49:15,23 54:6 67:25 71:20 72:21 75:21

**questioning** 71:25

**questions** 5:12,23 8:20 16:14 23:13 26:16 30:20 35:8,24 38:23 64:12 65:14 75:17,18 77:1

**quick** 15:16 61:4 64:15

**quickly** 64:21

**quote** 74:11

**quoting** 71:22

**R**

**radar** 19:19 32:13 40:18

**raise** 4:9

**ran** 68:25

**random** 61:17

**read** 15:15 36:11 37:18 45:14 46:20 77:10

**ready** 8:15,22 16:13,16 18:14 30:19 35:25 38:22

**real** 15:15

**reasonable** 31:9

**reasons** 31:8

**reassign** 12:6

**reassigned** 11:13,22 12:15

**reassignment** 12:24

**recall** 7:16,19 9:20 11:18 25:17 29:13, 23 30:3,6,8,14 34:2,6 37:10,11 39:4,5 41:10,23 42:21,22 43:16 44:10,19 45:7 46:5,9 47:11 48:14,16,17 50:23 51:13 52:22 53:11 56:18 59:23,24 61:17,24,25 65:7,10 68:19 71:25 72:4, 25 73:9 75:2,7 76:17,21,23

**receive** 17:14 22:8 34:18,22 35:10 77:9

**received** 12:15 34:14

**receiving** 39:4 69:12

**recently** 6:15,16

**recognize** 18:17 41:4 43:15 46:4 50:17 52:21

**recommend** 30:25 54:22 67:1

**recommendation** 32:7,24 33:3,16 34:10,14 35:4,5 36:19 37:12 38:13 40:10 41:22 46:8 66:25 67:2

**recommended** 40:5

**recommends** 31:7

**record** 4:1,18 5:12 6:2 42:25 61:9,11 77:3,5,21

**recorded** 4:8 77:2

**recording** 4:18,20

**REDIRECT** 75:23

**refer** 77:10

**referring** 60:20

**registered** 15:18

**Regulation** 31:12

**regulations** 22:7

**rehire** 54:22

**Reich** 53:4,6,14 75:6

**relates** 50:11

**relations** 28:1 44:16 45:17

**relationship** 20:5 63:7

**release** 63:15

**released** 63:25 64:2

**relevance** 23:8 72:11

**relevant** 72:14

**rely** 24:12

**relying** 26:2

**remember** 11:21 13:6 29:21 30:13 32:9,15 36:6 44:20 47:12 48:20 54:4, 5,6 61:16 70:24

**removed** 71:17

**Reno** 4:5

**repeat** 23:16 28:23 67:25 72:21

**rephrase** 5:24

**report** 14:8 15:17 20:1 44:25 63:9,13, 16,18,22

**reported** 15:20 44:19,20 45:2 72:19, 24 74:14 76:4

**reporter** 13:19

**reporting** 31:23

**reports** 12:11 17:10,11 19:17

**represent** 4:23 11:12 17:2 30:24 36:2 38:25 53:13 64:11

**representation** 18:21 31:1 36:11 39:2 62:3

**representative** 27:10

**represented** 18:19

**request** 56:5

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: requested..standard

**requested**  46:7 56:15

**requesting**  39:2

**required**  34:1

**requirements**  23:4,18 24:18 25:6
31:9

**resolution**  53:14 56:8

**resolve**  53:1 56:17

**resolved**  63:9

**resources**  23:24

**respect**  24:8 67:20 68:2 69:10 70:20
71:24 74:8

**respond**  41:19 56:2

**responded**  56:25

**response**  41:9,11,18 42:8,11,12,15
45:11,12,14 52:2 55:23 56:2,4,24

**result**  53:24 55:2

**retaliated**  48:15

**return**  50:13 52:10 55:15 59:3

**returned**  31:20

**review**  26:13 30:19 38:22 45:12 77:11

**reviewed**  45:19

**rights**  9:8,10,13,14 60:16 72:8

**Riley**  73:14,23

**rise**  16:6

**risen**  13:10 19:19

**Road**  4:4

**Roger**  12:5,9,11 14:23 16:24 17:10,11
19:13,17,22 20:2,3,6,7,8,9,11 21:6
26:21 28:18,19,21 29:1 32:21 33:10
41:13 63:5

**role**  54:14 64:13 70:2,16 71:14

**Rossi**  15:19

**rotation**  18:4

**rude**  62:24

**rules**  5:11 15:10 22:7

**run**  8:6 13:3

--------

**S**

**S-C-U-R-R-Y**  68:22

**Sabrina**  15:20

**safety**  22:3

**Sally**  4:3

**Sandhill**  4:4

**Sandra**  16:25

**scale**  69:22

**school**  4:2 5:2 6:11,12,19 7:2,8,9
9:20,21,24 10:1 11:13,14 14:18 15:10,
23 20:12 21:22 23:4,20 28:21 32:15
39:20 48:24 49:10 50:6 53:8 55:21
56:20 57:11,12 58:4,5,9 59:20 60:10
61:14 63:1 64:4,11 65:22 67:19 68:2
69:18 71:2,16 72:7,19,23 73:7

