# Exhibit 33

# Exhibit 33

1
2
3
4

Andrea L. Dooley, Arbitrator
5111 Telegraph Avenue #273
Oakland, CA 94609
(510) 719-3089
andrealdooley@gmail.com

5
6

IN THE ARBITRATION PROCEEDINGS

BETWEEN THE PARTIES

7
8
9
10
11
12
13

TRINA OLSEN,

              Employee,

and

WASHOE COUNTY SCHOOL DISTRICT,

              Employer.

(Letters of Admonition and Termination)

Case No.: LA-627-2018

DECISION AND AWARD

14

## INTRODUCTION

15
16
17
18
19
20
21

This dispute involves the grievance of probationary Assistant Principal Trina Olsen ("Employee" or "Olsen") pursuant to Nevada Revised Statutes 391.822 and 391.824. Pursuant to an agreement between the parties, the parties selected the undersigned Arbitrator to serve as the neutral decision-maker in this case. The matter came for hearing in Reno, Nevada, on November 1, 2 and 28, 2018. The parties submitted this matter to the Arbitrator after presentation of evidence and closing written briefs.

22
23

## APPEARANCES

24
25

For the Employee:          Michael Langton, Esq.
                           801 Riverside Drive
                           Reno, NV, 89503

26

For the Employer:          Virginia R. Doran
                           Director of Labor Relations

DECISION AND AWARD - 1

Washoe County School District
425 E. Ninth Street
PO Box 30425
Reno, NV 89520

## ISSUE

The parties have agreed to the following statement of issues:

1.  Did the District have just cause to issue two Letters of Admonition to the Grievant? If not, what is the remedy?

2.  Did the District have just cause to terminate the Grievant? If not, what is the remedy?

In addition, the Employee raises the following issues:

1.  What effect does NRS 391.660 have in this case? Specifically, how does NRS 391.660 affect NRS 391.800, 391.820, 391.822 and 391.824?

2.  Did the School District, by and through Superintendent Davis violate NRS 391.824 when she terminated Grievant before receiving a written report from the Arbitrator? If so, what shall the remedy be?

3.  Is Trina Olsen entitled to final and binding arbitration and not advisory arbitration?

4.  Did the District comply with the requirements of the collective bargaining agreement when it alleged that there was just cause to terminate Grievant? If not, what shall the remedy be?

## RELEVANT LAW

**NRS 391.820 - Probationary employment: Term; notice of reemployment; school district required to offer probationary administrator contract as teacher under certain circumstances; request for expedited hearing if dismissed before completion of current school year.**
Except as otherwise provided in NRS 391.825:
    1. A probationary employee is employed on a contract basis for three 1-year periods and has no right to employment after any of the three probationary contract years.

DECISION AND AWARD - 2

OLSEN - 000015

2. The board shall notify each probationary employee in writing during the first, second and third school years of the employee's probationary period whether the employee is to be reemployed for the second or third year of the probationary period or for the fourth school year as a post probationary employee. Such notice must be provided:

(a) On or before May 1; or

(b) On or before May 15 of an odd-numbered year so long as the board notifies the employee of the extension by April 1.

3. Failure of the board to notify the probationary employee in writing on or before May 1 or May 15, as applicable, in the first or second year of the probationary period does not entitle the employee to post probationary status.

. . .

8. A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section.**[1] If:

(a) A post probationary teacher who is an administrator is not reemployed as an administrator after any year of his or her probationary period; and

(b) There is a position as a teacher available for the ensuing school year in the school district in which the person is employed,

(c) the board of trustees of the school district shall, on or before May 1 or May 15, as applicable, offer the person a contract as a teacher for the ensuing school year. The person may accept the contract in writing on or before May 10 or May 25, as applicable. If the person fails to accept the contract as a teacher, the person shall be deemed to have rejected the offer of a contract as a teacher.

**NRS 391.822   Written notice of intent to dismiss probationary employee required; contents of notice.**

1.   If the superintendent intends to recommend the dismissal of a probationary employee to the board before the end of a contract year, the superintendent must provide written notice to the employee, by registered or certified mail, not less than 15 business days before making the recommendation to the board.

2.   The written notice required pursuant to subsection 1 must:

(a) Include a statement of the reasons for the recommendation to dismiss the probationary employee;

(b) Inform the probationary employee that he or she may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the

---

[1] Emphasis added.

DECISION AND AWARD - 3

OLSEN - 000016

American Arbitration Association or its successor organization, by filing a written request with the superintendent not later than 10 business days after receiving notice from the superintendent pursuant to subsection 1; and

(c)  Include notice of the laws which govern the employment of a probationary employee of a school district which are contained in this chapter.

3.   If a written request for an expedited hearing is not filed by the probationary employee pursuant to subsection 2, the superintendent may recommend the dismissal of the probationary employee to the board.

**NRS 391.824   Request and procedures for expedited hearing concerning dismissal of probationary employee; actions of superintendent upon receipt of report from arbitrator.**

1.   If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

2.   An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The only issues the arbitrator may consider are whether the dismissal of the probationary employee would:

(a)  Violate the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b)  Be arbitrary or capricious.

3.   At the expedited hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee, which must include, without limitation, at least one reason provided in the written notice required pursuant to paragraph (a) of subsection 2 of NRS 391.822. To rebut such evidence, the probationary employee must prove that each reason:

(a)  Violates the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b)  Is arbitrary or capricious.

4.   The written report filed by the arbitrator pursuant to subsection 2 is not binding upon the superintendent or the board.

5.   The provisions of NRS 38.206 to 38.248, inclusive, do not apply to an expedited hearing, the written report of an arbitrator or any other portion of an arbitration conducted pursuant to this section.

6.   Not later than 5 business days after the superintendent receives the written report from the arbitrator pursuant to subsection 2, the superintendent shall:

(a) If the superintendent intends to recommend the dismissal of the probationary employee, file with the board the report and a written recommendation to dismiss, and provide to the employee, by registered or certified mail, written notice of the filing of the recommendation and the date, time and location of the

DECISION AND AWARD - 4

next regularly scheduled meeting of the board at which the recommendation to dismiss the employee will be considered; or

      (b)  If the superintendent does not intend to recommend the dismissal of the probationary employee, provide to the employee, by registered or certified mail, written notice that dismissal of the employee will not be recommended to the board and that no further action will be taken against the employee.