**schools**  17:15 20:3 24:14 70:7,8,13

**scope**  49:20

**Scurry**  68:20,22

**seek**  24:5 38:12

**Selene**  39:17

**send**  18:8 42:14

**sending**  50:24

**sense**  69:23

**sentence**  27:18 31:15,18 59:7,8
60:15

**separately**  51:2,3

**service**  33:4

**severity**  74:21

**share**  25:9

**she'd**  45:5

**she'll**  20:1

**shed**  64:13

**sheet**  17:14,16

**shipped**  45:8

**shortly**  63:8

**show**  13:13 38:20 62:21

**showing**  55:21 61:14

**side**  13:3 68:8,9 70:24,25

**sign**  56:15 62:8 69:19 74:12 77:10

**signature**  41:6,7 50:19

**signed**  28:19 32:21 33:12 41:12,18
53:4 59:9,17 62:7 66:17

**signing**  59:13 67:15

**similar**  28:3,5,7 43:1

**similarly**  50:10

**Simon**  59:19

**sit**  10:19 75:9

**sitting**  9:16

**situated**  50:10

**situation**  11:19 12:23 13:11 16:1
19:23 25:2 32:2,5,12,16 33:24 39:9
51:6 54:4 55:12 71:4 76:12

**situations**  49:21 67:6 74:6

**slightly**  41:23 68:5

**solemnly**  4:9

**sort**  67:4

**sound**  35:8

**sounds**  71:9

**source**  13:4

**South**  4:7

**speak**  63:4

**speaking**  9:21 10:16 76:10

**specific**  17:22 23:3 24:18 25:5,6
29:20 30:6 33:22 51:15 52:12 61:18
74:11,12

**specifically**  13:7 30:17 31:19 51:18
56:23 57:11 61:25 68:11 70:3 76:15,
17

**specifics**  17:12 19:6 30:3 40:16
48:16 51:11 56:13 75:2

**speculate**  29:18 72:14

**speculation**  28:22 45:22 49:24

**spelled**  68:22

**spelling**  4:14

**spoke**  15:22

**spoken**  9:19

**sporadic**  61:17

**stacks**  28:12

**staff**  15:18 31:19 44:1,6,8 70:18,20

**standard**  13:7 18:1 27:12,16,20,24
28:14 49:9,20

--------

**standards** 15:11 63:1

**start** 5:10 11:8

**started** 7:19

**Starting** 9:3

**state** 4:13 15:23 17:11 54:7,9,11,13 59:9,10 60:4

**stated** 15:21 60:21

**statement** 56:19 57:7

**statements** 59:13

**status** 40:1,4 66:14

**statute** 38:6 52:13 54:21

**statutes** 48:19

**step** 44:25

**steps** 24:1 55:3

**stipulations** 75:11

**straight** 36:12 39:6

**straighten** 28:24

**struggling** 6:23

**student** 12:1 15:18,21 16:3 31:21,24 57:4,6 60:23

**students** 56:21 59:3 70:18

**stuff** 28:2 58:15

**style** 6:5

**subject** 5:13 21:21 46:8 49:16,20 50:6 58:10

**subjective** 20:23

**submitted** 16:6

**subsequent** 51:9

**substance** 10:14

**Suite** 4:4,7

**superintendent** 7:3,4,7,13,14,21 8:1,2,6,8 10:2,9 12:8 23:19 24:9,13 28:6 32:10 33:3 46:23 66:16 69:24 70:3,7 71:12

**superintendent's** 24:15

**superintendents** 70:9,12,21

**supervise** 70:7

**supervised** 20:9

**supervision** 69:22

**supervisor** 31:11,17 69:23

**supervisors** 26:12

**supported** 34:10 35:8

**supposed** 52:8 53:23 57:16

**supposedly** 15:10

**surfaced** 32:13

**surrounding** 12:24

**suspended** 26:24 40:5,9

**suspending** 40:13

---