## RELEVANT CONTRACT PROVISIONS

### ARTICLE 1        DEFINITIONS

1.2    The term "unit member" or "member" as used in this Agreement, shall refer to Principals, Assistant Principals, Specialist, Directors and Assistant Directors, Coordinators 1 and 2, Lead Psychologist, Program Administrator, Site Administrators, Turning Point Administrator and other people who hold administrative credentials and serve in that capacity in WCSD. The exception will be those Administrators who are excluded by NRS 288.

### ARTICLE 18      DISMISSAL AND DISCIPLINARY PROCEDURES INCLUDING GRIEVANCE AND BINDING ARBITRATION

18.1    Disciplinary action, including but not limited to, demotion, suspension, dismissal, and non-renewal actions taken against post-probationary unit members (in accordance with NRS 391), shall be progressive in nature and related to the nature of the infraction. Unit members shall be given reasonable opportunity for improvement.

The school district shall not be discharged, demote, suspend or take any other disciplinary action against a post probationary bargaining unit member of this unit without just cause.

## STATEMENT OF THE FACTS

    Trina Olsen has been an employee of the Washoe County School District since 1992.[2]

After many years as a certificated teacher and then Dean of Students, Olsen became a

probationary Assistant Principal at Hug High School for the 2016-2017 school year, where she

reported to Principal Lauren Ford during the relevant time period. Olsen's area of oversight

---

[2] The hearings were conducted without a court reporter. Facts which have not been attributed to documents admitted into evidence have been summarized or quoted from the Arbitrator's notes, written at the time of the hearing.

DECISION AND AWARD - 5

OLSEN - 000018

including Multi-Tiered Systems of Support (MTSS) and Special Education. As a part of her responsibilities, Olsen also worked on the Hug Credit Attainment Program, a school-wide effort to help students complete courses and obtain credits toward graduation, as well as acting as the testing coordinator for Hug.[3]

On December 7, 2016, Olsen witnessed a student draw out two knives and begin attacking other students. Olsen used her walkie-talkie radio to call the police, including the School Resource Officer, and to call a Code Red alarm. She worked to evacuate students from the area as the School Resource Officer responded to the incident. During this incident, Olsen witnessed the officer shoot the student with his gun, killing the student.

Hug Credit Attainment Plan

Hug uses several on-line programs, including the A+ on-line program, to provide curriculum to students. The A+ Program includes the ABC Curriculum, which is a supplemental curriculum that can be used within a course if a student needs remedial assistance but does not qualify for course credit. Brad Bodine, another Assistant Principal, is the Curriculum vice principal who oversees credit questions.

A+ courses can qualify for credit towards graduation. However, during the winter break in 2016, Ford learned from the District that there were problems in issuing credits for A+ courses, because Hug was incorrectly providing students with credit for the ABC Curriculum. When Ford raised the issue to the assistant principals, including Olsen and Bodine, Olsen said she would take care of it.[4]

_____

[3] District Exhibit 13. Hereafter, District Exhibit will be abbreviated DX.
[4] DX 19, email from Bodine to Ford.

DECISION AND AWARD - 6

Patty Newbrough, an A+ teacher, proposed that they develop a program for students who were failing courses and who were missing blocks of time from school. Per Ford, Newbrough thought the school was under-utilizing the A+ credit recovery program. After meeting with Ford and the Assistant Principals, Olsen took the lead on the pilot program called Hugs Credit Attainment Program. With the permission of the District, the pilot would apply only to the prior semester. The intent of the program was to give students assignments in A+ to recover grades from classes they had failed the prior semester. This program was separate from the other on-line learning programs OLA and AE-OLA.[5]

In the spring of 2017, Bodine reported to Ford that there was a problem with the pilot program. Newbrough worked in the same classroom as teacher Wendy Labon. Bodine had explained the difference between the pilot program, OLA and EA-OLA to both teachers, but both teachers kept using the ABC curriculum to give credit to students. When Ford brought the problem to Olsen's attention, Olsen told Ford that she didn't know what OLA or EA-OLA is. Ford believed that either Olsen had directed Wendy to give the credit inappropriately or that Wendy was lying to Olson about the matter.

Sometime in the 2016-2017 school year, Sharon Black, a Hug English teacher, reported to Ford that Olsen had directed Black to "give out credits I shouldn't hand out."[6] Specifically, Black alleged that Olsen had told her to give credit for "ABC curriculum" that a student had completed two years earlier. Black notified Ford that she did not sign the forms assigning the credit.

_____

[5] Testimony of L. Ford.
[6] Testimony of L. Ford.
DECISION AND AWARD - 7

OLSEN - 000020

Bodine testified that he spoke with teachers about how far back they could go to recover credit for students, and that he spoke to one teacher who had talked to Olsen and wanted to make sure he was doing it right. Bodine reported, "(the teacher) didn't say Trina told him to change it."

Performance Evaluations

Ford conducted a 40th Day Observation of Olsen on September 27, 2016 and deemed Olsen to be "Level 3 effective."[7] Ford conducted an 80th Day Observation on November 8, 2016 during a Professional Development program Olsen had organized.[8] Ford rated Olsen "effective," and commended her efforts while providing recommendations for improvement.[9] Ford conducted a 120th Day Observation of Olsen on January 31, 2017 and signed off on it on April 15, 2017.[10] Ford completed Olsen's Performance Evaluation on or about April 21, 2017, and rated Olsen as Effective.[11] As a result of the shooting, District Administrator Mike Paul extended the deadline for completing evaluations. Ford cut and pasted Olsen's comments into Olsen's evaluation document, which Ford later removed at the direction of Mike Paul.

According to Ford, all new administrators have training on the evaluation process, and that all teachers who have been identified as "minimally effective" need to be reported to the Area Superintendent. Those teachers are entitled to notice of their rating in February so that they can have two more evaluations before the April final evaluation. Teachers who are rated "minimally effective" are placed on a Focused Assistance Program (FAP).

_____

[7] DX 9.
[8] DX 10.
[9] Id.
[10] DX 11.
[11] DX 12.

DECISION AND AWARD - 8

Olsen was responsible for evaluating teachers, including Lorrie Foley. It was Olsen's opinion that Foley be placed on an FAP. Olsen notified Ford on March 5, March 7, April 8, April 17 and April 20 that she wanted to discuss Foley's performance.[12] Olsen testified that she was not able to consult with Ford during that time because of Ford's absences from the high school.