**T**

**T-R-A-C-I** 4:15

**takes** 49:4

**taking** 5:10 6:5

**talk** 9:24 18:5 55:1 75:13 76:11

**talked** 75:12 76:15

**talking** 76:17,21

**teach** 74:24

**teacher** 7:4 18:9 22:18 26:11 66:4,12

**teachers** 21:20 22:8

**teaching** 22:11

**team** 24:10 41:14,15 47:6,14 62:10 66:24 67:5

**technical** 24:4

**technically** 28:8

**telling** 36:10

**template** 27:15

**templates** 27:20,25

**term** 24:8 26:6

**terminate** 35:5 42:1 43:23 66:18 67:6,7

**terminated** 42:2 62:5 73:8

**terminating** 72:18,23

**termination** 62:7,8 67:15 74:22

**testified** 64:25 69:2 71:10

**testify** 23:9 48:7 67:23 72:12 74:4

**testifying** 5:14

**testimony** 4:9 5:18 34:19 76:14

**testing** 11:22,23 12:16,25 22:11 74:7, 8,14,20 75:1

**thing** 21:4 26:15 35:24 60:22

**things** 10:21 18:2 22:1,10,14 25:19 28:24 33:22 46:22 64:14,17,18 65:14 74:13

**thinks** 9:7,13

**Thorndal** 5:3

**thought** 12:16

**thousands** 73:1

**threatened** 73:23

**threats** 22:3

**time** 4:6 5:22 7:5 11:19,24 12:3,4,13 15:25 16:22 17:6 19:3,18 23:12 29:22 30:7 34:1,2 38:12 40:4 41:20 42:1,17 44:8,17 59:22 61:10,12,18 64:8 66:8 71:18 74:1 76:22 77:4,6,21

**timeline** 46:22 48:21,22 55:4,7,8

**timely** 74:14

**times** 71:3 76:9

**title** 44:23

**today** 4:25 5:10,22 10:19

**Today's** 4:5

**told** 10:24 12:22 15:20 32:9 42:22,24 48:6

**tons** 29:25

**Traci** 4:8,15 5:4

**Tracy** 77:3

**train** 11:13

**transcript** 4:19

**transition** 44:22

**treated** 49:9,14 50:1,5,9 61:22 62:25 63:3,4

**treatment** 49:24

**trial** 5:19

**Trina** 4:2,25 5:9 26:10,22 30:25 36:16 45:7 62:21,25

**true** 57:12,17 60:24

**trust** 13:2

TRINA OLSEN vs Superintendent TRACI DAVIS
DAVIS, TRACI on 02/24/2020

Index: trusted..Zach

**trusted** 15:22

**truth** 4:10,11 10:21 39:8 59:16

**Turn** 60:14

**turnover** 27:4

**type** 17:21 67:12

**typical** 33:16

**typically** 17:10 18:3 66:15 71:2

---

**U**

**Uh-huh** 8:8 16:17 32:19 41:1 53:19, 21 77:16

**ultimately** 66:23

**underlined** 60:3

**understand** 5:14,20 9:4 10:14 36:18 38:12 51:11 55:4

**understanding** 9:6,9 10:5,18 20:5 32:1 33:25 36:8 40:8 46:18 49:19 51:4 52:8 53:23 54:20 56:7 64:14 66:13 67:18,23 69:18 74:8,20

**understood** 5:25 66:23 67:10,24 68:10 71:8 73:14

**unit** 65:21,24

**unlawful** 72:19,24

**unprofessional** 31:8

**upstairs** 76:3

**utilized** 71:21,23

---

**V**

**vacuum** 35:13

**vague** 24:7 26:7 49:11,23

**Vance** 5:1 13:25 14:2,4,7,10 35:18 49:11 54:1 64:10,17,24 67:24 75:16, 19 77:1

**variety** 58:11

**Vegas** 4:7 6:9

**versa** 67:7

**veto** 67:4,8,12

**vice** 67:7

**violated** 9:7,10,11,14 46:22

**violation** 11:23 12:17 22:11 48:18 74:19,21 75:3

**violations** 15:10 74:7,9,14 75:1

**Virginia** 14:23 16:25 29:4 44:15 47:3, 13

**vis-a-vis** 61:23 75:25

**visit** 9:20,21

**visual** 4:18,20

---

**W**

**walked** 21:15

**wanted** 51:3,4,12,16

**Washoe** 4:2 5:2 7:9 10:1 14:18 20:10, 12 21:21 23:4,20 28:20 39:20 46:21 49:10 53:8,15 56:20 58:4,5,8 63:1 64:3,11 66:4,11 67:19 68:1 69:17 71:15,16,18 72:7,18,23 73:7

**watch** 26:10,11

**ways** 31:16

**weeks** 55:18

**whistleblowing** 73:8

**Wilson** 15:21

**wondering** 23:17

**wonky** 7:23

**work** 4:4 6:4 12:11 21:12 24:10,19 25:4,10 27:25 40:12 54:18 55:6 62:16 66:21 68:5 74:24

**worked** 7:1 30:5 36:25 46:9 62:18 65:3

**working** 18:5 19:10 20:3 21:2 25:22 26:2 56:12 66:21

**works** 22:19

**write** 59:22 60:1

**writes** 68:16

**written** 11:20 31:16 72:3,4

**wrong** 10:10

**wrongly** 36:21

**wrote** 59:24,25

**WSPA** 27:10

---

**Y**

**year** 7:23 20:10 31:3 40:2

**years** 7:11,16 8:3

**yesterday** 8:17

---

**Z**

**Zach** 29:4