Olsen discussed Foley's performance with Laura Pincollini, a teacher-mentor, who told Olsen that "the decision to do a FAP rests only with the principal."[13] Olsen was not able to observe Foley because she had changed classrooms several times. Ultimately, Foley's evaluation was rated "effective," and in Ford's opinion, Olsen had waited too long to request a FAP and therefore needed to wait until the next year. There is no evidence that Olsen knew the deadline for notifying Roger Gonzalez about "minimally effective" teachers or that Ford ever discussed a plan with Olsen for managing Foley's evaluation process. When Olsen submitted an FAP for Foley, Mike Paul told her she could not do so.[14] Olsen again asked Ford for direction about Foley's evaluation on May 1, 2017, but there's no evidence she received a response.[15] Ford's recollection is that she repeatedly told Olsen not to put Foley on an FAP.

RISE Field Trip

In March and April 2017, Olsen arranged for students from two different programs to attend a field trip at RISE, the District's adult education program. Olsen notified Ford on March 6, 2017 that the SPED Action Team and the Senior MTSS team were collaborating to take

---

[12] EX 62, 63, 66-68
[13] DX 68.
[14] EX 70.
[15] DX 71.

DECISION AND AWARD - 9

OLSEN - 000022

students on a field trip to introduce them to RISE. The trip was approved by Tristan McElhaney, another Assistant Principal, as well as Victor at RISE.

Ford felt that she did not have clarity about why the students were taking the field trip or how students had been chosen to attend. At a Saturday retreat for the administration team, Ford asked Olsen how kids got on the list.

According to Ford, Olsen responded, "The Committee worked hard to do a good job."

In her testimony, Ford reported that she responded, "You don't fucking get it. How did the names get on this list?" and that she "lost (her) cool."

Marijuana Incident

On or about May 8 or 9, 2017, teacher Patrick Rossi told Olsen that another teacher had told him that Dean of Students Jessica Wilson had given drugs back to a student.[16] Patrick Rossi learned this information from Sabrina Cellucci.

Jessica Wilson wrote a statement about the incident and testified about it at the hearing. According to Wilson, Sabrina Cellucci brought her a wallet that belonged to a student which had marijuana in it. When the student asked for the wallet, Wilson asked her if she knew what was in the wallet. The student told Wilson that it belonged to her boyfriend and that she didn't smoke because she gets drug tested for work and in anticipation of taking college courses. Wilson "tossed the marijuana and told her that I never wanted to see it on campus again."[17] Wilson elected not to discipline the student at that time.

_____

[16] EX 57.
[17] EX 9.

DECISION AND AWARD - 10

OLSEN - 000023

Upon learning the story third hand from Rossi, Olsen conferred with her mentor Dave Murdock, who said she should reach out to Wilson about the matter.

On May 8, Olsen went to Wilson's office to talk to Wilson about the allegation that she had given marijuana back to a student. Olsen asked Wilson, "if I had handed drugs back to a student on Friday."[18] According to Olsen, Wilson admitted that she had given the wallet back to the student because she had seen Lauren Ford do the same thing." Wilson reported "I explained the situation" in her written statement but did not describe what she meant by "the situation" in her written statement.

While Wilson testified that she meant that she had seen Laura give a student no discipline in a similar situation, her comment at the time she spoke to Olsen was vague as to what "same thing" meant. Ford later documented that Wilson told her "that she could see that Trina mis-interpreted the comment" and that Trina did not ask any clarifying questions.[19]

Wilson said that Olsen told her, "I needed to protect myself and suspend the student." After that time, Wilson contacted the student and suspended the student for three days. The student did not return to school ever again.

Olsen also conferred with Brad Bodine, who related in a June 2, 2017, statement to Ford that, "On Monday May 8 Trina Olsen came into my office to speak with me regarding" Jessica Wilson and said, "(Olsen) asked Ms. Wilson if she did return the wallet with drugs in it. Ms. Olsen said that Jessica said, 'yes and Lauren has done the same thing.'"[20] In his statement,

---

[18] EX 9.
[19] EX 14.
[20] EX 61.

DECISION AND AWARD - 11

OLSEN - 000024

Bodine says that he told Olsen to tell Ford about the incident. Olsen recalled that Bodine told her to talk to Wilson about the incident.

On May 10, Olsen again reached out to Wilson, still concerned about the incident. Olsen "strongly suggested (Wilson) tell Ms. Ford about the situation."[21] On May 11, Wilson reported the incident to Ms. Ford.[22]

Ford believed that Olsen should have notified her of the allegations that Wilson gave drugs to a student rather than talking to Wilson about it. On a prior occasion, Ford had, for the safety of a student and to aid an ongoing investigation, returned a quantity of drugs to a student rather than take disciplinary action. That decision was made in concert with the campus police officer.

No other employees, including AP Brad Bodine, Dean of Students Jessica Wilson and teachers Patrick Rossi and Sabrina Cellucci, were disciplined for failing to report the incident to Ford.

Testing Issues

Olsen was the designated test coordinator for Hug High School. District trainings for test coordinators were conducted in the fall 2016 and spring 2017. Training coordinators at each school train the staff who will be handling the test materials and administering the tests.

On May 4, 2017, Olsen told Ford, "I'm dropping the ball with my workload . . .With everything I have over the next 7 days, can you help me prioritize my duties? . . . I don't know

---

[21] Testimony of J. Wilson.
[22] Id.

DECISION AND AWARD - 12

OLSEN - 000025

what else to do, I need your help."[23] Ford responded that "testing is our priority" but did not address Olsen's overall organizational difficulties at that time.[24]

On or about May 15, 2017, Sandy Aird, District Director of Assessment, notified Ford that she had received a tip about a test discrepancy or irregularity at Hug. Specifically, Olsen had sent out confidential information to the entire Hug staff by forwarding a spreadsheet that contained user IDs and passwords in "hidden" columns. Olsen had created the spreadsheet with the assistance of staff in the District office by downloading the information from the District platform. She "hid" the confidential columns before distributing the material. Ford had not been able to open the document when she approved its distribution, but Olsen was responsible for the distribution.[25] Aird directed Ford to remove Olsen as the test administrator. Aird admitted that the ability to keep confidential information in the spreadsheet was "a learning on our part."

Ford and two other Assistant Principals took over test coordination. In the course of taking over, Ford determined that Olsen did not have verification that every proctor had watched a video that was required by the State of Nevada Department of Education. As a result of the Testing Irregularity, the District notified Ford that Olsen could not be involved with testing, near test materials, have computer access or schedules. None of the tests were invalidated.

On May 17, 2017, Olsen was reassigned to Traner Middle School.[26]

On May 23, 2017, Olsen notified Roger Gonzalez that she wanted to file a complaint against Ford for changing her performance evaluation.[27] On May 24, 2017, Olsen received a

---

[23] EX 7.
[24] Id.
[25] EX 74.
[26] EX 83.
[27] EX 11.

DECISION AND AWARD - 13

OLSEN - 000026

notice of IDP for alleged misconduct in the period of April 7-May 15.[28] On May 25, Olsen

notified Gonzalez that she wanted to report an incident involving marijuana on campus.[29]

Gonzalez provided Olsen with the formal staff complaint form.[30]

On May 31, 2017, Olsen attended an Investigatory Due Process meeting with Ford and

Labor Relations Manager Virginia Doran to discuss allegations of misconduct that had occurred

during the 2016-17 school year.

On June 4, 2017, Olsen filed a Staff Complaint Form against Lauren Ford, reporting that,

"Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back

marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was

true, and she replied, 'yes, But I only did it because I saw Lauren (Ford) do it not too long

ago."[31]

On or about June 19, 2017, but dated June 8, 2017, Olsen filed another Staff Complaint

Form about Ford on the basis that Ford had not correctly conducted Olsen's evaluation and had

changed the narrative portion of the evaluation in violation of District policy.[32]

Ford conducted an investigation into the allegations discussed in the IPD meeting and on

July 19, 2017, issued a Letter of Admonition ("the First LOA") about the following alleged

misconduct[33]:

---

[28] EX 12.
[29] EX 13.
[30] EX 15.
[31] EX 16.
[32] EX 23.
[33] DX 4.

DECISION AND AWARD - 14

OLSEN - 000027

1.  That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.

2.  That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.

3.  That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's performance evaluation without permission to do so and did so at the direction of teacher-mentor Laura Pincollini, who did not have the authority to direct Olsen to do so.

4.  That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.

5.  That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.

In the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal.

On July 19, 2017, Olsen received a second Letter of Admonition ("the Second LOA") about the following alleged misconduct[34]:

1.  That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

_____

[34] DX 5.

DECISION AND AWARD - 15

OLSEN - 000028

2. That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.

3. That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.

4. That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.

5. That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."

6. That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School.

On July 19, 2017, Dr. Roger Gonzalez, Area Superintendent, directed Olsen to participate in an Investigatory/Due Process meeting on July 26, 2017 to discuss the following allegations:

1. That Olsen brought false claims and allegations against Lauren Ford when she reported a case involving marijuana on Hug's campus, when she said that "Jessica Wilson had returned marijuana to a student because she had seen Lauren Ford do the same thing."

2. That Olsen brought false claims and allegations against Ford regarding the supervision timeline.

DECISION AND AWARD - 16

OLSEN - 000029

3.  That Olsen discussed personnel matters with Hug staff members against the direction of management.[35]

After meeting with Gonzalez as directed on July 26, 2017, Gonzalez issued a Notice of Recommended Dismissal on June 28, 2018.[36] The recommended dismissal was based on the first and second Letters of Admonition, the allegations in the July 19 IDP Letter, and the allegation that after the IDP Meeting, Olsen contacted Ryley Coker and "made very threatening and unprofessional comments to him about his loyalty."[37]

Olsen was notified that she was discharged effective July 5, 2018.[38]

## POSITIONS OF THE PARTIES

DISTRICT'S POSITION

Trina Olsen was a probationary employee who is only entitled to the protections afforded by NRS 391.824 and is not entitled to final and binding arbitration under the Negotiated Agreement between the District and Washoe School Principals' Association.[39] Even if the terms of the agreement do apply, the Nevada Supreme Court recently held in *Washoe County School District v. White*, 133 Nev. Advance Opinion 43, (2017) that "Article 18.1 serves to preclude the District from choosing disciplinary actions that are clearly disproportionate to the proscribed conduct, while permitting the District to impose more severe penalties for repeated infractions."

Based on this standard, the District contends that the manifest weight of the evidence demonstrates that the two Letters of Admonition and the Discharge were warranted under the

---

[35] DX 7.
[36] DX 8.
[37] Id.
[38] EX 28.
[39] DX 1.

DECISION AND AWARD - 17

circumstances. Olsen engaged in dishonesty by making false allegations against her Principal and discussed her personnel actions with other District employees in contravention of a direct order.

For these reasons, the District asks the Arbitrator to deny the grievance and to recommend upholding the Recommended Discipline and Discharge.

EMPLOYEE'S POSITION

Trina Olsen was a 21-year veteran of the District, and therefore not a "probationary employee" subject to NRS 391.822 or 391.824. She should be afforded the protections of progressive discipline and binding arbitration contained in the Agreement between the District and the Washoe School Principals' Association. Under that standard, the District did not demonstrate just cause for the Letters of Admonition and the Discharge effective July 5, 2018.[40]

According to Olsen, if she is subject to the provisions of NRS 391.822 and 391.824, then the discharge is not final until the arbitrator's recommendations (if they uphold discharge) are adopted by the District and at a minimum, Olsen is entitled to back pay and benefits if and until the district superintendent recommends discharge to the School Board.

The District also withheld notes taken by Gonzalez and Ford during the course of their investigations. Olsen is entitled to review these notes, and they should be presumed to be adverse to the District's position because Olsen was denied her due process right to review the documents.

_____

[40] EX 28.

DECISION AND AWARD - 18

The District has engaged in disparate treatment for disciplining Olsen for her failure to report the marijuana incident but not disciplining other employees for engaging in the same alleged misconduct.

Regardless of what standard the Arbitrator applies, the District has failed to provide evidence that they had just cause to terminate Olsen.  For these reasons, Olson asks the Arbitrator assert contractual jurisdiction over this case, sustain the grievance and reinstate Ms. Olson with a make whole remedy.

**DISCUSSION**

Regardless of whether this case is properly subject to NRS 391.822 and 391.824 or is subject to the Negotiated Agreement's binding arbitration procedure, the parties agree that the Employer bears the burden to demonstrate that just cause exists for the discipline imposed on the grievant, Trina Olsen. The District has presented evidence about three disciplinary matters, and each will be considered in turn.

The just cause standard typically requires progressive discipline when appropriate, and it is expected that discipline will be corrective in nature as well, if the circumstances warrant it. An employer need not impose progressive discipline where the conduct is more serious. However, when a serious charge is made against an employee, it should be narrowly construed, because of the long-lasting effects of such an accusation on an employee's career.[41]

---

[41] Bornstein, Labor and Employment Arbitration (2011), §20.01

DECISION AND AWARD - 19

**I.      DOES THE EMPLOYER HAVE JUST CAUSE FOR DISCIPLINE?**

**First Letter of Admonition**

The First Letter of Admonition (LOA 1) contained five allegations about which the parties provided evidence.

Allegation 1: That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen had directed other teachers via email to change a student's grade.[42] The First LOA references an email, but no email was provided at the hearing to the Arbitrator, and there is no directive email in the record. The First LOA instead states: "After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval."[43]

This statement is undisputed by Olsen. Olson, Ford and Bodine each repeatedly testified that "the teacher owns the gradebook" and would be responsible for changes which would be approved by the AP for Curriculum (Bodine) and Ford. While Olsen had some confusion about whether she was permitted to sign off on a grade change, she was informally counseled on that issue, and never changed any grades or directed others to change grades without the express agreement of Ford. There was no evidence that Olsen ever directed via email or in person that the three teachers change a grade outside the three-week grading period.

---

[42] EX 12.
[43] DX 4.

DECISION AND AWARD - 20

OLSEN - 000033

Olsen was responsible for the Hug Credit Attainment Plan, a pilot program expressly created at the direction of Principal Ford for the purpose of finding permissible ways for students to complete classes and repair grades in order to graduate. That Ms. Olsen would be disciplined beyond the counseling she received is contrary to the goals of the program, which was to encourage teachers to support students to graduate.

The only relevant evidence provided was an email dated April 4, 2017, from Olsen to Labon, Rossi and Newbrough which stated, "The teacher owns the grade book and the principal can approve the grade change at any time. If Sharon can get Wendy the final to administer the test or if she wants to do it on her own, (student) will get the credit as soon as Sharon submits the grade change form. It's definitely a procedure that Lauren fully supports."[44] This email corroborates Olsen's defense that she was only informing teachers of the process of recovering credit, not directing grade changes.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

Allegation 2: That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen gave Sharon Black a notification of credit form to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502.[45] In the First LOA, Ford expands on a larger issue related to grade change forms which Olsen took responsibility for handling, but which Ford did not believe were

---

[44] EX 85.
[45] EX 12.

DECISION AND AWARD - 21

handled correctly.[46] The grade change forms issue arose in March 2017 after Olsen had started implementation of the Hug Credit Attainment Program. Despite accusations that Olsen had mishandled grade change forms, there was no evidence at hearing that any grade change forms were improperly handled, or that any discrepancies occurred at Olsen's direction.

Specifically, Ford did not provide the email from Sharon Black that she claimed demonstrated that Olsen had given a directive. If the email is the same one referenced above (EX 85), it is clear that Olsen was explaining the process, not directing any policy violation. It was also not clear, prior to receiving notification from the District, that there was a problem with the way that A+ course credit was being handled. Once Hug administration was notified of the problem, they seemed to work diligently to fix it while still focusing on supporting students to graduation.

This allegation occurred early in the school year, and there was ample time to counsel Olsen about problems relating to the Hug Credit Attainment Plan, yet Ford did not issue an IDP until late May and did not raise the issue in Olsen's performance evaluation. The confusion and delay around this issue, in addition to the lack of clear evidence of misconduct, suggest that the Employer was adding the issue to the LOA in order to bolster the discipline, and not because it was supported by just cause.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

---

[46] DX 4.

DECISION AND AWARD - 22

OLSEN - 000035

1

2
Allegation 3: That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's
performance evaluation without permission to do so and did so at the direction of teacher-mentor
Laura Pincollini, who did not have the authority to direct Olsen to do so.

3

4
It is undisputed that Olsen wanted to place Lorrie Foley on a Focused Assistance Plan

5
and made repeated efforts to get Ford's support and direction to do so. On at least five occasions

6
in March and April 2017, Olsen emailed Ford to initiate a discussion about putting Foley on an

7
FAP. It is Ford's recollection that she told Olsen that it was too late to do so, because the

8
deadline for notifying Roger Gonzalez that a FAP was needed had passed. There is no evidence

9
when that deadline was, or whether Olsen was ever notified about that deadline. Despite Ford's

10
testimony, it is clear that Olsen did not feel like she had received clear or timely advice from her

11
principal and sought advice elsewhere.

12
Ford contends that Olsen inappropriately took direction from Pincollini, who is a teacher-

13
mentor and not an administrator. It is the case that Olsen discussed Lorrie Foley with Laura

14
Pincollini, but the evidence indicates that Olsen was doing just that: discussing the matter. Olsen

15
consulted a veteran teacher-mentor with questions about how to handle what she perceived as a

16
low-performing teacher situation because she was not getting a response from Ford. Pincollini

17
did not direct Olsen's actions; she gave her advice as a long-time, experienced teacher familiar

18

19
with the performance evaluation process.[47]

20
Olsen proceeded to put Foley on a FAP without Ford's permission, which she knew or

21
should have known was not correct, since she would have needed Ford's permission to do so.

22
However, Ford's lack of responsiveness to Olsen's requests for help, coupled with Ford's own

23

24

25

26
_____

[47] EX 86.

DECISION AND AWARD - 23

failure to follow performance evaluation timelines (see EX 5) strongly suggest that the District does not typically consider this to be a discipline-worthy offense. It constitutes a form of disparate treatment to discipline Olsen for this issue when Ford shares responsibility for evaluation timeline issues. To the extent that any just cause might exist for discipline in this case, it warrants, at most, a verbal warning.

Allegation 4: That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.

It is undisputed that Olsen did not report the "marijuana incident" involving Wilson to Principal Ford, and instead directed Wilson to report it Ford herself. However, Cellucci, Rossi and Bodine also failed to report the incident to Ford or the District, and Wilson only reported the matter to Ford after being directed to do so by Olsen. This is a glaring example of disparate treatment, in that one employee is being disciplined for an action that four other people engaged in and were not disciplined for.

In reality, the decision to handle the matter as they did was one in which both Wilson and Olsen likely had the discretion to handle in a manner best suited to the student's needs. The real tragedy of this incident is that a young woman who was very close to graduation never returned to school because of Olsen's reaction. Wilson made the well-considered decision to let the "marijuana flakes" slide because she knew the student had a precarious living situation and a strong need to stay in school. Olsen disrupted that by substituting her judgment and failing to ask follow-up questions about Wilson's decision. At the same time, drugs in school is a serious issue about which reasonable minds can disagree, and while Olsen may bear responsibility for the student outcome related to the marijuana incident by telling Wilson she had to suspend the

DECISION AND AWARD - 24

student, failing to report it to Ford is not a reasonable cause for discipline, given that no one else reported it either.

Allegation 5: That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.

The evidence in the record is clear on this issue: Olsen and two other Assistant Principals organized a field trip for students from at least two separate programs to visit RISE, the adult learning academy in the District, in collaboration with one another and the RISE leadership. Olsen notified Ford of this field trip and got appropriate sign-off from RISE and from Tristan McElhaney for transportation.

For some reason, Ford questioned which students had been selected to attend the field trip. It's unclear why she wanted to know, and why Olsen's explanation that students from both programs were included was unsatisfactory. By Ford's own admission, she "lost her cool" and swore at Olsen about this matter. Based on the evidence, it's very hard to understand how this supports just cause for discipline against Olsen. The trip was authorized and appropriate and focused on students who would benefit from the visit. To discipline Olsen for not answering her question in the manner Ford wanted is unnecessarily punitive.

                    ***

Finally, in the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal.  Olsen was on leave and not given an opportunity to meet these performance expectations. **In summary, based on the evidence, the Arbitrator cannot conclude that the District had just cause to impose the First LOA on Olsen, and does not believe that the District did so with the intent of correcting Olsen's performance. The Arbitrator recommends that the First LOA be removed from Olsen's record.**

DECISION AND AWARD - 25

OLSEN - 000038

**Second Letter of Admonition**

The Second Letter of Admonition (LOA 2) contained six allegations about which the parties provided evidence.[48]

Allegation 1: That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

This allegation is undisputed. Olsen admits that, as the testing coordinator, she created a spreadsheet from District sources which contained both confidential and non-confidential information, that she "hid" the columns which had confidential information but did not secure them in any other way (such as in a new book or using password protection), and then distributed the spreadsheet to every faculty and staff email address at Hug High School. This breach of confidentiality was discovered by a District employee, who reported it to the Director of Assessment, who in turn reported it to the Nevada State Department of Education.

This breach of confidential information was a serious testing violation which resulted in the District and Hug administration taking active measures to remedy the breach and monitor the tests to ensure that no further violations occurred. Olsen was removed from her responsibilities as the testing coordinator and reassigned to Traner Middle School.

Olsen raised several defenses. First, the data was provided by the District, which had not taken measures to secure the data beyond telling test coordinators that the data was confidential. While this is true, and Aird admitted that this was "a learning" for the District, Olsen knew

---

[48] DX 5.

DECISION AND AWARD - 26

OLSEN - 000039

enough about Excel documents to know that "hidden" data isn't really hidden, and she bears some responsibility for the breach.

Second, Olsen argues that she sent a copy of the message to Ford prior to distributing it to the Hug staff and faculty. Ford could not open the document but "trusted Olsen" and didn't double-check the document at any time. Again, Ford should bear some responsibility for her oversight, but it was also reasonable of her to expect that Olsen, as the designated test coordinator, had done the job correctly, and the message was time-sensitive.

Finally, Olsen claims that she was overwhelmed and stressed out at the time this occurred and that she didn't realize, in her hasty and upset state of mind, that the information was not truly secure from every recipient. This may be an accurate description of Olsen's mindset, but it isn't a defense to the allegation. Under the circumstances, the Employer has just cause to discipline Olsen for the distribution of confidential information to non-qualified recipients.

Allegation 2: That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.

This allegation seems to be related to the prior issue, where Ford alleges that she requested that Olsen provide her with information on May 4, but Olsen did not do so. However, the only May 4 correspondence in the record between Ford and Olsen is an email chain called "guidance" wherein Olsen states, "I'm dropping the ball with my workload . . . can you help me prioritize my duties. . . I don't know what else to do, I need your help."[49] Ford responded to this email by telling Olsen to prioritize testing; the only question she asks Olsen is, "Why and whose classes do you need to attend?" There's no other evidence in the record that supports that Ford

_____

[49] EX 7.

DECISION AND AWARD - 27

requested information on May 4 that was not provided on May 10. Olsen did send the test coordinator email to Ford on May 11, 2017 at 6:34 a.m. and was promptly directed to send it to staff at 6:46 am. [50]

The evidence presented at the hearing does not support this allegation.

Allegation 3: That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.

Once Olsen was relieved of her test coordinator responsibilities, Hug and District administrators took over the tests. In that process, Aird determined that not every proctor had watched a video required by the state and completed an affidavit affirming that they'd watched it. Olsen was responsible for staff training and for ensuring that every proctor watched the video.

Olsen admitted that she did not show the video at her staff training, and that, to save time, she told people what was in the video and decided to send them the link to watch it on their own time. She claimed to be confused as to whether the video was required.

Olsen's testimony was, "I had a proctor training and was going to show the video, and I was gathering information from the NV website that I didn't actually have to show it, I could email it to them. I also showed during the IDP that during the training that we went through step by step and told them they would get the video. I also told them what was in the video. I was trying to get people to sign it. Running around like crazy to get the signatures. I said, 'you have to watch this.' I had every intention that they see it, but I hadn't gotten all the signatures. 'So overwhelmed. Couldn't keep my head above water.'"

_____

[50] EX 8.

DECISION AND AWARD - 28

As with the breach of confidentiality, Olsen describes her mindset and believes it is a defense. Instead, it's an explanation that she was not doing her job duties as assigned and was creating testing irregularities that put Hug and District into a difficult position with the State Department of Education. The District demonstrated that there was just cause for discipline under these circumstances.

Allegation 4: That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.

In the Second LOA, Ford alleges that Olsen emailed Rhonda Clarke and Brad Bodine with statements concerning her removal as test coordinator. Those emails were not in evidence at the hearing. It is undisputed that Olsen texted her friend and co-worker Ryley Coker before being admonished not to discuss the matter with co-workers. Once Olson had been so admonished, she let Coker know she shouldn't have been discussing the matter with him.

It is unclear from the record whether Olsen knew that she was not permitted to discuss her removal at the time that she communicated with her friend.[51] In any case, the Employer did not demonstrate that there is just cause to discipline Olsen for this allegation.

Allegation 5: That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."

Olsen's description of "being relieved" is an extension of her self-assessment that she was overwhelmed and needed help, and not itself "willful neglect or failure to observe and carry out the requirements" of the test coordinator role. She had already been removed from the role

---

[51] It's also unclear whether the Employer can direct a public employee not to discuss their own personnel matters with a friend. While neither party raised the issue, it is questionable whether any employer can restrain employees from discussing their terms and conditions of employment with co-workers.

DECISION AND AWARD - 29

OLSEN - 000042

and she was only stating her feelings about the pressure of the position being removed from her. Since her statements were made after removal, and do not relate in any way to misconduct, this allegation, even if true, could not be the basis for discipline.

<u>Allegation 6: That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.</u>

This allegation is undisputed. Olsen was directed by email not to use her office. She entered her office for the purpose of retrieving her radio so that she could perform her other duties as an AP. She told Aird that she could not remain in the office and left promptly after getting the radio. This does not constitute "use" of the office and doesn't warrant discipline.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School. Olsen did not have an opportunity to meet these expectations because she was on paid administrative leave.[52] **In summary, based on the evidence, the Arbitrator concludes that the District had just cause to impose the Second LOA on Olsen because of Allegations 1 and 3 relating to test irregularities that occurred because she was testing coordinator.**

---

[52] EX 29.

DECISION AND AWARD - 30

1

2

**Discharge Letter**

3

On the same day that Ford sent Olsen the two LOAs (July 19, 2017), Area

4

Superintendent Roger Gonzalez sent Olsen an IDP letter alleging three separate issues.[53] An IDP

5

meeting was held on July 26, 2017. Thereafter, Gonzalez took a leave of absence and Olsen was

6

placed on paid administrative leave. Gonzalez issued a Notice of Recommended Dismissal on

7

June 28, 2018.[54]

8

Allegation 1: That Olsen filed written false claims against Principal Lauren Ford regarding the
incident where Wilson returned marijuana to a student because she had witnessed Ford "do the
same thing a while ago."

9

10

In her Staff Complaint, Olsen asserted that Wilson had told her that she had returned

11

drugs to a student because she "saw Ford do the same thing a while ago." This was a hearsay

12

statement by Wilson which Olsen believed should be investigated by Ford's superiors. In her

13

view, if Ford had given drugs to a student, it was a serious matter which should be handled at the

14

District level. Olsen did not weigh in on the truth of the statement, merely that the appropriate

15

16

investigator was Ford's supervisor.

17

In Gonzalez's view, Olsen knew that the reference to "the same thing" meant Ford had

18

not suspended a student, not that Ford had returned a student's drugs. Ford and Wilson testified

19

about a separate incident where Ford declined to suspend a student after conferring with the

20

school police officer because doing so would endanger the student and an ongoing investigation.

21

However, there was no evidence that Olsen knew about that case, or knew what Wilson was

22

23

24

25

26

[53] DX 7.
[54] DX 8.

DECISION AND AWARD - 31

referring to when she heard "the same thing." Gonzalez did not say why he believed that Olsen was willfully lying.

Olsen's misunderstanding was mistaken but made in good faith. There's no evidence to support Gonzalez's conclusion that she was willfully dishonest with the intent to harm Ford. Rather, she was passing along to the District what would be a serious allegation if true and expecting a full and fair investigation.

Even if Olsen was being negligent in making the complaint (she could have asked Wilson to clarify the comment), taking disciplinary action against someone for making a complaint of alleged misconduct is retaliatory and has the effect of inhibiting people from coming forward with other allegations of misconduct. There is genuine uncertainty about what Wilson's statement meant. In the third hand account Olsen received, Wilson had found drugs in a student's wallet and then returned the drugs to the student. When asked about it, Wilson said that "Lauren had done the same thing." It's not unreasonable to find that statement shocking to hear about one's superior and to believe that the District should take steps to investigate the matter.

The evidence presented by the District did not support the allegation that Olsen made false allegations or was dishonest. Olsen reported a hearsay statement and expected a fair investigation, and instead was terminated. This discipline is retaliatory and overly punitive. The evidence on this allegation does not support discharge.

Allegation 2: That Olsen brought false claims and allegations against Ford regarding the supervision timeline and evaluation process.

Olsen filed a separate complaint against Ford alleging problems with the way Ford conducted Olsen's performance evaluation. There were several specific problems: that Ford hadn't followed the proper timeline, that Ford hadn't given her notice of her second observation,

DECISION AND AWARD - 32

that Ford had removed positive statements from Olsen's performance evaluation and that Olsen was not permitted to submit a rebuttal statement.

It is true that Ford did not follow the evaluation timeline. First, the December 7 school shooting was disruptive to operations and the District gave Hug extra time to complete certain paperwork because of that incident. Second, Ford, for reasons that she didn't explain, did not complete the evaluations of her subordinate staff on the schedule required by the District. Therefore, Olsen's 120th day observation and her evaluation were completed late by Ford.

After their April 21 evaluation meeting, Ford added Olsen's rebuttal comments into the narrative of the final performance evaluation. When Mike Paul notified Ford that the "artifact" should not be in the narrative, Ford removed it, as Olsen alleged, but was required to do so by the District and not in retaliation against Olsen.

At the point at which Olsen filed this Staff Complaint, she was very concerned that her performance evaluation would not be considered on its positive merits because of the testing irregularities issue. She had been reassigned to Traner and was very concerned that she was being disciplined for performance issues which she believed Ford had also committed and wanted to bring that to the District's attention.

Olsen's actions in filing this Complaint were "CYA" and self-protective, but they weren't false. Ford had not followed the timelines and had altered Olsen's evaluation, even if it was at Mike Paul's direction. Therefore, the facts do not support the allegation that Olsen filed a false claim against Ford for supervision and performance evaluation issues. The District does not have just cause to terminate Ms. Olsen on this basis.

<u>Allegation 3: That Olsen discussed personnel matters with Hug staff members against the direction of management.</u>

DECISION AND AWARD - 33

As with Allegation 5 in the Second LOA, it's unclear that Olsen was aware that she couldn't discuss her own personnel matters with people she believed were her friends after the IDP meeting. It's strains credibility that she would not be able to exercise her own judgment in sharing details about her own case with friends of her choosing, and the Arbitrator again questions whether the Employer even has the authority to restrain the speech of a public employee who wants to discuss the terms and conditions of their employment with their co-workers. Even if the Employer has the authority, the violation of this rule should not, under these circumstances, be the basis for discharge, where the Employer held open the case from June 2017 until July 2018. The evidence in the hearing does not demonstrate that the Employer has just cause to discipline for this allegation.

**For these reasons, the Arbitrator concludes that the Employer did not meet their burden of proof that the alleged actions constituted misconduct. The District does not have just cause for termination of Trina Olson.**

## II.      WHAT IS THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

As stated above, the District contends that this case is governed by NRS 391.822 and 391.824, the non-binding arbitration procedures which govern the dismissal of probationary employees. The Grievant contends that she should be afforded the binding arbitration process set forth in the Grievance Procedure in the Negotiated Agreement. The resolution of this question hinges on whether Olsen was a probationary employee at the time she was removed from her position as an Assistant Principal.

DECISION AND AWARD - 34

While Olsen is a long-time employee of the District, she was a probationary employee in the position of AP. It is undisputed that she was in a probationary period in the 2016-2017 school year, when all these issues arose.

NRS 391.820(8) states: "A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section**." This clearly defines the probationary status of a post-probationary teacher who is employed as an administrator. This section applied to Olsen, despite her many years of service.

Probationary employees are considered to be working in a trial period. "The purpose of a trial period is to afford an employee the opportunity to demonstrate that he has the ability for the job in question or can with some familiarization therewith achieve the necessary skills within a reasonable period of time to perform the job in an acceptable manner."[55]

Non-probationary APs are indisputably covered by the Negotiated Agreement, and by the clear language of the grievance procedure are protected by binding arbitration. By virtue of the fact that the term "non-probationary" is used repeatedly in that section, the reader of the contract

---

[55] Elkouri & Elkouri, "How Arbitration Works," 6th edition, p. 892, citing *American Welding & Mfg. Co.*, 52 LA 889, 893 (Stouffer 1969).

DECISION AND AWARD - 35

can conclude that "probationary" employees are not covered by binding arbitration. The process for removing probationary employees is governed by NRS 391.822 and 391.824.

The record is silent about what rights Ms. Olsen may have as a senior member of another bargaining unit, such as a certificated teachers unit or a unit that covers Deans of Students. It is clear that she was still in her trial period as a probationary AP pursuant to NRS 391.820(8) and is therefore subject to the state law governing her removal.

## III.   HAS THE DISTRICT MET THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

NRS 391.824 defines the procedure for a hearing concerning dismissal of a probationary employee. It says in pertinent part:

> (1)     If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

The District violated this section of NRS 391.822 when it terminated Olsen on July 5, 2018 without waiting for the final report from the Arbitrator. While an extensive amount of time had passed since the events in question, likely at great financial cost to the District, the delay was entirely due to the District's failure to follow up on the IDP meeting of July 26, 2017 in a timely fashion. The statute is clear that the superintendent must not take action until receipt of the written report of the arbitrator, and in this case, they acted prematurely by ending Ms. Olsen's employment before a hearing could be conducted.

The statute also states:

> (2)     An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The

DECISION AND AWARD - 36

only issues the arbitrator may consider are whether the dismissal of the probationary employee would:

    (a) violate the legal rights of the probationary employee provided by federal law or the laws of this State; or

    (b) be arbitrary or capricious.

    (3) At the evidentiary hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee.

At the hearing in this matter, the District stated three reasons for the dismissal of Ms. Olsen. As stated above, the evidence provided by the District did not support the conclusion that dismissal is warranted. Olsen did not knowingly file false claims against Principal Lauren Ford, and, if she did discuss her employment action with co-workers, it was not knowingly in violation of a rule, nor did it warrant dismissal. Because of the retaliatory nature of the recommendation of dismissal, the Employer's lack of just cause for discharge is arbitrary and capricious.

There are two other areas that warrant discussion. First of all, the December 7 shooting that was witnessed by Ms. Olsen was a significant event in the life of Hug High School, its community and Ms. Olsen in particular. There was no evidence that the trauma of this event was addressed. Ms. Olsen must have had great personal courage and a deep reserve of competence to respond in the way she did. The fact that she later felt like she was overwhelmed, under water and needed help seems like an obvious and unfortunate consequence of witnessing a knife attack on students and the subsequent shooting death of the student who initiated the attack.

Given that Ms. Olsen had a stellar track record as a teacher and Dean of Students, it was reasonable to expect that she would excel as an AP.  Based on feedback from her peers and principal, it sounds as though she struggled in the role. While the shooting may not have been the cause of that, Ms. Olsen's bravery and trauma should have been handled in a more sensitive manner than her prolonged and painful dismissal suggests.

DECISION AND AWARD - 37

The second thing that warrants discussion springs from that issue. As a probationary employee who had completed one year but who had a testing irregularity did not need to be dismissed. NRS 391.750 lays out a number of options which would have addressed the issue in a less punitive fashion. For example, the District could have returned Olsen to a Dean of Students position, where she was last successful, or they could have decided to otherwise not reemploy her as an administrator and offered to return her to the classroom, per 391.820. The decision to move forward with dismissal seems to have prolonged the cost and pain to both Ms. Olsen and the District, which is particularly unfortunate, given that dismissal was not warranted.

### DECISION AND AWARD

For the foregoing reasons, the Arbitrator finds that the grievance is sustained in part and denied in part. The District has met their burden of showing there was just cause for the first and third allegations in the Second Letter of Admonition but has failed to show that there was just cause for the First Letter of Admonition and the Notice of Dismissal.

Because the Dismissal should not have been implemented until after receipt of this written report, the Employer must reinstate Ms. Olsen and make her whole back to July 5, 2018. Upon receipt of this written report, the superintendent will then follow the provisions of 391.824(6). It is the opinion of the Arbitrator that the District has been arbitrary and capricious in its decision to dismiss Ms. Olsen and recommend that the superintendent review Ms. Olsen's file to determine whether she is eligible for placement as an AP or for some other position.

Because the allegations concerning testing irregularities were the basis for the LOA, they can be considered as part of Ms. Olsen's job record but should not be the basis for dismissal, as

DECISION AND AWARD - 38

OLSEN - 000051

that would violate principles of double jeopardy which are commonly applied in labor arbitration matters.

Dated: December 13, 2018.

Andrea L. Dooley, Arbitrator

DECISION AND AWARD - 39

OLSEN - 000052