# EXHIBIT 1

Transcript of Deposition of Trina Rae Olsen dated November 4, 2020, including deposition exhibits.

EXHIBIT 1

Transcript of Deposition of Trina Rae Olsen dated November 4, 2020, including deposition exhibits.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

TRINA OLSEN, Case No. 3:19-cv-00665-MMD-WGC

Plaintiff,

vs.

WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of the State of Nevada; Washoe County School District Superintendent TRACI DAVIS; et al.,

Defendants.

_____________________________/

DEPOSITION OF

TRINA RAE OLSEN

November 4, 2020

Reno, Nevada

REPORTED BY: CONSTANCE S. EISENBERG, CCR #142, RMR, CRR

Job No. 675078

A P P E A R A N C E S

For the Plaintiff, via videoconference:
LUKE ANDREW BUSBY, LTD.
BY: LUKE BUSBY, ESQ.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
Luke@lukeandrewbusbyltd.com

For the Washoe County School District:
DOTSON LAW
BY: JUSTIN C. VANCE, ESQ.
5355 Reno Corporate Drive, Ste. 100
Reno, Nevada 89511
775-501-9400
Jvance@dotsonlaw.legal

For Washoe County School District Superintendent, Traci Davis:
THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ.
6590 S. McCarran Blvd., Ste. B
Reno, Nevada 89509
775-786-2882
Fax 775-786-8004
Kparks@thorndal.com



INDEX


| EXAMINATION | PAGE |
|---|---|
| TRINA RAE OLSEN | 6 |
| EXAMINATION BY MR. VANCE | 6 |
| EXAMINATION BY MS. PARKS | 255 |
| EXAMINATION BY MR. BUSBY | 262 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Email chain, 5/17/17, WCSD 1496 to 1497 | 53 |
| EXHIBIT 2 | Notice of Temporary Assignment to Traner, Olsen 000222 | 63 |
| EXHIBIT 3 | 5/18/17 email string with Gonzalez | 68 |
| EXHIBIT 4 | 5/23/17 emails, Ford/Doran, evaluation narrative | 73 |
| EXHIBIT 5 | Notice of Investigatory/Due Process Meeting from Lauren Ford | 82 |
| EXHIBIT 6 | Request for meeting, WCSD 4347 | 101 |
| EXHIBIT 7 | Emails, Olsen/Gonzalez, WCSD 2968 through 2970 | 111 |
| EXHIBIT 8 | 6/26/17, Notice of Investigatory Due Process Meeting | 125 |
| EXHIBIT 9 | 7/19/17 Letter of Admonition | 133 |
| EXHIBIT 10 | 7/19/17 Letter of Admonition from 2nd IDP | 152 |
| EXHIBIT 11 | 7/19/19 Notice of Investigatory/Due Process Meeting | 154 |





| | | |
|---|---|---|
| EXHIBIT 12 | Staff complaint form | 157 |
| EXHIBIT 13 | Text messages | 158 |
| EXHIBIT 14 | 7/26/17, handwritten notes, Alyson Kendrick | 167 |
| EXHIBIT 15 | 7/27/17, Notice of Administrative Leave With Pay | 169 |
| EXHIBIT 16 | 11/14/17 letter re: ADM G17-18#001 Part 1 | 175 |
| EXHIBIT 17 | 11/14/17 letter re: ADM G17-18#001 Part 2 | 175 |
| EXHIBIT 18 | 6/28/17, Notice of Recommended Dismissal | 189 |
| EXHIBIT 19 | 7/6/17, letter to Traci Davis | 192 |
| EXHIBIT 20 | 7/6/17, letter to Traci Davis Re: Grievance Protesting Recommendation to Discharge | 192 |
| EXHIBIT 21 | 6/27/18, letter from Traci Davis | 195 |
| EXHIBIT 22 | Decision and Award | 199 |
| EXHIBIT 23 | 12/20/18 email re: Settlement agreement | 205 |
| EXHIBIT 24 | 1/9/19 letter, Reich to Langton | 209 |
| EXHIBIT 25 | 2/8/19 revised Letter of Admonition | 213 |
| EXHIBIT 26 | Email correspondence with Anthony Spotts | 214 |
| EXHIBIT 27 | 11/13/19 Declaration of Trina Olsen | 221 |
| EXHIBIT 28 | 8/4/20 letter from Ellison | 224 |
| EXHIBIT 29 | Declaration No. 2 of Trina Olsen | 227 |
| EXHIBIT 30 | (Withdrawn) | --- |
| EXHIBIT 31 | Bank statement - *CONFIDENTIAL* (Not attached) | 231 |





| | | |
|---|---|---|
| EXHIBIT 32 | Bank statement - *CONFIDENTIAL* (Not attached) | 235 |
| EXHIBIT 33 | (Withdrawn) | --- |
| EXHIBIT 34 | (Withdrawn) | --- |
| EXHIBIT 35 | (Withdrawn) | --- |
| EXHIBIT 36 | Invoice list - *CONFIDENTIAL* (Not attached) | 250 |


-o0o-

BE IT REMEMBERED that on Wednesday, November 4, 2020, at the hour of 9:03 a.m. of said day, at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, CONSTANCE S. EISENBERG, a Nevada Certified Court Reporter, personally appeared TRINA RAE OLSEN, who was by me first duly sworn, and was examined as a witness in said cause.

-o0o-

TRINA RAE OLSEN
called as a witness, having been duly sworn,
testified as follows:

EXAMINATION

BY MR. VANCE:
Q Good morning Ms. Olsen.
A Good morning.
Q Thank you for being here this morning. I know we have rescheduled this a number of times.
A Yeah.
Q So it's good that we're finally here, got our Internet issues figured out, so we don't have to postpone it again.
Can you please state your name and spell it for the record.
A Trina Olsen, T-R-I-N-A, O-L-S-E-N.
Q And you are under oath. Do you understand the



significance of that?
A Yes.
Q Before we get started I would like to go over some brief ground rules to help this process move along as best we can.
You'll notice we have a court reporter who is taking down everything that's said. She has the hardest job in the room.
Sometimes we tend to do things like talk over one another. And in ordinary conversation we do things like nod our head, shake our head, maybe say "uh-huh" or "huh-uh." And that makes it more difficult for her to get a clear record.
So I'll ask that you try not to speak over me. I'll try not to speak over you, and ask that as opposed to shaking or nodding your head or using "uh-huh" or "huh-uh," that we try to give audible responses. Is that fair?
A Sure. Okay.
Q And I may fall into not doing that on occasion. But if you do and I notice that, I may say is that a "yes," is that a "no?"
I'm not trying to be snotty, I'm just trying to make sure we get a clear record. Okay?
A Yes, certainly.
Q If you would like to take a break at any time, you are welcome to do so. If I have a question pending, I would rather you answer the question first, then we can take a break and go off the record.



You'll be able to confer with your counsel. I'm sure you guys have arranged a way to be able to confer with each other despite the fact Mr. Busby is here via video link.
From time to time he may state an objection and that is part of the process. Objections aren't ruled on at this moment. If he states an objection and doesn't instruct you not to answer for a privileged reason, you are still to answer the question. Is that fair?
A Sure. Yes.
Q If you do not understand any of my questions, please let me know. I'm happy to rephrase or ask it again and try and ask a better question.
A Okay.
Q Sometimes I don't do my job very well. So help me help you, all right?
A Okay.
Q Following your deposition there will be a transcript prepared. You'll have the opportunity to review that and to make changes to your testimony. I'll just caution you that any substantive changes you make, like changing a "yes" to a "no" or "no" to a "yes," are the type of thing we can comment on at the time of trial and it could affect your credibility. Understood?
A Yes.
Q Okay. What did you do to prepare for your deposition today?



And let me clarify first. I don't want to know about any conversations you had with your attorney. The things that you discuss are attorney-client privileged and I'm not seeking to violate that.
So with that said, can you describe what did you to prepare for your deposition?
A Yeah.
MR. BUSBY: Just for the record, I'm going to object insofar as the question calls for any privileged communication.
Go ahead.
THE WITNESS: I reviewed documents just to -- I mean it has been over three years now, so I reviewed documents and just went through things in my head about what I thought were important, and just kind of practiced with my husband and talked about my case over all and the important details of it.
BY MR. VANCE:
Q Sure. What documents in particular did you review?
A The motion for summary judgment, the depositions that -- or I'm not sure what they are called, the statements from the -- that you took from other people.
Q Oh, the affidavits?
A Affidavits, yeah.
Q Okay.
A Those things. I just reviewed the answers, and reviewed -- let's see, motion for summary judgment.

I think I just kind of went through some of my notes, you know, just to refresh everything. And, yeah, that's it.

Hall investigation, I went over that. Although I don't really find that very relevant, I went over it.

**Q Okay. Did you review or did you bring with you any notes or anything like that today?**

A No. No.

**Q Could you state your address?**

A 1400 Belford Road, Reno, 89509.

**Q What's your date of birth?**

A 4/13/71.

**Q You are married?**

A Yes.

**Q Your husband's name is Brett?**

A Yes, it is.

**Q How long have you been married?**

A 11 years.

**Q Okay. Any children?**

A Two.

**Q Two children. How old are they?**

A I have an 18-year-old and a 10-year-old.

**Q 18-year-old. Is she going to college now or is she still in high school?**

A She's at UNR this year.

**Q Nice.**



A In the dorms, but about to get sent home because of the COVID.

**Q That's got to be really tough for an incoming freshman.**

A Yeah. Yeah. She's anxious for the next step though. She's ready. We'll see. She's got a pretty positive attitude.

**Q Can you give me an overview of your education, starting with high school?**

A Yeah. I was -- I graduated high school. I was an athlete so I received an athletic scholarship. I went to UNR.

In UNR I studied English as to teach secondary education and physical education, so I had a dual major.

When I graduated UNR I immediately went to work for the Washoe County School District and I was hired as a math teacher, ironically. And then like two weeks into it they must have had a plan because I was moved over to physical education when they knew somebody was leaving, so I taught PE for many years. Most of my career was at one school, at Wooster High School.

And toward the middle to end of that teaching experience, I started really working closely with kids on reading intervention, and just intervention and, you know, helping kids with their core classes and really using my content to build skills and help them with their core classes and graduation and, you know, to get over barriers, until I decided that I could do this a lot more and help kids a lot more if I -- this keeps falling. I could help kids a lot more if I was an administrator.



So at the age of 42 I got my master's degree so that I could help kids. And I got it very quickly because I was really motivated. I'm a very hard worker.

So I -- and I immediately began pursuing administration so I could lead. And then I went -- I was hired pretty quickly, put into the pools pretty quickly and got my experience as a dean, an athletic director, a reading interventionist.

There were lots of leadership positions on my way to administration until I was hired at Hug High School as an administrator.

**Q Okay.**

A And now I'm at Wooster.

**Q I know they are kind of intertwined, your education and employment. Right now I just want to focus on the education side of it, then get into the employment, which you have already given me a good overview.**

A Okay.

**Q Where did you go to high school?**

A Carson City High School.

**Q What year did you graduate?**

A '89.

**Q And then you said you were at UNR.**

A Yes.

**Q What was your bachelor's degree in, again?**

A It was in English and physical education.



**Q That's right. I was going to ask you if you did any post-grad work, but you just told me you got your masters.**

A Yes.

**Q What year did you get that?**

A '13. 2013. I also have my national board certification, which is a pretty big deal. The District recognizes it for -- and it's a big pay raise. It's not easy to get.

**Q Where was your master's from?**

A It was the -- what was it called? It was like the College of Education. I can't remember it. Sorry. That's embarrassing. That's escaping me right now. American College of Education. It's an online program.

**Q At any time if you don't remember or you don't know, those are perfectly acceptable answers.**

A Uh-huh.

**Q From time to time I may ask you -- you know, we're going to be talking about years, we're going to be talking about dates.**

A Uh-huh.

**Q Things like that. I should have told you this at the beginning.**

**You may not have a perfect recollection of the day that something happened. If you don't, that's fine.**

**I may ask you to provide me with an estimate, but I'm not going to ask you to guess.**

A Okay. Sure.
**Q You understand the difference between a guess and an estimate, right?**
A Yes, sure.
**Q From time to time something that you don't remember right now may come back to you. For example, the name of the place you got your master's.**
A That's embarrassing.
**Q That's perfectly fine. No worries.**
A Yes. And it was an online program so -- it fit perfectly with raising my kids. So American College of Education. Sorry, that escaped me a moment.
**Q No worries. You mentioned an additional license that you got, national --**
A My national boards.
**Q National boards?**
A For certified teaching standards.
**Q Will you describe what that is?**
A National Board For Certified Teaching Standards, it's like a two or three year process that you go through that you are -- just makes you a very highly qualified, recognized -- very highly-qualified teacher, just like those -- there are boards to other professions. It's the board, so it's difficult to pass. Not very many people do it, and I'm pretty proud that I have mine.
The District recognizes it and offers a substantial



raise if you have it, so I have that as well.
**Q What year did you get that?**
A I got it, I think -- I believe it was in 2002 or 2003, so many years ago.
And then I renewed it just before I went in to become an administrator. So you have to renew it after 10 years. You have to go through a pretty substantial process to renew it. And I renewed it.
And then you don't get it if you are an administrator. So I have my certificate, but you lose the raise when you become an administrator and start teaching.
**Q Got you. Do you continue to renew that after you become an administrator, or do you not worry about renewing it anymore?**
A Well, I'm renewed until after 30 years of employment anyway, so I probably won't have to renew it again -- but I guess it depends on where I'm at in the my career -- but I would definitely keep it updated, I'm sure. I went through a lot of trouble to get it.
**Q You said it took two to three years to get?**
A Two years. I think the process has changed a little bit now. I think they actually have a three-year timeline. I don't know if people can finish it early.
I'm not sure how it works now. It has changed a little bit since that date.
**Q At the time you did it, can you describe sort of the**



**process. Did you physically go to a campus to do course work? Did you do stuff on line? Tell me about testing. Just kind of how the overall process worked.**
A Sure. It's all about teaching. It's all about being a master teacher. So mostly -- there were four different components to it. Some of it was your, you know, your professional development, how you are contributing to the field, that kind of thing. That was one of the components. But there were three separate components regarding, you know, following standards. I had to videotape myself. I had to write about why I was teaching.
I had to really address different barriers that the kids in my class were facing, provide support, differentiation for those kids and be able to show that I could teach to all kids.
And that was in three different areas, you know, of teaching, so it was really about me. It wasn't about classes I was taking. It was about showing that I was a master teacher.
**Q Okay. Understood.**
**And you said that you completed that process in 2013, right?**
A That was the renewal. So the first one was 10 years before that, I believe it was around -- I believe it was around 2002 or 2003. And I think I renewed round '12 or '13. It was within the 10-year timeline I had to --
**Q Around the same time you got your master's?**
A No, I guess it was probably around 2011. I finished it



so -- oh no, no, no.
Gosh, I can't remember, but it was around the same time. I mean, when we're talking about around the same time, it was within a couple of years. I was doing one thing and I was doing the other.
**Q Fair enough.**
A Yeah, '11, '12, somewhere in there. I did a lot of school and a lot of work on my professional goals.
**Q Understood. Do you have any other education or any other licenses related to your profession, other than what we've already discussed?**
A No.
**Q Let's talk about your employment. What was your first job after you graduated?**
A After I graduated high school? Or college.
**Q Let's say college. I'm assuming you weren't a teacher after you graduated high school.**
A I was not a teacher. I did do some subbing during my college career, so I did work for the School District as a sub, I believe.
**Q How long did you to that for?**
A I don't remember. I think you had to have a certain amount of credits in education in order to be qualified to sub, so it was probably towards the end of my, I would say, the last year or two.

I did my student teaching at McQueen High School in English.

And then as soon as I graduated, I was hired at Vaughn Middle School, so exciting times.

**Q And so obviously I'm not in the same industry as you so I don't have a knowledge of exactly how it works. You talked about your student teaching. That's something you do while you are still working towards your degree?**

A Yeah. Well, you get your degree, and then it's like a fifth year program, so it's like in addition to get your teaching certificate.

**Q Kind of like a medical residency?**

A I would say, yeah, similar.

**Q Fair enough.**

A Just only a year.

**Q Sure. So you did that right when you got your degree. Did that for a year. And then you started at Vaughn Middle School, you said?**

A Uh-huh, yeah.

**Q What year was that?**

A I believe it was '96.

**Q And what did you do at Vaughn Middle School?**

A I was a PE teacher.

**Q How long did you do that for?**

A Two years at Vaughn and I wanted to be in a high school so then I applied for a position at Wooster High School, which was really near to Vaughn. My goal was to be at a high school.



**Q And when did you start at Wooster then?**

A I believe it would be '98.

**Q And were you also a PE teacher there?**

A Yes.

**Q How long?**

A Full time PE.

I believe I spent the next 15 years there. I think it was a total of 17 between Vaughn and Wooster. Yeah, I think that puts me about right.

**Q Okay. During those approximately 15 years at Wooster, did your job description or duties change at all?**

A Not very much. Towards the end when I started really working on leadership at my school, I was involved in a lot of committees and a lot of work for my principal, toward the school, you know, our school improvement plan.

I was involved in helping our struggling readers. We had a big grant on campus for readers. I worked a lot with our kids and their teachers. I just became very active involved on my own campus for my kids.

And as I, you know -- my job as a PE teacher was -- I loved my job. I love, love, loved my job and I was able to do a lot more outreach with kids in that role, which was kind of nice.

And I was the leader of many, many projects on campus.



We did -- I did District projects all the time too.

**Q I think PE teachers were always my favorite teachers, yeah.**

A I was especially in love with my job because I felt like I wasn't your typical PE teacher. I think your athletes love PE and you don't really have to do anything to convince them to love PE. I really worked well with our kids that were afraid of PE. So I was particularly proud of that.

**Q Okay. So you said were you there about 15 years. Does that bring us to 2013-ish?**

A Yeah. All that runs together now. Yeah, I believe so.

**Q I'm an attorney because I can't do math.**

A Yeah, I think I'm on my 23rd year now. I've been at Wooster for a couple of years. I have to think about -- I think I've been in leadership now for either five or six years, so added to that, that would put me about 23, so I think that's about right.

**Q By the time you finished at Wooster, that stint -- I'm talking about the 1998 to approximately '13-ish.**

A Yeah.

**Q Who was your direct supervisor at the end of your tenure there?**

A Leah Keuscher.

**Q Was she the principal there?**

A She was the principal, and she's the principal currently, and I'm back there again.



**Q At that time in 2013-ish, were you still -- was your official title still PE teacher or did you have any additional titles?**

**You described some of the things that you did, but had your actual job description or title changed?**

A Well, I was teaching different classes so, no. Yeah, I mean I was teaching different classes and I was doing my internship with Leah, I remember. Not internship, but there were additional hours, and I can't remember what they called it through the College of Education when I was finishing my master's, but she was give me some duties, you know, letting me help with testing, letting me do things like that, to try to get some experience before I transferred out into going into the pool for being a dean, and helping me with those experiences.

And so -- and I was also teaching reading then through the grant. I volunteered as a PE teacher to teach their reading program, and I gathered a bunch of data. I think that's what made Leah -- I think she liked that. My principal, she liked that I really worked hard for our kids and was able to show her some data.

**Q Okay. You mentioned going into the pool.**

A Yeah.

**Q And I understand that was probably not a swimming pool.**

A Yeah.

**Q Can you describe for me what you mean by "going into the pool"?**
A Yeah, I was actually the first class or the first group of people that made it into the pool. And what that means is they had a hiring pool of people that you had to go through a certain process with the District in order to make it into this pool of people. And then when they hired you at certain sites or school sites, they could only choose candidates from that pool. So you had to be in the pool in order to apply for site level deans, assistant principals.
There's -- I think there's even a teacher leadership pool. There's a teacher leadership pool, a dean pool, an assistant principal pool, a principal pool. And you've got to apply before you can actually apply for a job. So you do that.
Like, right now, I'm considering applying for the principal pool at the School District.
**Q Okay. So at this point in time you were applying for and getting your name into the dean pool?**
A Yes.
**Q And that pool is separate from the vice-president pool?**
A Vice principal.
**Q Or vice principal pool. Election last night. I've got it in my mind.**
**The vice principal pool and the principal pools, those are all separate pools?**



A They are all separate.
**Q How long after you got your name into that dean pool before you were hired as a dean?**
A Right away. I made it -- it's pretty difficult to get into the pools and I made it on my first try, so I was pretty proud of that.
And I got hired that summer. And so there was a couple of interviews I went through and I think it has to be the right fit at a school, you know, based on what you have to offer. And I became a dean at North Valleys.
**Q And who makes the hiring decision or who -- let's talk about that specific instance. Who made the hiring decision then to make you a dean at North Valleys?**
A I don't know. I went through the interview process there. And I believe -- I know that the people who interviewed me were the -- they have the two deans there so it was one of their current deans, and then I think two assistant principals were there.
I do not believe the principal was there for that interview but I'm sure that the assistant principal had to get it approved by our principal, because our principal makes those -- I think the principal at campus generally makes the hiring decisions. So I think she entrusted that to an assistant principal, but I believe the principal was involved.
**Q Is a dean considered an administrative position?**



A It's kind of a pseudo-admin position, so I would say no, it's a teacher position, because they get paid like a teacher.
In Vegas they do something different. They pay them higher, but not as high as an assistant principal.
Here you are not considered an administrator, but you are treated like an administrator, so you are in with all the administrators and your job is discipline, usually. Usually the deans handle discipline. And it's usually the deans that are promoted next to assistant principal.
**Q So it's kind of a stepping stone?**
A It's a stepping stone, yeah.
**Q How many deans were there at North Valleys while you were there?**
A Two.
**Q Two. And did you have different duties or did you do the same thing?**
A Oh. Oh, I didn't teach PE. That's it.
**Q I'm sorry, that wasn't a very good question. What I mean is did the two deans, while you were there, did you have the same duties or did it kind of divide and conquer?**
A We had the same duties in terms of discipline. Mostly deans handle the discipline and we work with one of the assistant principals to kind of guide us in that process, because there's a lot of legality to discipline.
And so we work closely with assistant principals on



that. Melinda Brown was our assistant principal. She's wonderful.
So we just divided the alphabet and then we would call in Melinda when we had questions or Linda when we got busy in the office.
But there were other little things that we would take the lead on, like the SEL, Social Emotional Learning piece, or, you know, gathering some data, or whatever -- I did like a smoking program to try to -- because we had a big smoking problem up there.
So we would kind of take little areas where we could support the school improvement plan, that we could lead, and -- but that weren't as high level as, you know, attendance or things like that, that the assistant principals were doing. So they would kind of give us tasks.
**Q How long were you a dean at North Valleys?**
A A year.
**Q And what happened next?**
A I moved over -- they lost one of their abilities to have two, apparently. And so I was able to -- I found that out early. It was disappointing, of course, because I was getting my feet wet. But I was able to move over to Galena High School. And I interviewed for athletic director and dean there, and I got that position.
**Q Who, while you were dean at Wooster -- or not Wooster,**

**I'm sorry, North Valleys?**
A Uh-huh.
**Q Who was your direct supervisor?**
A Melinda Brown was the assistant principal who mostly oversaw me and she evaluated me. And then the principal was Gina Curtis, but she didn't evaluate me, Melinda did.
**Q Okay. When you moved to Galena, as you said, athletic director?**
A Uh-huh.
**Q And dean?**
A Yes. It was like a half-and-half job.
**Q Can you describe for me what your duties were at that point.**
A Yeah. I had to learn the role of athletic director. That was a -- it was a lot. I supervised coaches. I arranged the duty schedule so that Admin was at the games. I made sure everybody had, like, their certification, taking care of -- made sure our coaches were cleared with HR, make sure their payment went through on time.
I was particularly proud of my work there because I had to learn a lot, but there was -- the person that was the athletic director before wasn't there to help me. He got moved, I guess, somewhere. And so I kind of had to pick up the ball and learn everything very, very quickly.
And by nature I'm a system builder, so -- and I'm pretty



techie, so I was realizing that a lot of the things that I knew that I was supposed to do weren't done. And so -- like there were coaches that weren't certified, there were problems with payroll and how that was done. Game changes -- that was one of the years that there was a ton of smoke, so a bunch of games got cancelled due to smoke, and so it was just a process.
So I just worked with my principal and my assistant principal. I was really, really close to my assistant principal, he's still my mentor to this day. He was the one I called during this later year here. And he was really a great role model for me.
**Q Was that Dave Murdock?**
A Dave Murdock, uh-huh. That's where I met him. And he's a fantastic leader, so I learned a lot.
And then I also did discipline.
There was a full time dean there and then I did half-time dean, so I would do less discipline than her because I was working on the athletic side of things.
**Q Okay. How long were you at Galena?**
A Two years.
**Q Did your job duties change at all during those two years?**
A Uh-huh. It switched to -- that's a whole interesting situation because it switched to reading interventionist. My principal -- so the other dean was Erica Sanchez. And I really --



I taught her everything. We were close friends. It was going really, really well that year.
But my boss, the principal at the time, did not choose me to take -- there was an opening for assistant principal. And he didn't choose me to go into that spot. So I approached him and questioned him and said, you know, is there a reason why the interim position -- I said did I not do a good job? You know, I asked him this question. And he said no, you did fine.
And then -- but he didn't give me an interview for that position, which really hurt. But, you know, I understand people are people. They are going to choose who they like or whatever.
And then he told me he was going to move me to the reading interventionist job, which I was really good at anyway.
And then that following year -- and I think this matters, I wouldn't normally say this in here -- but the dean that he chose that was highly favored over me but I couldn't understand why, they -- there was -- there's rumors, but they ended up both -- or the principal ended up getting fired the next year because of inappropriate relationship with her on campus.
So the person who got the job because -- and he didn't like me -- the next year the principal was fired from the school. And I wasn't a part of that situation, but I did wonder, you know, like that kind of solved the question of why I wasn't preferred over that person.
And, obviously, they don't share that part of it in the



District or in the newspaper so I guess some of that is hearsay, but he did get fired and apparently that was the reason why.
**Q Understood.**
**So you --**
A Anyway, I don't feel bad that I didn't have favor in that case. I still did my job and I went over and I had great relationships with teachers and I felt good about my role.
**Q I'd like to go back to what you were saying about not being interviewed for the assistant principal job.**
A Yes.
**Q At this point in time had you gone into the assistant principal pool?**
A Yes. Yes, I did. And that was a weird thing too, which my principal at North Valleys, she -- there was another dean who I was close to, her name is Laura. She had been trying to make the pool for a long time, to get into the pool.
And she's very talented. I don't know why she wasn't making it into the pool, but she tried -- so my first year was her third year as a dean.
And typically, in the School District, it's like a three year plan, right? If you don't become an assistant principal after three years or you don't get into a pool, like basically you are going back to teaching. That's kind of the progression. Like if they don't think you're ready to go up, then you go back into teaching, is typically how it happens.

It was her third year trying to get in a pool and it was my first. And we both had to have our principal's approval or recommendation to even apply for the pool. And I applied, because we all do, because we get feedback if we don't make it in and then we try again the next year. And I applied. I was very confident. And she didn't make it in and I did.

And so I was in a really weird situation because my principal had told me from the get-go that she was working on getting the dean -- sorry, if I'm going into too much detail -- but she had worked on getting the dean into that position, into the pool. And she -- my principal was angry that I made it into the pool. And she thought that I should have told her more. She felt that it was a really weird situation.

**Q Your principal was angry?**

A Yeah.

**Q But didn't she have to sign off on it?**

A She did. And she did. And so I don't -- I was just, you know, tail between my legs like I don't know what you want me to say, like was I not supposed to apply? I thought we were all supposed to.

And I think that she -- she felt that I was a barrier to her other dean getting -- which I think was part of the reason she was, like, you know, maybe it's best if you go to a different position. And so suddenly she didn't have a position for me.

**Q Okay.**



A But I had a great year. I had a really excellent evaluation at North Valleys, but -- and then she was able, that principal was able to fight, over the summer, the School District somehow, and get the dean into her -- to be her assistant principal without being in the pool.

So they circumvented the process and -- because of that pressure. So I think having me off campus allowed them -- because I made the pool, she didn't like that I was there.

So I don't know what happened but -- I don't know if that was too much to answer your question, but -- anyway.

**Q That's okay. You answered the question.**

A I could see where you were getting to with this so I wanted you to know what was going on with that.

**Q Can you tell me a little bit about how you transition, generally, from one position to another in a situation where you are not -- you are moved to Galena. Would you have considered that a promotion, or was it kind of a lateral move?**

A No, it was a lateral. It was a lateral. But it was a new experience. And every time I get a new experience I think it makes me more appealing to be an administrator, because having athletic experience -- because we have -- that's a really big role for one of our assistant principals, is to oversee athletics, just like there's an assistant principal who oversees discipline. Now I had discipline and athletics, as an athletic director.

**Q All right. And what I'm just trying to find out is how**



**it is that those lateral moves happen. Do you officially lose your job with the District and have to get rehired with the District?**

A Oh, no.

**Q How does that process work to just change positions to a different school?**

A Well, yeah. Well, you have to apply for them. So if I wouldn't have -- if I wouldn't have got the job at Galena or been offered the job at Galena, I would have gone back to teaching. They would have overaged me, so -- but because I'm not an administrator, the dean position, like you said, is a stepping stone. It's not administration.

So I had to go reapply at places. And the -- if I wouldn't have been offered one of those positions then I would have been overaged as a teacher. Then I would have just kept trying other places.

**Q So you wouldn't have necessarily been out of a job, you would have just kind of been demoted back to teaching and they would have found a position for you?**

A I don't know that you can say demoted, because I value my role as a teacher, but if it's a stepping stone, they get paid the same and so -- but, you know, with someone who is going into leadership, you want to stay in that stepping stone spot, so -- yeah. So I was -- I was -- I don't think I was lucky to get the job at Galena. I think I was -- I had what they were looking for



and I felt good about that move over there.

**Q You said you were at Galena for two years. Where did you go after Galena?**

A That's when I was hired at Hug.

**Q Can you tell me --**

A As an administrator.

**Q Can you tell me what year that happened.**

A So 2016. Yeah, 2016. Because it was the '16-'17 year that was my first year, and it was in the later part of that year, so 2017, that all of this happened.

**Q So during what months of 2016 would you have been -- do you need us to pause, Kathy?**

MS. PARKS: Huh-uh. Keep going. Thanks.

BY MR. VANCE:

**Q During what months of 2016 would you have been interviewing for that position?**

A July and August.

**Q And who interviewed you?**

A For the Hug position?

**Q Yes.**

A It was Lauren -- it was a big group of people. So it was Lauren Ford, Roger Gonzalez, Brad Bodine. He's one of the assistant principals there. He has been there forever.

And the rest of the people I don't believe I knew but there was a big group, probably a parent, probably lots of

Page 34

stakeholders.
**Q You were outnumbered?**
A Yeah. When you are getting hired into administration I think that's probably one of the biggest interviews you do, yeah.
**Q So you were interviewed in July or August and then started that school year August or September?**
A Yeah, August.
**Q August.**
A And it was probably July.
**Q How many assistant principals were there on staff at the time you were hired at Hug?**
A Including me?
**Q Including you.**
A Four.
**Q Who were they?**
A Tristan McElhaney, Rhonda Clark, Brad Bodine, myself, and then my principal was Lauren Ford.
**Q Sure. Now at North Valleys how many assistant principals were there?**
A I believe four. Because there was Desiree, Melinda, Josh and then Gina. Who am I forgetting? So maybe only three. I think at Hug they had more, even though they had less of a population because they were Title. I think that was a part of it.
They were given an extra -- they hired two that summer.

Page 35

Rhonda was there as a new hire and I was there as a new hire. And I don't think in the past they had had four, so I think they only had three before that.
**Q So does the number of assistant principals at a high school vary depending upon the needs of that school?**
A It varies, I think, based on population, or enrollment.
But I think there is some flexibility on campus and there's some ownership on campus of the principal to spread out their budget.
So if they have a certain grant, I think they can hire more.
**Q And how were -- you mentioned that Hug was a Title school. What do you mean by that?**
A Title 1 is a big grant for at-risk populations. So they get, I don't know, 3- or 400,000 -- I wasn't involved with the budget that much at that point -- 3- or $400,000 a year for having a certain percentage of free and reduced lunch where your kids are -- have a really low SES overall.
**Q What's SES?**
A Social -- socioeconomic status.
**Q Okay.**
A And so they don't have a lot of money. So the school gets more money so they can give them -- like the schools right now that have Title, which would be Sparks, Hug -- not Wooster -- they all have one-on-one technology for their kids. So they have

Page 36

a computer for every kid. So it just -- and it gives them more money to operate interventions, to do after school things, you know, Saturday things to get your kids caught up, and extra tutoring and extra help.
**Q Can you describe for me how the duties were broken down or shared between the four assistant principals at Hug?**
A Yeah. So you are going to make me remember. Let's see. I believe Brad was over curriculum. That's, you know, deciding the classes, the teacher schedule, all that.
I believe that Tristan was over attendance.
Rhonda oversaw the -- we had a new program on campus, the Gate program, so she -- I don't remember what else she did. I'm sure there was something else but I don't remember what it was.
And then we all had evaluation duties which takes up a good majority of our time, so we all split the teachers and had evaluation duties for our teachers.
And then I oversaw MTSS, which is huge. MTSS is Multitiered Systems of Support.
**Q Thank you.**
A Which is huge. It's like all your interventions, which is how you plan your tutoring, how you plan outreach for kids. It's when your kids are not doing well, what kind of supports do we supply them.
There was a lot of money involved in MTSS at Hug. Like

Page 37

somewhere at Reno and Galena, there's little to no MTSS program because they have -- they have a lot of kids that don't need -- so their program for their struggling kids is a lot smaller because their kids are largely on track.
At a school like Wooster, Sparks, Hug, they need a lot more MTSS, so there was a lot of planning in MTSS.
I oversaw Special Education. So I was in charge of making sure all the IEPs -- which were all legal -- meetings that, you know, making sure they are scheduled correctly; that there was an LEA at every one of them, that I am making sure and working with that department to follow protocol.
And I had never done that, so that was a lot.
I oversaw testing, which is a huge, huge part, especially at that time. Like this year, testing is not a big deal because they've cancelled all the tests.
But at that time, that was when they were doing the end of -- what were they called? It was the end of the year final exams. And it basically replaced the high school proficiency, so this kids had -- I mean, I had 2500 kids that had to pass the test in a secure setting. When I say 2500, I should say 2500 tests, not 2500 kids. Because the seniors had to take multiple tests in order to graduate high school. They had to pass that test, so --
And all the tests were being done electronically, so we had to have labs all over campus because our seniors were testing in every room during that time. So our technology had to be up to

date.

And testing turned out to be the hardest job that you could possibly imagine because of all the dynamics that were happening that particular year.

**Q We'll get into testing in a little bit.**

A Yeah.

**Q As you can imagine, we'll probably -- we will be talking about that in greater detail.**

A I'm sure. Okay.

**Q Can you tell me about -- I'm assuming you got a pay raise when you became an AP?**

A Yeah.

**Q What was the salary as an AP your first year?**

A I think it was 88,000 or 89,000 a year.

**Q What kind of benefits came with that?**

A I think mostly the same benefits as when I was a teacher. So I guess I don't know what you mean by that question. There might have been a couple of additional perks. I think there's a longevity bonus that comes with it.

**Q Yeah. And I didn't ask you specifically about benefits for a teacher, so I guess just in general, you know, what kind of benefits did you get. I'm not looking for any differentiating between the two positions, just in general, what were the benefits that you had at that time?**

A Sick days, vacation days, medical, dental, all the



normal stuff. There's a longevity bonus which was kind of nice. A little extra.

**Q How many vacation days did you get?**

MR. BUSBY: Objection. I'm going to ask that she be allowed to finish her answer to the question before you proceed to the next question.

THE WITNESS: I'm sorry, I didn't understand that. Sorry. I didn't understand you, Luke.

MR. BUSBY: I'm sorry. For the record, I'm objecting. You were interrupted in the middle of your answer, so I'm going to object insofar -- and I would ask that you be permitted to answer the question completely before you continue on to the next question.

BY MR. VANCE:

**Q Were you not finished with your answer?**

A No, yeah. No. So I can finish.

So the -- so the benefits, I think -- yeah, I think the benefits didn't change much. They were just the sick days, the medical. I don't think there's any additional stuff that you get for being an administrator.

**Q And how many vacation days did you get?**

A Oh, 15 days was the total we were allotted for a year, to include sick days and vacation. I think of those 15, I think four of them are considered vacation on an annual basis. And there's one, like some sort of weird gimme day, like if you don't



take it, you lose it. So you are supposed to at least take one vacation day every year.

And then I always donate to the sick bank, so I think they take that out annually, I'm not sure.

**Q Sure. And in your field and as an administrator, do you work -- I think a lot of people have the belief that teachers just work like nine months a year and then they have a whole summer off. Is that true? Or do you still work year round?**

MR. BUSBY: Objection. Compound question.

Go ahead.

THE WITNESS: There is a lot of belief in that. And sadly, I think it's, you know, people's work ethic that kind of gives people that feeling. I was one of those people who worked not only year round but every vacation, every summer.

I still do right now. Like I struggle to find the time. I'm only supposed to be 11 months a year. As a teacher you are supposed to work nine months a year. I know that teachers very often work over the summer to get their classrooms ready, things like that.

But as an administrator I am supposed -- my contract is 11 months a year. And I don't ever get a month off. So I struggle with that, with myself, in terms of I don't take a lot of days off. And I work very often on weekends.

And so, yeah -- but I do think the perception is that sometimes the District thinks that people aren't working as hard



as they are.

And I also do believe that there are principals and assistant principals who don't work hard and who definitely work less than they should, just in every job, I'm sure, in every profession.

BY MR. VANCE:

**Q And with your 11 months per year, you said that you -- tell me if I'm not phrasing it correctly. You said that you are on an 11-year contract?**

A 11-month.

**Q Or 11-month contract. But you still don't really take that month off; is that right?**

A Yes.

**Q And is that because you are not allowed to or just because you personally decide, you know, "I've got work to do, I need to be here doing X, Y and Z"?**

A A lot of the time it's -- that's a good question. I think I'm trying to figure that out.

I think a lot of the time it's because I'm a go-getter and I want to do a good job at my job. And when I'm given duties, I get things done. And when someone gets things done, they get handed more, you know. They are trusted and they -- so I work a lot by choice.

But certainly I'm learning to, now, that I'm -- I've been doing it for a couple of years, I'm certainly learning to

speak for myself and protect my time a little bit more. I know that I can't get everything accomplished.

For example, this summer we actually had a debate amongst the administrators and my principal, like, because one of our newest assistant principals took the month of July off, which is kind of typical, I think, down south, and I think there was even verbiage in School District documents, like, "typically we take the month off of July, but not if it doesn't work into your duties."

And my particular duties at my school right now are very front heavy. So with COVID, I had to inventory and get all of our computers up and working and ready to go. And I had to get them ready to check out, get them into classrooms. That was not an easy task, given the 6-foot rule and how do we keep them powered.

And the other thing was interventions and getting things up and running.

So I -- there was no way I could take July off. I couldn't. But one my coworkers did. And so, you know, I still am thinking when am I going to be able to take those days off.

And so I guess today is one of those days.

**Q Fair enough. I'm glad I could help.**

A Yeah.

**Q So is it fair to say that July was, if someone is going to take a month off, that's on an 11-year contract, is it typically July that would be the month that's taken off?**



A That's on an 11-month contract.

**Q Yeah.**

A Typically. It's not -- it's not written in stone but I think that's easiest for the principal. I think we're supposed to discuss it with our principal.

**Q Okay.**

A And so I haven't taken, really, any time off. I took three days to go to a trip in Oregon but I haven't really taken any time off all of summer.

**Q And that month, assuming somebody takes it, doesn't count against the sick days and vacation days that you have, then, during the rest of the year; is that right?**

A Correct. Yeah. And over June I was the only administrator working, again, because I did summer school and COVID, so it was all digital, I had to work with my teachers on a daily basis, I had to manage those kids.

So we had to post all those grades. We had 400 kids. We had the largest summer school in the District by far.

And so because we need so much more intervention -- and that mattered to me, I didn't want my kids to fall behind on credits -- so I had no time off this summer.

**Q Now prior to the facts giving rise to this case, which my understanding is we're talking about Spring 2017 --**

A Yes.

**Q -- is when things started to go sideways; is that fair?**



A Yeah.

**Q Prior to that period of time had you ever been disciplined at all by the Washoe County School District?**

A Never.

**Q And Lauren Ford was your supervisor at this time, right?**

A Yes.

**Q Can you describe for me what your relationship with Lauren Ford was like prior to Spring 2017.**

A It was good. She seemed to believe in me. She seemed to really like me. She asked me to do something, I went and did it right away.

My first two writeups on my -- we have to have three observations as a new administrator, and they are formal observations and they have to be done in a certain amount of time. So my first and my second one -- well, my first one was great. My second one was great too, although it came really late.

And I had a good relationship with her. She started to really lean on me, which I had experienced before. When she wanted something done, she came to me. And so -- and that's where I wasn't really good at -- I'm kind of like a Quarter Horse, you know. I wasn't really good at that time yet of protecting my time, so I was just taking on more and more all the time to prove myself or to be good -- to be a good soldier for her, and so -- and she was asking me to do stuff a lot.

And so, to me, I felt like she trusted me and that she



thought -- she told me that I was the only one of the group that she felt could be a principal. She told me that personally.

**Q And prior to Spring 2017, what was your overall opinion of her as a principal?**

A Prior to spring? So I mean I thought she was fine. There were things that I was beginning to question that I hadn't experienced before.

You know, she was -- she never -- she didn't come in to work on time. She missed almost every Friday of work. Just some things that I was noticing that I had never experienced before. I know she's a principal, I'm not her timekeeper, I'm not saying that. I'm just saying that as an assistant principal who is working really hard, I started to think what, you know, what is happening here. She was -- she was not on campus very much.

And then there were things happening with discipline over time that I really started to question. And it was hard for me.

But I was very, very much like "I'll do whatever my leader says" and I just tried to -- I certainly didn't know much as a new assistant principal.

So -- and I guess that kind of happens slowly, you know, just what's going on with some of these discipline issues.

When we had the stabbing and the shooting -- or not stabbing -- the shooting on campus with the kid with the knives, that was -- I was really, really proud of how I handed that, if

it's okay that I mention that, because it was in December and I was a brand new assistant principal. And in my mind, the most important thing I could do was know how to use my radio and know how to reach the police immediately. And I believe that my work that day was -- contributed to saving that kid's life. And I really to this day believe it.

And I was -- oh, I was also in charge of school safety. So I had a lot of things on my plate. And the superintendent said that Hug High School was flawless in that, you know. And I was in charge of those drills.

And so -- and when the kid had the knives, he brought them out like this. And the other assistant principal went running toward the area. We both saw him. We were standing right next to each other.

And I instantly got on and called the school police and said "Knives on campus, here's where we are, here is what the kids look like." And so that moment of stopping to get help, I think, was critical in getting our school police officer there, to get the whole SWAT team there, because within seconds he was -- you know, within another 60 second he was shot. So -- and they were already almost there.

So I was very, very proud of that moment, but I was ridiculed by my principal. And I remember just being so sad and then not -- it was a tough situation. And it was a scary situation for me. And I realized that I had done a really good



thing but she wasn't recognizing that. And so I just thought it was really heartbreaking.

**Q That was in December, you said, 2016?**

A It was in December, yeah. And then everybody knew, including the District police, they all knew that that was my voice that they heard that called. I called the Code Red on campus that locked down the campus. I took all the steps I was supposed to do. I was really proud of that.

My coworkers said they didn't even know how to call there, especially Rhonda, who was new, she said she didn't even know how to call the police. She asked me to teach her afterward.

I'm getting too much into that story. It's relevant to me, because to me, her not recognizing -- instead, she made fun of my voice on the radio, and so --

**Q That didn't sit well with you?**

A Yeah, it was emotional.

**Q Were there any other times prior to Spring 2017 that you had -- and, well, I guess I wouldn't call that a disagreement necessarily, you felt under-appreciated and felt that your teacher -- your principal was kind of making fun of you?**

A Oh, she did, out loud, make fun of my voice. And then -- and then just really never saying "good job," that was hard.

But I was a big girl, I could handle that. I just -- it was hard, thinking what in the world just happened and my



principal is not showing any -- you know, here I am, a new person, I had done everything for her. And so I just was like okay, you know, and then I just went on to the next thing. And it was painful, but I just kept doing it.

And so then my personality is, okay, what am I going to do next to make her feel like I'm a good worker, because it was really important for me. And that's when she started -- and she did trust me and she did believe in me even at that time. She just wasn't good at handing out praise.

So I felt like I can buck up on this. I still wasn't thinking she was a bad leader, I was just starting to question some of those things, you know.

And she was asking me to do stuff in Spring, starting January, she was asking me to lead huge projects on campus and she was asking me to put things together for that.

And so I just was like, okay, I'm going to do my job then. And I wouldn't complain about that. I mean, this is probably the first time I've complained about it.

MR. BUSBY: Excuse me. I'm going to -- do you mind if we take a quick break? I need to use the rest room.

MR. VANCE: Not at all. We've been going an hour so it's a good time. 5 minutes?

MR. BUSBY: Yeah.

MR. VANCE: Okay. We'll go off the record.

(A recess was taken.)



MR. VANCE: Let's go back on the record.

BY MR. VANCE:

**Q Ms. Olsen, you understand that you are still under oath, correct?**

A Yes, sir.

**Q Okay. I would like to move to the spring of 2017, which is kind of -- my understanding is that this litigation arises out of a series of events that kind of began around that time period. Is that fair?**

A Well, I don't know that this litigation is about that. This litigation is something that happened in May, so that would still be spring, so, yes.

**Q Yeah, I'm just trying to get a sense of, overall, when things started to go sideways.**

A Okay. Sure.

**Q And kind of where things started to happen that became important for what is now going to in this litigation.**

A Okay.

**Q It's my understanding you were testing coordinator in the spring of 2017; is that right?**

A Yes.

**Q Can you describe what those duties entailed.**

A Getting all of the people, departments, kids, everybody, technology, organized to take these very critical tests. So it took an extraordinary amount of planning. And the planning was

not always easy because all of our -- the people involved in testing all want certain conditions and certain things for their kids, like the math teachers wanted certain conditions for their math kids, and the English department wanted certain conditions for their English department, which made sense for their kids to be able to test better.

So it was a lot of collaboration and planning. So, yeah, technology, I had to work with people to help me set up and make sure -- they called them TSMs -- our TSMs were, like, buried in our admin office. These TSM computers were like the hub for delivering all the software to the computers and they were essential to be able to do testing for 2000 tests. And they were, like, buried in there.

So I started like months in advance, where are these TSMs? They were buried in the office, not even plugged in. So I got them all organized in the computer room, monitored by someone, so they could stay on all the time.

It just went on and on. There was a lot of stuff to prepare.

**Q Good job. Did you have a team that worked with you or under you?**

A No. That was what I was always trying to get from Mrs. Ford. There was some -- there was a certain person that was allowed to help me, she was a classified staff member. She was like a $15 an hour employee who helped me do a lot of the legwork.



And then when I needed help with, like, the computers, I would go to this new guy. His name was Mike Cohen, I would go to him and get -- you know, understand -- like I didn't understand how the stuff was pushed out. There was a lot of -- there was a District guy who helped me with understanding the tech part.

So I just went to the people that could help me at the time. And if I didn't know who to go to, I went to Lauren and said who do I get to help me for this or who do I get to help me for that.

Tristan was an assistant principal and he was pretty knowledgeable about the tech side so he would help me on some of that sometimes so I would consult with him.

And then when it came to scheduling for the team and -- for the tests, I mean, I would work with the department leaders and with admin team. So every week I would update the admin team in our admin meetings and say this is what I'm working on next, this is the plan I have. I would email it to them or I would type it out and say how does this work. Then I would go meet with the department leaders.

You know, it was a lot of collaboration and a lot of, you know, you really have to do a lot of buy-in for the whole school purpose. Because, like I said, like the math teachers might want one setup and the English teachers might want another. And their job is to kind of rally for their group of kids.

So, as you know, in leadership, you can't please



everybody, so I felt like it was important for them to be a part of that conversation so they knew why we were taking certain steps. So I tried to have a lot of personal conversations with teachers.

**Q Did you have any prior experience as a testing coordinator?**

A No. I had -- so testing coordinator includes all tests. Graduation tests. I was still doing HSPE from the previous year. There are tests for our CLS kids, which is our mentally disabled kids. There are special tests for them.

And then there's other, like data tests, like math tests and stuff. I had previously organized the math test, which there's no -- it's not a high stakes test but I had done that at Galena High School. I had helped with math testing.

**Q But this job as testing coordinator was significantly beyond that then; right?**

A Oh, yeah, it was huge, yeah, and very, very important role, because they are state graduation tests.

**Q Now eventually you ended up being removed as testing coordinator, right?**

A Yes.

**Q Do you know who made the decision to remove you as testing coordinator?**

A Lauren.

**Q That's your understanding, is that Lauren Ford made that**



**decision?**

A Lauren Ford, yeah.

**Q And what is it that makes you believe Lauren Ford made that decision?**

A She told me she was removing me as test testing coordinator.

**Q Okay. But she didn't tell you whether somebody with the State had required her to remove you as testing coordinator?**

A No.

**Q Okay.**

A She said, I'm removing you. And she was with Sandra Aird, the testing person. I don't remember her ever saying -- I mean, I knew the State was involved, but I've never heard of anyone, District wide, getting removed as coordinator for making an error.

MR. VANCE: Let's go ahead and mark Exhibit 1.

(Exhibit 1 marked for identification.)

BY MR. VANCE:

**Q We'll be going over a significance number of exhibits throughout the course of your deposition. I've tried the best I can, in order to expedite things, to have them all in order of how I anticipate using them. Things could change a little bit, but for the most part I'm hoping that we'll be able to just cruise through these.**

**I just ask that you don't take any with you when we're**

**done. The court reporter will need them back and she'll tackle you in the parking lot if you try to take them.**
A Okay. You got it.
**Q So Exhibit 1 that we're showing you, the Bates number is WCSD 1496 to 1497.**
A Uh-huh.
**Q It looks like an email chain between yourself and Lauren Ford; is that correct?**
A Yeah.
**Q Do you recall this email correspondence?**
A I do.
**Q If you look down at the email dated May 16th at 7:54 PM from Lauren Ford to you --**
A Uh-huh.
**Q -- second half of that first page, do you see that?**
A I do.
**Q It says, "Trina, per the NDE," Nevada Department of Education, "you are moved as testing coordinator." Do you know what that means?**
A It looks like that I was telling you that my memory, when she told me I was removed, seemed like it was from her. There's definitely an email. So my recollection was that she told me.
This also says "moved." I mean -- but, yeah, there's an email here that says it was per the Nevada Department of



Education.
When she told me in person that day, it felt like it was her, yeah.
**Q Okay. That's all I'm trying to get a sense for.**
**If this was a decision that was made by the Nevada Department of Education as opposed to Lauren Ford, you didn't have that knowledge or that belief at that time necessarily?**
A Sure, yeah.
**Q It's weird doing this with a mask. I want to lick my fingers to turn the page.**
**If you could turn to the second page of Exhibit 1.**
A Okay.
**Q Is this an email from you to Lauren?**
A Yes.
**Q Now, can you read that first paragraph, please.**
A Sure. "I will be around to help as you see fit. This is awful and I understand how bad this is. I truly am sorry. I'm completely numb right now."
**Q What did you mean when you said, "I understand how bad this is"?**
A I meant that I understand testing is a really important part of what we do. And I do understand that she's my boss and I understood that, like this is a big deal. I get it's a big deal.
**Q As we sit here today, do you dispute is that there was a testing error or do you acknowledge there was a testing error?**



A I acknowledge that there was a testing error.
**Q Can you describe your understanding of what that error was?**
A Yeah. There was a lot of information and very high level skills that were happening in a very short amount of stressful time. And that one of those skills was creating these -- I had to create these test tickets, so every kid had an individual test ticket with an individual code and all those things that we would put on their desks that day.
So I worked very, very closely with the District assessment people, because they knew I was new. That previous two or three days I was on the phone for hours with Mary Schumacher, trying to combine -- which is a very high level skill of combining two Excel spreadsheets, which data that was pulled from the State and also data that was pulled from the District Assessment Office. So we had to combine two Excel spreadsheets.
I don't know if you have ever done that, but it's a really big task.
**Q I'm not really good with Excel.**
A Well, very few people are -- and I actually think I'm okay with Excel, but this is a task very few people can do. There's no way I could have done it by myself.
So I worked with Mary Schumacher remotely on these two spreadsheets. And in that process we combined the two spreadsheets for the kids that were testing, which I think it had



like 2,500 kids' names on it with different test tickets. And there were like 50 columns of information.
Once we were able to get that and I was able to take that information and put it on to a test ticket, do a mail merge and put it on a test ticket, in order to get the tickets cut and ready for the kids on the first day of testing.
So I worked nonstop trying to get this done.
When I did get it done, Lauren was saying have you got this ready and have you got that ready, and that was the week before testing started on Monday. And it was probably Thursday, I think it was the 11th, and I was on the phone all day with her doing that. And then she said did you get the email out to staff? And I said I'm still working on it, because I was trying to get this high level skills done.
And I inadvertently -- because it was hard to know where the kids should go, there were all these rules, it was hard to know -- I thought, well, it would be helpful for the teachers, in addition to having all the information, that they have the list of where the kids are supposed to go that morning, you know, so they could say you are testing in English at this time in this location.
And so for my testing email that goes out to all staff, that's the one I was trying to improve with Lauren, I sent it to her, is this okay, is this -- you know, it's been a lot of work, is this okay. I included the Excel spreadsheet but I had hidden

all of the -- you can hide cells in Excel. So there were 50 columns. So I had hidden all those columns, so the Excel spreadsheet only showed the date and time of their -- and where the kids should be. So if any kid was lost, a teacher could go, oh, you are supposed to be in this room.

And I guess there's a way to lock that spreadsheet or something. But I had prepared it with Mary Schumacher, who is the head of -- or one of the bigwigs at Assessment who knew how to do this process, and I had prepared it.

And then I sent the it out to -- or I sent it to Lauren and had her approve it. And then I sent it out.

So apparently, somewhere in that document, if you expanded it and if a kid was to get their code before the testing time, then they could have cheated. They could have -- or not cheated, they could have taken it early. And so it was a test security issue.

So because it went out to staff and it wasn't locked, or that information was in that thing that I sent to staff, that was the issue.

But then they concluded after the investigation that that didn't happen, that nobody took it early.

But I understand it was a big deal because all those codes were there. But to be clear -- I mean, I was guided through that entire process.

**Q Do you know what needed to be done to fix that error, if anything?**



A Now?

**Q No, at the time. Yeah, at the time, once the error was discovered, did anything need to happen to fix it, to fix the breach of the test security?**

A You mean -- so after it was discovered, that day when we were doing testing.

**Q Right.**

A Oh, I'm sure they had to probably reissue the codes. I don't know, though. I was completely uninvolved at that point because they didn't let me be a part of it anymore.

But I'm sure there was things that had to be done and I'm sure that it was substantial -- I was very sad about it -- in order to maintain security moving forward, so I think they had to change the codes or something.

**Q But you weren't involved in that then?**

A No, they wouldn't even let me in my office over that error. It was shocking, actually.

**Q The end of Exhibit 1, that same email that we were just looking at, it says, "I know you are upset with me but do I have your support in keeping my job as an AP?"**

**Can you describe why you were concerned about this affecting your job as an AP?**

A Yeah. I'm actually glad that you bring this up because you're talking to someone who is a brand new assistant principal



who knows that her principal has not been kind to her, has not been supportive to her, has been -- there was a lot happening and I was just doing everything I could to win her favor and to, like, do what she needed me to do.

There was a lot of issues happening at that time, where I was requesting support outright in writing. I was working, you know, 20-hour days. I was not sleeping. I was -- it was an incredibly stressful time and I wasn't getting any support.

In fact, there was, actively, supports being removed from me during that time from that week. So right around May -- right around the whole time with the marijuana reporting, I mean, I had supports removed from me on the first morning of testing, before school, like, taken away. And I was a stress case.

So at this email, I'm thinking, oh, my gosh, like, I did everything I could. I have put my all into it. And she's the powerful one. You know, she is the -- I was still thinking does she trust me or not? I don't know if she trusts me. I don't know if she saw this as an error.

At this time, I think I'm a normal person, who is like, I'm a brand new assistant principal, I don't know if you see this as an error and you are going to support me, because you did approve the process and you were there with me the whole time through this, or if she was going to, you know, like try to go after me. And so I didn't -- I think it's an honest email to write.



**Q Yeah, you were concerned.**

A Yeah, I was concerned, like anybody else would be, honestly.

**Q And at this point in time you had believed that it was her who made the decision to remove you as testing coordinator, right?**

A Yeah, that was my belief. I mean, I believed -- yeah, she was clearly upset with me that whole week before. She was clearly -- her texts, her emails, her tone, everything was in -- I felt like I -- I felt sabotaged. It was hard. I just felt like no matter what I did, I couldn't make her happy.

And I was doing a great job, honestly. I mean that -- the mistake that happened was a mistake, that I was like, "Are you kidding me, this happened?" You know, like -- but it was a result of hours upon hours of after hours work, which I think is pretty normal for a testing coordinator about this time, to work a lot.

I think we were all working hard in the District at that time, I mean, but there was a lot happening from her that showed me that there was not a lot of support, and removal of supports.

And I was feeling like, "Are you going to support me or not?" And I wanted her to answer that, you know, so that's why I emailed her, like, "Is this a mistake or are you going to try to take my job?" It was more that kind of question.

**Q Did it have anything -- and I don't know, at the time were you familiar with Nevada statutes regarding test integrity**

**and the possibility of termination for certain violations of test integrity?**

MR. BUSBY: Object insofar as you've asked her a legal opinion.

Go ahead, Trina.

THE WITNESS: I knew that it was a big deal. And I knew that there were -- I mean, I had read all the work I was supposed to do and I knew that -- just like I think it was a well known -- you know, the reasons you can get fired as an administrator is usually money, or maybe something really, really important like this.

So, yeah, it certainly made me nervous because I knew that there was -- but I felt like -- I approved this with her many times. I asked for her support and I asked for help many, many times, so I felt like we were in together. That's what I felt like.

I knew that I had emailed her and texted her and asked her -- I knew that someone else helped me prepare that document. She had told me -- she actually put in my evaluation, in that January one, in my writeup, my official writeup, she said how everybody had said at the -- I wish we had that there, but she had said how the department leaders and teachers were so impressed by my organization around testing and that it made them feel good about me and that she was happy that I was over testing because I was doing a great job with getting it organized and being



detailed.

And then she said that's a really good thing because if there was an error, it would be -- it would be on me, not on you. I mean she put that in writing in my evaluation.

And so I felt like -- I mean I would never as an employee, because I have integrity, and I would never as an employee say this is your fault.

So in this I'm trying to say I'm trying to be accountable, and I'm trying to say, you know, Lauren, I really need your help, are you with me on this or not?

I feel like this is a -- that's what I was saying in that comment.

BY MR. VANCE:

**Q Sure. Thank you for that.**

**Let's turn to Exhibit 2.**

MR. VANCE: I guess let's mark Exhibit 2.

(Exhibit 2 marked for identification.)

BY MR. VANCE:

**Q Showing you what's been marked as Exhibit 2, Bates label is Olsen 000222. Can you take a look at this and tell me if you recognize it.**

A I do.

**Q Can you tell me what it is.**

A It's a letter from Roger Gonzalez saying that I was being reassigned to Traner Middle School for an investigation on



allegations of misconduct on my part.

**Q And the date on the letter is May 17th, 2017, and it says hand delivered. Do you recall being hand delivered this letter?**

A Yeah, I think so.

**Q Do you recall who gave it to you?**

A I think it was Roger. I think it was in the office. I'm not sure. That was a really horrible day for me.

**Q At the time that you received this, did you know what the allegations of misconduct were?**

A No, this was a shock to me.

So I still was like -- in my mind I was like, Does "this have to do with the testing error?" And to me, that wasn't a misconduct.

So it was confusing and shocking to me. It was confusing and shocking why I was being moved to a new campus, you know, which really felt punitive. Whether or not he says it is, it felt very, very punitive and very degrading, because of where I was put and what I was doing.

I started questioning in my mind, like why is this happening? What allegation has happened?

I can try to be accountable for my part in this testing error that happened or document error, or whatever you call it, that happened. I can try to be accountable for that, hoping that my principal was going to be supportive of me -- of us making an



error, but I -- the allegations of misconduct really got my head spinning about maybe this is about the week before, with the marijuana incident, which was heavy on my mind during this entire two days.

**Q Understood. Okay.**

**After receiving this letter, there's a couple of things in here. It says, You must turn over to principal Lauren Ford all Hug High School property in your possession."**

A Yeah.

**Q Did you do that after receiving this letter?**

A Yeah.

**Q What else did you do after you got this letter?**

A I think it was during that day -- I was already not allowed in the admin office, which still, to me, was shocking and degrading, like I didn't understand any of that. And I had no place to go. So I went and sat on the baseball field and just cried for a while because I didn't know where to go.

And then I got myself together and tried to, you know, clean my face and go up and face it and say what do you want me to do? I don't know where to go.

And she said something about visiting classrooms. And she wouldn't talk to me, she just kept texting me. And I was so confused at that time because in my mind I was still trying to believe that she liked me and that I was still leading, you know. And I was just really, really confused. And so eventually I was,

like, okay, shall I turn in my stuff?
So I did. When she finally said yes, go home, it was finally 2 o'clock or whatever, and I was supposed to report to Traner the next day. And so -- I don't know why I'm crying.
**Q That's okay. Don't worry about that.**
A But I was still trying to understand, like I was still grasping, like, "Are you going to be here for me?" Like, "You're my leader, you are the one that's supposed to support me in my learning."
Like, I was just thinking when is she going to talk to me, you know, like when is she going to have a conversation with me as my leader.
And I even -- even though there was stuff happening that whole semester that was confusing to me and that I wasn't sure was right and I was concerned about things happening on campus, I was still trying in every way to believe that she wanted the best for me and believe that she wanted to train me and believe that she -- she trusted me and respected me, you know, so I was confused.
**Q Okay. How long did you --**
A Let me grab a tissue.
**Q Sure.**
A I'm sorry. I'm actually not sure if I answered your question.
**Q You did. You did, yes.**
**How long did your reassignment to Traner Middle School**



**last?**
A The rest of the school year. So about three, four weeks, because it was in May.
**Q And then in June did you resume any activities back at Hug?**
A No. They -- yeah, he told me to take the summer off.
**Q From this moment on, did you ever go back to work at Hug?**
A No. No. I had to make an arrangement to even go get my stuff with the new principal.
**Q During these last few weeks that you were working at Traner, what were your duties there?**
A They put me in a room basically dealing with the SIP population, which is our kids that are high level behavior, have either emotional disturbance or -- so there are probably four or five kids in there. It's like an in-house detention with the kids. They need a lot of individual attention.
And then there was a classified employee who normally is in there with them, to get them their work, because they can't really make it through a classroom. They bust out of classrooms a lot, you know, just with behaviors.
And so I realized right away that -- that I was put there. And I know that working with kids like that is all about relationships, so I just started trying to build trust with them. And I missed quite a few days in there. I called in sick. I



always let the principal know. And emotional distress. I always worked with HR. I always let Roger Gonzalez know.
I don't think he was thrilled that I was taking days off but I didn't care. I was, you know, I was a mess. So I took days off appropriately and through the right channels, using my own sick time.
MR. VANCE: Let's mark Exhibit 3.
(Exhibit 3 marked for identification.)
BY MR. VANCE:
**Q Showing you what's been marked as Exhibit 3. Can you please take a look at this. This is an email string. It appears to be between you and Roger Gonzalez. Does that look right to you?**
A Yeah.
**Q Can you take a look at the last page, 2770, it starts "Good Morning, Roger."**
A Yes.
**Q Do you recognize this?**
A Yes, I do.
**Q Is this an email that you sent to Roger Gonzalez?**
A It is.
**Q In it you say, "There's much more to this situation and I will be defending myself."**
A Yes.
**Q What did you mean by that statement?**



A This is my first time reaching out to Roger, just letting him -- by this time I've realized that Lauren isn't going to work with me. She's not going to say hey, this was us, she's not going to take any accountability, she's not going to do any protecting of me. It's all -- I've realized that.
And so this is me -- I think, first of all, never being in any trouble, I had no idea of the process.
So I'm reaching out to him as the next person in charge, and saying -- and then I -- and this actually is very important to me because it's me saying you might not be aware -- I'm saying that there's this marijuana situation that's happening too. And I don't feel comfortable putting it on -- you know, saying I'm reporting this, on an email. I didn't know the process for reporting.
I'm starting to realize that she's -- that she's not going to support me in any way. And so I feel like I have to, like, let him know that there's something happening in this background that I just reported and, you know, but I can't say it on an email.
**Q Sure. So at this point in time -- and we'll get into the marijuana incident in a little bit.**
A Yeah.
**Q But at this point in time you hadn't reported the marijuana incident to Roger Gonzalez but you're thinking, okay, there's more going on here?**

A Oh, yeah.
**Q You just wanted him to know that there's more than just these testing issues going on.**
A Yes. And so I'm saying I'm being accused of misconduct -- but I don't know of any misconduct -- but there is something happening I have reported on campus and, like, I need your help, like what is going on?
I never expected to be removed from campus for making a mistake. I never expected that my principal, who I was wanting to believe supported me and trusted me and believed in my work, would -- was not. That wasn't happening.
So it made me realize that something else was driving all this, that there was something else happening. And I didn't know for sure but my guess was that it had to do with the marijuana incident.
**Q Do you know what direction Roger or Lauren were receiving from the Department of Education at this time?**
A No.
**Q Did you have any communications -- and I say at this time, I realize that's pretty broad.**
A Uh-huh.
**Q But May 16th, May 17th, the time that you're getting notice of these allegations against you, did you have any conversations either in person or over the phone with either Roger Gonzalez or Lauren Ford?**



A Over the phone?
**Q Yes.**
A I don't think so.
**Q Okay.**
A I don't think I talked to either one of them at all, other than when they were sitting in the -- in her office, other than when -- yeah, I think that's when they gave me the letter.
And I remember just being shocked. And then, you know, and I -- she had said something about multiple allegations and I'm like, "What?" You know, I just made a -- I'm just thinking is this about the one mistake on the email that we both sent out? Or, like, the word "allegations of misconduct," I just -- I couldn't wrap my brain around it.
So I was just in a guessing game at that point. My principal isn't supporting me. Like, what's happening.
**Q You were just trying to figure out what's going on?**
A Yeah. Yeah.
**Q Sounds like Roger mentioned in his response email to you that you had the right to seek legal counsel.**
**Did you seek legal counsel at that time?**
A No, I think I wrote him back and said -- I think I wrote him back a couple of days later and said -- wait, what did I say? I was trying to get someone to kind of walk me through the process. I had never been in any trouble. I had never been -- I didn't really even know what an IDP was. I just kind of learned



it like the month before when one of our teachers didn't follow like a suicide protocol, so I was just learning how to discipline employees. I had never been disciplined myself.
I didn't understand any of that process. Maybe it was being naive or just never experiencing -- I wasn't very political.
But I think -- I'm sorry, I forgot the question. Did I answer it?
**Q Yeah, I was asking if you sought legal counsel at this time.**
A Oh, no, I didn't, because I wasn't a member of the union so I couldn't go to them for help.
I was -- I just didn't know who I could talk to, to understand what to do. So I did not do that because I wrote him another email after that saying I don't think that it was the right thing to say.
Then I got nervous about saying I was going to get legal counsel, because I was like I don't think I should be saying that to the area supe; because in my mind I'm thinking maybe the area supe is going to help me. I actually thought Roger was the next person who would help me, at least walk me through the process.
I think I wrote him back and said I'm not getting a lawyer. I'm pretty sure I did.
I wrote him another one saying, no, it's the not right time for that, I'll just go through whatever process you have for me.



**Q You mentioned IDPs. It was shortly after this that you got an IDP, right?**
A Yes.
**Q Let's go ahead and mark Exhibit 4.**
A A few days later.
(Exhibit 4 marked for identification.)
MR. BUSBY: I think you're thinking Exhibit 5.
MR. VANCE: No, I'm not. I am going to go to Exhibit 4 first. I am trying to keep this stuff in order.
So Exhibit 4 does come before Exhibit 5, so we'll get to the IDP, but there is one more thing that we'll discuss really quick before we get there.
THE WITNESS: Okay.
BY MR. VANCE:
**Q So I'm showing you what's been marked as Exhibit 4. Go ahead and take a look at that.**
A Okay.
**Q Can you tell me what that appears to be.**
A Yeah. This is when I started to go into being defensive of what was happening with me, and understanding that, feeling like Lauren was coming after my job. And so I was trying to write down all the details of what had happened.
And, at some point, I think that morning -- yeah, on May 22nd, I emailed the director. His name is Mike Paul, the director of the evaluations system, the My PGS system, and asked

him for time stamps of my evaluation from my principal.
So I'm now fully aware that my principal is going to support me and I'm in protection of my job mode. And I want to write down time stamps of when my principal did the evaluation. And so I emailed Mike Paul that morning, May 22nd, in the morning. And by -- before noon.
So just a couple of hours later I hear from Lauren Ford saying I'm changing your evaluation, which was finalized and locked. She had to get permission from the District to change my evaluation. So it was finalized and locked back in April.
And so I didn't email her, I emailed Mike Paul. And he must have somehow reached out to Lauren Ford, because within -- I mean, that's my guess. I'm speculating, of course.
But he -- within 2 hours of that email, out of the blue she emails me and says I'm changing your evaluation. And the change in the evaluation was to remove all the positive elements.
So I forwarded that to Roger, thinking Roger is a person that I should go to for help. And I said, "Roger, being that you -- she has these allegations against me and the situation I'm in, I don't believe that changing my evaluation is appropriate right now," like I was expecting him to stop it because my evaluation was positive, you know.
And he said, no, you just do what she says.
**Q Sure. So these are -- just to make sure we've correctly identified what this is, it looks like it starts with the email**



**from Lauren Ford to you dated May 22nd, 2017.**
A Yep.
**Q Mentioning that she is changing your evaluation.**
A Yep.
**Q Then after that you forwarded to it Roger Gonzalez?**
A Yeah.
**Q And brought up your concerns to him; is that fair?**
A Yes. Because at this point I still think Roger might help me or at least be someone I could go to for support in the process.
**Q Sure. So in here, Lauren -- it looks like she has a number of bullet point items. Is that what you were referring to as the positive elements of your evaluation?**
A Yeah.
**Q Now in her email he says that these comments were generated by you. Do you dispute that?**
A Well, it depends on how you define "generated." Because she was -- for my evaluation, I asked her if I could provide her evidence of the things that I've done, which is very common practice, like -- so that someone can provide evidence to put into your evaluation so that they can give you a proper rating.
So when she rates me in a certain area, I can say, "but I did this," right?
**Q Uh-huh.**
A So her ratings, I asked her, I said can I provide



evidence in these areas, I think I did a really good job. And she said sure.
So I wrote her an email and said here's the evidence. And she had already given me -- and all of us, as administrators -- the feeling that she wasn't doing her job, because none of our evaluations were done on time, like she did my final observation after my evaluation.
So I knew that she wasn't putting any work into the evaluations because they weren't done.
And so I knew that if I was going to give the evidence, then I would just type it out for her and send it to her.
So I sent it to her. And she said -- and then we had this big, long three-hour meeting about my evaluation. And she said -- and she agreed with some of my rate -- like, I was like, "I'm really good at data." You know, we just talked about the elements of the evaluation like we do in any post evaluation meeting.
And she said -- I go, "Did you get the email that I sent you with the evidence?" And she said, "Yeah, would it make you feel better if I put that in your evaluation?" I said, "Well, sure, that's why I sent it to you."
So she copied and pasted it, which is actually unheard of, like they are trained not to copy and paste anything. So the fact that I'm showing -- I know well enough to provide information in an email so that she would put it in my evaluation -- because



she just copied and pasted it without even reading it, sitting right in front of me. I don't have access to put in it my evaluation, she did that, because it's my evaluation. I can't change my own evaluation.
So she put it in there. And if she didn't know to copy and paste something in an evaluation, then that's just another signal of her not knowing her job well, because even I knew that that wasn't supposed to happen.
But regardless, she put it in there and she said, "I think that I agree with these things." She told me that. She just put it in without really even reading them, and they supported my evaluation. And she locked my evaluation and I got an effective evaluation.
So did I generate them in terms of evidence? That is not un- -- that's not -- it's definitely normal to do that.
Did she put it in to her own words and put it in my evaluation? No, she copied and pasted because it was easiest for her at that moment.
**Q Okay. So did she, when she removed these comments from your evaluation, did she change your evaluation from effective to something less than that?**
A She did not change the qualitative ratings.
**Q Okay.**
A But she took out the positive narrative.
**Q Right. And in this email she's telling you that this**

**was just the wrong spot to put that; is that right?**
A And she makes it appear that I put it there. And I didn't. So she asked for evidence. It was normal. She's saying that because I generated it, it should go -- there's a spot below that is for comments regarding your narrative, so if somebody isn't happy with how things are, they would put stuff in to be proof.
But she certainly put it in there. And she certainly knew to put it in there. And if she wasn't going to put it in there, she should have said, "Why don't you put that in the notes," at the time of my evaluation.
She shouldn't have taken the positive -- what I think is she reread it. My guess is that she reread it and saw that a lot of the things that were in, that she put in, because she posted -- she pasted it in there -- conflicted with her -- what she was writing in my IDP.
So I think that she saw that they were conflicting with those things and she was like, "I better get them out of there because it appears that I put them in."
So nonetheless, her mistake of not knowing she shouldn't paste something into an evaluation is just another red flag on doing evaluation process. Even I knew that.
So it's shocking to me that this happened and that she was allowed to even go back and change my positive evaluation that she had put in there, it was shocking to me, and that Roger



Gonzalez allowed it during the middle of an investigation about misconduct that specifically addressed things that were positive in here.
**Q And did you end up following Roger's advice to go back into My PGS system and put those back in, in the employee -- what is employee note section?**
A Yeah, I think I did. Honestly, I don't remember. I remember being really overwhelmed and maybe kind of manic at that point, you know, because my job was at stake and I was moved, but I think I took the time to do that. I don't remember. I'm pretty sure I did. But I think I put in there -- not these things. I think I put in that she removed them when she shouldn't have, that she's the one that pasted it in. So I think I put in the story that I just told.
**Q And your report, after she removed these enumerate -- let me just confirm, these bullet points?**
A Yeah.
**Q Are these the bullets points that you had provided that she then copied and pasted into your report originally?**
A Yeah, yeah, she did it right in front of me.
**Q Okay. But that's --**
A She was like, "Oh, yeah, I agree with all of this." And she goes, "Let's put it in there."
**Q I just want to make sure --**
A And she put it in.



**Q -- that these bullet points that we see on Exhibit 4 are those same items.**
MR. BUSBY: I'm going to object again. I would just add the comment she be allowed to complete her answer before you interrupt her with your question. Thank you.
THE WITNESS: Thank you.
Yeah, I believe they are.
BY MR. VANCE:
**Q Okay.**
A I don't remember exactly every detail. I just remember seeing her, saying, "Yeah, let's put this evidence that you provided me into your evaluation." That's a normal -- it's normal to put evidence in but it's not normal for her to copy and paste it, to be -- to be lazy. I don't know what else to say.
It's normal for someone to get evidence in an evaluative setting and say, yeah, I agree, you did a great job in testing, let's put this in, and she's supposed to write her own narrative.
**Q Right.**
A So she just agreed and was just like, "Oh, this looks good. Trina wrote it."
**Q And Ms. Olsen, I'm going to have to tell you at this time -- so, for example, my question here was just whether these bullet points --**
A Oh, okay.
**Q -- reflect what it is that you had given to her.**



A Okay.
**Q And I appreciate that you want to give me a lot of information, but your attorney doesn't like it when I interrupt you.**
A Okay. You got it.
**Q So I do want to be clear, you know, when I ask a question, let's try to focus just on the question I ask, otherwise, we're going to be here all day. And if I can't, like, put the brakes on say hold on a second, let's get back to my question, then it's going to be kind of a rough process the rest of the day.**
MR. BUSBY: Object, for the record, to that instruction for the deponent. Just because the deponent is offering an answer you don't like, doesn't mean you can interrupt her in the middle of it or --
MR. VANCE: Right. But I can ask that my question be answered, right? We're not here for me to just say okay, go ahead and give me a narrative of everything that happened. I do get the opportunity to ask questions.
MR. BUSBY: You do. But you don't get to interrupt her when she --
MR. VANCE: If I don't get the opportunity then we're not going to get through this in the seven hours I've got allotted.
MR. BUSBY: I'm lodging my objection for the record.

Go ahead.
THE WITNESS: I do believe I was answering your question. I can get long-winded and I will try to stay focused on the question, but I do believe that in this case I was answering the question that was important at that time.
MR. VANCE: Let's go ahead and move to Exhibit 5.
(Exhibit 5 marked for identification.)
BY MR. VANCE:
**Q All right. Showing you what's been marked as Exhibit 5. Do you recognize this?**
A Yes.
**Q What is it?**
A It's the first IDP she gave me, from Lauren Ford.
**Q Okay. That's what I was going to ask, is "she" being Lauren Ford?**
A Yes.
**Q Okay. And do you recall how you received it?**
A Well, it says emailed in US mail. I think I did get it in the mail and I think that it was emailed to me.
**Q Okay. Before you received this notice of IDP did you have any hints or indications that you would be receiving it? Or was this kind of out of the blue for you?**
A It was -- yeah, I thought that I would get an IDP for this specific error that happened with the test that caused me to go to Traner. I had no idea that this was coming.



**Q Because this doesn't involve the testing issues, right?**
A Right.
**Q The letter directs you to have an IDP meeting on May 31st, 2017. Do you recall that?**
A I'm sorry, I'm a little chilly. I'm just going to put on my coat.
I'm sorry.
**Q Yeah, so the letter directs you to have an IDP meeting on May 31st at the District Office; is that right?**
A Yes.
**Q Do you recall attending that meeting?**
A I do.
**Q To your recollection, did it go forward on that date?**
A Yes.
**Q Who was in attendance at that meeting?**
A Virginia Doran and Lauren Ford.
**Q Anybody else?**
A I don't believe so, no.
**Q Did you have legal representation with you?**
A No. I didn't record it, I didn't take notes. That was kind of being naive. You know, I had no idea that I should be bringing those things, so I didn't do anything.
I think I did start taking notes in the middle of the meeting. I thought it was just to -- what it says, just asking me questions, so --



**Q Sure. Did you provide those notes, if you recall, in the context of this litigation?**
A I don't think so. I don't think I kept those notes. But, again, that's three years ago. I have millions of papers in a file and I don't remember having those, keeping those.
**Q Fair enough. Now this letter contains, looks like seven bullet points; is that right?**
A I believe so.
**Q And is it your understanding that those bullet points represent the allegations that are being brought against you?**
A At that time?
**Q Yes.**
A Yes.
**Q During the IDP meeting did you have an opportunity to the discuss these allegations?**
A Yes.
**Q Can you describe kind of the process of how that went during the meeting.**
A They just went through each bullet point and asked questions, and I defended myself and tried to provide evidence. I can't remember if I actually brought papers in or what I did. I just responded to them.
I think at that time it never in a million years did I think that this was something legal, I guess. So I just responded to them, I believe. It was my first experience in a room doing



that kind of thing.
**Q Who was asking you questions?**
A I think it was mostly Virginia Doran.
**Q And did she ask you questions about each of the allegations that are in that letter?**
A She did.
**Q And did you respond to each of those allegations?**
A Yes.
**Q Were there any of the allegations in here that you agreed with? Or did you generally disagree with each of the allegations?**
A No, I disagreed with all of them. And it was -- I just -- it felt like a joke to me, honestly. I mean I hate to sound that -- I mean the allegations that are presented here just didn't seem to have any merit, they didn't seem to make any sense. They were from months before. I had no idea they were coming. It just -- it did not make any sense.
And in almost every case I was like this isn't true, this isn't true, this isn't true. So I was just getting a taste of what was happening and I was very confused, but I really felt like none of these are true, what is happening.
So I was mad, you know.
**Q At the time of this meeting, were you still working?**
A At Traner, yes.
**Q There are a number of allegations in the IDP letter. I**

**want to talk to one -- about one in particular that I know you probably want to talk about as well, and that's the marijuana issue.**
A Yeah.
**Q In your complaint, which I've got a copy of it here, there's no need to mark it as an exhibit. Paragraph 14 of your complaint.**
MR. BUSBY: I'm going to object for the record. If you are going to refer to documents in the deposition, a copy needs to be provided to the deponent so she can see it. I need a copy as well.
MR. VANCE: You don't have a copy of the complaint?
MR. BUSBY: I wasn't sent one by you. It's not marked in order.
MR. VANCE: It's not marked as an exhibit. I'll read it.
MR. BUSBY: I'd appreciate if you let me continue my objection before interrupting me and I can have a clear record. And because this is on video it's hard for me to hear what you are saying when I'm talking, so would you mind letting me finish?
MR. VANCE: Sure.
MR. BUSBY: So I wasn't provided this. It hasn't been marked as an exhibit. It's not in the record, so I would object to any use of it in the deposition.
MR. VANCE: Sure. Objection noted, Luke.



BY MR. VANCE:
**Q Paragraph 14 of the complaint says, "On or about May 8th, 2017, Hug High teacher and department leader Patrick Rossi," that's R-O-S-S-I, "told Olsen that another teacher had told him that dean of students at Hug High Jessica Wilson had given drugs back to a student."**
**Do you recall that particular allegation?**
A Yes.
**Q Who is Jessica Wilson?**
A She was the dean of students at the time.
**Q And who is Patrick Rossi?**
A Patrick Rossi was a department leader teacher, so he led a department of teachers and he was a teacher himself.
**Q Do you know why we came to you with that information?**
A Because he trusted me to deal with it.
**Q Can you describe what Rossi told you at that time?**
A Yeah, he told me that he believed that Jessica Wilson had given back drugs to a student, that was turned in to the office, or to the discipline office, so to Jessica's office. And that during that meeting he believed that Jessica gave back the marijuana.
And he said that -- because he knew about that, he said he was reporting it based on a teacher that he was very close to and that she was scared to come report it because she was afraid that she would be in trouble.



She had been in trouble for, I don't know, something in the past, and she was afraid of Administration.
So Patrick came and said I'm worried about her because this dean gave back a student marijuana and now the student and the boyfriend is harassing the teacher, so -- the teacher that originally turned it in.
Do you want me to do that again?
**Q I want to make sure I understand. I want to make sure I'm following. Okay? Tell me if I don't have it straight.**
A I can use names, yeah.
**Q So the understanding is that you were told that drugs had been taken to the office.**
A Yes, by Sabrina Cellucci.
**Q And that Jessica had then returned those drugs that had already been taken to the office?**
A Yes.
**Q To a student?**
A Yes.
**Q Understood. All right.**
**Did you then eventually talk to Jessica Wilson about this?**
A Yes.
**Q Do you recall when you had that conversation with her?**
A Immediately. I walked from -- as soon as Patrick left my office -- and by the way, you asked me about what he reported



and what that conversation was, so that it also included his concern that the teacher was being harassed, so that was a big issue to me too.
So he left my office and I walked right in to Jessica's office. And I was concerned for her because if she screwed up, you know, she's a young dean, trying to do the best thing. And I didn't feel like she had had a lot of guidance on campus.
So I wanted to confirm with her -- and she was my subordinate so I wanted to confirm with her that that's what happened. And so I walked in and closed the door and said did you give drugs back to a kid? And she -- do you want me to continue?
**Q Yeah.**
A Because you didn't ask that question.
**Q Well, that was going to be my next one, though I appreciate you putting the pause on it so that we can make sure we're on track.**
A Okay.
**Q Yeah, I wanted you to describe how that conversation with Jessica went.**
A I remember it like it was yesterday even though it was three and a half years ago, but -- because it was a scary time.
And I walked in and said did you give a student back drugs?
And she was sitting at her computer and she threw up her hands and she goes like this, and she goes "Yes." She goes, "Yes,

I did." And she said, "But I only did it because Lauren Ford did the same thing." Or she goes, "Because Lauren did the same thing." And I -- or something to that effect.

She said, "I only did it because Lauren did the same thing." And I go, "What?" It was like both of us were like, "What?"

And I go, "What? Lauren?" And she goes, "Yes." I go, "Our Lauren?" And she said, "Yes, Lauren. Lauren Ford."

And I go, "Oh, my God. Oh, my God." And I'm just thinking how is it that I'm in this situation. I'm a brand new AP. And, I mean, I knew it was big right away.

And then I was like -- and then she said something about Lauren, and I was -- I just was like in disbelief that that had happened.

So then I said to her -- and I said, "Well," I go, "I have to think about this. I don't know what to do." And I said, "But the very first thing you need to do is you didn't put it in Infinite Campus, you didn't call the parent, the student wasn't suspended. There's no record that this even happened."

And I said, "You have to protect yourself," like, "you need to call that student up there and get" -- "issue consequences."

And the behavior matrix -- like we're supposed to follow a behavior matrix so we stay consistent across the District in terms of certain offenses.



So the behavior matrix for this student said that we should suspend. But we do have some autonomy to do things based on situations. So I was like, "You need to get that student up here and issue the consequences that you are supposed to."

And she instantly got on the phone and called down to the student's classroom.

And I said, "You need to take care of this. I need to figure out what to do."

And so the student came up, I guess. I didn't deal with it from that point. I left the office and I was basically in a panic, like I don't know what to do.

So that's when I -- I don't know if you want to know next steps.

**Q We'll get into the next steps, yeah.**

**So is it fair to say that as you left Jessica Wilson's office you were of the belief that Lauren Ford had given drugs back to a student?**

A It's fair to believe that I knew that there were problems on campus. It's fair to believe that I knew that Jessica had just admitted that she gave drugs back to a kid, which was later proven.

And it's fair to assume that she said, "Yes, I gave" -- you know, I said, "Did you give drugs back to a kid?" And she said "Yes. I only did it because I've seen Lauren do the same thing." So she's trying -- that was her gut feeling to just



defend herself on why she would do such a thing.

And I said, "Lauren. Lauren. Our Lauren?" And she said, "Yes, our Lauren. Lauren Ford." And I was like, "Oh, my God."

And so it's fair to believe that it could have happened. And whatever -- she told me that it did, and that's not my job to investigate. That was my boss.

I mean she was my subordinate, so I went to her. But when it came to my boss, that's not my job. So I knew that it got way bigger at that moment, and it wasn't my job to determine if my boss did that. It was somebody else's job to investigate that situation.

And so -- and as a brand new AP, I was in shock, like what is happening?

**Q Did you have any follow-up conversations with Jessica Wilson about that afterwards?**

A Yeah, I did. I think I called her after school.

At this point Lauren is giving me every -- every reason to believe that she can't -- that she's not happy with me.

I feel like I can't go to Lauren Ford because the allegation that Jessica -- was about Lauren Ford, so it doesn't make sense to go to Lauren Ford about it. You know, I was trying to think of who I should go to and I was trying to read up on the situation.

And so after school, I believe -- and this is where my



timeline is a little shaky because there was so much happening in those moments, but I believe after school I called her and I had her call me back. And she -- I said this is really bothering me, like I'm concerned about you, this is not the right thing to do, like never putting drugs back in hand.

And I said I equate it -- I said something like I know it's legal now, it's not like cocaine or meth, you know, or something like that. I said I know it's legal now, but it's the same thing as putting alcohol and -- you know, giving a kid back their alcohol.

And I said it's a very big deal, like -- and you didn't contact the parents and you didn't -- I said you didn't contact the parents and I said you didn't document it, so like you're legally bound, even if you don't give them a consequence, your job is to document everything that happens, you know, to put it in the Infinite Campus system, and to contact the parents.

And I told her, I said, "If that was my kid and somebody gave them back drugs and then didn't call me," like, "I would sue the District. I'd be so upset." And I was using that for emphasis. I've never sued anyone.

But I was like, "You've got to understand how serious this is."

And she said "Okay," like, you know, "thank you for your advice." I said, "I saw that you did document it now," and I said, "I just still don't know what to do."

Page 94

And she's like, "Okay. Thanks for your advice." And I'm sure she was losing it too.

**Q Did you have any follow-up conversations with her specifically regarding her statement that she had seen Lauren Ford do the same thing?**

A No. At that point, I don't -- there's a protocol in the District that when something happens, like you are not supposed to go to them and ask about them and ask questions. That's supposed to be handled with an investigation.

And I couldn't go to Lauren and report it. I -- because she alleged it was her, and -- or that also did it, you know, that's the reason I did it. And so the protocol is you are not supposed to go, like start conversations with all these people. You are supposed to do an official investigation, I think.

So we're always told -- even in this letter it says you are not allowed to talk to any employee, so I didn't know who to go to.

So I called Dave Murdock that night, because he's so thorough, and he's a good friend. And I said -- I said that I went to my dean and I said this and this is what she said. I go, "I don't know what to do. I don't know who I talk to."

I really didn't even know there was such a thing as a complaint, which you'll clearly see in subsequent documents. I'm like, "What? What do I do?" You know, I -- I didn't know who to go to or what to do.

Page 95

And so he gave me a couple of options, and I thought about it, because that was Friday night. So I thought about it over the weekend. And then first thing Monday morning I went and reported to Brad, because one of the options Dave mentioned to get support was to go to Brad Bodine, who is an assistant principal on campus.

And he was like a mentor on campus. I mean, he was a person, one of the two people, either him or Tristan, I went to for every question I had. I had a lot of questions because I was new. And I trusted him.

And so I went in to him, and asked him, or told -- and I reported to him.

And my expectation -- I'm sorry, I'm rambling again. Do you want me to continue?

**Q Well, I did want to ask you what Brad Bodine told you.**

A Yeah. So I walked in to Brad, told him what happened. Didn't even sit down. And he said -- and it was so disappointing, like it was so disappointing. He said that's easy. Tell Jessica to self-report to Lauren.

And I looked at him and I said that's it? Like I didn't know what to do. I was like, that's it? That's all I do?

And it was, like, really hard for me because I was hoping that he was going to stand with me and take -- help me through the next steps of what to do. And he said -- he never said go talk to Lauren Ford. He never said go to Roger Gonzalez.

Page 96

He never said to go to the police. He never said anything.

He said that's easy, go tell Jessica to self-report. He even used the term, "that's easy."

And I said okay. And I remember feeling super angry when I left because I knew that something else had to be done but I didn't know what.

And so I was like two days away from the biggest day of my professional career in doing testing, and I was overwhelmed and -- or I guess that was five days away now, that -- there's my timeline. Right.

So that was the Monday before the Monday test, so I was five days, five working days away from the Monday test. I was stressed. And so I left his office.

I walked directly to her office and I opened the door. And I said -- and then I closed it. And I said, "Jessica, you need to self-report this whole situation to Lauren Ford." I said, "I spoke to Brad and that's what I'm directing you to do, is to self-report to Lauren Ford."

And then I went to my office. And that night, because I didn't get the support I thought I would get from Brad -- not that he didn't support me, he just took the around-the-side level too. You know, he never reported it either.

So I felt like I did what I was supposed to do by reporting to Brad. He's the senior -- he had been an AP for 15 years, I think. And I felt like okay, for the moment, this is

Page 97

taken care of. I told Jessica to go self-report. She was like, "Okay," you know, she was -- you know, because she knew this was big too.

And then that night I went home and started learning or teaching myself about the negotiated agreement and what my duties -- like I went to documents and I went to papers to try to figure out what I had to do in this situation because, obviously, I wasn't going to get help from Brad.

And then that's when I saw that it was a 15-day report. And so I was like -- I feel like I did enough right now and the situation was taken care of, it's in Infinite Campus, Brad told me what to do, I told her to self-report. I was like for the moment it's okay, I have 15 days if I need to do something else, right?

And so I just -- then I just put all my time right back into testing, figuring that I had time.

**Q Gotcha. So this 15-day requirement, I want to ask you a little bit about this.**

A Sure.

**Q Now as a licensed educator there are certain things that trigger mandatory reporting, right?**

A Uh-huh.

**Q For example, you know, abuse of a student?**

A Right. That would be different.

**Q That's what I want to ask. Is this sort of thing, the drug issue, something that falls under the category of mandatory**

**reporting?**
A No, it isn't. And I actually -- I'm glad you asked that because I think there's a real distinction between -- first of all, the marijuana incident, there was no immediate peril, there was no immediate danger with the kids.
This was a supervisor's not following policy situation, not a kid has marijuana in their hand right now and it's sitting in the office and there's -- it involved making -- you know, I was reporting something I thought was dangerous for kids, but that had already transpired and passed. And so by the time I learned about it, it was done.
And so to me this was a -- our leaders aren't doing, they're not following policy and that could put kids in danger.
**Q So can you give me more information on where you found this 15-day reporting policy?**
A Yeah. It was in the negotiated agreement.
**Q And what exactly was the policy, if you recall? Not word for word, but I'm just -- you know, you mentioned it's different than the mandatory reporting requirement for things such as abuse.**
A Yeah.
**Q So what is supposed to happen?**
A I don't remember. It just fit into -- it fit into what I was looking for. Like this incident kind of fit in to -- in the negotiated agreement, when you want to make a report, that's where



I thought I saw the verbiage, you know, in terms of reading a document and figuring out where I was responsible.
I felt like -- I just don't remember the specific verbiage, but it was somewhere in there and there was a 15-day kind of -- that's all I know.
**Q Fair enough.**
A It seemed to fit my situation.
**Q And all you can tell me is what you know. I'm not going to ask you to go beyond that, so that's fine.**
**Did you feel at that time that there was the need to get school police involved?**
A I did not feel at the time I needed to get school police involved.
**Q And does that go back to what you just told me that there wasn't any immediate threat to safety at the time?**
A Yeah. We always involve school police when there's marijuana. Like my experience as a dean, when we had marijuana on campus -- and granted, it was that year that it was legalized, and so it was like just brand new.
We always involved school police and the school policemen would decide if they cited the student or whatever. So it was that -- we always involved them.
But, like I said, the marijuana piece of that had already happened and there was no marijuana to investigate. There was none of that. And our deans did involve the school police



normally when there was marijuana on campus, but the marijuana had been gone for like four days by then.
**Q Sure. At some point did either Brad Bodine or Dave Murdock suggest to you that you discuss the matter with Lauren Ford?**
A Brad Bodine did not. And he said in his statement he did, and he did not. I think that was his protection, kind of. He's worried he is going to get in trouble.
He did not. His sentence was very quick.
And my conversation with Dave Murdock was he was giving -- he gave me options. He was like, "you could do this, you could do this, you could do this."
And I chose the option that I felt I was the most comfortable with.
**Q Was one of the options that he gave you to talk to Lauren Ford?**
A I don't believe so. I can't recollect now but I believe the options he said was could you go to -- or maybe he did say -- he said could you go to Lauren. And I said, no, I can't go to Lauren. It was about Lauren. You know, I said I can't go to her.
I really felt like if I went to her that she was going to -- it was going to be about me. I don't know. It was really weird. I don't think she trusted me. There was a relationship that was already tough because of testing, and -- and, most importantly, the allegation was about her, and so I didn't feel



that that was my role. I felt like it had to be handled by someone else.
And so when he -- he said can you go to Brad, he'll support you, he'll give you help, I was like that seemed like the perfect next step, to go to my mentor, my equal on campus who was a long time AP and he would walk through the steps with me.
And he also mentioned Roger Gonzalez. And I was like, "I can't just go straight to Roger Gonzalez right now," like, "can I?" I mean, like I wanted to handle it discreetly. I wanted to handle it taking the right steps. I knew I had to do something with the information.
So my choice, after talking to Dave Murdock, was to go to Brad and to try to get support in the next steps as a new AP.
MR. VANCE: Let's move to Exhibit 6, if we could.
(Exhibit 6 marked for identification.)
BY MR. VANCE:
**Q Okay. I'm showing you what's been marked as Exhibit 6. The Bates number is WCSD 4347.**
A Uh-huh.
**Q Do you recognize this document?**
A Yeah.
**Q It looks like an email from you to Roger Gonzalez?**
A It is.
**Q Did you send that email?**
A I did.

Q So at some point in time you did report the marijuana incident to Roger Gonzalez. Is that what this is, is your -- well, your first report to Roger?
A So I think the first time I was trying to say something is happening, I need your help, was in that last email we looked at, where I was like, "There's more to this going on," but I hadn't -- I had no proof that Lauren's actions were based on the marijuana. It was just a feeling.
I was like, "There's something happening and I need to talk to you." And that was that first email on the 16th, I believe, or the 17th.
Q The one that you wrote after getting the notice of reassignment?
A Yeah, it was --
Q We'll find it here.
A It was exhibit -- this one.
Q Exhibit 3?
A Exhibit 3, on the 18th. I was asking questions about the process. This confirms, obviously, that I don't know the process. I don't know what to do.
Q Well, this is in response to the allegations of misconduct, right? This email that you sent?
A Yes.
Q And so -- and I think we discussed this earlier. You said that you had some -- that there's more to it than what he knows, right?



A Yeah. That last line is very -- like, to me, it's ominous, like there's something happening here and I need to talk to you. And I didn't feel comfortable just throwing it on an email. I just didn't know what was happening at this point.
And I just said, "I just got this letter from you saying there's allegations of misconduct," and I'm like, "What misconduct? I made a mistake in an email." And so I was confused.
And that's why I was, like, starting to be aware that it might be related to the marijuana problem.
But I'm not going to say this is my guess, it's the marijuana issue, in my first email to him. So I'm trying to alert him that something is happening, I need to talk to you, but I don't know the process.
Q Gotcha.
A So that was my first time trying to reach out to him.
And then by this one I had started reading and trying to understand policy and understand what to do and what was happening. And that's why I tried to be all fancy and quote articles.
Q Gotcha.
A But this is what I'm saying, "There's a marijuana incident," like, "I need to talk to you."
Q So the first time that you mentioned to him specifically the marijuana incident, was this Exhibit 6, the May 25th email?



MR. BUSBY: Objection. Asked and answered.
Go ahead.
THE WITNESS: It's the first time I used the word "marijuana." I think I alluded to it in that one, but this is the first time I used, like, "there's a marijuana incident that we need to discuss."
So I obviously made it clear that something is happening that's bigger than the testing, yes, because he wouldn't respond to me.
BY MR. VANCE:
Q And there was -- let's see. Let's go back to Exhibit 3. That's the one we just talked about. Okay? So you said that you alluded to it in Exhibit 3.
So what made you decide to report this to Roger Gonzalez?
A I started to realize that maybe my removal from campus had to do with Lauren Ford. I guessed that Jessica had reported, as I had told her. And I had -- so I started to think that it was because she was retaliating, like I started to think that this was all combined and that I needed to report this.
And, also, that was the right thing to do after I read the negotiated agreement and had time to sit and understand all these things, that 15-day process. I was like, "I've got to" -- "You have to know what's going on. I reported this on campus. This is what's happening."



And I started feeling like she was retaliating against me. I was like, "What are these allegations of misconduct? What's happening to me?"
Again, it was a testing error that I felt like any normal principal would have said, "Oh, my God, Trina, yeah, this is a big deal, we've got to fix it."
And, you know, even if she would have removed me as testing coordinator, that doesn't mean remove me from campus, not allow me anywhere, treat me poorly.
I was still -- I realized now that there was something way deeper that Lauren Ford was doing. I mean it's unheard of for a testing coordinator to be removed from campus, especially since I was brand new and was supported, you know, like she approved my emails and everything, you know.
So I had done a great job on campus up to this point.
Q At this point in time, your email to Roger Gonzalez, had you had any discussions with Lauren Ford about the marijuana allegations?
A No.
And Roger was the -- you know, he was the person that oversaw Hug High School, so he was the -- he was the person I felt like I should be reporting to as the -- I don't know, the public official or the person who oversaw, or whatever. He was the one that I thought that I was required to report to.

**Q Right. And this email, Exhibit 6, this email was dated the day after you received the first IDP letter; is that right?**

A I think so. I'm not sure. You would have to look at that date.

**Q Yeah, that was exhibit -- oh, Exhibit 5, right? Yeah, that was May 24th, and so this email was May 25th.**

**Was there anybody else, other than who we already discussed -- Brad Modine, Dave Murdock, by now Roger Gonzalez -- anyone else that you had reported the marijuana issue to?**

MR. BUSBY: I'm going to object insofar as it calls for privileged communications.

Otherwise, go ahead and answer, Trina.

THE WITNESS: I don't believe so. I believe those are the only people.

I was following the direction of that letter that said don't talk to anyone about the testing error, but I was like, "This has to be related." I mean, you know, things were just starting to -- like, this has to be more than just the testing error, you know.

It was, like I said, it was unheard of to remove an assistant principal from campus for making an error.

BY MR. VANCE:

**Q Can you read the second paragraph of Exhibit 6 there.**

A "I know I'm responsible for the testing error and I'm accountable for that incident. I've been waiting for notification



and allegations for this incident and have not heard anything at this time. There is a lot to be learned from this incident that needs to be discussed."

**Q And I know we've already talked about the testing error but can you just explain what you meant by saying that you knew you were responsible for the error?**

A Yeah. I'm actually really glad you asked that question again. You have to remember that I am a brand new AP who is fighting for her job and trying to figure out if my -- if the -- if my principal was supporting me.

And then at this point, I feel like there's a lot of people telling you to be accountable and to admit your errors. And what I've learned from this whole three years is nobody really wants you to do that because if you admit your errors, like, if you admit -- like, I mean I'm so reflective and so accountable. I'm trying to show Roger, like, I'm a part of this error. You know what I mean? I'm trying to win credibility from him that I understand this process but not that it was all my fault.

And I feel like, telling the truth in these situations, they just steamroll you. And I will always tell the truth because that's who I am.

So you're asking me why did I tell the truth? Because I'm trying to be reflective and accountable in an error that I know I was involved in.

And it really ticks me off that Lauren never was, yet



she says I was -- I wasn't accountable, you know.

So here I am trying to be a good person to Roger Gonzalez, saying, "I'm willing to say," like, "there was a mistake involved in this," right?

And at this point I'm still willing to take it all on my shoulders, because I'm never going to say Lauren Ford did it. Like, I'm never going to be that person. Like, if I'm involved in that process and I'm learning? But I would expect her to trust me, as a new assistant principal, and to say "I was a part of that problem."

And that's where the biggest problem in our relationship was, was she didn't do that for me. She was like, "It's all her fault, this new AP." And that's why I wrote that.

**Q So you kind of took the high road --**

A I took the high road.

**Q -- and were accepting accountability, but feel that Lauren Ford --**

A Didn't.

**Q -- really failed to accept responsibility where she should have?**

A Not only failed to accept responsibility, she outright blamed. She told everybody there it was me and all my fault and there was no mention of all the stuff that went into that moment and who else was involved in that moment.

Because I wouldn't even say it was just her. I would



say Mary Schumacher of Assessment was a part of that. She helped me build the spreadsheet that had the codes in it, you know.

And it was hours and hours, I think, not having enough support from Student Assessment on these huge high level tests -- that are now gone, by the way, because they weren't successful, I think, across the District.

But I think there was multiple people. And they didn't just look at it as an error. They looked at it as here's where I can get Trina.

And I'm piecing this together and not hearing anything from anyone, so I'm still trying to take the high road, to this day.

**Q So you are pretty frustrated with Lauren Ford at this point?**

A And it's getting worse by the moment.

**Q Did you -- now at this point in time you are still at Traner, right?**

A Yes.

**Q Did you have any indications or any belief as to whether or not you were going to eventually end up back at Hug working with Lauren again?**

A No. I mean, I didn't know what it was going to happen. I imagined that I would be back working at Hug.

And then she got promoted at this very week. So having an allegation of marijuana at this very -- like these two weeks

that this is happening, she is actively getting promoted to area superintendent and getting announced to the whole district. I should say in the next four weeks, I think.

So, I mean I -- I believe that the fact that there was an allegation of, from my dean, you know, that that was happening, I believe that was scaring her to death in her pending promotion.

**Q Do you -- are you able to narrow down a little bit when Lauren got her promotion?**

A I believe it was announced -- she talked about it on campus like as if it was a given.

**Q So she expected it?**

A Uh-huh.

**Q She knew it was coming?**

A She was being trained or people were always talking about her going down to Vegas to get this training and, you know, that she was Traci's favorite.

That's all just hearsay, of course, but we all knew that she was probably going to get the job, and it was really odd.

And I think that that happened -- I think around the third week in June, I think, it was announced to the staff.

I believe that it was actually the day -- I remember it -- well, I think around the 18th or 25th, somewhere in there.

**Q Of June?**

A Yeah.

**Q I won't hold you to a specific date. Estimate is fine.**



A But, yeah, I mean that was actively happening. And then she was announced at that time, so, of course, those three weeks leading up to it, whatever interview process and all that, was going on.

So I'm sure that it wouldn't have looked good if they knew that there was an allegation of Lauren Ford returning marijuana. And I believe, myself, I believe that played a part.

MR. VANCE: Let's go ahead and mark Exhibit 7.

(Exhibit 7 marked for identification.)

BY MR. VANCE:

**Q All right. I'm showing you what's been marked as Exhibit 7. It's Bates number WCSD 2968 through 2970. It's an email chain. And it appears to be between you and Roger Gonzalez. Is that correct?**

A Yes, it is.

**Q Do you recall having this correspondence with Roger?**

A Yes.

**Q Can you describe for me what the purpose of this email correspondence was.**

A Well, with the first email it says -- I mean, like I'm basically begging for help. I said I need your help, I don't have a -- I'm not a member of the union, I'm doing this in the dark. I got news yesterday that there were more allegations coming at me for testing violation. I'm just feeling attacked from every corner.



I feel like at this point, he's still someone that I can go to, to get help.

I'd been told not to talk to any district employee, so I'm afraid to talk to anyone except for my husband. You know, I'm like, "Where do I go?" So I'm begging -- I mean, I'm literally begging for help.

**Q When you said, "I got news yesterday that there were more allegations coming at me," were you referring to the IDP meeting that you had the day before?**

A No, the IDP, the letter, that I got two separate IDPs, one for those first allegations that you already went through --

**Q Uh-huh.**

A -- and then one for the testing allegations.

So I stated there's more allegations coming at me for testing violations. So I had already done the IDP meeting to defend myself to the first set of allegations.

**Q Right.**

A The second IDP letter, investigatory due process letter, I was waiting for it, because I knew there was going to be something for the testing.

**Q Right. So you hadn't received that second IDP letter, right?**

A It looks like not.

**Q We'll get into that in just a second. So just for timeline sake, I'm trying to figure out what it would have been,**



**because this is an email dated June 1st, 2017.**

A Uh-huh.

**Q So it says, "I got news yesterday there were more allegations coming at me for testing violations." And I'm just trying to figure out where it would have been. Yesterday would have been May 31st. So what was it on May 31st that gave you indication of additional allegations coming?**

A I think it was probably -- I don't remember specifically, but it was probably when I was at the IDP meeting with Lauren Ford and Virginia Doran. Because I was in that meeting and I think I was like, "I don't understand. I thought that originally this was about testing violations."

So -- and then I think they said there's a whole other IDP coming at you. And I was like, "What?" Because when I got this first IDP, I thought I was going to be the testing violation that happened, or the testing error, I like to say, that happened.

So when I got that first letter I was like, "I'm confused." And so when I went to the IDP I mentioned it to them. And I think that that's when -- that's why I said I got news yesterday. I'm pretty sure. So I think that meeting was the day before.

**Q Okay. What did Roger direct you to do in response to this first email that you sent?**

A I want to note that I said here, "I've tried to do the right thing every step but I'm out of my league and I need support

in reporting things."

Like, this is me reaching out again. He never -- he would never meet with me. So I'm basically saying, "Please help me," like, "I need to report something that I told you about."

And then he said you're aware that the testing issue took place. And then he tries to get me to report to Lauren because -- I think at this time, I don't -- I mean, I would have to look through the -- because you can see it's all happening within like 48 hours --

**Q Yeah.**

A -- between them and between me and everything that's happening.

So I think at this time, I don't know if Roger has been told about -- I'm pretty -- so I have to back up. I don't know if you want me to continue because it's complicated.

**Q Well, the question that I had originally asked was whether, how Roger Gonzalez had responded to your first email. So we are kind of getting outside the bounds of that question.**

A Okay. So here is how he responded, right?

**Q Right. You mention in there that he said -- I think you said that he directed you to report to Lauren Ford?**

A Yes. And then I wrote back to him and I said my concern is about my supervisor, so like I don't feel I should have to report to the supervisor when there was something I needed to report about my supervisor.



**Q Where does he tell you to report to Lauren Ford?**

A On the bottom of page 2. He says, "Please note that Lauren Ford is your immediate supervisor. I am her supervisor. If you have a formal complaint please utilize attached form."

**Q Anything else that you would construe as him telling you to report it to Lauren Ford?**

A No, but Virginia Doran also told me to report to Lauren Ford, so they were all -- both of them tried, at this point.

And then also Virginia Doran, I think in some other email, had said you need to report to your supervisor. Maybe she told me that personally, I can't remember.

**Q Gotcha.**

A But she didn't know about the -- I'm talking about like the week before. So she didn't know about the marijuana allegation against Lauren Ford until that IDP meeting, because that was when the cat came out of the bag, like that was when I had tried to get a meeting with Roger Gonzalez and I wasn't able to, so I wasn't talking to anyone.

But the allegation was on here that I didn't report to anyone for the marijuana. So I had to tell Lauren, I had to confront Lauren about why I didn't report to her at that meeting because -- and I felt safer because Virginia Doran was sitting there.

**Q And was that the first time -- well --**

A Yes.



**Q Was your perception at that time that Lauren Ford hadn't heard that there were allegations against her relating to marijuana?**

A Yeah, my perception at that time was -- and I don't know still to this day, but my perception at that time was that -- God, I don't know what it was. It was that she knew about the marijuana because Jessica had reported to her, and she was obviously upset with me for not reporting to her, because she put it on my IDP.

**Q Right.**

A And so my perception was that maybe Jessica didn't say that she had implicated her as well.

**Q Yeah, so from your perspective did it seem that Lauren was getting this information for the first time that she was potentially implicated in the marijuana issue -- incident?**

A It could have been, unless Jessica and her worked out in their conversation during that time, because -- and that's where, you know, the great investigation starts, because during that meeting with Jessica, when they -- Jessica wrote a statement, there's clear indicators in Jessica's statement that she definitely gave the kid back marijuana, and that the -- that Lauren Ford was aware of the texts that happened between them, and that -- and that she felt that I should have reported it.

So she became mad at me, she didn't discipline Jessica. And I don't know if she said something to Lauren about saying --



and Jessica was pretty honest, she was pretty outspoken and honest. So if she did say something to Lauren, I could see -- because Jessica admitted to lying in her statement. I could see that maybe they had a conversation about it and that maybe she was pretending. I don't know. That's the great unknown.

I don't know what happened in that meeting with her, but I do know that Jessica admitted to lying on her statement at arbitration.

**Q In what way did she admit to lying on her statement, like specifically what part?**

A She said -- in her statement, when the arbitrator and my lawyer called her out about her statement and what she wrote, she wrote, "at that point I tossed the marijuana," like she took the marijuana out and handed the wallet back to the student.

And then later, two days before arbitration, it was discovered, the texts were discovered where Jessica admitted to the teacher that she gave back the marijuana to the kid.

And so at arbitration, she said I don't know why I wrote that. I didn't toss it. I gave it back to her.

And she said it wasn't very much, it was a nugget, or whatever she called it. But it was is a measurable, smokeable amount of marijuana. It wasn't residue, like they had tried to say.

And she said I didn't -- I feel like Jessica had a moment of I am a good person, I'm going to tell the truth, and so

she said I don't know why I wrote that. And she said you wrote that you threw it away, but you didn't. And she said, no, I didn't throw it away, I gave it back to her.

And then she said she gave it back to her because she worried that the kid's boy- -- the girl's boyfriend was going to beat her up -- because he had a history -- if she didn't give it back to him.

**Q Now we're kind of getting off track a little bit but it's still something we need to talk about.**

A Uh-huh.

**Q You mentioned Jessica Wilson's statement. Is it your understanding that Jessica Wilson subsequently said that when she said she'd seen Lauren Ford do the same thing, she was referring to the fact that she hadn't disciplined the student before for having drugs?**

A She wasn't. She said -- she said that -- I mean, I guess I can't decide what she was referring to in that moment. But it was really clear in that moment. I said, "Did you give a student back drugs?" And she said -- she said, "Yes, I did. I only did it because I saw Lauren do the same thing," right?

And so during -- so I lost my train of thought.

**Q Right. And I understand what you are talking about.**

A Yeah.

**Q You mentioned that already, that conversation you had.**

A Okay. Yeah. I'm sorry, I don't know where I was going



with that. Sorry.

**Q I'm just talking about her subsequent statement afterwards, if you recall her clarifying that what she meant was that she had seen Lauren Ford not give discipline to a student before?**

A So the only thing I can conclude about that and how I think things happened, really, are pretty evident in her statement that there was a story created when her and Lauren talked about it.

I believe that -- and that's why she didn't put the full facts on the thing because I think at some point there was a talk probably about Jessica could lose her job for this, maybe Jessica probably told her, like I said, "I saw you do it too," or something, I don't know.

And I think that in that private conversation with those two employees, it became about fixing that story so that Jessica was protected, and then that's when she was mad at me and put it on my IDP.

So that's the only thing I can conclude, but -- and the only thing I think that really shows that is the fact that she didn't tell the truth on her -- why would she have any reason to change her story on her IDP -- or on her statement?

And so it seems to me that Jessica probably did tell her and they changed their story to mean -- but I don't know.

**Q That would be speculation on your part, right?**



A Yeah. Yeah. I don't know. I just am trying to figure out why I'm being treated the way I was.

But I will tell you -- I'm sorry, I'm jumping ahead again.

**Q That's okay. And we're going to get to all the facts. So don't worry, I'm sure we will discuss whatever is on your mind.**

**On this Exhibit 7, there is -- on Roger Gonzalez's email on page 2 of the exhibit --**

A Uh-huh.

**Q -- at the end of it, it says, "On another note, have you been in communication with Tiffany McMaster? When are you planning to return to work?"**

A Yeah.

**Q And you mention you have been in contact with Tiffany and you're returning to work tomorrow.**

**Can you kind of describe what was happening at that point in time? Where were you returning to work?**

A At Traner.

**Q Okay. So had you taken time off? You had mentioned earlier you had taken some time off. Was this a period of time that you had taken off and he was wondering when you were going to go back then?**

A Yeah. Like I received -- I think I had received something earlier that morning, maybe it was IDP, I don't know what it was. And I was just a mess. I was, like, these



allegations that were just crazy were coming at me. And I had -- like I started crying at school, I was embarrassed.

And I just told Tiffany -- I called the HR. Before I told Tiffany, I called the HR and said, "Am I entitled to use, like, distress days?" Like, it was just embarrassing being there. I was just a mess.

So I communicated with her and Roger and HR about it. So I was going through every avenue I could to make sure I was approved to use those, those days, because I was crying and stuff.

**Q And thank you for clarifying that. I just, when I read it without context, my initial thought was, oh, so then did she go back to Hug? But you had told me earlier that you didn't go back to Hug.**

A Oh, no. Yeah.

**Q So I was just -- I wanted to make sure I understood the context here.**

A I was completely assigned to that school for the end of the year. And I went there and then I got some more documents and I was crying, you know. I never used my sick days so I felt like it was appropriate.

**Q Do you know how many you used, leading up to his question about you returning?**

A Not very many. I think like two, yeah. I think they were vacation days, not sick time. I don't think I was sick.

**Q Gotcha. Now eventually you --**

A I did have them all marked though. I document everything, so that's part of -- when he started talking to me about those days and stuff, I had everything documented.

**Q Sure. Eventually, you received a second IDP; right?**

A Yes.

**Q And we're going to talk about that now. So let's go ahead and mark Exhibit 8.**

MR. BUSBY: Just a minute. We need to take a lunch break at some point.

MR. VANCE: Lunch?

MR. BUSBY: It seems like you are about to launch into a great big subject and it's almost noon. Do you mind if we stop now and have a half-hour lunch break?

MR. VANCE: This would be a logical stopping point. That's fine.

You said take a half hour? Does that give everybody the time you need?

MR. BUSBY: Is that okay, Trina?

THE WITNESS: Yeah, I just -- the only thing I'm worried about is I feel there was a really important piece of marijuana discussion that I didn't get to respond to. I don't know if I get to, like --

BY MR. VANCE:

**Q Well, if there's something else that you would like to add to a response that you've given, that's fine. And we can go**



**ahead and do that now before the lunch break, if that works.**

A Can I just take two minutes to say that?

MR. BUSBY: Go ahead.

THE WITNESS: The only other piece that I think was really important is that when I told Virginia Doran and Lauren Ford about the -- you know, the reason I didn't report it to her was because it was about her, "because Jessica had implicated you," you know, and I was trying to figure out what to do.

After that meeting, Virginia Doran -- or Lauren Ford was allowed, after she learned that there was an allegation against her, she was allowed to go back to the school and meet with Jessica privately and meet with the Admin team privately. And that's when they came up with, "Oh, she was talking about the suspension."

So I just felt that was an important piece because by that afternoon she had sent an email back to Virginia Doran, Lauren Ford sent a statement saying I talked to everybody. So she was allowed to go back and kind of get her story straight.

BY MR. VANCE:

**Q What afternoon are you referring to?**

A The same day as the IDP. She directly went to school.

**Q So on May 31st?**

A Yes. I believe, yeah. That's when the IDP was, right?

**Q Yes. Trying to keep it straight.**

A I just think that's a significant piece of this whole



story, that she was able to go back and kind get her story because Roger Gonzalez wouldn't talk to me. I had no one to report to.

And I do think that this was really -- was it this one?

**Q Which exhibit are you looking at?**

A Sorry. I think it was -- was it this one?

Oh, yeah. This is interesting because Roger Gonzalez --

**Q Can you just tell the reporter what you are referring to.**

A Sorry. Exhibit 7. At the top there's an email from Roger Gonzalez to Virginia Doran, on June 1st, at 2:30 in the afternoon. And he's referring to what he received, "he" being Roger, is referring to what he received from me.

And he says I don't want to meet with her at this time. And at this point he has never met with me. I've asked him several times in emails can I meet with you, and he won't meet with me.

He's never spoken to me about my allegation. And he tells me to file a complaint and use the form in the below.

And he says with regard to the marijuana allegation, which is actually about suspension not about returning drugs. So he already knows about it now from Lauren Ford, because I haven't spoken to him. I haven't turned in a form, I haven't reported the marijuana.

And I think that's a pretty big thing that he is already saying he knows what it's about, so he spoke to Lauren Ford,



basically.

And so there was an allegation that happened during the IDP where Virginia Doran, when something that serious -- I mean, I looked in the negotiated agreement. It seemed like she should have stopped and said this is a brand new thing. You've opened up a can of worms, I think she said to me. I said I don't mean to. This is what happened. I've been trying to report it but Roger won't respond to me. And they were like, "Whoa."

And then she immediately let Lauren go out. And someone, whether it's her or Virginia Doran, whether it's Lauren Ford or Virginia Doran, alerted Roger. And he's already made a decision before he ever gets my report. I think that's significant.

MR. VANCE: Okay. All right. Shall we take a lunch break?

MR. BUSBY: Great time. Yeah.

MR. VANCE: All right. And Kathy? Let's just go off the record.

(A lunch recess was taken.)

(Exhibit 8 marked for identification.)

MR. VANCE: Back on the record.

BY MR. VANCE:

**Q Ms. Olsen, welcome back.**

A Thank you.

**Q You understand you are still under oath, right?**

A Yes, sir.
**Q Getting back into it, let's go ahead and take a look at Exhibit 8. Just before we took the break we mentioned the fact that you received a second IDP letter at some point in time.**
A Uh-huh.
**Q Take a look at Exhibit 8 and if you can tell me that that's what that is.**
A Yes, it's the second IDP.
**Q And did you actually receive a copy of this letter?**
A Yeah.
There was some -- I remember there was some, not -- it wasn't clear when I got it, I couldn't find a date, because the date is wrong on it.
**Q Yeah, that's something I noticed too. So the date says June 26th, 2017, and it's directing you to meet for an IDP meeting on June 26th, 2017?**
A Yeah.
**Q One of those dates is most likely wrong. Is that right?**
A Yeah, the one at the top is wrong, the delivery date, so that the June 26th is when the meeting was.
**Q That's what I was going to ask you next, if you knew which date was correct.**
**So sounds like the meeting took place on June 26th, 2017?**
A Yeah, I believe so. Yeah, I remember that date was



wrong but I don't remember when I got it.
**Q Did you attend that meeting?**
A Yes.
**Q Who else was in attendance?**
A That was the meeting -- it was Virginia Doran, Lauren Ford and Sandra Aird, who is the director of assessment testing.
**Q Okay. I was going to ask you who Sandra Aird was but you answered that question. Thank you.**
A Yes.
**Q Were you represented by counsel at that meeting?**
A No, I was not. I did ask to record it, I think, and then I think my recording failed, but I think they have it recorded. I was still bobbling things.
**Q Understood. Now, as with the first IDP letter that we already talked about, looks like this one contains bullet items that are listing the allegations against you. Is that right?**
A Yes.
**Q And did you, when you received this letter, did you understand that that's what these bullet points were, were the allegations that were being made against you in that letter?**
A Uh-huh.
**Q Can you describe what happened during that 2nd IDP meeting?**
A Yeah. We went through each bullet and talked about the errors. And Sandra was there. And we -- I just defended myself



to each bullet.
**Q Okay. But you had an opportunity with respect to each of these allegations to provide a response?**
A Yes, I did.
**Q Did you -- were there any allegations that you agreed with, or did you disagree with all of them, or somewhere in between?**
A I disagreed with all of them, with the exception of the testing, the video that they are supposed to watch. But what I told them at the time, I said I know I got it in writing. And I was able to find that later, after arbitration even. I know I got it in writing that said that I could email the staff to get approval, but I was so overwhelmed when that was all happening that I took responsibility and -- during arbitration on that particular bullet because I was like I couldn't confirm that every one of the teachers watched the video, but I could confirm that Lauren Ford was at the meeting when I trained everybody, and that there was something in writing that said that it was okay to send it to them in an email.
So -- but I couldn't find that during arbitration. I never -- and then I found it later when I was preparing other documents.
**Q Of course, right?**
A Right.
But anyway, I, again, you know, I was trying to be



accountable and honest. That was one of those things that slipped through a little bit because there was just a handful, a couple of people that didn't actually confirm in writing on my sheet that they watched the video, and so -- so that was one of the things I was like, yeah, I don't think I got everybody's signature on that. And that was just because I was overwhelmed trying to get the test tickets ready.
**Q And I want to make sure I understand exactly which allegation you are referring to.**
A Yeah.
**Q It looks like it might be the fourth bullet point down on the first page of Exhibit 8. If you want to read that and confirm if that's the issue that you're talking about.**
A Yes.
**Q Okay.**
A Yes. And there is something from the Department of Assessment that says that they could -- I could email it to them.
**Q Got you.**
**Are there any other allegations in this IDP letter that you either agreed with or accepted responsibility for at the time of your IDP meeting?**
A Well, just the partial acceptance of responsibilities for the main one, that I thought was going to be the only one on this letter, which was the testing error that we talked about.
**Q Is that the first bullet point there?**

A Yes.
Q And when you say "partial," do you mean that you accepted responsibility for it but also was trying to explain that Lauren Ford had signed off on it as well?
A Yeah, she was my supervisor and she was in charge of training and making sure that I was doing the right thing, so I am -- I told them I did do that, I did send it, you know, with Lauren's approval --
Q Did anything else --
A -- and with the help of other people.
Q Oh, I'm sorry.
A Go ahead.
Q Did anything else happen at the time of this meeting other than the discussions of the allegations against you?
A I don't think so.
Q At the time of this meeting, so June 26th, 2017, were you still working?
A It was summer break and Roger Gonzalez told me not to report.
Q Okay.
A So I got that whole summer off because I was on leave, so --
Q At that point in time that you had the summer off, did you -- this was before you got the notice of administrative leave with pay, right?



A Yes.
Q Were you still getting paid even though you weren't reporting to work?
A Yes.
Q Did you have any -- were there any representations made to you at the meeting about what would happen next?
A I don't believe so. I think just that the investigation would be over and they would give me the findings, but I don't remember that specific conversation; that was just my understanding.
Q Sure. That's all I'm trying to get --
A Yeah.
Q -- is a sense of your understanding.
Did you expect then to get a Letter of Admonition or did you expect to get something saying we've completed our investigation, you are clear. What expectation did you have about what action they would take, if any?
A That's a good question.
My expectation is that they would see the evidence that I had, and then understanding that a lot of these allegations were even without merit, completely, and that after both of the IDPs that they would say okay, yeah, she didn't do anything wrong.
I thought that's what the investigation was for, for me to show my evidence and for them to say okay, yeah, well, you are responsible for this and you are not supposed to do testing now



for a little while.
That was my original -- but there were so many allegations and they came from every which direction, and they seemed not -- I mean the testing one seemed connected, obviously, but the other allegations were unconnected. They were from months previous.
It just seemed like all that information was kind of gathered and thrown on a piece of paper. So I had this feeling that there was a bigger push going on that had to do with me losing my job.
So I was hopeful that they would hear my evidence and say oh, okay, we didn't prove that, I guess you go back to work. That's what I was hoping. But, you know, my senses were telling me that there was something deeper happening.
Q Now you mentioned the variety of allegations and some from months back.
A Yes.
Q With respect to this second IDP letter in particular, were all of these allegations just related to testing, or were there allegations in here that related to ancillary issues, if you remember? I guess we can look at it.
A They were mostly related to testing, or that day of testing.
I mean, for example, there was one -- there was one -- I mean it was the most ridiculous allegation I had ever seen. I was



assistant principal and they told me I was removed from testing as the coordinator, but I needed to still do my job that day, I was back on campus. So as my job, I grabbed my police radio every morning and I head out to duty.
And so there was someone in my office and they had told me don't go to -- or don't go into your office and work, that you can't be in your office and work. So I was like "Okay."
So I asked Sandra, who was in my office, I said can I just grab my radio? And because -- so I leaned in and grabbed my radio so I could go out to duty. And that ended up an allegation, which, to me, is just unbelievable.
That's when I started going, "They're just after me," because, I mean, why would they be upset at me grabbing my radio? I was a good employee, you know, like -- to do my duty, I needed my radio, to do my duty and to go out.
MR. VANCE: All right. Let's go to Exhibit 9, if we could mark that please.
(Exhibit 9 marked for identification.)
BY MR. VANCE:
Q All right. I'm showing you what's been marked as Exhibit 9. Do you recognize this document?
A Oh, yeah. Yes.
Q What's that?
A It's Letter of Admonition issued by Lauren Ford.
Q And it's my understanding this is one of two letters

that you got?
A At the same time on the same date.
Q And I do want to get into both of them.
A Okay.
Q But we'll just address them one at a time.
A Sure.
Q I think the next one is going to be my next exhibit, but for now let's focus on this first one.
A Sure.
Q It says that it was hand-delivered to you. Do you recall it coming via hand delivery?
A Yeah. They made a meeting with me and I went down there to the School District Office and picked it up and sat in Lauren Ford's office.
Q At the time -- you say they made a meeting. Who called you to a meeting?
A Virginia Doran and Lauren Ford, I believe, yeah.
Q And at the time they called you into the meeting did you know that this is what it was about?
A I believe -- gosh, I mean, I'm sure that that's what I assumed. I don't remember the specific wording that was used but I'm sure it was about the follow-up to the IDPs, like here is what happened.
Q Okay. Did anything else happen at that meeting, other than them delivering the letters of admonition to you?



A No, except that immediately, or Roger Gonzalez told me to come over to his office immediately after getting these, and -- which was a doorway. So as soon as I got these I walked over to his office and he handed me a third IDP. So I received two letters of admonition and a third IDP all at the same time.
Q Just like that?
A Which is not -- I mean, I'll probably keep saying this the whole time, but it's not supposed to happen in the negotiated agreement, but I got used to things not happening the way they were supposed to happen.
It's supposed to be you get a Letter of Admonition, you have time to fix the problems, you get another one. I don't know.
Anyway, it really, to me, that's a shocking moment when they hand me two letters of admonition and an IDP in the same five-minute window.
Q Okay. So we'll be going over that as well, that third IDP.
So for now can you just confirm that at the end of Exhibit 9, the last page there --
A Uh-huh. Uh-huh.
Q -- that that is your signature.
A Yes.
Q And am I correct in assuming that your signature is just acknowledging receipt of it; it's not acknowledging your agreement --



A Agreement.
Q -- with that, right?
A Yes, correct.
Q Does this letter address each of the allegations, from your first IDP letter -- and go ahead and take your time to review it.
A Do you want me to match it to the -- I'm pretty sure all seven of them are the -- okay. Is this the first one?
Q Yeah.
A Do you want me to make sure all seven bullets are matched, is that what you are saying?
Q I just want to confirm that there isn't anything that's left out of this Letter of Admonition that was brought up in your IDP meeting and your IDP letters.
A I don't know how to answer that because it's actually pretty difficult to follow all this wording that they have. And there's a lot of it. And some of it, I think, is out of order, but my recollection is that all of the elements were there, matching the seven. I can take the time to do that.
I feel comfortable moving forward with that, if you are. I will tell you that at some point Lauren Ford revised the Letter of Admonition. I couldn't find where the revision was in the document.
Q We'll get to that as well. Don't worry.
That's what I want to do make sure, though, as we sit



here today, that you didn't have the belief that there was anything that was left out of this Letter of Admonition, from the IDPs. And it sounds like you don't have that belief, that there is something that's missing.
A I believe that it's matching. I don't agree with -- I mean, she didn't include any of my evidence.
Q Understood. I'm not asking to you acknowledge agreement or anything with that. I just want to see if the same topics are covered.
A Yeah.
Q Is there anything that you can recall in this Letter of Admonition that is beyond the notice that you were given in your IDP letter, like any additional allegations?
A Gosh, I wish I had time to sit here and go through it, because I do think I remember her, like, going, "Oh, in addition you did this. Oh, in addition you did" --
MR. BUSBY: Ms. Olsen, you do have time. If he asks you a question that requires you to review the entirety of those documents, you are entitled to review the entirety. So please feel free to do so.
THE WITNESS: Okay. I'll look at it.
I need to look at the things side to side.
BY MR. VANCE:
Q Yeah. Which one do you want to look at, the IDP letter?
A Exhibit 8, which is the IDP, and Exhibit 9, which is the

LOA of the IDP, because I do remember some of the allegations didn't really match.

**Q Now eight is the second IDP.**

A Oh.

**Q And we were looking at the first LOA, right? Let's just make sure we're on the same page here.**

A I agree. Let me find the first LOA.

**Q I think it might be five.**

A Yes.

So, see, this is where her wording just got really confusing to me, because the allegation on number one says you sent an email.

**Q And just -- I'm just going to stop you, not because I don't want you to answer, but if you could --**

MR. BUSBY: Mr. Vance, I object. The witness is trying to answer the question you asked her. I ask that she be allowed to finish before you interrupt her.

MR. VANCE: Thank you, Luke. I'm trying to help her answer the question by referring her to the correct document for the court reporter's benefit. So don't worry, I'm going to let her answer the question.

I just want to make sure that you let the court reporter know which document you are referring to when you point, if you could.

THE WITNESS: Exhibit 5 is the IDP and then Exhibit 9 is



the LOA.

BY MR. VANCE:

**Q Sure. Go ahead.**

A Okay. So the -- it says in the allegation that I sent an email giving a directive to issue a final grade change that violated an administrative procedure.

It says, "Under further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three-week grading window must have principal and district approval."

So, to me, that doesn't answer the question. The allegation was did you issue a directive to change a grade. And she's saying you knew about the policy. That's the way I read it.

And so I don't think she proved -- because I very clearly, in this one, I had an email that very clearly proved that I didn't issue a directive. I actually referred to the principal. Like the email that she gave me, I said you have to have principal approval.

And so I -- this one, in particular, at arbitration, they were like, yeah, this clearly is not a directive. But she doesn't -- she doesn't say that I issued a directive, she said something else.

**Q Sure.**

A You know, so that kind of is how this whole document goes.



**Q And that's not exactly what I'm trying to ask, though.**

A Okay.

**Q I appreciate that, but I just want to know if there's -- because even though you disagree -- and I understand that you disagree with the LOA.**

A Uh-huh.

**Q Right?**

A Uh-huh.

**Q I'm just trying to confirm if there's anything, if there's any new allegations in the LOA beyond the allegations in the IDP letter.**

A Okay. So I did answer that question but maybe I didn't say it in a way that is understandable.

What I mean is that the new allegation, she says, is that I was saying I didn't know the policy, but you really did. So she's saying, like, almost like I'm being dishonest, like you did know the policy.

So, to me, that allegation at the bottom, when she concludes her statement, she's -- to me, she's saying you said you didn't know about the policy but you really did. So she's basically calling me a liar, you know, like it doesn't refer to whether or not I gave a directive. So, to me, that's kind of a new allegation, because I don't like being called a liar. So she's saying that I wasn't honest in that particular element.

**Q Understood. And that element, the element does refer**



**though to -- it's talking about the same allegation, but she phrases it in a way that you believe is different than how it was in the IDP?**

A Yes. To me, it's a new -- that's how she kind of does it all throughout. She doesn't know how to answer her own questions in what she accused me of.

There's actually one in particular in this one, where -- I mean, read this fourth bullet. I mean, I can read it out loud. It doesn't even accuse me of anything.

**Q In which one?**

A The IDP, which is Exhibit Number 5, the fourth bullet. I remember asking at the IDP itself, I said -- I said to Virginia Doran and to Lauren Ford, I said, "I don't know what I'm being accused of." Like, "What is my misconduct in this particular bullet?"

And they couldn't respond. They couldn't answer. She said just respond to it, is what Virginia Doran said. And I go, "Okay. But I don't know how you want me to defend myself when I don't know what you are accusing me of," it was so poorly worded. And so I said that during the IDP. And she said just respond. And I was like, "Okay."

So that could be the one that we look at next because --

**Q Okay.**

A -- I mean -- okay.

Which she has out of order on this, because it says we

moved to item number four on the IDP.
I can read -- do you want me to read anything out loud, or just let myself read it?
**Q Yeah, just go ahead and review it yourself and let me know what it is that you think is problematic.**
A So there's no allegation in here. She says on Friday, March 3rd, you presented a PowerPoint explaining the process.
So I'm asked to defend myself to misconduct and there's no misconduct listed on this one.
And then she writes this huge thing. It's alleged that you sent an email. Let me read it now on this side.
Like she -- one of the big issues is she says things in here like they are fact, and they are not fact. They are lies. So -- but she wasn't required to provide any evidence, of course.
And then she says down here that "The only staff that did not follow written guidance given in the PowerPoint you created for the incomplete learning, were you and Wendy Labon." Which that's not true.
So that -- I think that's the allegation she tries to make in the LOA, but that never is even mentioned in here, that I made mistakes and Wendy Labon made mistakes.
And so "the only staff that didn't follow written guidance given in the PowerPoint you created" -- and she keeps saying that I created it and led this process, so -- "you copied me and the only VP evaluator on each content area on the emails,



further demonstrating your leadership at the incomplete" -- so here's what she's trying to do in this, is she's trying to say I led the incomplete learning process.
And she says that "further demonstrating your leadership of the incomplete learning process and failure to follow your own guidance to staff."
And so my question, which I'm not even alleged of that, she's just basically trying to say that I led this thing. And this thing, this incomplete learning thing, ended up being investigated, like there was a huge investigation on our campus because they thought -- I don't know, she didn't include me in the investigation. This is a whole big problem.
So I think she's trying to say that, Trina, you led this process, because there was trouble with it on campus. And what's interesting -- I think this is a big, big deal -- but what's interesting about this is I'm an assistant principal who is brand new, you know, and this is in the spring. So she's asking me to lead something that I vet with -- I have mountains of evidence showing I vetted it with the Admin every single time, every email, every meeting. And so she's trying to say that I fully led the staff on something.
As a brand new AP, I wouldn't ever -- no AP would lead something without their principal's direct supervision and approval. I was still nervous even standing in front of a crowd.
I only did it because she told me to do it. And



everything I did, I vetted through her.
So when there ended up being problems with this in April, in March, there was an investigation on our campus. I remember she was so upset. And Kristen McNeill was there, Paul LaMarca was there. I mean all these bigwigs were there.
And she said she was in trouble for incomplete learning, or something was happening and she wouldn't let me go in and help out, and I said, "I don't understand."
And so she said, "Well, you led it." And I was like, "I didn't lead it, we did." Like, "This was your idea and your thing. You just told me to take the," you know, "make the PowerPoint and stuff," but it's not something -- I wasn't the leader at the school.
So it was very concerning, like she could so easily blame me on something.
But there's really no allegation here, but in here she says that the only staff that did not follow -- I don't even see where there's an allegation in here other than you didn't follow directions that you gave to people, but I did.
**Q So to make sure I understand, you believe that the Letter of Admonition, that the conclusions that she drew in there based on the allegations in the IDP letter, if you can call them allegations, were unfair and incorrect?**
A Yeah. There's no allegation of misconduct here. If you read it, I don't see a single allegation of anything that I did



wrong.
And then I had to defend myself to something that I didn't do wrong, but really I think she only put it in there to try to say that I led it.
**Q Okay.**
A And the reason I think she did that, because that was their focus at arbitration. So I don't know what happened behind closed doors with this incomplete learning thing, but it was really confusing to me for arbitration that they tried to focus on this. And there's no allegation here other than her trying to say I'm the one that did it, as a brand new AP in the District, which is asinine, in my opinion.
I was like, "I didn't do it. We did this as a team. I did it because you told me to do it."
**Q Okay. Anything else in the LOA that you believe conflicts with the IDP letter?**
A Let me look here. Let me read something.
So, for example, the second bullet on Exhibit 5 says that "allegedly you gave Sharon Black a notification of credit form to use to change a grade in the '15-'16 school year, which violated administrative procedure," blah, blah, blah.
And then when you look on her writeup, at the end, she says "After further investigation as to being directed to see teachers being directed to see teachers to change grades, statements revealed that the directive given was that no student

would receive credit, and forms were handed to Brad Bodine. Further investigation as to never signing approval for grade changes, I found eight such approvals signed by you."

As to never signing approval for grade changes, that's not in the allegation. So I'm being accused of signing grade changes? I don't really get it.

She doesn't really address "allegedly give Sharon a notification of credit form," because I didn't do that. They shared the email with me and I proved that in arbitration too, that I was like, "It's your discretion and with principal approval, and there was no form attached to it."

So this is the kind of stuff I was defending myself to arbitration that was just, like, ridiculous. I'm like, "That didn't happen. Here it is." And when she writes it up she doesn't even address the original allegation.

So I could probably go on and on to all of them but she doesn't -- she doesn't come to the conclusion that matches the allegation in her LOA.

**Q Okay.**

A She basically says you just did this wrong and this wrong and this wrong, so -- I mean, I don't see it that way.

**Q Fair enough.**

**Let's turn to page -- on Exhibit 9. Oh, let's see. 2494. I think it's the second or third to last. Third to last.**

A Okay.



**Q Now, in this -- the second paragraph there, addresses the allegations that you had failed to report the May 8th drug --**

A Oh, yeah.

**Q -- issue, right?**

A Oh, yeah. Yeah. I should probably mention that one.

**Q So what I wanted to ask, if you look in this narrative of this paragraph, there's a number of quotes where it looks like she is quoting something that you said during the IDP meeting, right?**

A Okay.

**Q Do you see what I'm saying?**

A Uh-huh.

**Q Are there any quotes or any statements that she attributes to you in this letter that you contend you didn't make during the IDP meeting?**

**Go ahead. And take a look and let me know if there's anything that stands out to you.**

A Do you want me to just go through it line by line?

She says here, "You did not report this incident to me, school police or any other administrator on Hug campus," which is not true. I told her I reported to Brad Bodine, and that's an administrator on campus.

**Q And so what I want to do -- I understand that you disagree with a lot of her conclusions.**

A You want me to check with her --



**Q But specifically the quotes is what I'm interested, is if anything of the things she's attributed to you as having said, if you disagree with that.**

A Okay. Sorry. Brad Bodine --

MR. BUSBY: Just one second. I'm going to step out of the room for a second -- I've got to turn on the AC -- if you guys can wait until I get back.

MR. VANCE: Can she continue to review?

MR. BUSBY: Yeah.

All right. Back.

THE WITNESS: Okay.

MR. BUSBY: Thanks.

THE WITNESS: Well, I don't have a recording, nor can I remember -- I don't think they have a recording because they said -- I think they said they didn't have a recording.

So there's quotes around all this stuff that I can see me for the most part saying, but I can't assure that it's perfect. I mean, there's grammatical errors, even in that sentence, which I wouldn't speak that way.

BY MR. VANCE:

**Q Sure.**

A So I don't think it's word for word, but so far -- I'm surprised that there's quotes around that much when we didn't have a recording.

And then -- yeah. And then I know you didn't ask me --



you asked me to make sure the quotes are specific, but I -- she says right there that I reported to Brad.

Yeah. I can see me saying that, yeah.

She doesn't -- it doesn't even make any sense. So this can't be direct quotes, but I'm quoted. It doesn't even make sense.

"Did not want" -- "did not talk with the student and that you could not remember if and who reported to you that the teacher was being bullied and harassed and that there could be retribution."

"You also did not remember who" -- "you also did not remember who told you it was Sabrina Cellucci," but she has that in quotes. Like she's saying it, but she has it in quotes as if I said it. So that's an issue.

**Q Understood.**

A It's not my quote; it's her quote.

I would say that it's so hard to follow. I mean honestly, I'm -- I mean -- it's so hard to follow. I mean, like she has herself quoted, but says it's me. And so I think that the majority -- if I can just say the majority of the ideas, I think in some cases it seems correct.

But again, it's three years ago and I don't have a recording or any sort of transcript from that meeting, nor do they, to my knowledge, so I don't know how she quoted all that.

**Q Fair enough. And it's my understanding that you don't**

agree that these would be direct quotes then.
A Yes, I don't agree that they are direct quotes. Yes.
Q Okay. Fair enough.
At the end, also, of the LOA --
MR. BUSBY: Just a second. I'm going to just insert an objection to the last question. Asked and answered. Go ahead.
BY MR. VANCE:
Q At the end of the LOA, I guess second to last page, there's a list of performance expectations. Do you see that?
A Yeah.
Q Did you comply with each of those performance expectations?
A At this time I wasn't working.
Q That would make it hard, huh?
A Yeah.
Q Okay.
A And it's all about the new principal, and I didn't work with her.
Q Ms. Oronoz?
A Yeah.
Q Did you ever, ever work with Ms. Oronoz at all?
A No. She took Lauren's place when I was let -- when I was directed off campus.
I will tell you that these -- I'll just tell you later. Sorry. I'm expanding.



Q No, go ahead.
A When I finally did get put back to work after I won arbitration, like two years later, my principal was never notified of the updated LOA expectation, so -- but I had told her about them.
Q Okay.
A I did not do any testing or things like that.
Q Gotcha. And you are right, and we'll get into that in a little while.
A Okay.
Q But is it fair to state that these performance expectations, in particular, in this LOA, weren't necessarily the performance expectations that you had in your revised LOA later on, right?
A Yeah, but Lauren Ford rewrote the revised LOA.
Q Okay. And at this point in time following this LOA you had not been terminated, had you?
A No.
Q Had you been put on leave?
A No.
Q Oh, not official leave, at least.
A Right.
Q You were still unofficially not working, per Roger Gonzalez?
A Basically -- yeah, he was like, "Don't go to campus."



Stay off of campus, is what he was saying.
MR. VANCE: Let's mark Exhibit 10.
(Exhibit 10 marked for identification.)
MR. VANCE: Thank you.
BY MR. VANCE:
Q All right. I'm showing you what been marked as Exhibit 10.
A Okay.
Q Can you tell me if you recognize that document.
A Yeah, it's the LOA from the second IDP.
Q Okay. And this was hand-delivered to you on the same day as the first one when you were called to the District Office.
A Yeah.
Q Go ahead and flip to the last page.
A Okay.
Q Is that your signature?
A No, that's Roger Gonzalez.
Q At the bottom?
A Oh.
Q Let's make sure you've got the right --
A Looks like they are stapled, but there are two documents in here.
Q Oh, did we get two exhibits? Let me fix that.
A I'm sure that's the IDP from Roger.
Q It's got like two. We are all right. We just have



Exhibit 11 stuck in there with Exhibit 10.
MS. PARKS: Justin, what's Bates stamp 10 then?
THE COURT: 10 is WCSD 2488, is where it starts, and ends on 2491.
MS. PARKS: Okay.
BY MR. VANCE:
Q All right. That is the real Exhibit 10. Can you turn to the last page of that and confirm for me if that's your signature.
A Yes, it is.
Q And just with -- the same as the last one, it's my understanding that this signature isn't a recognition that you agree with the allegations and conclusions, but it's just an acknowledgment of receipt?
A Yes.
Q As with the first LOA, there's a list of performance expectations, right?
A Yeah, I'm sure.
Q And go ahead and take a look at the last page and make sure.
A Yeah.
Q Did you have an opportunity to meet any of these performance expectations?
A No.
Q And does that include following the revised LOA that was

issued later on down the line, do you know if any of these carried on?
A Yeah, I believe that these ones in particular -- because I was able to beat every single allegation on the first IDP and was innocent on all of those, so I didn't have to do that. They took that out of my file.
This one they revised to include not to be involved in testing for three years. I think -- I think she kept all of these things in there. I think this is exactly the same, but I don't remember. I would have to look at the revised one.
Q But it's fair then to conclude that at this point in time you didn't have the opportunity to meet those performance expectations because you weren't actually working at that time?
A Correct.
Q And again, you weren't terminated at this point in time, were you?
A No.
Q Let's go ahead and turn to the next exhibit, 11, which was the other document I believe you were given that same day.
(Exhibit 11 marked for identification.)
BY MR. VANCE:
Q All right. Showing you Exhibit 11. It starts Bates numbered Olsen 000213. Can you take a look at that and confirm whether that's a document that you received?
A Yes, next door.



Q Yeah. This is the third IDP notice you received then, the same day you got the LOAs?
A Yes.
Q Hand-delivered by Roger Gonzalez?
A Yes. I actually was very angry when he handed it to me, and I spoke to him.
Q At the time he handed it to you, did you already know what the contents were going to be, or was it -- were you just totally blindsided by it?
A Well, from the other two LOAs, I felt, because the negotiated agreements -- and I was doing a lot of reading at this time to understand the process more.
And the negotiated agreement says if you get two LOAs or two IDPs, and then a third IDP, like it basically signals they are going after your job. Like, I mean, that's the interpretation when I read the negotiated agreement.
So when I got these I actually said to Lauren and Virginia in their office, I said, "Well, I guess I'm keeping my job." You know, like I'm going to -- you know, still not sure what's happening. I said, "I guess I'm keeping my job. I didn't get fired."
And then I walked next door and he handed me this. And I just started laughing. And I had said so this is now when you go after my job, you know, like this is -- this is the next step of what you do. And he goes "No, no." And I go, "Yes, it is.



Yes, it is." Like, "I see what you are doing."
And I said, "Okay. I'll see you at the next IDP meeting," like I knew, that was when I really knew that there was intent to go after my job, in my heart.
Q And this third IDP notice, it identifies a meeting to take place July 26th, 2016. I'm guessing that's a typo, since the meeting can't take place a year before the notice itself.
Do you know when the meeting actually took place?
A That's pretty common all throughout their documents. I believe it was July 26th, 2017. I think it was like a week later.
Q And did you attend that meeting?
A Yes. I'm sorry, when I took this from him, I said to him, "So now I'm in trouble for reporting." That's what I said to him. He said no, you are not. And I said yes, I am, that's why I have this.
Q Sure.
A So -- but, yes, I attended that meeting.
Q Now, this IDP, and we'll get into the meeting in a little bit, but the IDP notice itself has three allegations this time; is that right?
A Yes.
Q First, that you brought false claims against Lauren Ford regarding the marijuana incident.
A Yeah.
Q That you brought false claims against Lauren Ford



regarding the supervision timeline.
A Uh-huh.
Q And that you failed to follow directions to not discuss ongoing personnel matters with Hug staff.
A Those were the allegations, yes.
Q Those were the allegations.
I'm assuming you disagree with those allegations?
A I proved that they were false at arbitration.
Q So these particular allegations were discussed during the arbitration as well?
A Oh, yes.
Q Okay.
A At great length.
Q So the reference to the staff complaint, I just want to make sure that we're talking about the correct thing here.
MR. VANCE: Let's go ahead and mark Exhibit 12.
(Exhibit 12 marked for identification.)
BY MR. VANCE:
Q Showing you what's been marked as Exhibit 12, it has the Bates number Olsen 000073. And it says page 1 of 2. But for some reason the second page wasn't with this. I'm not sure that it really matters that much, but does this look like the staff complaint form that you filed after exchanging emails with Roger Gonzalez?
A Yes, it does.

Q Is this the staff complaint form that's at issue in the third IDP notice, to your knowledge?
A Yes.
Q And then there's the allegation about discussing ongoing personnel matters with Hug staff members.
Was that involving Ryley Coker, do you know?
A Yes. Yes.
MR. VANCE: Let's mark Exhibit 13.
(Exhibit 13 marked for identification.)
BY MR. VANCE:
Q All right. I'm showing you what's been marked as Exhibit 13. And it looks like a series of text messages. Has the name "Ryley" at the top.
A Uh-huh.
Q It looks like this is a document you produced. Can you describe for me what these are.
A Yeah. They are text messages between Ryley and I.
Q And who is Ryley Coker?
A He's a teacher, a subordinate. And he was a big help to me on campus. He wanted to get into leadership, so I was having him do a lot of projects that were to help him get experience. So he was someone I worked with closely.
Q Okay. If you could turn to the fourth page of the exhibit, up at the top right, the number is 456.
A Okay.



Q Are you there?
A Yeah.
Q It says, "Please keep the reason above confidential completely. I found out last night I'm not supposed to talk to anyone about this. Thanks, Ryley." Do you see that?
A Yeah.
Q What was your discussion like with Ryley about this issue?
A When I first found out about the testing error, no one told me not to talk to anyone. I had never been in trouble before.
So as I was leaving, it was at the end of the day and it was in the middle of testing, so people were reaching out to me, like, hey, I need to get this unlocked or I need this situation. So these people were regularly in touch with me, and I was leaving campus.
And so the day before I had told him that there was a testing issue and I was being removed. And so then that evening -- so the night before, where it says I found out last night, that was when I got an email from Lauren -- I think we have it in one of our exhibits already -- and it said you are not to discuss this with anyone, not to talk to any employees.
Well, I told Ryley -- I had already told him because I didn't know I wasn't allowed to talk to him.
And so it was an honest, you know, thing that I would



answer to an employee, there was some sort of testing issue and I have been removed as coordinator -- because he was texting me because he was right in the middle of being a testing proctor.
And so the next day, being that I got the email saying don't talk to anyone, I was worried that he was going to go tell everybody that Trina got in trouble for a testing error. I'm sure that went around anyway because I left campus in the middle of the day.
So I was trying to just say hey, don't talk about this, because I don't want to, like, jeopardize my situation.
Q You had just learned that you were not supposed to talk about it?
A Yeah.
Q So you were letting him know, hey, let's not talk about it?
A And this was the right thing to do, was for me to let him know, please don't talk about it because I'm not supposed to talk about it.
But I don't think talking to him about it the day before, I didn't break any rules, I just didn't know about them.
I actually think that was a good thing that I did.
Q Let's turn to the next page.
A Uh-huh.
Q Second column there.
A Uh-huh.



Q Looks like the third -- second full message down says, "Still not sure. It's nuts." Do you see what I'm talking about?
A Yeah.
Q Can you read that.
A Read the blue one out loud?
Q Yes, please.
A "Still not sure. It's nuts. But okay with either way. I'll fill you in a bit later today."
Q And that was sent on July 17th, 2017?
A It looks like. Yeah, the 17th, yeah.
Q So where it says "I'll fill you in a bit later today," did you fill him in later that day, do you recall?
A Yeah, we talked. We talked. We talked about the -- what was happening and I told him I didn't know. And "fill him in" was just, "I went through an investigation and the investigation is over, I'm just waiting for results and I don't know what's going to happen to me."
Q Was that a phone conversation you had with him?
A A phone conversation, yes.
Q Okay. And then let's fast forward to the next day.
A Okay.
Q Where it says, "I've never felt so betrayed in my life." Can you read that message for me, please, along with the next one.
A Yeah, I would be happy to.

I said, "I've never felt" -- so the very next day, less than 24 hours later, I said, "I've never felt so betrayed in my life. Nothing hurts more than what you just did to me" -- or -- "that but you just did to me."

What I meant to say was "what you just did to me." It must have been Siri.

"I will never understand."

Did I read it all?

**Q Yeah, and then the next one too.**

A Oh. "You should know I defended you all year, every step of the way. You should know I was your friend. You should know I was new, green, but believed in good. You should know how she talked about you and what I did to stand up for you, and tell her you were," I have got to go down here, "a great teacher."

"Now I just feel sorry for you. I have my family and that's really what matters. Karma."

**Q Can you give me some context for this text.**

A I sure can. Sorry. My toes are cold and my shoe came off.

**Q No problem.**

A I sure can.

I -- when I left campus -- so I had talked to him. I considered him a friend.

He was someone who was -- you can see in other texts from before -- I could pull up a million texts on how he was -- he



had some problems and I was always like, "You're fine, just be a leader, just do the best you can." You know, I was just always supportive of him.

And there was a teacher in particular that he wanted to report for bullying to the District that Lauren was very fond of. So there was that battle there. And I always tried to keep him calm and try to, you know, "Let me know if anything bad happens, but everything is okay, just," you know, so we developed a friendship. And I believed in his leadership.

And so he -- when he was doing the testing stuff, he was one of many teachers that I was close to. And he texted me to see if, you know, "What happened?" And, "Everything went so smoothly with testing."

And that's when I said, "There was an error," you know, blah, blah, blah, and I said, "I can't talk to you."

So then we didn't talk at all for -- up until this day. So that was May.

And then this is July 17th. We didn't talk at all.

And suddenly out of the blue he texts me and said how are you doing, are you coming back to Hug? And I was like -- and if we look at the date of this. You see the 19th.

**Q "This" being Exhibit 11?**

A Sorry, "this" being Exhibit 11, when I got the IDP from Roger Gonzalez. I had not spoken to Ryley since the day I left campus, but he suddenly texted me on July 17th and said hey, how



is it going, what are you doing?

And then that night, after we talked -- and my feeling, my understanding was that the investigation was done. I had already done the investigatory meetings. There was nothing left to handle. I didn't think that it was inappropriate for me to talk to him anymore because I had already done the investigation, and it said up to the investigatory meeting.

And I didn't tell him anything out of context anyway. I just said I don't know what's going to happen. We'll see. I'm done with the meetings, you know.

So he then wrote an email to Roger Gonzalez, and he said he copied Lauren Ford, but he accidentally copied me.

And so he sent an email to Roger Gonzalez and said, basically, that Trina is not a bad administrator, but I think it would be really disruptive -- and he's like kissing butt to Lauren Ford -- because, oh, for the work that Lauren Ford has done, not that Trina is a bad administrator, but I think it would be really bad if she came back to the Hug campus.

So he thought he was, like, advocating for Lauren, and he said he -- so Roger Gonzalez added that to my IDP because I talked to him on the 17th.

So -- but it was after the IDP meetings that I was required not to talk, so I was so hurt that he did that. And then he accidentally copied me. You know, I just felt betrayed, like -- like he said he didn't want me back at campus because he



was trying to be an administrator at Hug. And I think he thought he had Lauren's favor and that Lauren might promote him because he had just finished his master's.

**Q Do you know today if Ryley Coker is an administrator?**

A I do not think so. I don't think it worked the way he wanted it to. I don't know what he is doing but I really doubt it.

And that was the only thing I ever said to him, it was basically karma, and you hurt me.

And that's because -- and it almost felt intentional, like I don't know what happened, but it was very ironic that he texted me after two months, and then the very -- within 48 hours I had an IDP allegation. So it almost seemed like -- it seemed too coincidental to be true, honestly.

But, again, what do I know? I can only have these little pieces of the puzzle.

**Q Gotcha. No, thank you for providing me with that context.**

**Let's flip back to Exhibit 11 again. This is going back to that third IDP letter.**

A Yes.

**Q I guess we don't really need the exhibit, but I just wanted to talk about the meeting that you said happened on or around July 26th, 2017.**

A Uh-huh.

**Q Who was present at that meeting?**
A That one got a lot bigger. I don't know the secretary's name. I think it was Roger Gonzalez's secretary. I was finally able to get Alyson Kendrick, who is the president of the union, to come with me, which the whole union thing still is hard for me to understand. She wanted to be there to take notes for me. And I recorded that one. Finally, I was starting to understand how big this was.
So it was Aly Kendrick, that secretary, Roger Gonzalez. Roger Gonzalez brought Richard Swanberg, I don't know why, but he's another area supe, probably to back him up. So he was there. Myself, Aly Kendrick. That's all I remember.
**Q Did you have legal representation at that time?**
A No.
**Q Okay.**
A I did not have a lawyer.
**Q Did Brett go with you at all?**
A No.
**Q You mentioned Alyson Kendrick. Well, the whole WSPA issue, when -- did you have problems at the beginning of this, having union representation?**
A At the beginning I didn't ask for union representation because I didn't think that I could have a union rep because I wasn't a member, not understanding that -- and still people don't know this. It's not common knowledge. They don't get it, that if



you are not a member they are still supposed to be there for employees during those things, but -- so, no, I didn't ask her.
And then I started to understand and read more, and then I was like the union should be here for me. And so she said that she's not -- they are not getting involved, is what she kept telling me.
But she came to this meeting with me. I still don't understand all the rules on that. I think they were just afraid of getting involved, but -- and so -- but I had since -- I wasn't a member of the union, but I had since joined the union in this short time period.
And she's like, "I'll come with you to the meeting but since you weren't a member, we don't get into the habit of defending clients that aren't a member before."
**Q Interesting. Okay.**
**Let's go -- you mentioned she took notes, right?**
A Yeah.
MR. VANCE: Let's mark Exhibit 14.
(Exhibit 14 marked for identification.)
BY MR. VANCE:
**Q All right. I'm showing you Exhibit 14, which is Bates numbered, it starts Olsen 000216. This is a document that you produced. And I believe it was produced as Alyson Kendrick notes, but can you confirm that these are the notes that Alyson Kendrick took for you at that third IDP meeting?**



A Yeah.
**Q How did you get them? Did she just give them to you afterwards?**
A Yeah.
**Q Have you had a chance to review them before?**
A Yeah, I've had this since that day.
**Q Was -- and if you need to review it again, let me know. I'm just wondering if there's anything in her notes that you believe don't reflect the discussion that happened at the third IDP meeting.**
A It seems like so far, page 1. Yeah, that's exactly what I said to you, "That's easy. Go tell her to self-report."
Again, yeah, "RG says, 'Did he tell you to go to Lauren?'" And I said, "He told you that, but he didn't tell me that. I don't remember him saying that."
So I did what he said and went to Jessica. Yeah.
"Did you tell this to Lauren?" No, that was in error, my understanding of what happened.
I'll stop mumbling. Yeah, I'm just reading it.
Yeah, this looks -- I think it all looks good.
**Q It's accurate, as far as you can tell?**
A Yeah.
**Q So during that third IDP meeting, was each point from the IDP letter discussed?**
A Yes.



**Q And you had the opportunity to respond to those allegations?**
A Yes.
**Q And then at the end of Ms. Kendrick's notes, it says "Closing statement by TO."**
**I assume "TO" was you?**
A Yes.
**Q Do you recall being able to give a closing statement at that third IDP meeting?**
A Yes. And I don't know where that is or if I have it. I think I did it.
**Q Was it a written statement or did you speak?**
A I think I brought something in because I was starting to get involved, like I can see where you're going and I wanted to have a moment to say something, so I was starting to defend myself. So I made a statement but I don't remember what -- I think I gave it to them. I don't know where it is now. Probably on my computer somewhere.
MR. VANCE: Okay. Fair enough.
Let's mark Exhibit 15.
(Exhibit 15 marked for identification.)
BY MR. VANCE:
**Q Do you recognize Exhibit 15?**
A Yeah.
**Q Can you tell me what it is.**

A It's a notice that I was put on administrative leave, a leave of absence.
Q And did you actually -- it's dated July 27th, 2017. It says via US mail and email. Do you recall receiving it via email?
A I don't. I don't remember. Maybe.
Q Don't remember how you got it, but you got it?
A I got it, yes. Yes.
Q And so what did you understand it to mean that you were placed on administrative leave with pay?
A It meant that I wasn't going to work and I was going to -- I guess my feeling was that they were going to finish this investigation and tell me whether I was fired or going back to work.
Q And if we go to the second paragraph of Exhibit 15.
A Uh-huh.
Q Third sentence. It starts right in the middle of that paragraph, "while you are on administrative leave." Do you see that?
A Yeah.
Q Could you read that for me.
A "While you were on administrative leave with pay you must be available by telephone and available to report to a worksite or another location as you may be directed, during regular business hours, in order that the District can contact you, if need be."



Q What did you understand that to mean?
A Is I have to be available if they call me.
Q Right. I guess it wasn't just a paid vacation, was it? Like, if you got called in, you were expected to go in?
A Go right back to work. Yeah. My feeling was, if they called me to say go into work, I was going to go back in to work.
Q Did you stay available in case somebody called you to go back in to work?
A Of course, yes. I was always available.
Q So at this point in time you still had not been terminated, correct?
A Correct.
Q Continued to receive your regular pay and benefits at this point in time?
A Yeah, for a year.
Q For a year.
A For the next year.
Q Okay.
A With little to no contact.
Q At some point in time did you seek to appeal the LOAs that you had received?
A I did, yeah. I followed the process step by step.
Q And do you know when you did that?
A I believe it was September or October of that year, I appealed it.



Q And how did you do it? If you can just walk me briefly through the process. We won't get into the actual hearing yet, but we will go through that, but if you can just walk me through the process of how you initiated that.
A I just went through the negotiated agreement and it said what to do. And I may have sent an email or two to Virginia Doran saying is this the right thing, and then I submitted it.
I prepared these huge documents, actually huge binders, with all my evidence and everything, and I wrote a document saying I think I want to appeal this. And I think by then I had hired a lawyer.
Q Okay. Who was that?
A Langton.
Q Michael Langton?
A Yes.
Q Did he help you prepare that document or did you prepare it yourself?
MR. BUSBY: Objection. Calls for attorney-client privileged communications.
Trina, don't answer that.
MR. VANCE: Well, Luke I disagree with that. It's not asking for her to disclose anything that was discussed with her attorney. It's just asking to disclose who prepared the document. The document itself isn't a privileged document because it was submitted.



MR. BUSBY: Trina, don't answer that.
MR. VANCE: You are refusing to allow her to answer that question?
MR. BUSBY: Yes, I am, on the basis of attorney-client privilege.
MR. VANCE: Ah, boy. Let's go off the record. Let's take a break. Five minutes?
THE WITNESS: Sure.
(A recess was taken.)
MR. VANCE: Let's go back on the record and we'll just straighten something out real quick.
BY MR. VANCE:
Q So we were talking about your appeal of the LOAs.
A Yes.
Q And you mentioned that you submitted documents -- and a written document to the School District to initiate the appeal, right?
A Yeah, I followed the process.
Q And I then asked you who prepared the document. Mr. Busby lodged an objection and asked you not to answer when I asked you whether that was prepared by counsel. So don't answer the question.
I just want to confirm that Mr. Busby is still instructing you not to answer.
MR. BUSBY: Yes.

MR. VANCE: And for the record, it's not worth stopping the deposition over but it's my position that that is not a correct interpretation of the attorney-client privilege. This is a document that was provided to a third party. And even if the documents itself were privileged, that privilege would be waived.

That being said, the document itself isn't even a privileged document. And asking simply who drafted it has nothing to do with attorney-client privilege.

So I'll just preserve that on the record and we'll move on.

BY MR. VANCE:

**Q What happened as a result of your appeal?**

A My lawyer -- so do you want me to talk about the appeal itself, or after?

**Q The appeal itself.**

A Okay.

**Q Did you have a hearing, for example?**

A Yeah, I was allowed to -- oh, no. So Kristen McNeill responded to my appeal, my written appeal. And she upheld all of the -- or many of them, almost all of them, of the allegations.

I appealed them all and she upheld many of them.

**Q Okay.**

A Oh. Sorry. Yeah, so there was the meeting in between. I was thinking -- right? I can't remember now.

So the meeting, and then -- yeah, so there was a meeting



where I got to talk about the allegations. And then she responded to the allegations. Yeah, sorry.

**Q Okay. No worries. Let's mark Exhibits 16 and 17 so we can have those ready to go and then we'll kind of get into that in detail.**

A Yeah. Okay. Sorry. It's coming back to me now --

**Q That's okay.**

A -- the order of things.

(Exhibits 16 and 17 marked for identification.)

THE WITNESS: Okay. Yeah.

BY MR. VANCE:

**Q All right. I'm showing you Exhibit 16 and 17. We'll talk about them one at a time.**

A Okay.

**Q But can you tell me what these are.**

A It's --

**Q I guess, starting with 16, let's just take them one at a time. If you can tell me what Exhibit 16 is.**

A It's her answer to my appeal of the first IDP.

**Q And Exhibit 17, what is that?**

A Is her -- Kristen McNeill's answer to my appeal of the second IDP, or I should say LOA, because it's appeal of the LOA. I received a Letter of Admonition which is the discipline portion. The IDP is just the allegation. So when I got the LOA, that was like discipline. And so I appealed that. So this is her answer



to that.

And this is the answer to the appeal to the second LOA.

**Q And you were trying to remember whether or not there had been a meeting or a hearing in between here?**

A Yes. Yes, she does.

**Q She references a hearing on September 28, 2017. Do you recall that going forward?**

A Yes, that makes sense now, because I submitted something in writing and had a hearing.

**Q And who was that in front of?**

A The hearing was in front of Kristen McNeill, Virginia Doran, Lauren Ford, and myself and my lawyer. And my husband was allowed to attend and observe.

**Q Anyone else present that you can recall?**

A No.

**Q And what did the hearing cover, if you recall?**

A They gave me 90 minutes to defend myself to all 15 allegations.

**Q And that would include both the allegations from both IDP letters that eventually became discipline in your LOAs?**

A Yes. And I started that meeting out right away by saying this is not enough time. I said there's no way I can possibly defend myself to 15 allegations that are this complicated and unrelated. And I said so I'm just going to stick to the ones that I think are most important.



And then what was really compelling to me about that meeting or that hearing, or whatever you would call it, was that I started with the first LOA, and as soon as I got to the bullet about the marijuana, Virginia Doran interrupted me and said you are not supposed to talk -- she said you are not supposed to talk about that. That's a whole separate thing with Roger Gonzalez and we'll talk about that.

He's refraining from -- and so he hadn't given me any discipline on his IDP yet, which was very late, because now this was the end of September. And I was still waiting for discipline, which the negotiated agreement said I should have got it long ago, and in no circumstances more than 60 days is what it said. And so I should have got it long ago.

So she interrupted and said we're not talking about that, he's waiting to see what happens with these LOAs before he does that.

And then my lawyer at the time objected and said she can talk about if she wants. And I said it's on the IDP. It's on the IDP, or the LOA. It's one of the allegations, was that I didn't report it, and I said so of course I'm going to talk about it.

And then she said okay.

And then through the next few minutes of my explanation I mentioned the complaint. And Kristen McNeill stopped the meeting and said wait a minute, you filed complaints?

So she had not been briefed about the complaints that I

Page 178

filed. So I really felt -- and I have that all on record and I have that all recorded.
And I really was floored that Virginia Doran tried to get me not to talk about the marijuana incident specifically, and then had not briefed the area superintendent on complaints that I had lodged in about Lauren Ford.
So I didn't feel -- I said, first of all, it blows me away that you would not be briefed or understand that this was happening too, that they have not told you about that, and when it's on my LOA and/or a part of my situation.
And then after the meeting that night I went home and emailed her the complaints. And I said it appeared during the meeting that you were unaware of the complaints I filed. I think it's fair that you have them.
**Q Okay. And during that meeting -- you mentioned that you had 90 minutes?**
A Uh-huh.
**Q So at that point in time were you presenting evidence and testimony?**
A I was speaking a lot faster than I am today to try and get it in. I couldn't even get to the testing bullets, I believe. I mostly stuck to the first LOA and I think the main testing error over here. There was just no way. I mean, look how many hours this has taken us already. But I did my best to get the information out.

Page 179

**Q And did Ms. McNeill ask you any questions?**
A Very few. She mostly listened and, you know, indicated that she didn't know about some of it. It really felt like she heard. It felt like -- it felt like she was going to be mad because she didn't know -- have all the information. It felt like she was trying to listen and understand.
You know, I told her, I said I've been here for 22 years. I have never had any discipline. I've never filed a complaint against any of my employers. I'm just a rule follower.
And I really felt that she was going to side for me, like she was going to see what I was being subjected to and what was happening to me and say this just needs to go away.
And I've heard of that happening in the District, so -- but I was wrong. She upheld everything.
**Q And in addition to this hearing, did you submit additional documents to her afterwards for her consideration?**
A Yes. I let her know that there was -- about the marijuana incident. And I said I'm happy to meet with you more if you want, but this is where I think the problem started.
**Q And so then Exhibit 16 and 17 are her -- is her decision regarding the allegations in the first and second LOA; is that true?**
A Yeah, these are -- yeah, her decision on it, whether she upheld it or not. And there was a couple of them that she took out.

Page 180

**Q Do you remember which one of them she took out?**
A I know one of them was -- there was an allegation on the first IDP from Lauren Ford about taking the phone out of a secretary's hand during a 911 event when we had an ambulance coming. And she took that out, because the assistant principal didn't substantiate it.
And I was in charge of student safety and I was very aware of the student's condition and the -- and I didn't take it out of her hand, I asked her. I said can I talk to them because I know what happened. It was a repeat 911 call from the day before which I also handled.
**Q So McNeill found in your favor on that particular issue?**
A Yeah.
**Q Do you know if there were any other issues that she found in your favor on?**
A Yeah, I think there were one or two others. I just can't remember.
And then they ended up back on -- I think one or two of them ended up back on the -- what's interesting to me again is about that incomplete. It's on Exhibit 16. Again, about that really wonky allegation where she basically accuses me of leading something but doesn't say that there's anything wrong with leading. You know, I still don't get it. That's what --
MS. PARKS: What was that word you just said, "leading"?
THE WITNESS: Leading. Like, to lead.

Page 181

MS. PARKS: Thank you.
THE WITNESS: So her decision point is that, yeah, you led it. And there was -- I still don't get that because I did lead it under her direction, but there's nothing wrong with leading. I don't understand how that ever ended up in my letter, unless they are saying something is bad about incomplete learning, but they don't ever address that. They just said yeah, you led it.
I'm like, yes, I guess I led it at my principal's direction. So I still find that the most bizarre allegation at all, that -- so I think that something happened outside of this with incomplete learning, where there was -- somebody was in trouble, or somebody was -- incomplete learning process didn't follow policy or something, and someone got in trouble or something and then she's saying "but you led it."
BY MR. VANCE:
**Q Right.**
A But it doesn't say that anything was ever wrong with incomplete learning. Am I making sense?
**Q Yeah, I understand your dispute there.**
A Yeah. So they upheld an LOA allegation of misconduct and all they did was say that I led it, but they didn't say that anything was wrong with leading it. It's bizarre.
**Q All right. Let's turn to page -- to Exhibit 17, page 285.**

A Okay.
Q It says Decision Point. Kind of in the middle there.
A Uh-huh.
Q "This should be removed from the LOA as there's no corroborating evidence or witness to you saying this statement." Do you see that?
A Yes. Oh, that's the center thing, yeah.
Q Yeah, so was that another instance of her removing something and siding with you?
A Yeah.
Q Can you describe what that issue was.
A Lauren Ford had an allegation on the IDP that said as I was leaving the room I said, "What's the big deal, it was just an email," about the testing error.
And during the investigatory due process meeting with Lauren Ford and Virginia Doran I highly disputed that. I said I would never just write something off like that, I did not say that. And Sandra Aird didn't back it up, was my understanding. She said that I said that to them.
And so because Sandra Aird didn't agree with Lauren Ford, and I said, "I didn't say that, that's ridiculous," they took it off.
So I think because she didn't have -- that was an allegation that required somebody else to confirm, because she said that Sandra was in the room, and Sandra didn't confirm it.



Q Okay. Can you think off the top of your head of any other allegations that McNeill sided with you on? I'm looking through and don't see anything, but I don't want to forget anything, if you have a recollection of one.
A There's only one or two.
She did say in -- on Exhibit 17, page 283, that "to this allegation I agree that the word 'dishonesty' should be removed."
Q Okay.
A Which was important to me. I've never been dishonest and I am repeatedly accused of being dishonest.
But then she -- yeah.
I don't see any others.
Q Okay.
A Oh, here's one. This is the one that was about the -- yes, that was the one about the -- taking away the phone. She didn't -- she said she was unable to corroborate evidence and she had it removed. That was on Exhibit 16.
That's all I see.
Q Okay. Thank you.
Following McNeill's decision on your appeal --
A Uh-huh.
Q -- or decisions, I should say, because technically, I guess, it was two separate LOAs that were being addressed, right?
A Yes. Uh-huh.
Q Were you still employed at that time?



A Yes.
Q Still on leave with pay?
A Yeah.
Q Not yet terminated, right?
A Not yet terminated.
Q And after this, was there a mediation?
A Yes. December.
Q Who attended that?
A It was -- there was a mediator from California. My lawyer, myself, my husband. Virginia Doran was in the room. Chris Reich was in another room, so she would go consult with him, but he never entered the room.
Q Okay. Do you know how that mediator was selected?
A I can't remember but I believe we had to, like, do the same thing like we did with the arbitrator, where we struck, you know, certain people. But I'm not sure, I can't remember the process on that.
Q Do you think the parties agreed on the mediator?
A I think we did.
Q What was the result of the mediation?
A It failed.
Q Obviously, right?
A Yeah, they tried to force me to resign.
Q And obviously you didn't want to do that?
A I said no. And then they offered me money. Not very



much.
Q How much?
A I thought it was 10,000, but my husband says he thought it was 5,000. I think there was a reason for one of those two numbers but it was either 5,000 or 10,000.
Q Okay. Regardless of which one it was, you rejected that, right?
A Oh, yeah, I rejected it.
Q So for some time, December 2017, all the way to June 2018, was there anything going on during that time frame? Because I know you then got your notice of recommended dismissal which we'll talk about here in a minute.
A Yeah.
Q But is there anything that we're missing in between the mediation and that notice in June of 2018?
A No. That's when I started engaging the board. I just, you know, I just kept looking for help in process, like why aren't people following the process, you know, who's overseeing this. I have evidence, why isn't anybody -- so I think I wrote my first letter to the board, kind of asking them for oversight.
And then I went in to -- I mean, there's no other way to put it, I went into a depression. It was like I went in to manic writing phase, trying to write everything down that possibly happened that entire year to, you know, every little detail of every single thing that happened with incomplete learning, with

Rise, with the marijuana incident in particular, just to get it on paper. And I started to draft a whistleblower retaliation complaint.

And at the same time I felt like I was really starting to read the law, which is way more complicated. I'm so glad I have a great lawyer. But I started to read the law to understand, and really realize that nobody was going to save me, you know, like I just was going to have to go to arbitration.

And I remember saying to Langton, like, are they going to fire me now? I fully expected that they were going to fire me. And that was when I first started learning about the law, that they can't -- they weren't supposed to fire me because NRS said, you know, Nevada, the constitution said that they can't fire me before arbitration.

So I was like what's next? Do we go to arbitration? And no one contacted me. No one. Like at all.

And so I went in to manic mode and wrote this whistleblower retaliation complaint with all my details. It was like 32 pages, but I only submitted a tiny, like a letter portion, couple of pages of it. And I submitted that in mid to late February, I think like third week in February.

And I did because I read some stuff on line that said if you don't bring to the attention of your employers that there were problems, then you can't bring it up after you are fired, you know, like it's -- I read some things that said you need to tell



them what's going on. So my version of that was this whistleblower retaliation complaint.

And my lawyer was a part of that process.

And then I submitted it and I brought a copy directly to Traci Davis. And I never heard anything.

**Q Do you know what date you took that to her?**

A I believe it was right around the third week of February, so maybe the 25th, somewhere -- it's somewhere around that time.

**Q Of 2018?**

A Of 2018, yeah. So -- and I had not heard from anyone about whether I was going to be fired, whether -- what the next step was. I swept through mediation. And Virginia Doran told me out the door that I was -- if I don't do this, then I was going to be fired. She told me that at mediation. And I was like, well, I guess you are going to have to fire me. See you in court.

And that just depressed me and scared me and horrified me. So that's when I went in to -- and I just kept expecting I was going to get a termination letter, because she told me they were going to fire me. And then I didn't.

So then I sat around and waited. I didn't know what else to do. And Langton really didn't have anything for me to do. He said just wait. So I waited.

And then I sent out an email. At some point, I can't remember when, but at some point I sent an email to Traci Davis



and said according to the negotiated agreement I get like 15 minutes, or something like that, I can't remember. And I never got a response. I sent that to her email directly.

I asked if I could meet with her. And then at another point sometime in there, I showed up to the -- I think it was getting closer to when I got my letter though. I showed up and just said can I -- Langton suggested to me, he said just go down there.

MR. BUSBY: Hey, just a second. I'm going to object insofar as the questions calls for any attorney-client communications.

MR. VANCE: What question was that?

MR. BUSBY: I'm going to direct my client not to answer any questions insofar as they call for communications between her and her former counsel, or I.

Go ahead.

THE WITNESS: I get you.

MR. VANCE: And that is correct. I don't want to know anything that he told you. That is a correct application of the attorney-client privilege.

MR. BUSBY: Go ahead, Trina.

THE WITNESS: Okay. I got you. Thank you.

Then I tried to go down there and she wouldn't receive me. So to this date I've never spoken to her, ever.

///



BY MR. VANCE:

**Q Never spoken with Traci Davis?**

A The only time I ever had a conversation with her was -- or -- was "good morning" when we went to her deposition.

**Q As part of this litigation?**

A Yeah.

**Q Okay.**

A Yeah, I never spoke to her.

**Q All right. So there was this kind of void, this time where nothing was happening. You were still getting paid?**

A Uh-huh.

**Q Right? Still on leave with pay?**

A Uh-huh.

MR. VANCE: Let's go ahead and mark Exhibit 18.

(Exhibit 18 marked for identification.)

BY MR. VANCE:

**Q I'm showing you what's been marked as Exhibit 18.**

A Uh-huh.

**Q Do you recognize this document?**

A Yes, I do.

**Q And it says Notice of Recommended Dismissal. How did you receive it?**

A In the mail.

**Q Now this references the third IDP meeting and the allegations leading up to it, correct?**

A Yeah.
**Q And it also refers to the prior IDPs and the LOAs, right?**
A Uh-huh.
**Q States your termination to be effective July 5th, 2018?**
A Yes.
**Q What did you do upon receiving this?**
MR. BUSBY: Just a sec. I'm going to object to the previous question insofar as it's inaccurate as to what to the document says.
Go ahead.
THE WITNESS: So it was like -- I think my lawyer also emailed me.
BY MR. VANCE:
**Q And don't tell me anything that he said.**
A Okay. You asked me how I got this. I just was telling you. Yes. Thank you.
**Q Okay.**
A So I got this from them and from in the mail.
And my thought was, right away -- I actually, in that six months, I couldn't understand why I wasn't hearing from anyone. We were long past any of the deadlines in the negotiated agreement. To me, policy, you know, policy, policy, policy. And I -- we were long past all that, and then this came.
And up to this date I was like, well, maybe they are



going to put me back to work, like they couldn't find any evidence to fire me, so maybe they're going to put me back to work. That was my feeling.
You know, I never heard anything from Roger Gonzalez. It was on Kristen McNeill. I heard that September, in that mediation, Roger Gonzalez wasn't part of any of that. And then I never heard from him. And he's the one that had the IDP toward my termination. So for me to get this, it was like I just shook my head, you know.
And then what I find very compelling about this is that it came to me the day before he retired, after 30 years. So it felt like he -- it felt like it was intentional. It felt like he was protecting himself.
It felt like, he was like, "Well, I can't fire her now so I'm just going to wait." But, regardless, I mean that's what it felt like. It came the day before he retired.
And he was on leave much of the time during the time that I was waiting.
**Q Do you know why he was on leave?**
A I don't know why, but he was on leave -- my mediation was like December 10th or something of 2017. And I know that he went on leave right about that time. And he didn't come back until the end of February. I got my whistleblower report in to the District just before he got back.
**Q Okay. You didn't know if it was a medical issue or**



**anything like that?**
A No idea. They won't share any of that. It's all confidential. But he was gone for that long.
And then he was gone again. They took his name off of the website and everything starting in like April, that he was not going to be overseeing that area anymore, whatever. I noticed that because I was watching. It was like where is he.
**Q Uh-huh. Understood.**
**So after receiving this, it sounds like you, through your attorney, submitted some letters seeking a grievance hearing and/or an arbitration. Does that sound right?**
A We submitted two letters.
**Q Okay.**
A The one was -- go ahead.
**Q Yeah, we'll go ahead and just pull them up.**
A One was the arbitration and the other one was contesting the dismissal as against the law.
MR. VANCE: Okay. Let's mark Exhibits 19 and 20, please.
(Exhibits 19 and 20 marked for identification.)
BY MR. VANCE:
**Q We'll take these one at a time here. Let's just start with Exhibit 19.**
A Okay.
**Q Now this wasn't addressed to you, it was addressed to**



**Traci Davis, from your attorney; correct?**
A Yes.
**Q But it looks like you were copied with this; is that right?**
A I believe so, yes.
**Q Do you recall being copied with this letter?**
A Yes.
**Q And do you recognize it?**
A Yes.
**Q And know what it is?**
A Yeah, I do.
**Q What is this letter, to your knowledge?**
A This is if you wish to appeal this action, you will need to follow NRS 391.822 --
**Q I think the first paragraph tells us what it is. It sounds like it is a request for an expedited arbitration hearing?**
A Oh, I'm sorry. I didn't the read that first paragraph. I went right to the second.
**Q That's okay.**
A It was -- I was trying to determine if it was this one or the other one.
Yes, it was requesting arbitration, is the answer.
**Q Okay. If you look at Exhibit 20.**
A Yes.
**Q Do you recognize that document as well?**

A I do.
Q And were you also copied on that one?
A Yes.
Q And looks like this one is asking for a grievance hearing, right?
A Yes.
Q Do you know why these two different letters were sent on the same day?
A I believe so. One is doing what he was supposed to do, which is requesting arbitration. And the other one is saying we don't -- we're protesting the recommendation to discharge as against the law. So they are two different things.
Q And subsequent to this, did you receive a termination letter?
A Yes, but it came very late and we had to request it.
Q Okay. Can you describe that process of having to request it.
A Yeah, it was me saying am I fired or am I not fired, like, where is it? Because I think it had to happen in a certain amount of time, emails.
And then suddenly my paycheck was stopped. And so I wasn't fired but they took my money. And that was a pretty big signal because I didn't know that was going to happen.
I actually figured that I would be fired, and then they would, you know, do whatever. But I wasn't fired and they took my



paycheck.
Q Do you know -- I know this is asking you to go back quite a ways, but do you know the time frame that you were anticipating to receive a paycheck, that you first didn't get it?
A Yeah.
Q Would that have been in July?
A No, it was this -- it was -- I believe it was August. I believe it was August. So this -- when did I get the letter from Traci Davis? Is that the next one?
Q We'll go to that next. That will make it easier. Sure.
MR. VANCE: Let's mark as Exhibit 21.
(Exhibit 21 marked for identification.)
BY MR. VANCE:
Q All right. Do you recognize that letter?
A Oh, yes. So it was July. Yeah.
Yeah, this is my termination letter. I actually got two of them from her because she had the wrong date on it.
Q Okay. Do you recall -- is this the correct letter?
A I believe it is because it says effective July 5th, and I think she had another one that said effective July 6th. There was an email from Virginia Doran saying the other one was wrong, here's the correct one.
Q And the Notice of Recommended Dismissal mentioned that the termination would be effective July 5th, right?
A Right.



Q Okay. So you did receive this letter. Do you know how you received it? Was it through your counsel or was it directly mailed to you?
A I can't -- I think it was mailed. I'm not sure. One of those two ways or both of those ways, I'm not sure. But I did get it.
And I do believe I got it on July 27th. So I remember -- my paycheck is on the 22nd. And I know it was about five days before I got this letter.
Q Did you get paid once per month or twice per month?
A Once per month.
Q Always on the 22nd?
A Yes, always on the 22nd. And it came -- so that should have been for the pay period up to July 10th, from June 11th to July 10th.
So even -- it should have been my paycheck from before July 5th. If they were going to even say that, I should have been paid for -- before that even. So it was like a month's worth of pay in addition to the July 5th date. So they just ended my pay without warning. I should have got that paycheck, is what I'm saying.
Q All right. So prior to receiving this letter, I think you were just describing that you had to ask for the letter, that you didn't really know whether you had been terminated until they stopped your pay?



A Yes. Well, even when they stopped my pay. I mean, I would assume I was terminated at that point.
Q Yeah. Upon -- that is a pretty good indicator, right?
Upon receiving this letter, Exhibit 21, did you still understand that you would be having the arbitration?
A It hadn't been scheduled. My understanding was that we were trying to get a date for the arbitration.
And, again, I keep referring to the negotiated agreement and District policy, which ended up being worthless to me, honestly.
But, again, I kept falling on that document and it said a 20-day expedited arbitration. And so we were like go, you know, you took my paycheck, let's go. Let's get this arbitration on the books.
And then they just drug their feet. It took six months. And we kept demanding to my lawyer and demanding to the School District, like why don't we have a date. And I really believe that was the financial squeeze part that destroys people.
Q You mentioned them dragging their feet. We'll get into that in a little bit more detail later.
You set it took six months. This letter is dated July 27th, right?
A Yeah.
Q And the arbitration, I believe, started -- do you recall when, November 1st?

A I think November 1st and 2nd. And then it was like three weeks until the third date. I had to add a day.

**Q Okay. So August, September, October. Calculate three months and a few days.**

A Well, from the time they took my paycheck until the time I got my money, that's the time I count, because that's my life, you know, my money, that I can't pay my bills and caused me a hardship.

So I didn't get my paycheck until -- or that money until mid January.

**Q Okay.**

A I might be five months -- sorry.

**Q That's okay. I just want to make sure we know what -- I know what you are referring to.**

**So when you say six months or five months, whatever that time frame is, you are talking about the time period that you were without pay?**

A Yeah.

**Q Not the time period between your termination and actually having the arbitration?**

A Yeah, I'm talking about the real parts of life where you are -- withheld your paycheck and you can't pay your bills.

And remember, I was not paid from June 11th until I got my check in January, so actually it was six months.

**Q So June 11th, do you know why your check was June 11th**



**instead of 22nd?**

A June 11th is the start of the new pay period, and it goes to July 10th. And so I should have been paid in that period but I wasn't, because that should have been what my July 22nd paycheck was.

**Q Okay.**

A So, I didn't get any money from that pay period, which was June 11th. And then I didn't get any of my award back pay until January -- I don't know what it was, I can --

**Q 2019?**

A Yeah. 2019. Yeah.

**Q Thank you for clarifying that.**

A Yeah.

**Q So eventually the arbitration took place. Do you remember the name of the arbitrator?**

A Andrea Dooley.

**Q Do you know how she was selected?**

A Yeah, we had to strike names until we agreed on that last one.

**Q Okay.**

A I wasn't very involved in that process.

**Q Yeah, that's okay.**

MR. VANCE: Let's mark Exhibit 22.

(Exhibit 22 marked for identification.)

///



BY MR. VANCE:

**Q Okay. I'm showing you what's been marked as Exhibit 22. Do you recognize this document?**

A Yes.

**Q What is it?**

A It is my -- the decision of arbitration from the arbitrator.

**Q Now it's 39 pages long, so I don't want to go through it all, especially if you want to get out of here at a reasonable hour.**

A I get it.

**Q But have you had the opportunity to review this document?**

A Yes.

**Q Do you agree that, in essence, it sustains in part and denies in part the grievance that you had?**

MR. BUSBY: Object. That's vague and ambiguous.

Go ahead and answer.

THE WITNESS: Sustains in part and denies in part, I -- my feeling is that when you are attacked with 18 allegations and you are able to produce mountains of evidence to where she completely -- especially on the IDP, that it was for my job to fire me -- that was completely negated. I feel like it was a huge win.

But there's one allegation on the testing that she



sustained, where I admitted that not everybody in the staff had a signature. And there was one that she co- -- the arbitrator said both Lauren and I -- Lauren Ford and I beared responsibility for this other testing error.

BY MR. VANCE:

**Q Right.**

A So yes, she sustained that, to answer your question, I guess yes, but I think, by and large, I'm -- I won in every account.

**Q Yeah. And that's just what I'm trying to get a sense for is what this decision, without reading through 39 pages, get a sense for, overall, what the decision was. My understanding is the first LOA was tossed.**

A Uh-huh.

**Q Right?**

A Yes.

**Q The second LOA, that allegations one and three were allowed to stand and the rest was to be scrubbed, right?**

A Yes.

**Q And that she found that there was no basis for your termination?**

A No basis for my termination.

**Q Right?**

A Yeah, sorry. Your general analysis that it was kind of even, just -- it bothered me, so I needed to clarify.

Q You're right, it sounded even by saying granted in part and denied in part.
A Yes.
Q You know, that is the effect, but, yes, you are right, the majority of the allegations were, you know -- she disagreed with.
A Uh-huh.
Q And only a couple of them she agreed with, right?
A And in addition, she said it was arbitrary and capricious. She said it was retaliatory. So there were things that were not involved with this that were added to this, so I just think -- I wanted to clarify that too.
Q Sure. And so tell me, at the arbitration, did the arbitrator address all of the issues from the first LOA?
A No. I mean, yes, the arbitrator gave me opportunity and we addressed everything that was in there, but I think everything in that LOA wasn't on the termination letter.
So Roger Gonzalez's termination letter, I think is what we went through. But then they brought up things that weren't on the termination letter. It was just so messy.
Q Okay.
A But I don't think that was the arbitrator, I think that was the District. They added stuff back on that wasn't sustained, or took things off. It was just messy.
Q Is there anything you feel the arbitrator missed, like



missed in hearing?
A No.
Q She addressed the first LOA? Is that a "yes"?
A Yes.
Q She addressed the second LOA?
A Yes.
Q And did she address that third IDP?
A She did, yes.
Q Okay. And so what was the general recommendation of the arbitrator following this arbitration?
A That I be awarded --
MR. BUSBY: I'm going to object for the record. Calls for legal opinion.
Go ahead, Trina.
THE WITNESS: Okay. Thank you.
She said I won, that she recommended that I get my job back and I be placed as an assistant principal back in the District, and that I get all my back pay and made whole.
"Made whole" was -- I had to figure out what all that meant, but made whole.
BY MR. VANCE:
Q Okay. And I know -- I'm not trying to suggest that it happened just like this. Right? We'll get into the things that happened immediately following the arbitration.
A Sure.



Q But with respect to her recommendation, you did get your job back, right?
A At some point, yeah, mid-January.
Q And were you provided back pay?
A I was provided back pay.
Q And were you provided back benefits?
A Yes.
Q Okay. Let's --
A Kind of.
Q Kind of.
A I had to pay -- that was just a point in contention and I just didn't have time to deal with it but they -- when they cancelled my insurance and they didn't tell me, I luckily figured that out and went and paid for additional insurance through my husband's company.
And so I tried to give them the receipts on what I paid, and they kept saying well how do we know that's the right amount, blah, blah -- it was just very, very difficult. So I just ended up letting it go because it took like two or three months.
So I never got paid for the replacement insurance that -- I just got my insurance. And now I have to actually pay more for insurance than I did before, because there was a gap in my plan. And so I had some, like, grandfathered-in policies, like -- and they, I had to pay the higher amount for them because there was a gap in my plan and it had lapsed, and they wouldn't



fix that for me.
MR. VANCE: Let's mark Exhibit 23.
(Exhibit 23 marked for identification.)
BY MR. VANCE:
Q Now this is something -- I don't know if you've seen this or not. It purports to be an email from Chris Reich, who is counsel for the District, right?
A Uh-huh.
Q To your attorney, Michael Langton?
A Yes.
Q And it references a settlement agreement.
A Yep.
Q Were you aware at this point in time that there were additional settlement discussions taking place?
A I remember telling my lawyer --
MR. BUSBY: I'm going to object to the question insofar as it calls for any attorney-client privileged communications. I'm going to direct my client not to discuss anything she said to her lawyer or anything her lawyer said to her.
THE WITNESS: Okay.
BY MR. VANCE:
Q And that is a correct instruction. I don't want to know what you told your lawyer or what he told you.
A I forgot, sorry.
Q So, no, without telling me anything that you guys

discussed, were you aware that there were settlement discussions that were taking place between your attorney and District counsel?
A No.
Q Okay. You weren't aware of that at all?
A I think it's how you define "settlement."
Q Uh-huh.
A I don't -- I can't say what I'm saying because I -- I just said I want things in writing, I don't want to talk about anything, like I don't believe anybody. That's basically -- so --
Q You had some mistrust for the District?
A Yeah. Yes. I was like I don't know what's happening but I don't want to talk about anything unless it's in writing.
Q Do you recall ever receiving a proposed written settlement agreement from the District?
A Yes.
Q And did you review that, that proposed agreement?
A Yes.
Q And, I take it, as we're sitting here today, that you rejected that agreement as well, right?
A Yes. It was probably the hardest moment of my life.
Q And what was it about that proposed agreement in particular that you didn't like?
A The settlement agreement didn't do anything other than offer me what I had already won, in my mind. I couldn't believe -- it felt like a ransom. It felt like you sign here and



say you won't ever talk about this and you're dropping it.
It felt like a gag order. I didn't really know what a gag order meant, but it was like you can't ever talk about it to press, you can't tell people what happened to you. You can't do anything. You just have to pretend it didn't happen, and then we'll give you the money that you just won, you know.
So I cried a lot over that because, to me, I had won my life back, I had followed the process that they told me to follow. And they were still saying, okay, you can have it if you sign this.
And I remember I refused to sign it. I said -- I guess -- and then my husband and I really, really had a hard time with that because my feeling was if I didn't sign it, then they were going to say okay, we'll go to lawsuit, you know.
And I wasn't a lawyer or anything, I didn't know what was going to happen with this, but I was like what are they going to do, take me -- take me to court? Now we just go to lawsuit?
And, to me, they must be rejecting what the arbitrator said, so I'm going to have to go to lawsuit if I don't sign this.
And I was like how is it possible that they are using taxpayer money to hold my award ransom? Like they either need to give it to me or not, one of the two. Give it to me or not. I should not have to sign anything.
And I just cried my eyes out. And I told my husband we can't do this. We are just going to have to keep pressing on, you



know. I'm just going to have to get a second job or whatever I can do to keep it going.
And then as soon as I declined to sign it, they gave me my award, or my job back the next day. So it was pressure.
Q Sure. Was there a non-disparagement clause in that mediation statement? Is that what you were referring to by the gag order?
A Yeah.
Q And that was something you did not want to sign?
A That's right. I felt like they were trying to brush it under the rug. And if I signed that, then I went through everything for nothing, because they were just going to do it to the next employee.
Q And was it your belief that the non-disparagement clause prohibited you from talking at all about the whole process?
A Yeah.
MR. BUSBY: Objection. Calls for legal conclusion.
Go ahead.
THE WITNESS: Yes.
BY MR. VANCE:
Q In Exhibit 23 here there is a statement from Mr. Reich. He says, "I also want to memorialize that you agreed to waive the five-day time limit for the Superintendent's response time, due to settlement discussions."
Were you at any point aware of an agreement between



Mr. Reich and Mr. Langton to delay that timeline?
A No. I do not believe I was aware at all. I believe I was actually pushing, like why haven't they done --
MR. BUSBY: Objection insofar as the question calls for attorney-client communications. And I direct my client not to disclose any communications between your previous counsel and yourself, or myself, in turn. Thank you.
THE WITNESS: I do not believe -- thank you.
No, I did not know about this. I was mad that it was past five days, and I hadn't gotten my money or my job back.
BY MR. VANCE:
Q And it was taking so long?
A Yeah. And it was Christmas. I really needed the money.
Q And then you referenced, you mentioned rejecting the proposed settlement, and the next day getting a letter. So let's move to Exhibit 24.
(Exhibit 24 marked for identification.)
BY MR. VANCE:
Q All right. I'm showing you what's been marked as Exhibit 24. Do you recognize this document?
A Uh-huh.
Q Is that a "yes"?
A Yes. My apologies.
Q No worries. Are you familiar with the letter?
A Yes.

Q And is this the letter you were referring to, having received after rejecting that settlement agreement?
A Yeah. It was the most heartbreaking thing ever.
Q This letter or the rejection of the settlement agreement?
A This was -- I think this might have beat this. No, the settlement was the hardest one, but this was the second hardest one.
MS. PARKS: I know, I'm sorry, I'm sitting way down here. Did you say it was the most heartbreaking thing ever?
THE WITNESS: Yeah.
MS. PARKS: Thank you.
BY MR. VANCE:
Q And why was that?
A Because it says that we're going to put you back, but we still don't agree with you. We still side with our administrators.
So I thought I'm going to go through this whole process that I respect, and I just went through hell for a year and a half, I went through hell and back. And I went through this whole process to save my career and my family's future and everything that was on the line.
And I thought that when they got a third-party arbitrator that really spent three full days looking at the evidence and saw that I was falsely accused, I thought they would



finally go, oh, crap, maybe Trina was right, you know.
I thought they might say, you know, Lauren Ford shouldn't have done this, Roger Gonzalez shouldn't have done this.
And I thought they would look at it and have evidence. But they still said -- and that's my reputation, you know. They still said we still side with our administrator.
So here we sat at this whole process to prove who's at fault here, and it was proven with a sound arbitrator decision. And they still said "but we side with administrators."
It was heartbreaking, because I spent 22 years of my life at this place, and building relationships. And it was heartbreaking.
Q Okay.
A So -- it still bothers me.
Q There are a few things that the letter says that the Washoe County School District is going to do. First is reinstate your employment?
A Uh-huh.
Q And we already talked about that. They did that, right?
A Right.
Q Place you as an AP or other position. They did that, right?
A Yeah.
Q Where did they place you as an AP?
A Wooster High School.



Q Who was your supervisor at Wooster High School?
A Leah Keuscher.
Q Is she still, by the way?
A She is.
Q You had worked with Ms. Keuscher before, right?
A Yes.
Q Had a good relationship with Ms. Keuscher?
A Yes.
Q And we already talked about back pay and benefits.
Did they remove the first LOA from your file?
A As far as I know, yes.
Q And did they revise the second LOA to include allegations one and three?
A They did.
Q Okay.
A Which I was -- I contested pretty heavily as well.
Q Right.
MR. BUSBY: Trina, I'm sorry. I can't hear you. Can you speak up?
THE WITNESS: I apologize. I said yes, which I contested pretty heavily as well, on email with Chris Reich and other people.
BY MR. VANCE:
Q And Anthony Spotts?
A With Anthony Spotts, yeah.



MR. VANCE: Let's mark as Exhibit 25.
(Exhibit 25 marked for identification.)
BY MR. VANCE:
Q I feel like we're coming down the home stretch here.
A Good.
Q Go ahead and take a look at Exhibit 25.
A Uh-huh.
Q Do you recognize that?
A Yes.
Q Did you, in fact, receive it?
A I think I did.
Q And it says -- I'm sorry, go ahead.
A I think I did. It's the final one.
Q It says hand-delivered. Did you get it via hand-delivery?
A No.
Q Do you remember how you got it?
A I'm just guessing at this point but I'm pretty sure I received it via email. I don't remember ever seeing Lauren Ford at that time or any of these people hand-delivering me something.
Q Okay. You know you got it, you just don't recall exactly how?
A I'm pretty sure it was an email.
Q Okay. Now there's a spot for a signature down here and I don't see one. I do believe, and tell me if I'm wrong, I do

believe that you eventually signed it under protest; is that right?

A I don't remember either, but I think I did. I think I -- yeah, maybe you'll have those emails in your next set, but I think I said, first of all, like the arbitrator said, that Lauren Ford should bear some responsibility. So she -- she's writing the letter to me about an item that the arbitrator said she should be disciplined for as well. So that was really --

Q Yeah, we'll get into those emails here in a second.

A Okay.

Q I haven't seen a version that's signed, but I believe that I saw somewhere a reference to you having signed it eventually. So I'm just wondering what your recollection is in that regard.

A I think -- I'm not positive, but it wasn't hand-delivered, I can tell you that.

And I'm pretty sure that, after I argued with Anthony Spotts about it for a long time, that he sent me one and said you need to sign it, like it's really not up for discussion, like you just need to sign it.

And I think I finally signed it and sent it back to him on an email.

MR. VANCE: Okay. Let's go ahead and mark Exhibit 26.

(Exhibit 26 marked for identification.)

///



BY MR. VANCE:

Q All right. Now that's a big email string.

A Uh-huh.

Q Go ahead and take a look at Exhibit 26. Do you recognize this email string?

Go ahead and thumb through it as much as you need to.

A Okay.

Oh, yeah.

MR. BUSBY: Oh, just a sec. I think these are emails that were subject to our clawback agreements.

Do you mind if we go off the record for a second and discuss this?

MR. VANCE: Yeah. Yeah. No, not at all.

(A discussion was held off the record.)

MR. VANCE: Let's go back on the record.

MR. BUSBY: Okay.

MR. VANCE: For the record, I've taken back Exhibit 26. There were two pages in there that had some privileged communications in there. That would have been the second and third page of the exhibit which would have been 226 and 227.

We've removed those from the exhibit, so that's why there's going to be a gap in the Bates numbers, and we're agreeing that those can be clawed back and will be destroyed.

And I think Mr. Busby is going to send some follow-up communication to that effect.



MR. BUSBY: Correct. So stipulated. Thank you.

BY MR. VANCE:

Q All right. Attaching or handing you the new Exhibit 26.

A Okay.

Q Do you understand that to be emails between yourself and Anthony Spotts?

A Yeah.

Q And what I would like to do is turn to the last page of that exhibit.

A Okay.

Q And the very first email, which is the very last email on the exhibit, February 8th, 2019.

A I'm sorry, you said the last page -- which page?

Q Yeah, the last page of the exhibit, down at the very bottom, there's no text in the email but it's from Anthony Spotts to you, February 8, 2019?

A Uh-huh.

Q Do you think that might have been the email where he attached the new LOA?

A I have no idea.

Q Okay. Because the next email up from that is from you to Anthony Spotts, referring to specific issues that you have with the letter being in your personnel file. Do you see that?

A Yeah, okay. That would make sense then.

Q Okay. What were -- I think we talked about this a



little bit but it was before we got into the emails. What were your concerns about the LOA?

A Well, it says right there, but it says something about being dishonest. And as determined by the arbitrator, I was not dishonest, so I wanted that out.

It says -- oh, I was asking if he'd communicated with my principal. I should be -- I believe she should be involved because her time is impacted. Asked him where I could respond to this.

And then the biggest thing is that Lauren Ford was said by the arbitrator that -- should bear responsibility for the testing error as well, and so I felt it was disparate treatment that -- I'm not sure if I say that word right, "disparate" -- disparate --

Q It works.

A -- treatment to issue me an LOA in my file, my employee file and not issue her one, and let her write it. It seemed ridiculous to me.

Q Sure. Do you know if there were any disciplinary actions ever taken with respect to Ms. Ford?

A No, they would never tell me that.

Q Right. That would be confidential, right?

A Uh-huh.

Q And Ms. Ford's conduct in particular wasn't the subject of the arbitration, was it?

A I guess not. Depends on how you look at it. Sure felt like it was to me.

**Q And I understand that, yes.**

**But with respect to Arbitrator Dooley's decision, Arbitrator Dooley did say that the first and third items in that LOA were able to stand, right?**

A And that Lauren Ford should bear responsibility for them.

**Q Right. But was that something that was -- did you believe that a decision holding her responsible was supposed to appear in your LOA? Was that your position?**

A I believed that it was nonsense to have the person who was also accused of it writing my letter.

**Q Okay.**

A It did not make sense that she was also -- was supposed to bear a responsibility, a third-party arbitrator, like a judge type, someone that they trusted to make a good solid decision was actually writing my letter.

I would have felt better about it if they would have had someone from the District write it. I couldn't believe that they allowed her to do that after falsely accusing me of so many other things.

**Q So it was a source of frustration for you?**

A It was a source of frustration. That's a good way to say it.



**Q If we turn to page 12 of the exhibit.**

A Okay.

**Q And by page 12, it says 12 of 16 in the bottom right. I know we skipped a couple of pages here.**

**So let me know when you are there.**

A I'm there.

**Q The email from you to Anthony Spotts on March 25th, 2019 --**

A Uh-huh.

**Q -- states -- well, can you just read that first paragraph or sentence that comes after "Anthony."**

A "Anthony, the district's revised letter states," quote, "'continuation or repetition of the deficiencies as states" -- it should be "stated" -- "'in this document may result in suspension, demotion, dismissal or recommendation not to reemploy.'"

**Q And the next one too, I'm sorry.**

A "The arbitrator's ruling said on pages" -- "page 38, lines 24 to 26, and page 39, lines one and two, said that these items could not be the basis for future dismissal because it would violate the principles of double jeopardy."

**Q And that was something that apparently gave you concern?**

A Yes.

**Q And I'm -- I know what arbitrator Dooley's award said.**

**In the response from Anthony Spotts, his second paragraph says, "When we state 'continuation or repetition' of the deficiencies, it means that if a same or similar incident happens again, the District has the right to elevate the potential disciplinary action to the next step in the progressive discipline process based on the new incident. We would not relitigate the previous incident, only reference that you received a Letter of Admonition."**



**Do you see that?**

A Uh-huh.

**Q Do you remember getting that email response from him?**

A I do.

**Q Did that clarify your concern at all or help your concern --**

A No.

**Q -- in that regard? Why not?**

A I have zero trust for the School District. I mean they -- I mean -- I just felt like -- I mean, what was I going to do? I was just going to say my point and then they were going to do what they wanted to, but, to me, I knew what they were trying to say, but, to me, it felt like I was just at risk to be fired again.

**Q Okay.**

A And I just felt like they were looking for whatever way they could to fire me. I was still scared.

**Q And his representation to you, that that wasn't what they were trying to do, wasn't satisfactory to you?**



MR. BUSBY: Objection. Mischaracterizes the email.

Go ahead, Trina.

THE WITNESS: Yeah, I mean I understood why he wrote it and I know that was his side of things, but he wasn't in my brain or standing in my shoes, and so it didn't ease my concern.

MR. VANCE: Okay. Let's mark Exhibit 27.

(Exhibit 27 marked for identification.)

BY MR. VANCE:

**Q Showing you what's been marked as Exhibit 27. It says Declaration of Trina Olsen. Do you -- well, turn to the second page there.**

A Uh-huh.

**Q And tell me if that's your signature.**

A Yes.

**Q Do you recall signing this document?**

A Yes.

**Q And I want to ask you about paragraph 12. It says, "Even though I prevailed in the arbitration against the District, I still believe that I'm at risk for being fired for reporting Ford and Wilson."**

**Do you see that?**

A Yeah.

**Q Has the Washoe County School District, since your reinstatement, taken any further retaliatory actions against you?**

MR. BUSBY: Objection. Calls for legal conclusion.

Go ahead, Trina.
THE WITNESS: I believe they have.
BY MR. VANCE:
**Q In what way?**
A Well, first, allowing Lauren Ford to write my revised LOA certainly didn't feel appropriate.
I really felt that Hall's investigation was -- was really, really bad and hurtful to my reputation and my career.
And they released -- it was a confidential document, and they released it to the RGJ on -- they held onto it intentionally, and then they released it, which I thought it was confidential. I thought we couldn't release it.
So they released it to the news on the very day I filed this lawsuit. And then it made the -- it made the newspaper file something that was like Lauren Ford's name was cleared, which made me look -- it made my reputation -- it made me look like I accused her, but I never did, you know, I just -- I reported hearsay, what Jessica said about her. It wasn't my job.
But it looked like, oh, you know, Lauren is all cleared, she was falsely accused kind of thing, so it really muddied the waters for the public.
And then in that document he says over and over that I was dishonest. And I find that very offensive.
**Q You are talking about Anthony Hall?**
A Yeah.



**Q And was Anthony Hall an employee of the School District?**
A Yes.
**Q He was employed by the School District?**
A Well, I believe --
**Q Paid by the School District, like a salaried --**
A Paid by the School District.
**Q Salaried employee of the School District?**
A No. Hired.
MR. BUSBY: And I object and ask that the witness be allowed to answer the question uninterrupted.
Go ahead.
THE WITNESS: He was hired by the School District.
BY MR. VANCE:
**Q All right. So he wasn't an employee; he was hired by them to do an investigation?**
A Yes, as an outside paid person.
**Q As a third party, right?**
A Yes, uh-huh.
MR. BUSBY: Well, objection. Mischaracterizes facts.
Go ahead.
Never mind. Go ahead.
BY MR. VANCE:
**Q And following this investigation, did you have any adverse employment consequences, such as a reduction in pay, threats of termination, anything of that sort?**



MR. BUSBY: Objection. Compound question.
Go ahead.
THE WITNESS: No.
MR. VANCE: Let's mark Exhibit 28.
(Exhibit 28 marked for identification.)
THE WITNESS: To answer that last question, to respond to that last question, am I allowed to consider, like, future pay in that conversation?
Because I feel like my career path was derailed and I didn't have the experience that I needed to apply for the principal pool because I was off of school for a year and a half, so I didn't -- and it clearly says I need three years of experience to apply.
BY MR. VANCE:
**Q Okay. I see what you are saying.**
A And I feel that being in a lawsuit with the School District has greatly impacted my career path to be a principal or an area superintendent, myself.
And I feel very strongly about that because I think I'm a good leader, so I feel like it is very sad.
**Q And the lawsuit with the School District that you are referring to is the one that you filed, not that the School District filed, right?**
A Yes, true.
**Q Show you what's been marked as Exhibit 28. Have you**



**seen this document before?**
A Yes.
**Q Okay. This one is more recent?**
A Uh-huh.
**Q We're not talking about 2017 anymore?**
A Yeah.
**Q That's good.**
**So August 4th, 2020, a letter from the School District Human Resources to you.**
A Uh-huh.
**Q And you received of this in the mail?**
A I can't remember how I received it.
**Q Okay. And that's fine, but you remember that you did receive it?**
A I did, yes.
**Q And this is indicating that your LOA was to be in your file for three years from the original date.**
A Uh-huh.
**Q And that time was up and it was being removed.**
**Is it your understanding that that LOA was removed from your file?**
A Yes.
**Q And so as we sit here today, do you have any LOAs in your file?**
A I don't know. I haven't looked at my file, but I know

that I had to personally go into my school file and show my principal and have it removed from my school file. But I think there's an HR file at the District Office.

**Q Okay. I'm not sure I'm following. Can you explain that to me a little bit.**

A I think they keep letters -- they keep an employee file on site of current things. And then I think -- I don't know how they communicate with the District, but there's a District file as well.

And so I asked -- or I asked -- I showed Leah this so that I could help with testing now. I said look, I'm free to help with testing, if you need me.

And she said, well, let's just go look to make sure it's out of your file here. And then they pulled something out and tore it up.

**Q Okay.**

A So -- I had to make that happen on my campus though, because she didn't get this, I don't believe. She did not get this, my principal, is what she told me.

**Q Understood. But you were able to handle that and make sure that that isn't in your file anymore?**

A Yes, but that's not the district file, so I didn't go verify that it was removed.

**Q Right. Just based on the letter itself, they are representing to you that it has been removed?**



A Sure.

**Q You just haven't verified one way or another if that's the case?**

A Right. I have this letter someplace.

**Q Let's take a five-minute break. Is that okay?**

A Yeah.

MR. VANCE: I'm getting in the home stretch here but I've got to use the rest room and hopefully we'll come back and not be too much longer, although I understand Kathy has three or four hours of questions, herself.

(A recess was taken.)

BY MR. VANCE:

**Q I know I sound like a broken record, but you understand you are still under oath, right?**

A Yes.

MR. VANCE: Okay. Let's move to Exhibit 29.

(Exhibit 29 marked for identification.)

BY MR. VANCE:

**Q All right. Go ahead and take a look at that. Is that your signature on page 2 of Exhibit 29?**

A Yes.

**Q Do you recognize the document?**

A Yeah. I'm trying to remember, is this the second one? I probably need to read through it.

**Q Yeah, go ahead and take your time.**



A Yeah. Oh, yeah.

**Q And you sounded confused at first, like you had just seen one; and, in fact, you did.**

A Yeah. They just looked the same.

**Q Exhibit 27 is one declaration and this one is your second declaration.**

A Yeah, uh-huh.

**Q I want to ask you about a few things in this. Can you go to paragraph 7?**

A Sure.

**Q Can you read that paragraph for me?**

A "At this time my husband and I were living off our savings and credit cards because I did not receive a paycheck since around June of 2018."

**Q Can you tell me a little bit about that.**

A Yeah. We had money in savings. We were remodeling our house. And we had money in savings pretty consistently.

But because of all the payments for the lawyer, which ended up being, well, with the arbitrator and everything, it was well over $30,000 that I had to pay out.

I kept having to withdraw from our savings or withdraw from house projects, and to -- to pay the lawyer.

**Q Okay. That actually clarifies for me a little bit. You are not saying that because you weren't receiving a paycheck that you were unable to survive; you are saying that because you were**



**paying lawyer fees and things like that, that that was the source of your financial difficulties?**

A No, I'm saying that because I didn't get a paycheck, I had to have income from a -- you know, to take care of things, from -- luckily we had money in savings.

**Q Okay.**

A So I didn't have a paycheck, which normally we continue to save and our savings goes up. So I didn't have a paycheck, so we had to use our savings for certain areas.

**Q Okay.**

A And we didn't think it would go on this long, you know, or this much money.

When I first spoke to or tried to get an estimate about a price, it was like, oh, probably 10 grand, you know, for -- but because there were so many allegations it ended up being way more money.

**Q A little more than what you expected.**

A Uh-huh.

**Q Understood. And at this point in time was your husband working?**

A He was.

**Q Alston Construction?**

A Alston, yeah.

**Q Do you know how much he was making at the time?**

A A hundred, a hundred and ten, somewhere in there, I

think.
Q Hundred and ten --
A Thousand.
Q 110,000 per year?
A Uh-huh.
Q Okay. I was going to say 100, 110, that's not a lot; but 110,000, that's different.
A Yes. I'm sorry.
Q No, it's okay. I just want to make sure it's clear.
A Yeah.
Q And he was making a salary at this point in time, right?
A Yes.
Q And did you have -- can you explain to me what RV Share is.
A RV Share is a place where you can just -- like you share everything else -- it's like a co-op to rent your RV.
Q Did you get any money from RV Share?
A Uh-huh. We did that to supplement our income.
Q When did you start doing RV Share?
A During this time when I lost my paycheck.
Q Okay. And I should talk to you about it. I've actually wondered if I should try doing RV Share. Maybe another time you can tell me how it works out. But do you know -- well, let's just -- see, I don't want to go through all of these exhibits if I don't have to.



And the fact that I've got them -- I know I've provided them to you, Luke, and to you, Kathy, premarked. If I'm going to skip one -- I don't really feel the need to go through Exhibit 30.
So should we mark what is Exhibit 31 as Exhibit 30, or should we just mark it as Exhibit 31 to be consistent. Do you have a preference there?
MR. BUSBY: I prefer to stick with the premarked numbers, if you don't mind. I mean, it doesn't matter if we don't have an Exhibit 30 in the record, does it?
MS. PARKS: No.
MR. VANCE: I mean --
MS. PARKS: If you don't refer to it.
MR. VANCE: -- it just feels weird.
Let's go ahead and we'll mark Exhibit 31.
(Exhibit 31 marked for identification.)
MR. BUSBY: For the record, I would like to indicate that this document has been marked confidential. I believe it's subject to nondisclosure based on its contents. And I would ask that it be considered as much when used in this deposition or trial.
MR. VANCE: Right. And per the protective order, you can request, Luke, that this be marked confidential in the transcript, or have a separate transcript provided, right?
MR. BUSBY: Yeah, as long as it's indicated in the transcript that it's confidential, I'm just noting that for the



record. So it's -- if you are going to mark it or if you're going to try to use it at trial, so we can get a pretrial order --
MR. VANCE: Right.
MR. BUSBY: That's -- we will flag it for the court.
MR. VANCE: Right. And also if we were to file a motion or anything like that and attach it, we need to file it under seal.
MR. BUSBY: Right.
MR. VANCE: So there will be a few things here -- well, depending how things go, there may be a few items, Luke, as you've probably seen, that have the confidential designation.
MR. BUSBY: Yeah.
MR. VANCE: Do you want that -- do you want this to just be a standing comment on the record that from this point forward --
MR. BUSBY: I'll just note it for the record for each of the items, so it's clear on the transcript and it's the clear on the court reporter's exhibit list.
MR. VANCE: All right. Fair enough.
For the record, I believe Mr. Busby already said this, Exhibit 31 is a confidential document.
BY MR. VANCE:
Q This was provided, Ms. Olsen, to us in response to some written discovery. It looks like it reflects a Wells Fargo money market savings account in the name of you and your husband; is



that right?
A It looks like, yes.
Q There is an entry on August 30th, that would be page 2 of the exhibit.
A Uh-huh.
Q It says -- it's in the amount of $7,000 and it says Burning Man Rental Plus.
A Yeah.
Q Do you see that?
A Uh-huh.
Q What was that for?
A Renting my camper to someone who was going to Burning Man that was from England.
Q Was that part of the RV Share or was that, like, outside of the context of RV Share?
A No, it was part of RV share, I believe, yeah.
Q That's what I was wondering because sometimes in your document I see reference to RV Share that looked like it was a similar thing, but I wasn't sure. So thank you for clarifying that.
During this time period, do you know how much you made doing RV Share?
A Yeah, it was actually -- it was not bad. That, the Burning Man thing was huge, obviously, because -- and then -- because of the cleaning involved and the storage and

transportation.

But then we rented it a handful more times, maybe 700 to $1,000 each time, So it helped to make ends meet during this time.

**Q Okay. Now with respect to credit cards, isn't it true that both prior to your termination and after your termination with the District that you frequently used credit cards?**

A No. I don't think so.

**Q No?**

A I don't believe so. I believe it was about that time that we started -- I don't remember. Because we were not -- we were very -- actually, we didn't even have a credit card for many, many years. We were just a believer in using the cash that we had.

But we started to get, the year before, I think, we started -- the year before all this started I believe is when we started to -- like, I applied for a bunch of travel credit cards because I wanted to play the earn points game.

And then we ended up with a Venture card. So at first I got the Alaska card and we were trying to get free points to make our travel cheaper.

**Q Right.**

A But I wouldn't say we used them very much. We put money on them to get the points and then, you know, we were playing the point game.

**Q Right.**



A And now we use a credit card regularly every single day. We don't use our cash card at all, we just pay it off every month so that we can gain points.

**Q We do the same thing.**

A Yes.

**Q The Venture card, in particular, is fantastic.**

A The Venture card, yes, exactly what we use. But on regular basis we have do not have cards, really, the last few years.

MR. VANCE: Let's look at Exhibit 32.

(Exhibit 32 marked for identification.)

BY MR. VANCE:

**Q All right. Showing you what's been marked as Exhibit 32.**

**I believe Mr. Busby would like to put something on the record here.**

MR. BUSBY: Yeah, I would just like to indicate for the record this document is also marked confidential pursuant to the Court's protective order, and I would like as much indicated in that transcript.

BY MR. VANCE:

**Q Now this purports to be a Capital One statement?**

A Uh-huh.

**Q For the time period of May 19th to June 18th, 2018. Is that right?**



A Yeah.

**Q And at this point in time you had not yet been terminated by the Washoe County School District, right?**

A That's right.

**Q And it reflects --**

A It was very close.

**Q Right, it was. It reflects just over $7,000 in transactions, right?**

A Right.

**Q And is that in line with what you were telling me, that you started to use them to accumulate points and then you would subsequently pay them off?**

A Yeah. Yeah. And you can even -- I mean this was a really complicated time because we were trying to get points and I was just -- we don't -- our credit was good, you know, so we -- like you could see that there's travel stuff on here and we were trying to accumulate points, but, yeah.

You had to spend so much on the credit card before you got the initial points, so these were all pretty new cards.

**Q Okay.**

A And then so we just would, you know, try to pay it off.

**Q Do you know how new they were?**

A Huh?

**Q Do you know how new they were, like how many --**

A I don't. I mean --



**Q -- statements you would have received prior to this?**

A Yeah, when you asked for all of this documentation, I -- it was -- I knew it was going to be difficult to kind of go through because there was so much happening, like I changed my daughter's account to a savings account for the family, or vice-versa.

My son had -- I mean I have so many accounts in my checking account, like savings objects and, you know, we're always moving around money.

But, yeah, in particular, we just -- we don't normally use credit cards but we did that in the year previous to this. We got -- we had a Capital One, I think two of the Bank of America cards for the Alaska, so we could get the companion pass. And then I think we applied for the Venture. I think that came shortly after.

And then now these have all subsequently been closed, I believe. The only one we have now is Venture.

**Q Okay. This Capital One card in particular, I believe, and tell me if you think I'm wrong, that there may have been one statement that predates this one that I was provided. And I'm wondering if you think that that may have been the first one that you received since getting the card, if it was that new.**

A It may have because there were some dates that I couldn't -- I can't remember now, honestly, but there were some dates that you had requested to have from our financial

information and I'm like, oh, that card didn't exist during that time.

**Q Right.**

A So they -- yeah.

**Q Okay. And would you agree that even during the time period following your termination, up until your reinstatement, that you were able to pay your credit cards on a monthly basis to avoid paying interest?**

A Yeah.

**Q Okay.**

A Because I went through my savings. And we mostly did -- we didn't use our credit card for, like for living, up until the end, because most of the stuff for the lawyer and all that 35,000-ish that came out, mostly was applied at the end for the arbitration and the -- you know, that's when all the money, like, mostly November, December, is when I had to pay it all.

And so, yeah, we -- and I just -- I want to follow that with I think I know where you are going with this, and honestly, I think it's very unfair. Because we are a family that takes very good care of our money. We have a very small house. We have a small mortgage. Our cars are paid off. We had money in savings. We were working on making our savings go up.

And I believe that that is the only reason that I was able to fight, because normally people can't lose a thousand or a hundred thousand dollars of income. I should say 90,000-ish of



income, you know, 6- or $7,000 a month of income and survive that.

They lose their house, they lose their lifestyle, they lose everything.

But we were in a position where my husband had just had huge promotions and we had a very tiny mortgage and no bills.

So we were trying to earn, you know, trying to be smart with our money with credit points. And, yeah, I could pay my bills.

**Q Okay.**

A And so it shouldn't be held against me that I manage my money well and could survive the financial pressure of the School District. In fact, I would say that the fact that I could survive financially, the crunch of the School District and what they were doing to me, is something that most families can't do.

And I was offered a teaching job. And when people are offered a teaching job when they are being attacked like this, they usually take it because they need to -- they don't want to lose their home, they are afraid that they are losing their career, you know.

So I felt very fortunate that I was able, in a financial position -- doesn't mean that it didn't hurt me. It shouldn't have lasted six months. And I shouldn't have had to wipe out my savings. I shouldn't have had to end up with a huge credit card bill in December over it, which I did, and I paid it off in January when I got my back pay.



But if I wouldn't have got that back pay, I'd have been in a world of hurt. I would have had to get another job, you know, the works. So -- anyway.

**Q No, I understand. Thank you for sharing that.**

A I want you to know that I feel very fortunate that the financial pressure that was put on me -- and that's, I believe, part of the game with the School District. I really, really feel in my heart that -- that that's why I was fired, that's why they took my paycheck, was to put financial pressure on me to cave.

And I -- and that's why it drug out for six months and, you know, all that stuff. I feel that I was very lucky to be in a position to not lose my home when I was fighting for my integrity and my honor.

**Q You were able to weather the storm.**

A Yeah.

**Q Let's go back to Exhibit 29 real quick.**

**Yeah, sorry, I'm taking you backwards now.**

A It's okay.

Okay.

**Q I would like to look at paragraph 2. Can you read that for me, please.**

A "After being fired in July of 2018 I requested arbitration, which was supposed to occur within a few weeks after the request. Washoe County School District kept delaying arbitration which finally occurred in late November 2018."



**Q Okay. I guess my first question is the arbitration started November 1st, 2018, right?**

A Yes, I believe so.

**Q Okay. What is your basis for the statement that Washoe County School District kept delaying the arbitration. What do you mean by that?**

MR. BUSBY: I'm going to object insofar as it calls for attorney-client communications.

Otherwise, you can answer, Trina.

THE WITNESS: I don't know. My husband and I were like why aren't they scheduling, what is happening.

BY MR. VANCE:

**Q All right. The allegation, though, in here, which you signed, is that Washoe County School District kept delaying the arbitration, right?**

A Uh-huh.

**Q So what facts are you aware of that it was the Washoe County School District that was delaying the arbitration?**

MR. BUSBY: Same objection, Trina, insofar as the question calls for any communications with your former counsel.

Go ahead and answer.

THE WITNESS: Because I kept saying I'm ready and there kept being a delay, and it took a long time. That's all I know.

BY MR. VANCE:

**Q Okay. And at this point in time Mr. Langton was your**

**counsel, right?**
A Yes.
**Q Were you aware of what his schedule was like between the time that he requested arbitration and arbitration took place?**
MR. BUSBY: Objection, Trina. Don't answer that. Privileged.
BY MR. VANCE:
**Q Were you aware of his schedule?**
MR. BUSBY: Trina, don't answer that. There's only one way she can know that, Justin.
MR. VANCE: Saying "Yes, I'm aware of it," or, "No, I'm not aware of it," does not reveal a communication.
MR. BUSBY: How is she going to become aware of it?
MR. VANCE: Yeah, if he told her.
MR. BUSBY: Yeah, well, that's an attorney -- that's a privileged communication.
MR. VANCE: It's not asking what did he tell you, what did he tell you about his schedule. The question is simply whether or not she was aware of his schedule. That doesn't call for a privileged communication.
And, regardless, it's pretty clear under federal law that attorney-client privilege of facts and things that don't constitute actual -- actual advice of counsel, don't fall into the attorney-client privilege anyway.
MR. BUSBY: We're in Nevada, Justin. We're applying



state law privilege in federal.
MR. VANCE: Well, this is in Federal Court.
MR. BUSBY: Okay. I'm --
MR. VANCE: Specifically the Ninth Circuit, in Colton v. United States, 306 F2d 633, 2d -- well, not Ninth Circuit, I'm sorry. That's Second District. No, that's who's citing that. Okay.
Michaelson, 511 F2d 882, Ninth Circuit, 1975, talks specifically about information that is not attorney-client privilege, including things such as the fact of having retained counsel, what your financial arrangement is with counsel, things of that sort.
I would encourage you to read that opinion because it gives you a nice little course on what is and is not attorney-client privilege.
And my question was not one which calls for attorney-client privilege.
So I'll ask you once again, Mr. Busby, are you instructing her not to answer that question?
MR. BUSBY: I am.
BY MR. VANCE:
**Q Okay. Do you know what the arbitrator's schedule was like?**
A I think I heard wind of her having certain dates open, and I was, like, I want the I earliest date. But there was no



hurry --
MR. BUSBY: Trina, insofar as the question asks for communication between you and your prior counsel, I'm going to direct you not to answer.
THE WITNESS: Sure.
Okay. So, no. I mean, I didn't, no.
BY MR. VANCE:
**Q Now you were terminated in July, right?**
A Uh-huh.
**Q In the end of August you were in Point Reyes, California?**
A Yes. In August?
**Q Yeah.**
A I don't know. Was I?
**Q Yes. But if you don't recall --**
A Okay. If you say so. I don't remember my vacation habits that year.
**Q Okay. That's fair.**
**Do you recall going to Hawaii?**
A I do.
**Q Was that end of September and early October?**
A Probably. I had that -- it was my anniversary and I had that booked almost completely with points, and I booked it in January, so, yeah.
**Q Booked a hotel in January?**



A I think January, February.
**Q Because the airline was in June, wasn't it?**
A Or maybe -- maybe then, I don't know. I booked one of them first, one or the other, but it was early.
**Q All right. You booked it before you were terminated, right?**
A Yeah.
**Q I'm presuming you didn't want to cancel your trip to Hawaii to have the arbitration, did you?**
A Yeah, we thought about it, you know, we were concerned, and yeah.
**Q Okay.**
A But I did go to Hawaii. And once again, my spending habits and my prearranged trips that I had paid for with points should be no concern on that.
I mean, I just feel like just because I am responsible for my money and I had savings to take care of stuff and the financial pressure was not as bad as they wanted it to be, that I shouldn't be penalized for that.
**Q Yeah, and I guess what I'm just trying to get at is you made a statement and you signed it and sworn that it's true.**
A Uh-huh.
**Q Right? And the statement is that the Washoe County School District kept delaying the arbitration. So I'm just trying to get -- get a sense for -- I mean, despite your counsel's basis**

**of objection as to attorney-client privilege, I'm just trying to get a sense for what -- what forms the basis for your assertion that Washoe County School District was delaying it.**

A I can tell you that I -- my husband and I demanded many times, why isn't this being scheduled right now. It was a very concerning, like, we were beside ourselves on why it was gone -- or it was being delayed.

So my assumption is that they weren't -- I can't tell you what my conversation -- it was with my attorney, but I was very adamant that it should happen now. And I couldn't get them to schedule it.

And the negotiated agreement said 20 days. It said that the arbitration would be expedited and it would be in 20 days.

So my assumption was that they were going to schedule it in 20 days. And it didn't happen.

So I thought that they were held to that negotiated agreement and that that 20 days meant something.

So when it didn't happen, I kept saying what, why isn't it happening.

And with every passing month of me not having a paycheck we were in more peril.

And so, yes, I went to Hawaii, but by the time November came around, and -- because I thought we'll do arbitration and I'm going to win or I'm going to go get a job somewhere else and we'll cancel Hawaii, right?



So it was a tough situation, but by the time November came around, that's when all the big charges hit me, all the extra hours from my lawyer for preparation, all the days for arbitration, arbitrator bill, all those things, and that's when we ran out of money and I had to live on credit cards.

So, there you go. I didn't put -- I didn't stop my Hawaii trip to save a few travel points so that I would have -- you know, I didn't stop my trip to Hawaii, not because arbitration hadn't even been scheduled yet.

**Q Okay.**

A So --

**Q I want to go back to the issue of administrative leave with pay, and the discussion that we had about you being available to report to work.**

A Uh-huh.

**Q Were you available to report to work in June 2018 prior to your termination?**

A Yeah.

**Q When did you go to Puerto Vallarta?**

A Oh. That was my -- that's just -- it's comical to me that you know all of my travel. That's my in-law's 60th wedding anniversary, so they paid for us to travel to Puerto Vallarta for five days.

**Q Okay. And that was in June of 2018?**

A Yes. And it didn't cost me a dime.



**Q That's good. Did you let anybody with the School District know that you were going to be gone to Puerto Vallarta?**

A I don't recall.

**Q You didn't request any time off or take any sick leave or anything like that?**

A No.

**Q So if they had tried to call you at that time and said hey, we want you to come in to work, you would have been unable to come in to work, right?**

A Well, I had my phone with me.

**Q But you were off in Mexico, right?**

A Yeah. At that point I might have -- are you saying I should have sat by my phone in my house for a year and a half and waited for them to call and say you're going back to work tomorrow?

Because if they would have called me when I was in Mexico and said you are going back to work, I would have said hallelujah, I'll be there, because I'll fly home; or I would have said is it appropriate for me to take one or two of my saved vacation days that I've banked because I'm out of town.

**Q I'm not saying anything, I'm just asking questions. Okay? That's my job.**

A Yeah. Okay. I'm sorry, I didn't mean to sound defensive. I'm saying I think you need to think real life in this situation. And real life in this situation is I was sitting at



home for a year and a half. And it was shocking to me that no one ever called me.

And now you are telling me I need to -- I mean you are suggesting that I should have emailed to say I'm going out of town?

**Q No, I'm not making the suggestion. I'm just asking, because we had the discussion earlier in your deposition, and you said that you were available to report to work during this time.**

A And I was. And I will contend I was.

**Q And I was just following up on that line of questioning.**

A Okay.

**Q Okay?**

A I'm sorry, it seemed out of -- in nowhere land in terms of what real life was. So I apologize if I got defensive but I certainly was by my phone and ready to go back to work at any point if they ever would have put me back to work. It would have been the best moment of my life, honestly.

**Q Now, I don't know as we need to mark this as an exhibit. Let's see if we can -- because it is another confidential document.**

**My understanding is that you received a payment from Washoe County School District on June 22nd, 2018. Do you agree or disagree with that?**

A I think I did because I said I'm still an employee, why haven't I received my longevity bonus, which is a once a year

thing.
Q Okay. And just to confirm, because I know you were telling me about this earlier, the June 22nd payment from them, would that have been your last one that you got, up until your reinstatement?
A Yeah, June 22nd, I think, was the last day I got paid, which would have been from the time period of May 11th to June 10th.
Q Okay. That's what my follow-up question was going to be, was what pay period was that for.
A Uh-huh.
MR. VANCE: All right. We're rounding the corner here. Let's go ahead and mark Exhibit 36.
MR. BUSBY: For the record, I'm going to add this is a confidential document under the protective order and I would like the court reporter to indicate as much in the transcript.
(Exhibit 36 marked for identification.)
BY MR. VANCE:
Q Showing you what's been marked as Exhibit 36.
A Uh-huh.
Q Do you recognize these documents?
A Yeah.
Q Okay. These were produced by you probably in response to a request for production from me. But they were produced for you, nonetheless.



Can you describe what they show.
A Yeah, they show therapy sessions.
Q Okay. And what were those therapy sessions for?
A For me, and I'm not sure if it's for me and my daughter. Yeah, I think it's a combination, myself and my daughter, for therapy sessions.
Q Okay. Is there a way of distinguishing which ones are for you and which ones are for your daughter?
A I don't know. She didn't -- I would guess that maybe the payment or insurance amount, because she's on a different insurance plan, might help us.
Q Okay.
A Because some of them are 35 and some of them are 20.
Q Yeah, do you have an idea which one would be which?
A I don't know.
Q Okay. That's fair. And I don't want to get into any -- I don't have the need to talk about anything with your daughter at all.
A Uh-huh.
Q But my understanding is that you are claiming some form of emotional distress as part of this litigation; is that correct?
A Yeah.
Q And so I imagine that this is, in part, provided as evidence for that, right?
A Yeah.



Q When did you begin --
MR. BUSBY: Well, just a sec. I'm going to object to the prior question insofar as it asks for a legal opinion.
Go ahead.
BY MR. VANCE:
Q When did you begin doing psychotherapy?
A I think I'd seen her with my daughter a couple of times. My daughter was in middle school. There was some issues. Really, I just like to talk to people about my parenting practice and, you know, that kind of stuff.
So I think I had seen her a little bit, but then we had a really -- she was a good therapist, and so when I started experiencing this, I started going by myself and for my issues.
Q Okay. And I don't believe you've actually produced records themselves, have you?
MR. VANCE: Or, Luke, do you know?
MR. BUSBY: I'm not being deposed.
MR. VANCE: That's true, you're not.
MR. BUSBY: So --
MR. VANCE: Luke, please raise your right hand.
MR. BUSBY: Yeah, we appropriately responded to the requests for production, and we've disclosed witnesses, you know, in accordance with the Federal Rules of Civil Procedure, insofar as who we plan using at trial.
///



BY MR. VANCE:
Q Do you know, Ms. Olsen, whether or not you have produced any records of the psychotherapy sessions?
A I don't. I mean, other than financial records?
Q No. Yeah, I understand this is a financial record. I mean, kind of like if you go to the doctor, there's a medical record that's generated that provides diagnosis, treatment options, things like that?
A Oh. No.
Q You haven't provided that?
A Huh-uh. I don't -- I don't have those documents. She didn't give those to me.
Q Okay. And as we sit here today, are you still attending psychotherapy sessions?
A No.
Q When did that stop?
A It might be on here. Looks like 2019, looks like, between -- that might be my daughter. I'm not sure.
2018, 2019. I just didn't feel like I needed it as much anymore, so kind of in line with what happened.
Q Fair enough.
I think you've already mentioned this. You are claiming attorney's fees for Mr. Langton's services, right?
A Uh-huh.
Q And do you recall how much those fees are?

A About 27,000. And then the arbitrator was, I believe, 5,000 something, somewhere in there.

**Q And I understand that's an approximation.**

A Yes.

**Q Okay. I won't hold it to you exactly.**

A I think that we produced documents that had those numbers or those receipts, but my recollection is about that much.

**Q All right. And isn't it true that you would have incurred fees to pay both Mr. Langton and the arbitrator, regardless of whether that arbitration occurred before or after your termination?**

A Yeah, I guess so.

**Q And you would have incurred those fees regardless of whether the arbitrator sided with you or sided with the School District?**

A Yes.

**Q As we sit here today, you're still employed with the School District?**

A Yes.

**Q Still receiving salary and benefits?**

A Uh-huh. Yes.

**Q Thank you. I didn't even catch it.**

**Have you received any pay raises since you were reinstated?**

A Uh-huh. Yes.



**Q Have you had any further communications with Lauren Ford since you were reinstated?**

A No.

**Q I might be done. But I want to go back and check some notes and things like that. So if you don't mind, let's go off the record for five minutes or so --**

A Okay.

**Q -- and reconvene, and hopefully get this wrapped up soon. Is that all right?**

A Uh-huh. Sure, yes.

(A recess was taken.)

MS. PARKS: All right. Very good.

EXAMINATION

BY MS. PARKS:

**Q Ms. Olsen, good afternoon. I know we're getting late in the day. I'll try to be brief.**

**As you know, my name is Kathy Parks. I represent Traci Davis in this litigation.**

A Okay.

**Q I'm likely to jump around a little bit because my colleague did such an a thorough job.**

**With respect to the emotional distress and the therapy sessions that we were just talking about before we went off the record, do you have an estimate of how many times you saw a mental**



**health professional for emotional distress that you would relate to the events that are subject of this case?**

A Well, I mean, I think -- I mean, I saw her pretty regularly, in tears, about -- so I don't know. At that point, maybe once a month, maybe twice, you know, every two weeks or so, or I would just call her and say I just really -- I'm a verbal processor, so it really helped me to go in and just cry and say what's happening.

So to answer your question, I don't think I can give you an accurate, but maybe once a year -- or, sorry, once a month or twice a month for one and a half years.

**Q All right. And remind me the name of this counselor again.**

A Megan -- she changed her last name. Megan Weller.

**Q And prior to May of 2017, you had been seeing Ms. Weller along with your daughter for issues, mental health issues therapy?**

A Yeah, here and there, mostly my daughter, but I would go to support her because she was young at the time. She was like 14 or 15.

**Q Other than Ms. Weller, prior to May of 2007, have you ever been treated, evaluated, or seen by any other mental healthcare providers?**

A No.

**Q Have you ever taken any anti-depressant medications or anti-anxiety medications during your lifetime?**



A I think there was a time a few years ago where, like, I was experiencing anxiety because -- do you remember when --

MR. BUSBY: Just for the record, I'm going to object. Overbroad, and relevance. Go ahead.

THE WITNESS: Thank you.

I was -- I had some anxiety issues when Brianna Denison went missing. And I was a single mom at the time, of a baby. And it was before I -- it was right about the time I met Brett. We have been together for 15 years, so it was right about that time.

And I had some experiences in my life where children had gone missing so it really bothered me and scared me with my daughter, so I didn't understand what was happening to me but I was getting like heart palpations. And I finally found out it had to do with anxiety, so I was prescribed, like -- what is the medication that's -- Xanax.

BY MS. PARKS:

**Q And what's the name of the medical care provider who prescribed you that medication?**

A Oh, I think it was years ago. I think it was Dr. Lemieux.

**Q Could you spell that for me.**

A L-E-M-I-E-U-X.

And then I also don't like to fly so I occasionally get a refill. I haven't done it in years, but I occasionally get -- and at that time when I was dealing with the anxiety, I got a

refill occasionally to have it on hand to fly. But I never took it regularly.

Q Okay. Dr. Lemieux, was that your primary care physician?

A Yeah, I think at the time that was. He's retired now.

Q All right. Can you give me any estimate, as you sit here, what the costs were to you for mental health therapy after -- that you received after May of 2017?

A Oh, a few hundred dollars, probably. Maybe three or four hundred. That's just an estimate.

Q That's all right.

A Based on how long I saw her, once a month or twice a month, or sometimes three times in three weeks, and then not at all for a month, you know.

Q All right. And you indicated that you discontinued that treatment in what year?

A I don't think it was an intentional. I just stopped needing it so I just stopped making appointments, which I think was around 2018 or 2019.

Q Okay. Earlier in your testimony when you were talking about the whistleblower complaint that you prepared --

A Uh-huh.

Q -- you mentioned that in putting together this material, it was 32 pages long, but you only submitted a portion of it to the District. Is that correct?



A Yes.

Q What happened to the other -- to the other pages of information or documents that you did not submit to the District with your whistleblower complaint?

A I still have them. I felt like I was going to submit the paperwork for the complaint and give them the top reasons of what was going on, and some of the reasons, and then I figured they would investigate. So I figured they would ask me and I could share the whole crux of what was happening.

And so I just kind of said here is a little bit. I didn't feel it was appropriate to just -- I mean, to me, I knew what was happening was I was -- I was in that manic mode of I got to get everything on paper. And I was scared. And I felt like if I don't write this all down right now, so I just put it all on paper and then what came of it was the whistleblower complaint.

Q And you still have that information or those documents?

A Uh-huh, saved in my computer.

Q Okay. Is that information that you shared with your attorney?

MR. BUSBY: Objection. It calls for attorney-client --

MS. PARKS: It doesn't ask her if she's provided those documents to you.

MR. BUSBY: Same objection as to --

THE WITNESS: I don't even know. I don't even know the answer.



BY MS. PARKS:

Q Okay. But you could easily locate those documents, could you not, then?

A I believe so.

MR. BUSBY: Yeah, Kathy, I'll represent that if -- we'll take a look and see if they have been disclosed yet. If they have, then we'll produce them.

MS. PARKS: Thank you.

BY MS. PARKS:

Q With respect to the whistleblower complaint, I think you indicated that you brought or attempted to bring a copy of the whistleblower complaint to Traci Davis during the third week of February, 2018; is that correct?

A Yes.

Q You did not see Ms. Davis on that date; is that correct?

A No. I tried to, but she wouldn't. I went to the desk and said can I see -- I need to submit this to Traci Davis. And I had like four copies of it, and I said could you please deliver this to her, and I signed the book.

Q You asked whoever you came into contact with --

A Yes.

Q -- at the District Office to give that to Ms. Davis?

A Yes. They had the names on it of who I wanted it to go to.

Q All right. And I think you testified earlier in your



deposition that you've never spoken to Ms. Davis, other than saying hello to her when she came to your school at one point?

A No, saying hello to her at your -- at her deposition.

Q Oh, at the deposition. Okay.

A Yes.

Q Otherwise, you never spoke with Ms. Davis before her termination from employment with the District?

A To this date I've never spoke to Ms. Davis.

Q All right. So she was not in attendance, to your knowledge, at the mediation that you talked about earlier; correct?

A No.

Q She did not testify at the arbitration hearing --

A She did not.

Q -- correct?

A Right.

Q You never spoke to Ms. Davis then about the marijuana incident?

A I tried and the answer is no.

Q All right.

A She would not allow it.

Q All right. And Ms. Davis, to your knowledge, had nothing to do with any of your personnel evaluations; would that be fair to say?

A My evaluations?

**Q Right.**

A I would say that's fair to say.

**Q And she didn't attend any of the IDP meetings that we discussed earlier, correct?**

A She did not.

MS. PARKS: Those are all the questions I have. Thank you.

THE WITNESS: Okay.

MR. VANCE: All right. We're all done.

MR. BUSBY: I'm sorry, I -- Kathy, are you done?

MS. PARKS: Yes.

MR. BUSBY: I just have one clarifying question.

EXAMINATION

BY MR. BUSBY:

**Q Ms. Olsen, can you pull up Exhibit 27.**

A Yes.

**Q Do you remember being questioned at the beginning of your deposition about your licenses in Nevada?**

A Yes.

**Q Can you turn to the exhibit attached to this document, the last page?**

A Yes.

**Q Okay. Does this -- what does this show?**

A It shows that I'm licensed as a teacher and a school administrator.



**Q Okay. Is that still true?**

A Yes.

MR. BUSBY: Okay. All right.

Yeah, that's it. Thanks.

MR. VANCE: Thank you, Luke.

Thank you, Ms. Olsen. I appreciate it.

You'll have the opportunity to review a copy of your transcript and that's something that will be coordinated through counsel. I don't really have anything else I need to say about it.

(The proceedings concluded at 4:27 p.m.)

-o0o-



REPORTER'S CERTIFICATION

I, CONSTANCE S. EISENBERG, a Certified Court Reporter in and for the State of Nevada, do hereby certify;

That on Wednesday, November 4, 2020, at the hour of 9:03 a.m. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared TRINA RAE OLSEN, who was duly sworn by me to testify in the within-entitled proceedings;

That said deposition was taken in verbatim stenotype notes by me and thereafter transcribed into typewriting as herein appears;

That I am not a relative nor an employee of any of the parties, nor am I financially or otherwise interested in this action;

That the foregoing transcript, consisting of pages 1 through 264, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 23rd day of November, 2020.

Constance S. Eisenberg
______________________________
CONSTANCE S. EISENBERG, CCR #142, RMR, CRR



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on ________________________ (date) at __________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |

ERRATA SHEET

Page Line Should read: Reason for Change:

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

___ ___ ________________________ __________________

________________________ __________________

Date: __________ ______________________________

Signature of Witness

______________________________

Name Typed or Printed



HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

Litigation Services is committed to compliance with applicable federal and state laws and regulations ("Privacy Laws") governing the protection and security of patient health information. Notice is hereby given to all parties that transcripts of depositions and legal proceedings, and transcript exhibits, may contain patient health information that is protected from unauthorized access, use and disclosure by Privacy Laws. Litigation Services requires that access, maintenance, use, and disclosure (including but not limited to electronic database maintenance and access, storage, distribution/ dissemination and communication) of transcripts/exhibits containing patient information be performed in compliance with Privacy Laws. No transcript or exhibit containing protected patient health information may be further disclosed except as permitted by Privacy Laws. Litigation Services expects that all parties, parties' attorneys, and their HIPAA Business Associates and Subcontractors will make every reasonable effort to protect and secure patient health information, and to comply with applicable Privacy Law mandates, including but not limited to restrictions on access, storage, use, and disclosure (sharing) of transcripts and transcript exhibits, and applying "minimum necessary" standards where appropriate. It is recommended that your office review its policies regarding sharing of transcripts and exhibits - including access, storage, use, and disclosure - for compliance with Privacy Laws.

© All Rights Reserved. Litigation Services (rev. 6/1/2019)

**Read, Breanne**

**From:** Ford, Lauren
**Sent:** Wednesday, May 17, 2017 6:00 AM
**To:** Doran, Virginia
**Subject:** Fwd: Questions

FYI

Get Outlook for iOS

---

From: Olsen, Trina <tolsen@washoeschools.net>
Sent: Wednesday, May 17, 2017 5:58 AM
Subject: Re: Questions
To: Ford, Lauren <lfford@washoeschools.net>

I did read it. This came after I told the proctors for tomorrow that I am no longer the test coordinator so they were not surprised. I didn't give a reason other than I had made a big mistake.

Sent from my iPhone

On May 17, 2017, at 5:51 AM, Ford, Lauren <LFFord@washoeschools.net> wrote:

> Trina please confirm that you read this message.
>
> Get Outlook for iOS
>
> ---
>
> From: Ford, Lauren <lfford@washoeschools.net>
> Sent: Tuesday, May 16, 2017 7:54 PM
> Subject: Re: Questions
> To: Olsen, Trina <tolsen@washoeschools.net>
>
> Trina,
> Per the NDE, Nevada Department of Education, you are moved as testing coordinator.
> That applies to all testing.
> You must not interfere with any of the testing processes on Hug campus.
> You will need to meet with me, Tristan and Brad tomorrow to explain what needs to happen for CTE, NAA and HSPE.
> You cannot use your office. There are testing materials in that room so you will need to explain where those items are to me, Brad and Tristan.
> You cannot go to any testing rooms.
> I will let you know when to meet with us to discuss this tomorrow.
> This is a confidential matter. Do not discuss this with any WSCD employee.
> Lauren
>
> Get Outlook for iOS
>
> ---
>
> From: Olsen, Trina <tolsen@washoeschools.net>
> Sent: Tuesday, May 16, 2017 4:47 PM

EXHIBIT 1
Witness: Olsen
C. EISENBERG, NV CCR 142



WCSD 1496

Subject: Questions
To: Ford, Lauren <lfford@washoeschools.net>

I will be around to help as you see fit. This is awful and I understand how bad this is. I truly am sorry. I'm completely numb right now

I know I'm not to be involved with EOCs. Does this also mean I need to hand over CTE, the NAA (which must be mailed back), and June HSPE?

Does this affect my position as an AP in the district?

I know you are upset with me, but do I have your support in keeping my job as an AP?

I'm worried, of course. Trina

Sent from my iPhone

83

Washoe County School District
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley Clerk *
Debra Feemster * Veronica Frenkel* John Mayer * Malena Raymond * Traci Davis, Superintendent

May 17, 2017

**HAND DELIVERED**
Trina Olsen
1400 Belford Road
Reno, NV 89509

**RE: Notice of Temporary Reassignment to Traner MS**

Dear Ms. Olsen:

Be advised, you are hereby being temporarily reassigned to Traner Middle School effective **Thursday, May 18, 2017**, pending an investigation into allegations of misconduct on your part. This is not disciplinary, but rather this temporary reassignment is for the protection of your rights as well as the rights of students and staff at Hug High School. Be further advised, you must turn over to Principal Lauren Ford all Hug High School property in your possession. If you need to enter Hug HS property for any reason, you must contact me for approval.

You are further directed not to discuss this pending investigation with anyone (including District staff, students and parents) except your WSPA representative.

Contact me with any questions.

Sincerely,

Roger J. Gonzalez

Roger Gonzalez
Area Superintendent

cc: Dawn Huckaby, Chief Human Resources Officer
Virginia R. Doran, Labor Relations Manager
Lauren Ford, Principal, Hug HS
Zach Lewis, Human Resources Technician

EXHIBIT
2
Witness: Olsen
C. EISENBERG, NV CCR 142

**Read, Breanne**

**From:** Doran, Virginia
**Sent:** Thursday, May 18, 2017 9:19 AM
**To:** Gonzalez, Roger
**Subject:** RE: questions about process

I would also let her know that once the investigation is completed, she will receive official notification with the pertinent allegations and be provided with a date and time for any subsequent meetings that may be necessary. Until such time, you cannot discuss the investigation as it has yet to be completed.
V

**From:** Gonzalez, Roger
**Sent:** Thursday, May 18, 2017 9:15 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Cc:** Doran, Virginia <VRDoran@washoeschools.net>
**Subject:** Re: questions about process
**Importance:** High

Hi Trina,

As per the letter, you may discuss this matter with your WSPA representative. You may certainly seek legal counsel if that is your choice. Please know that your temporary reassignment is not disciplinary and that an investigation is pending with regard to allegations of possible misconduct.

Roger J. Gonzalez, Ed.D.
Area Superintendent, Area 2

Washoe County School District
Every Child, By Name And Face, To Graduation

775-348-0261
425 East Ninth Street
Reno, Nevada 89520-3425

**From:** "Olsen, Trina" <TOlsen@washoeschools.net>
**Date:** Thursday, May 18, 2017 at 7:42 AM
**To:** Roger Gonzalez <rgonzalez@washoeschools.net>
**Subject:** questions about process

EXHIBIT 3
Witness: Olsen
C. EISENBERG, NV CCR 142

Good morning Roger,

Your letter states that I am being investigated for allegations of misconduct. Who may I speak to about these allegations and my rights? Your letter also says, I am "further directed not to discuss this pending investigation with anyone, including district staff, students, and parents". The word "anyone" is all-encompassing, and I do not want to jeopardize my rights. I'm unsure who I can speak to legally at this time and if it is prudent of me to speak to a lawyer or WSPA representative. I am concerned because I don't know if there are other allegations other than a very large mistake in an email (and I do understand the magnitude of this mistake). You might not be aware, but there is much more to this situation, and I will be defending myself.

I need to speak with a high level district employee about this matter as soon as possible so I understand the allegations and process and can protect myself accordingly.

Thank you,

Trina Olsen
Assistant Principal
**Hug High School**

**Read, Breanne**

**From:** Ford, Lauren
**Sent:** Tuesday, May 23, 2017 12:51 PM
**To:** Doran, Virginia
**Subject:** Fwd: evaluation narrative correction

FYI.

Get Outlook for iOS

From: Gonzalez, Roger <rgonzalez@washoeschools.net>
Sent: Tuesday, May 23, 2017 2:38 PM
Subject: Re: evaluation narrative correction
To: Olsen, Trina <tolsen@washoeschools.net>
Cc: Ford, Lauren <lfford@washoeschools.net>

Hi Trina,

I would ask that you follow your supervisor's direction and if there are comments or a response you would like to make to your evaluation that you use the MyPGS system as requested.

Roger J. Gonzalez, Ed.D.
Area Superintendent, Area 2

Washoe County School District
Every Child, By Name And Face, To Graduation™

775-348-0261
425 East Ninth Street
Reno, Nevada 89520-3425

**From:** "Olsen, Trina" <TOlsen@washoeschools.net>
**Date:** Tuesday, May 23, 2017 at 7:11 AM
**To:** Roger Gonzalez <rgonzalez@washoeschools.net>
**Subject:** Re: evaluation narrative correction

EXHIBIT 4
Witness: Olsen
C. EISENBERG, NV CCR 142

Roger,

In light of the situation I am in, I do not believe changing my evaluation at this time is acceptable or accountable.

I have significant evaluation concerns, which we can discuss at a later date. I felt it was important that you were aware of this change during the investigation.

Trina

**From:** Ford, Lauren
**Sent:** Monday, May 22, 2017 11:59 AM
**To:** Olsen, Trina
**Subject:** evaluation narrative correction

Trina,
As you may recall when we were completing your evaluation there were several comments that you gave me that were included at the end of the evaluation narrative. Because these comments were generated by you, the narrative section of the evaluation was not the correct place in the evaluation to include them. I have had the evaluation reopened and have taken them out of the narrative. They are all listed below:

- Trina works with her special education leadership teamweekly to collaborate and develop department goals as a team
- Trina works with her special education department monthly to develop team goals and provide training. She works with the DLs to support them in their development of the agenda and leadership of this team.
- Trina meets with MTSS teams regularly to make progress toward MTSS goals in building a new, sustainable system. As a result, Trina's MTSs teams have made major gains in their 2016-17 credit goals as compared to last year, as noted in an email showing substantial data improvements at HUG to Roger Gonzales and Lauren Ford.
- Trina meets with district MTSS personnel to outline plans and get input on next directions. Meetings include Trish Shaffer and Michelle Hammond.
- Trina regularly uses email to communicate with teachers about School Safety drill goals and provides data feedback. She also regularly asks for input regarding improvement in those emails and then responds to their requests for broken equipment or elements of the drill that need to be addressed. This results in the teachers feeling heard and improves their feelings of safety on campus. (artifacts can be provided).
- Trina has met multiple times with numerous testing groups to promote collaboration and input for test administration that largely impacts teachers, especially in WIDA and EOC. She met with department leaders to go over ideas, communicated on email, and then went personally to every involved department leader to get their input and approval and buy-in. She then communicated with the entire staff on an email dated March 15th asking for entire staff input for final vetting. She is extremely pro-active
- Trina regularly works with the Art and World Language department and is working with them toward a standard's based gradebook in the final quarter of this school year as a pro-active step to align to school goals
- Trina maintains a positive relationship with all of her evaluees, including teachers that struggle, because of her accountability in being in their classroom regularly and providing frequent supports
- Trina regularly meets with district personnel to reflect on her leadership and obtain advice in working with departments and struggling teachers

- *Trina has a very organized calendar and carefully plans time to accommodate teacher meetings and collaborations.*
- *Trina's organization and proactive communication with staff about upcoming testing events, teacher observations, and large-scale initiatives are always aligned to school goals and support learning goals established by administration*
- *Trina has properly requested and utilized human resources on campus to effectively accomplish goals. She is one of the only assistant principals in the district that oversees testing and does not have a secretary, so she advocated for help.*

- *Trina proactively seeks feedback and support from her principal by emailing and talking to her about next steps in situations where she needs to learn.*
- *Trina has not missed any major deadlines regarding testing or emergency preparedness she is often ahead of the curve and is extremely proactive in planning these important school responsibilities with staff and admin.*
- *Trina worked with aspiring leaders on campus to develop leadership and delegate duties. (school safety, testing, MTSS).*
- *Trina is mentored by veteran APs Tristan McElhany and Brad Bodine through her own advocacy.*
- *Trina is skilled in data analysis and regularly supplies data outcomes of student performance data to administration and to staff at meetings and via email.*

Should you still want these comments on record, you may go to the employee sign off page in MyPGS and paste them into the employee comment section. Or you may also paste them into a word document and upload as an artifact.
Thanks,
Lauren

# PROCTER R. HUG HIGH SCHOOL

**PRIDE, HONOR, INTEGRITY, LOYALTY**

*Campus Principal – Ms. Lauren Ford Baxter*
*Assistant Principal – Ms. Rhonda Clark*
*Assistant Principal – Mr. Brad Bodine*
*Assistant Principal – Dr. Trina Olsen*
*Assistant Principal – Mr. Tristan McElhany*

*2880 Sutro Street*
*Reno, NV 89512*
*Phone (775) 321-3200*

---

May 24, 2017

**EMAILED AND US MAIL**

Trina Olsen
1400 Belford Road
Reno, NV 89509

EXHIBIT 5
Witness: Olsen
C. EISENBERG, NV CCR 142

RE: Notice of Investigatory/Due Process Meeting and Right to Representation

Dear Mrs. Trina Olsen:

You are directed to meet with me for an investigatory/due process meeting on Wednesday, May 31, 2017 at 11:00 am at the District office, 425 East Ninth Street. Please check into the Welcome Center and you will be directed to the meeting. In attendance at the meeting with you and me will be Virginia Doran Labor Relations Manager.

The purpose of this meeting is to discuss the allegations of unprofessional conduct as follows:

> NRS 391.750 a. Inefficiency; c. Unprofessional conduct; d. Insubordination; e. Neglect of duty; i. Inadequate performance; k. Failure to comply with such reasonable requirements as a board may prescribe; l. Failure to show normal improvement and evidence of professional training and growth; p. Dishonesty; t. Gross misconduct; and
>
> Administrative Regulations, 4111.4 Ethical Standards; Administrative Procedure 5504 Grading: Incompletes / Appeals; and Administrative Procedure 5502 Academic Grading Policy High School.

The allegations are regarding incidents that occurred April 7- May 15, 2017, and consist of the following:

- Allegedly you sent an email to Wendy Labon, Patrick Rossi and Patricia Newbrough giving a directive to issue a final and change a grade for the 14-15 school year violating administrative procedure 5504 and 5502.
- Allegedly you gave Sharon Black a notification of credit form to use to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502.
- Allegedly you failed to get my approval prior to putting in Lorrie Foley's evaluation that you recommended her to be placed on a FAP. After reviewing the narrative you sent me an email on April 8th and I told you that Lorrie could not be placed on an FAP. In an email received on April 20th and in the meeting held on April 27th with Lorrie Foley, Elaine Lancaster, WEA Representative and me you stated that Laura Pincollini gave you guidance and you followed it, to include the FAP.
- You allegedly sent an email, Friday, May 12th to Brad Bodine and Patrick Rossi asking for direction and credit to be issued, on an issue that was discussed in a meeting on May 10th with Elaine Lancaster, Wendy Labon and Brad Bodine where I stated that Brad Bodine would review all A+ courses to ensure all policies were followed. You stated in the meeting on May 10th that you do not know the policy around A+ for AE credits, OLA credits and incomplete learning. You sent an email to Brad Bodine on May 12th about Juan. You stated, "He has access to A+. I don't want Juan in any trouble for not being trained. Can you please work with Juan and Patty in making sure that he gets the info he needs to work with A+? He also needs the policies for incomplete learning (like not contacting teachers about past classes). You sent an email to Brad Bodine and I on May 17th stating that, "Given the questions that are arising about the Incomplete Learning Process that was rolled out by admin in a staff meeting, I do not want to be involved with moving forward with this until our admin team vets the process and provides written guidelines for teacher and A+ teachers. On Friday, March 3, 2017 you presented a PowerPoint explaining this process.
- You allegedly failed to report to me an incident reported to you on May 8th involving a student, staff member and drugs. On May 8th Patrick Rossi reported to you that he was told by Sabrina Cellucci that Jessica Wilson gave drugs back to a student. You stated to Jessica Wilson that you spoke with a trusted mentor/confidant from another school. You did not state this confidant's name. You

---

# PROCTER R. HUG HIGH SCHOOL

PRIDE, HONOR, INTEGRITY, LOYALTY

*Campus Principal – Ms. Lauren Ford Baxter*
*Assistant Principal – Ms. Rhonda Clark*
*Assistant Principal – Mr. Brad Bodine*
*Assistant Principal – Dr. Trina Olsen*
*Assistant Principal – Mr. Tristan McElhany*

*2880 Sutro Street*
*Reno, NV 89512*
*Phone (775) 321-3200*

directed Jessica to self-report what she did to me. You did not report this incident to me, school police or any other administer on Hug Campus.

- It is alleged that on May 5th you responded to a student issue. It is alleged that while Mary Caraway was on the phone speaking to the 911 operator you allegedly took the phone out of her hand to speak to the operator.
- It is alleged that you failed to supervise staff under your required supervision as demonstrated by: the list of students that Wendy Labon sent to Rise. Your alleged lack of attendance at Special Education teacher meetings and at Senior Special Education Action Committee (SSAC) meetings. Your alleged cancelation of meetings with the SPED department leaders from February 14th to the end of the school year because of the 3 weeks of testing.

At the meeting, you will have the opportunity to respond to all allegations. You will also be advised at the meeting, on the record, that you will be required to respond to all allegations and that failure to do so may constitute insubordination.

You are hereby further advised not to discuss this meeting or the allegations of potential misconduct with anyone except your WSPA representative. You are further directed not to contact anyone involved with this investigation (directly or indirectly) including employees of the WCSD. Please feel free to contact me with any questions.

Be advised that if the allegations are found to be true, you may face disciplinary action, which can range from a written warning, written reprimand, suspension without pay, letter of admonition, demotion, or termination. Be further advised, that you have the right to have an Association Representative or other representation present with you at the meeting. The District has not reached a conclusion as to what, if any, discipline is appropriate, but will do so only after it receives your response to the allegations.

If legal counsel will represent you, you must inform me no later than Tuesday, May 30, 2017 at 5:00 pm.

Sincerely,

Lauren Ford VRS

Lauren Ford
Principal Hug High School

Attachments: NRS 391.750
WCSD Administrative Regulations 4111.4 Ethical Standards, Administrative Procedure 5504 Grading: Incompletes / Appeals, Administrative Procedure 5502 Academic Grading Policy High School.

cc: Dawn Huckaby, Chief Human Resources Officer
Roger Gonzalez, Area Superintendent
Virginia Doran, Labor Relations Manager

# request for meeting

sen, Trina

Thu 5/25/2017 7:42 AM

Sent Items

To: Gonzalez, Roger <RGonzalez@WashoeSchools.net>;

Roger,

I read the WCSD/WSPA's negotiated agreement last night and learned about some timelines that may affect my ability to file a grievance or report an incident.

I know I am responsible for the testing error and I am accountable for that incident. I have been waiting for notification and allegations for this incident, and have not heard anything at this time. There is a lot to be learned from this incident that needs to be discussed.

Due to the timeline in Article 22.1 and the process listed in Article 22.1.4.1, and in order to protect myself and my rights, I'd like to submit a grievance to you against Principal Lauren Ford for violation of contract items and other issues. I will be providing written notice to the chief human resources officer per Article 22.1.4.2.

itionally, I'd like to report an incident on campus involving marijuana that was reported to me within 15 days ago, as well as other significant campus safety concerns.

I believe the findings from this investigation will have an impact on my own pending allegations from my principal that resulted in my temporary placement to another school site. I'd like to request a meeting with you to report these items as soon as possible.

Thank you,

Trina Olsen
Assistant Principal
**Hug High School**

EXHIBIT 6
Witness: Olsen
C. EISENBERG, NV CCR 142

**Read, Breanne**

**From:** Doran, Virginia
**Sent:** Thursday, June 1, 2017 3:51 PM
**To:** Gonzalez, Roger
**Subject:** RE: Support

I concur...let's see where this goes.
V

**From:** Gonzalez, Roger
**Sent:** Thursday, June 01, 2017 2:34 PM
**To:** Doran, Virginia <VRDoran@washoeschools.net>
**Subject:** FW: Support

I got this back from her. I do not want to meet with her at this time. With regard to the marijuana allegation ( which was actually about suspension not about returning drugs), it seems she is only going to bury herself deeper. Should I advise her to just use the form?

Roger J. Gonzalez, Ed.D.
Area Superintendent, Area 2

Washoe County School District
Every Child, By Name And Face, To Graduation™

775-348-0261
425 East Ninth Street
Reno, Nevada 89520-3425

---

**From:** "Olsen, Trina" <TOlsen@washoeschools.net>
**Date:** Thursday, June 1, 2017 at 1:46 PM
**To:** Roger Gonzalez <rgonzalez@washoeschools.net>
**Subject:** Re: Support

Thank you. I have a complaint and will fill out the paperwork.

Is this also where I would report the allegation that I referred to in my email last week involving marijuana? I discussed it in yesterday's meeting, so Virginia Doran is aware of this reference. Trina

---

**From:** Gonzalez, Roger
**Sent:** Thursday, June 1, 2017 11:13:01 AM
**To:** Olsen, Trina
**Subject:** Re: Support

EXHIBIT 7
Witness: Olsen
C. EISENBERG, NV CCR 142

Trina,
If you have a formal complaint about your supervisor, please use the form

I attached in my previous email.

Roger J. Gonzalez, Ed.D.
Area Superintendent, Area 2

775-348-0261
425 East Ninth Street
Reno, Nevada 89520-3425

On 6/1/17, 11:09 AM, "Olsen, Trina" <TOlsen@washoeschools.net> wrote:

>Yes I have been in contact with Tiffany and I am returning to work
>tomorrow.
>
>My concerns regard my supervisor (Lauren Ford), which is why I want to
>talk to you. Is this the correct protocol? I'm doing my best to do things
>correctly.
>
>I can also contact Ali Kendrick or Kenny Cervantes as district mentors,
>correct? Is this route preferred for this initial consultation?
>
>
>
>Sent from my iPhone
>
>> On Jun 1, 2017, at 11:03 AM, Gonzalez, Roger
>><RGonzalez@WashoeSchools.net> wrote:
>>
>> Trina,
>>
>> You are aware that a testing issue took place at Hug HS. There will be
>>an
>> IDP after the State completes its investigation. This is separate from
>>the
>> IDP that took place yesterday as the State has not concluded their
>> investigation. Please note that Lauren Ford is your immediate
>>supervisor,
>> I am her supervisor. If you have a formal complaint, please utilize the
>> attached form.
>>
>> On another note, have you been in communication with Tiffany McMaster?
>> When are you planning to return to work?
>>
>> Roger
>>
>>
>> Roger J. Gonzalez, Ed.D.
>> Area Superintendent, Area 2
>>
>>
>> 775-348-0261
>> 425 East Ninth Street
>> Reno, Nevada 89520-3425
>>

\>>
\>>
\>>
\>>
\>>> On 6/1/17, 10:19 AM, "Olsen, Trina" <TOlsen@washoeschools.net> wrote:
\>>>
\>>> Roger,
\>>>
\>>> I need your help. I'm without a WSPA representative and I'm doing this
\>>>in
\>>> the dark. I got news yesterday that there were more allegations coming
\>>>at
\>>> me for testing violations. I need an informal meeting to talk to you as
\>>> my immediate supervisor. I've tried to do the right thing in every
\>>>step,
\>>> but I'm realizing I'm out of my league and I need support in reporting
\>>> things.
\>>>
\>>> Can you and I please meet as soon as possible?
\>>>
\>>> Sent from my iPhone
\>>
\>> <Staff Harassment Complaint Form[1].pdf>

# PROCTER R. HUG HIGH SCHOOL

PRIDE, HONOR, INTEGRITY, LOYALTY

*Campus Principal – Ms. Lauren Ford Baxter*
*Assistant Principal – Ms. Rhonda Clark*
*Assistant Principal – Mr. Brad Bodine*
*Assistant Principal – Dr. Trina Olsen*
*Assistant Principal – Mr. Tristan McElhany*

*2880 Sutro Street*
*Reno, NV 89512*
*Phone (775) 321-3200*

June 26, 2017

HAND DELIVERED

Trina Olsen
1400 Belford Road
Reno, NV 89509

EXHIBIT
8
Witness: Olsen
C. EISENBERG, NV CCR 142

RE: Notice of Investigatory/Due Process Meeting and Right to Representation

Dear Mrs. Trina Olsen:

You are directed to meet with me for an investigatory/due process meeting on Monday, June 26, 2017 at 12:30 at the District office. In the Admin East Conference Room in Building A. In attendance at the meeting with you and me will be Virginia Doran Labor Relations Manager and Sandra Aird, Assessment Director.

The purpose of this meeting is to discuss the allegations of unprofessional conduct as follows:

> NRS 391.750 a. Inefficiency, c. Unprofessional conduct, d. Insubordination; e. Neglect of duty, i. Inadequate performance; k. Failure to comply with such reasonable requirements as a board may prescribe; o. Willful neglect or failure to observe and carry out the requirements of this title; p. Dishonesty (q) Intentional failure to observe and carry out the requirements of a plan to ensure the security of examinations and assessments adopted pursuant to NRS 390.270 or 390.275; t. Gross misconduct; and
>
> Nevada Testing Primer, Nevada Student Assessments Spring 2017 EOC presentation, February 2017, Email sent on Friday, April 7, 2017 new! NDE test security and administration training for spring 2017, HS Weekly Principal Email April 6, 2017.

The allegations are regarding incidents that occurred during spring testing, and consist of the following:

- Allegedly you sent an email to all Hug Staff on May 11, 2017 that included secure testing materials, student identifying information. You state in the email, "Please keep this list confidential as you reference it so sensitive information is not seen by our students." After receiving an email from me at 6:21 am stating that I could not open the excel documents, you sent an email stating that, "This document lists every student test, (we have 2400+) and where/when they are testing for each test."
- Allegedly you failed to provide me with requested information from an email sent to you on Wednesday, May 10, 2017.
- Allegedly you were dishonest with me about meeting with the department leaders to vet the testing schedule.
- It is alleged that on Thursday, May 11, 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017.
- It is alleged that on Tuesday May 16, 2017 after being notified by Sandra Aird that you were removed from testing, you stated upon leaving the office, "What's the big deal it was just an email."
- It is alleged that on the evening of Tuesday, May 16, 2017 you sent a text to Rhonda Clark and Brad Bodine stating, "I have been paper-thin for a while, at least I'll get some rest tonight. I really feel bad they won't let me finish it."
- It is alleged that after reading and sending a confirmation email on Wednesday, May 17, 2017 about being removed as testing coordinator and told you cannot use your office, you entered the building and went right into your office to get your radio.
- It is alleged that you are unaware of the seriousness around your testing removal by sending a text to me on Wednesday, May 17, 2017 asking for a space to work stating, "Also, I don't have a space to work. The therapist is in Tristan's office. She had a student come on so I left to get coffee until this is figured out. Can you help me get testing items out of my office so I can work in my own office? Should I go home and work?"

# PROCTER R. HUG HIGH SCHOOL

**PRIDE, HONOR, INTEGRITY, LOYALTY**


Campus Principal – Ms. Lauren Ford Baxter
Assistant Principal – Ms. Rhonda Clark
Assistant Principal – Mr. Brad Bodine
Assistant Principal – Dr. Trina Olsen
Assistant Principal – Mr. Tristan McElhany

2880 Sutro Street
Reno, NV 89512
Phone (775) 321-3200


At the meeting, you will have the opportunity to respond to all allegations. You will also be advised at the meeting, on the record, that you will be required to respond to all allegations and that failure to do so may constitute insubordination.

You are hereby further advised not to discuss this meeting or the allegations of potential misconduct with anyone except your WSPA representative. You are further directed not to contact anyone involved with this investigation (directly or indirectly) including employees of the WCSD. Please feel free to contact me with any questions.

Be advised that if the allegations are found to be true, you may face disciplinary action, which can range from a written warning, written reprimand, suspension without pay, letter of admonition, demotion, or termination. Be further advised, that you have the right to have an Association Representative or other representation present with you at the meeting. The District has not reached a conclusion as to what, if any, discipline is appropriate, but will do so only after it receives your response to the allegations.

If legal counsel will represent you, you must inform me no later than Tuesday, June 23, 2017 at 5:00 pm.

Sincerely,

Lauren Ford
Principal Hug High School

Attachments: NRS 391.750 Nevada Testing Primer, Nevada Student Assessments Spring 2017 EOC presentation, February 2017, Email sent on Friday, April 7, 2017, HS Weekly Principal Email April 6, 2017

cc: Dawn Huckaby, Chief Human Resources Officer
Roger Gonzales, Area Superintendent
Virginia Doran, Labor Relations Manager
Sandra Aird, Assessment Director

*Washoe County School District*
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley, Clerk * Debra Feemster * Veronica Frenkel * John Mayer * Malena Raymond * Traci Davis, Superintendent

LETTER OF ADMONITION
HAND DELIVERED

July 19, 2017

RECEIVED
JUL 19 2017

Trina Olsen
1400 Belford Road
Reno, NV 89509

Dear Mrs. Trina Olsen:

I am providing you this written notice that your conduct constitutes cause for potential disciplinary action under NRS 391.750 a. Inefficiency; c. Unprofessional conduct; d. Insubordination; e. Neglect of duty; i. Inadequate performance; k. Failure to comply with such reasonable requirements as a board may prescribe; l. Failure to show normal improvement and evidence of professional training and growth; p. Dishonesty; t. Gross misconduct; and Administrative Regulations, 4111.4 Ethical Standards; Administrative Procedure 5504 Grading: Incompletes / Appeals; and Administrative Procedure 5502 Academic Grading Policy High School and to give you an opportunity to correct your performance and conduct. An Investigatory Due Process (IDP) meeting was held on Wednesday, May 31, 2017 at 11:00am at the District office, 425 East Ninth Street. Also in attendance at this meeting with you and me was Virginia Doran Labor Relations Manager. You notified Virginia Doran prior to our meeting that you would not have representation at the meeting.

The specific causes are as follows:

It is alleged that on Friday, April 7, 2017 you sent an email to Wendy Labon, Patrick Rossi and Patricia Newbrough giving a directive to issue a final and change a grade for the 14-15 school year violating administrative procedure 5504 and 5502. During the IDP meeting on May 31, 2017 you stated, "The statement you gave in the email was not a directive, it was something the principal had stated to you many times." You also stated, "I did not have knowledge of the policy I did not look it up, as a new VP you expected to get guidance from the principal. I could of learned in a conversation when Lauren received this email." You also stated, "I believed I knew the answer, I made the assumption that I believed I knew the answer so I didn't think to copy the principal, I clearly thought it was the correct policy, it was an error." After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval.

It is alleged that you gave Sharon Black a notification of credit form to use to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502. In the IDP meeting you stated, "The principal was in the hallway visibly upset, about a situation I knew nothing about. The principal handed me a stack of forms, that could have been one of them, I do not remember I just got this today in an email. You (Lauren Ford) directed me to go see teachers to change grades, I took them to the teachers

EXHIBIT
9
Witness: Olsen
C. EISENBERG, NV CCR 142

even though I didn't know what was going on and I was uncomfortable." You also stated, "Brad and Tristan can confirm that Lauren handed these to me and said to see if I could talk to teachers to see if this satisfied getting credit for the course." "It is so hard for me to answer questions, I do not know what forms were attached, I didn't follow up or submit forms to issue credits to students, the principal does that, I do not know how many forms the principal signed, but she signs them all." "I didn't know what A, B, C was." After further investigation as to being directed to see teachers to change grades, statements revealed that the directive given was that no student would receive credit and forms were handed to Brad Bodine. Further investigation as to never signing approval for grade changes, I found eight such approvals signed by you.

We moved to item 4 on the IDP because the first two items related to the 4th. It is alleged that you sent an email, Friday, May 12th to Brad Bodine and Patrick Rossi asking for direction and credit to be issued, on an issue that was discussed in a meeting on May 10th with Elaine Lancaster, Wendy Labon and Brad Bodine where I stated that Brad Bodine would review all A+ courses to ensure all policies were followed. You stated in the meeting on May 10th that you do not know the policy around A+ for AE credits, OLA credits and incomplete learning. You sent an email to Brad Bodine on May 12th about Juan. You stated, "He has access to A+. I don't want Juan in any trouble for not being trained. Can you please work with Juan and Patty in making sure that he gets the info he needs to work with A+? He also needs the policies for incomplete learning (like not contacting teachers about past classes). You sent an email to Brad Bodine and I on May 17th stating that, "Given the questions that are arising about the Incomplete Learning Process that was rolled out by admin in a staff meeting, I do not want to be involved with moving forward with this until our admin team vets the process and provides written guidelines for teacher and A+ teachers. On Friday, March 3, 2017 you presented a PowerPoint explaining this process. In the IDP meeting you stated that "I didn't have specifics about why Wendy had to be removed from A+, I was clueless on the directives that Lauren and Brad gave to Wendy I didn't have details as to why I didn't know why." "We did the incomplete learning process roll out as a team." You also stated, "I took the lead on this process because of a directive from my principal." "I started sensing are people making mistakes, Wendy and myself made mistakes." "Training beyond the roll out document was needed, I am still unclear on the details of this process. I wanted to take a step back and vet this process, give written guidance, there were red flags." When shown the slide from the presentation with written guidance, you stated, "Yes I wrote this and can refresh from this." After further investigation as to your understanding of Wendy Labon's errors, emails, meetings and statements indicate that errors were brought to your attention and mistakes can be interpreted from the emails. Statements also conclude that you were explained that the difference between AE/ AE OLA credit were explained to you on two occasions by Brad Bodine. Statements and emails also conclude that the Incomplete Learning process was designed by you and your team and vetted through the admin team. In an email to Roger and me dated February 26, 2017 you indicated the team for incomplete learning was Trina Olsen Patrick Rossi, Patty Newbrough and Wendy Labon. The only staff that did not follow the written guidance given in the power point you created for the Incomplete Learning process were you and Wendy Labon, an employee you directly supervise. All email correspondence that was sent to teachers containing directions on the incomplete learning process came from you and included the team members, Patrick Rossi, Patty Newbrough and Wendy Labon. You copied me and only the VP evaluator of each content area on the emails, further demonstrating your leadership of the Incomplete Learning Process and failure to follow your own guidance to staff.

It is alleged that you failed to get my approval prior to putting in Lorrie Foley's evaluation that you recommended her to be placed on a FAP. After reviewing the narrative you sent me an email on April 8th, and I told you that Lorrie could not be placed on an FAP. In an email received on April 20th and in the meeting held on April 27th with Lorrie Foley, Elaine Lancaster, WEA Representative and me you stated that Laura Pincollini gave you guidance and you followed it, to include the FAP. In the IDP meeting you stated, "I was directed by Lauren Ford that I didn't meet the dead lines from Roger so I could not give Lorrie a minimally effective evaluation." "On April 16th I received an email from Laura stating that Lauren said yes to a FAP." You also stated, "That on April 8th in the hallway that when Lauren stated I did not have enough evidence to do an FAP that I had an abundance of evidence she questioned my due diligence as a VP. I was doing my job. You didn't say no you just said not enough evidence. I felt you were doubting my evidence not the FAP. You (Lauren) did not reply to my emails about putting Lorrie Foley on a FAP." When asked if you attended the evaluation trainings you stated, "Yes." When asked if you looked at the guidance resources in MyPGS you stated, "I went to you (Lauren) and you said you didn't know, I did not look at the guidance I went to my principal and she didn't know." "I was doing my job, I never heard no from you, I got an email from Laura P. that said you had approved the FAP. I made the assumption you met with her and approved the FAP." You also stated that, "I brought up in a meeting with Laura and Revae that I can't give a minimally effective evaluation can I do a FAP. Then I sent you the email on April 20th." Further investigation revealed that you have attended trainings on teacher evaluation and that you did not review the guidance in the MyPGS system. Further investigation revealed that when I stated, "you do not have enough evidence to do an FAP." you assumed that this response was not a no to the FAP but questioning your evidence. Further investigation also indicates that you signed and finalized the evaluation for Lorrie Foley on April 12, 2017 without my approval and prior to your email correspondence with Laura Pincollini.

It is alleged you failed to report to me an incident reported to you on May 8th involving a student, staff member and drugs. On May 8th Patrick Rossi reported to you that he was told by Sabrina Cellucci that Jessica Wilson gave drugs back to a student. You stated to Jessica Wilson that you spoke with a trusted mentor/confidant from another school. You did not state this confidant's name. You directed Jessica to self-report what she did to me. You did not report this incident to me, school police or any other administer on Hug Campus. In the IDP meeting you stated, "Patrick reported Jessica Wilson gave a student back drugs, he was scarred and didn't know what to do so he told me what happened." You also stated, "You were scared and worried about Jessica, wanted to talk to her if it was true." You also stated, "You went to Jessica first because it was the professional thing to do. When I did Jessica stated I saw Lauren do the same thing not too long ago, I was taken back. An allegation against Lauren scared me, it's about my boss I thought about what to do, Roger or administration what do I do it is a sensitive situation involving a supervisor's integrity." You then stated, "I reported Jessica's allegation about Lauren to Brad, my campus mentor, he told me to go to Jessica and have her self-report that's between them." "I looked up guidance to report and found I had a 15 day time line to report the incident that is why I sent the email to Roger on 5/25." You also stated, "Understand her integrity is what I was concerned about, that's why I went to Brad." You also stated, "I brainstormed with Dave Murdock my personal friend and mentor as a professional over discipline for years what to do." You then stated, "I developed options with my mentor, 1- go to Roger, 2 - talk with Brad or 3 - talk to Lauren. I didn't want to damage the principal's reputation so I went to Brad." You also stated, " I was trying to protect myself, I reported this to a coworker, Brad, and sent an email about filing a grievance against Principal Ford on 5-25." When asked if you confirmed this allegation with Jessica you responded, "I did". When asked

about the IDP process and why you didn't come to the principal you stated, "I wrote an IDP this year because Lauren said to, I didn't realize or have the knowledge I couldn't talk to Jessica." You also stated, "I did not talk to the student and that you could not remember if and who reported to you that the teacher was being bullied or harassed or that there could be retribution taken against the teacher about this incident. You also did not remember who told you it was Sabrina Celluci." After further investigation statements conclude that Patrick Rossi did not know for sure if the wallet was given back containing marijuana. Further investigation indicated that in your requested evaluation revision document emailed on April 19th to me, you stated "Trina learned to write an IDP letter; she followed protocol and worked with her principal and the district in a timely, professional manner." Further investigation also indicated that you were advised by Brad Bodine to speak with me and let me know what was said. Further investigation also indicated that when you confronted Jessica Wilson about if she suspended the student Jessica indicated no and that I would probably do the same thing. You did not ask for further clarification of this statement. Jessica stated this in response to your request to suspend the student. In Jessica's professional opinion she did not feel that she should suspend the student out of school.

It is alleged that on May 5th you responded to a student issue. It is alleged that while Mary Caraway was on the phone speaking to the 911 operator you allegedly took the phone out of her hand to speak to the operator. In the IDP meeting you responded, "I put out my hand for the phone when Mary could not answer the paramedics questions on the phone." You also stated, "Tristan was in the room and that he could give a statement about what occurred." After further investigation, two statements indicate that you took the phone from Mary. Tristan could not write a statement about this incident as he did not see the interaction between you and Mary.

It is alleged that you failed to supervise staff under your required supervision as demonstrated by: the list of students that Wendy Labon sent to Rise. Your alleged lack of attendance at Special Education teacher meetings and at Senior Special Education Action Committee (SSAC) meetings. Your alleged cancelation of meetings with the SPED department leaders from February 14th to the end of the school year because of the 3 weeks of testing. In the IDP meeting you presented a calendar cancelation dated Tuesday, May 9th. You stated, "You had verbal conversations with me about the Rise trip." You also stated that I was copied on an email from Wendy about students signing up to go on the Rise trip." You also stated, "I did not know I was supposed to vet the list. I trusted the teachers whoever are our campus leaders and the lead counselor. I didn't realize you wanted me to vet the list." You also stated, "Hindsight I would like to see the list, I wouldn't deny any kid going." You also stated, "I only missed SPED meetings for 1- HS CAP meeting, mandatory testing meeting and that one is rescheduled for 5-15." You also stated, "I was at them they are a priority they were from 3-4 afterschool, I also popped into MTSS meetings and held monthly leader meetings, I am a new AP with too many responsibilities. I felt horrible asking to take anything away." You also stated, "The SSAC, I created and co-led with Wendy Labon. We created the agendas together." You also stated, " I tried to discuss my workload with you many times, I worked myself to death, you were not very supportive, you told me we are all busy Trina" you also stated, "I do not know anyone else who has my responsibilities." When asked if you reviewed the High School Assistant Principal Summary Job Description you stated, "Probably, back when I applied for the pool." When asked if you remembered your interview for Hug VP and if you remembered any questions you were asked you stated, "Not questions but general ideas of what was discussed." After further investigation of your correspondence with Rise I was not copied on any of the emails you or

Wendy sent to Rise. Your email to Victor on April 7, 2017 indicates that the students listed were, "struggling and either failing all of their classes right now or have vanished." You did not indicate to Victor that students were signing up by choice.

Performance Expectations
I expect you to:

1. Attend a weekly meeting with the principal where you will submit and review all agendas prior to holding meetings with staff. These meetings will be established by the Hug HS Principal. Ms. Cristina Oronoz.
2. Attend a weekly Vice Principal PLC and review minutes form those meetings with the Principal at your weekly meetings.
3. Copy Ms. Oronoz on all emails you are sending to teachers.
4. You may not email or contact or direct a teacher to contact by phone or email any department or school in WCSD without Ms. Oronoz's written approval. You must submit in writing why you want to contact this department or school and vet all items prior to giving them to me for approval.
5. Not email teachers about issuing credits.
6. Have Ms. Oronoz's written approval for all guidance in regards to teacher evaluations and issuing credits.
7. Attend a class taught by Labor Relations Department on employee discipline. Register for the class in MyPGS and confirm date with Ms. Oronoz.
8. Invite Ms. Oronoz to all meetings under your supervision; SSAC, SPED, SPED department lead and MTSS.
9. Submit minutes from all meetings you are holding and review them with Ms. Oronoz at your meetings.
10. Follow the written guidance on evaluations that has been developed by the Hug leadership team. You must follow all guidance and expectations on the evaluation process at Hug and may not deviate from the teams approach to evaluations.
11. Submit to Ms. Oronoz all evaluations 10 days prior to the district due date for review and approval.
12. Report to Ms. Oronoz all incidents involving staff and students that are in violation of District Policy, state NRS or of a safety concern and you are directed to not consult outside mentors for guidance. You must follow all District Guidance on employee discipline.
13. Follow all verbal and written guidance given to you from the Principal, District Departments and Vice Principals.
14. Work collaboratively with the principal, vice principal and leadership team on all projects.
15. Not solicit or follow guidance regarding administrative procedures from teachers.

You must make these improvements immediately.

Assistance
In order to assist you in meeting these expectations, Ms. Oronoz will:

1. Set up the weekly calendar invite for weekly meetings.
2. Help you find the class taught by the Labor Relations Department in MyPGS.
3. Assist you in calendaring all responsibilities that fall under your supervision to ensure they are completed.

In addition, I strongly encourage you to:

1. Review the teacher evaluation guidance in MyPGS, prior to your first meeting with Ms. Oronoz.
2. Have a yearly calendar drafted prior to your first meeting with Ms. Oronoz.

This is a serious situation. Continuation or repetition of the deficiencies as stated in this document may result in suspension, demotion, dismissal, or a recommendation not to reemploy.

Sincerely,

Lauren Ford
Area Superintendent, Former Hug HS Principal

cc: Dawn Huckaby, Chief Human Resources Officer
Roger Gonzalez, Area Superintendent
Cristina Oronoz, Hug HS Principal
Zack Lewis Human Resources Technician

I acknowledge receipt of this letter of admonition.

7-19-17

Employee signature Date

*Washoe County School District*
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley, Clerk * Debra Feemster * Veronica Frenkel * John Mayer * Malena Raymond * Traci Davis, Superintendent

LETTER OF ADMONITION
**HAND DELIVERED**

RECEIVED
JUL 19 2017
Washoe County School District
Department of Labor Relations

July 19, 2017

Trina Olsen
1400 Belford Road
Reno, NV 89509

Dear Mrs. Trina Olsen:

I am providing you this written notice that your performance and conduct constitutes cause for potential disciplinary action under NRS 391.750 a. Inefficiency, c. Unprofessional conduct; d. Insubordination; e. Neglect of duty; i. Inadequate performance; k. Failure to comply with such reasonable requirements as a board may prescribe; o. Willful neglect or failure to observe and carry out the requirements of the title; p. Dishonest; q. Intentional failure to observe and carry out the requirements of a plan to ensure the security of examinations and assessments adopted pursuant to NRS 390.270 or 390.275; t. Gross misconduct; and

Nevada Testing Primer, Nevada Student Assessments Spring 2017 EOC presentation, February 2017, Email sent on Friday, April 7, 2017 new! NDE test security and administration training for spring 2017, HS Weekly Principal Email April 6, 2017, and to give you an opportunity to correct your performance and conduct.

The specific causes are as follows:

It is alleged you sent an email to all Hug Staff on May 11, 2017 that included secure testing materials, student identifying information. You state in the email, "Please keep this list confidential as you reference it so sensitive information is not seen by our students." After receiving an email from me at 6:21 am stating that I could not open the excel documents, you sent an email stating that, "This document lists every student test, (we have 2400+) and where/when they are testing for each test." During the IDP meeting on June 26, 2017 you stated, "Yes this is true. It slipped my mind I didn't work with those columns. I forgot I had sensitive items in the document, did not occur to me." After further investigation it is confirmed that you sent the email to Hug Staff with secure testing materials included. In addition you were dishonest in your email communication to me on May 11, 2017 when you stated that, "This document lists every student test (we have 2400+) and where/when they are testing for each test." The document included more than the student, and where and when they were testing.

It is alleged that you failed to provide me with requested information from an email sent to you on Wednesday, May 10, 2017. In the IDP meeting you stated "I sent Lauren a text message that evening

EXHIBIT 10
Witness: Olsen
C. EISENBERG, NV CCR 142

stating I could not get the info to her that night I attended the world language 2 hour event." You also stated, "May 4th I sent an email begging for your help, I was dropping the ball, I didn't get offered support, it didn't get done because I was drowning." You also stated, "She didn't take anything off my plate, she didn't support me."

Further investigation concludes that you did not provide me with the requested information in the email on May 10, 2017. Further investigation also concludes that you did not take support when it was offered to you. You sent an email on May 4, 2017 at 8:18am asking for support at 5:50 PM on May 4, 2017 I gave you guidance on how to handle those items. In addition on Saturday, May 13, 2017, Tristan McElhany was at Hug with you setting up computers to ensure they were ready for testing on Monday.

It is alleged that you were dishonest with me about meeting with the department leaders to vet the testing schedule. In the IDP meeting you stated, "I met with Keith Roberts and Natalia Calhan on 1-27 and with all department leaders and key people on 3/3 they were all there." You also stated, "Keith Roberts emailed me, I met with the English department May 1st and met with math on a day, I did everything I could to make everyone happy. I met with Geoff Philips many of times. I'm never dishonest, complete false statement, communication is my strong suit." In addition you showed us two calendar invites you sent out, one dated 1/27 and one dated 3/3. After further investigation, nine (9) department leaders stated that there was not a department lead meeting to discuss the testing schedule. Three (3) department leaders and one (1) other staff member indicated attending a meeting where a schedule was shown to them and no input was taken from them. Further investigation concludes that you were dishonest during the IDP meeting and with me about holding a department leader meeting to vet the testing schedule.

It is alleged that on Thursday, May 11, 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams explaining that you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017. In the IDP meeting you stated, "That is true I did not verify if they did watch the video. I did the admin training on May 11th informed them about the video, I watched it, I talked about it and used the video to create the EOC training. Nothing says the video is mandatory to watch. I am pretty positive that everything in the video was included in my training, I have the four (4) page document if that is untrue, mistake on my part." At this point in the meeting Sandy Aird showed you an email sent on April 6th and again on April 7th. She showed you that you were sent the email and it states that all proctors must observe the video and sign the verification that they saw the video. Sandy Aird also stated that on May 17th the proctors had not viewed the video and that we had them watch the video and sign the form that day before they proctored. You then stated, "I made a mistake to send by email and go over at the meeting. Lauren was there and heard me say that I didn't have to show it here it was in their in box." After further investigation, it is evident that you did not show the Test administrator test security NDE spring 2017 video and you did not verify that staff watched the video. At the testing meeting you did state that you did not have to show the video. Sandy showing you the emails and showing you where the statements were about the video also indicate that you did not thoroughly read the emails you received on April 6th and April 7th. As the testing coordinator for Hug HS it is your responsibility to implement all directives given to you by the Assessment department.

It is alleged that on Tuesday May 16, 2017 after being notified by Sandra Aird that you were removed from testing, you stated upon leaving the office, "What's the big deal it was just an email." In the IDP meeting you stated, "I don't believe I said that, the look on my face was numb, I was in a state of shock, I want to appoigize to Sandy for the look on face. I didn't say it." Virginia Doran then asked you "Which was it, you didn't say it or you don't believe you did?" You then stated, "If these two say I did, I don't believe I would just say it, maybe it was misinterpreted." Further investigation could not determine if you made this statement or not.

It is alleged that on the evening of Tuesday, May 16, 2017 you sent a text to Rhonda Clark and Brad Bodine stating, "I have been paper-thin for a while, at least I'll get some rest tonight. I really feel bad they won't let me finish it." In the IDP meeting you stated, "That was before I was told I couldn't talk to them. Yes I sent that, I was paper thin no one was helping me. I regret saying that." You also stated, "I was exhausted I had the slightest sense of relief that you (Sandy Aird) came and told me. I knew it was going to happen. I wish I could help them, it is very hard to ask for help from someone who wouldn't help me." You also stated, "I don't see how it is misconduct to apologize to them." After further investigation it is determined that you did send a text to Rhonda and Brad with the above statement. It is also evident by your statements, that you were relieved to be removed from testing. This further demonstrates your willful neglect or failure to observe and carry out the requirements of this title.

It is alleged that after reading and sending a confirmation email on Wednesday, May 17, 2017 about being removed as testing coordinator and told you cannot use your office, you entered the building and went right into your office to get your radio. In the IDP meeting you stated, "I was supposed to go on duty, there was chaos everywhere, my police radio was on my desk, I told Sandra I am not supposed to be in here. I don't think I entered for long it was on the corner of my desk." Further investigation revealed that you entered your office to retrieve your radio after being directed by email that you could not use your office.

It is alleged that you are unaware of the seriousness around your testing removal by sending a text to me on Wednesday, May 17, 2017 asking for a space to work stating, "Also, I don't have a space to work. The therapist is in Tristan's office. She had a student come on so I left to get coffee until this is figured out. Can you help me get testing items out of my office so I can work in my own office? Should I go home and work?" In the IDP meeting you stated, " I thought I could help, I thought I was going to be supported at this time, I didn't know where to go to set up my surface, I texted you to go off campus until we could figure out where I could work. I don't think it was wrong of me. I was still an AP and allowed in my office. So yes I asked where to work." At this time Virginia Doran explained why you could not be close to testing because of the strict restrictions on testing information. Virginia also stated "You are not the most important thing, students are the most important thing, you are focused on where you should be the most important thing was the students." You then stated, "She (LF) was awful to me, I was confused, emotional, I was looking for something from Lauren, I wanted Lauren to say, you can get through this, I was looking for a scrap but I realized I was not going to get it." Further investigation revealed that you still feel that you were entitled to have access to your office and that you were putting yourself before the seriousness of the testing and potential adverse impact of students. You were wanting my attention at this time without the understanding that I needed to deal with testing.

Performance Expectations

I expect you to:
1. Not be involved in testing for the next 3 years.
2. Not be able to hold the role of testing coordinator for 3 years.
3. You must attend a weekly meeting with the principal where you will submit and review all agendas prior to holding meetings with staff. These meetings will be on a designated day that is convenient to the principal.
4. You must submit minutes from all meetings you are holding and review them with the principal at the designated meetings.

You must make these improvements immediately.

Assistance
In order to assist you in meeting these expectations, the principal will:
1. Not assign you to the role of testing coordinator.
2. Not assign any testing, proctor or administrator to you.
3. Set up the weekly calendar invite for 1:1 meeting beginning in August.

In addition, I strongly encourage you to:
1. Review all emails in their entirety and well in advance of work you must complete.
2. After reviewing documents from the District or the state, set up a meeting with the admin team to discuss the information and be open to support when it is offered.

This is a serious situation. Because you were in the role of testing coordinator for Hug High School when this violation occurred this Letter of Admonition will remain in your personal file for 3 years. Continuation or repetition of the deficiencies as stated in this document may result in suspension, demotion, dismissal, or a recommendation not to reemploy.

Sincerely,

Lauren Ford
Area Superintendent, Former Principal Hug High School

cc: Dawn Huckaby, Chief Human Resources Officer
Roger Gonzales, Area Superintendent
Virginia R. Doran, Labor Relations Manager
Zack Lewis, Human Resources Technician
Sandra Aird, Assessment Director

I acknowledge receipt of this letter of admonition.

Employee signature 7-19-17
Date

Washoe County School District

Every Child, By Name And Face, To Graduation

Roger J. Gonzalez, Ed.D.
Area Superintendent, Area 2
Office of School Leadership
Washoe County School District
425 East Ninth Street
P.O. Box 30425
Reno, NV 89520-3425

Phone (775)789-4658
Fax (775) 322-7048

July 19, 2017

**HAND DELIVERED**

Trina Olsen
1400 Belford Road
Reno, NV 89509

RE: Notice of Investigatory/Due Process Meeting and Right to Representation

Dear Ms. Olsen:

You are directed to meet with me for an investigatory/due process meeting on Wednesday, July 26, 2016 at 2:00 p.m. The meeting will take place in my office. In attendance at the meeting with you and me will be Richard Swanberg, Area Superintendent.

The purpose of this meeting is to discuss [illegible] professional conduct as follows:

> NRS 391.750- (d) Insubordination; [illegible] Conduct; (k) Failure to comply with such reasonable requirements as a board may [illegible], (u) Gross Misconduct; making false accusations towards your immediate supervisor, and [illegible] tion 4425

The allegations are regarding incidents that occurred in May 2017 and ongoing and consist of the following:

- On May 25, 2017, you emailed me and indicated that you wanted to report a case that involved marijuana on Hug's campus. You subsequently filed a staff complaint against Lauren Ford, then Principal of Hug HS alleging that the Dean, Jessica Wilson, had returned marijuana to a student because she had seen Lauren Ford do the same thing. It is alleged that you have brought false claims and allegations against Lauren Ford.

- It is alleged that you brought false claims and allegations against Lauren Ford regarding following the supervision timeline, specifically that you did not have opportunities to discuss your progress and make a response to your evaluation.

- It is also alleged that, although you were directed not to discuss your ongoing personnel matters with Hug staff members, you have not followed that direction and have had discussions with Hug staff about your pending case.

At the meeting, you will have the opportunity to respond to all allegations. You will also be advised at the meeting, on the record, that you will be required to respond to all allegations and that failure to do so may constitute insubordination.

You are hereby further advised not to discuss this meeting or the allegations of potential misconduct with anyone except your WSPA representative. You are further directed not to contact anyone involved with this investigation (directly or indirectly) including employees of the WCSD. Please feel free to contact me with any questions.

EXHIBIT 11
Witness: Olsen
C. EISENBERG, NV CCR 142

OLSEN 000213

Be advised that if the allegations are found to be true, you may face disciplinary action, which can range from a written warning, written reprimand, suspension without pay, letter of admonition, demotion, or termination. Be further advised, that you have the right to have an Association Representative or other representation present with you at the meeting. The District has not reached a conclusion as to what, if any, discipline is appropriate, but will do so only after it receives your response to the allegations.

If legal counsel will represent you, you must inform me no later than Tuesday, July 25, 2017 at 5:00 pm.

Sincerely,

Dr. Roger J. Gonzalez
Area Superintendent

Attachments: NRS 391.750
WCSD Administrative Regulation 4425

cc: Dawn Huckaby, Chief Human Resources Officer
Virginia R. Doran, Labor Relations Manager

Washoe County School District

# Staff Complaint Form
## Based On Discrimination, Harassment/Sexual Harassment, Hostile Work Environment or Intimidation

Pursuant to Nevada Revised Statutes 388.132 and 388.135 and WCSD Board Policy and Administrative Regulation 4111.3, the Washoe County School District is committed to maintaining a learning environment that is free from bullying, cyber-bullying, discrimination, harassment, sexual harassment or hostile work environment based on race, national origin or color, age, disability, religious preference, sex (including non-conformity to gender stereotypes), sexual orientation, or gender identity or expression. Intimidation or retaliatory acts are prohibited. This complaint shall remain confidential to the fullest extent allowed by law.

***Complainant Information:***

| | | | |
|---|---|---|---|
| Name: Trina Olsen | | | |
| Address: 1400 Belford Road | City: Reno | State: NV | ZIP: 89509 |
| Home Phone: 775-233-9347 | Work Phone: 775-233-9347 | Email: tolsen@washoeschools.net | |
| School or Work Location/Department: Hug High School | | Occupation: Assistant Principal | |

This complaint alleges (check all that apply):

___Discrimination ___Harassment ___Sexual Harassment
___Intimidation ___Retaliation ___Hostile Work Environment
___Bullying ___Cyber-Bullying

EXHIBIT 12
Witness: Olsen
C. EISENBERG, NV CCR 142

On the basis of (check all that apply):
__Race, color or national origin __Age __Disability __Religious preference
__Gender (including non-conformity to gender stereotypes), sexual orientation, or gender identity or expression
__Alleged Violations of NRS 388.135

***Subject of Complaint:***

| |
|---|
| Name: Lauren Ford |
| Occupation (if known): Principal |
| School or Work Location/Department (if known): Hug High School, Reno, NV |

***Complaint:***

| | |
|---|---|
| Incident(s) occurred or began on or about (date): May 8th | Time of Occurrence (approximate is acceptable): |
| Place of Occurrence (description of area or address). Example: "Room N-99, Anytown High School"): My office (Trina Olsen, Asst. Principal) and in Dean's Office (Jessica Wilson) | |
| Time and Place that you addressed complaint with supervisor, or reason for not addressing complaint with supervisor: Reported to Brad Bodine in his office on approximately may 9th; directed Jessica Wilson to self-report to L.Ford | |

Description of Incident (Please attach additional information as necessary.):

Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was true, and she replied, "yes. But I only did it because I saw Lauren (Ford) do it not too long ago." I talked to my personal mentor in the district who has overseen discipline for years, who suggested several options to report (R. Gonzalez, school police, and Brad Bodine). I decided to report to Brad Bodine as another mentor and long term Assistant Principal on the Hug Campus. He told me to direct Jessica to self-report. I went immediately to tell JW to self-report to LF. When I didn't hear anything from LF, I sent an email to Roger Gonzalez on May 25th indicating that I needed to report an incident regarding Marijuana. Within the grievance guidelines, I believed I was reporting this within the timeline but I am unsure. Also, this report is was difficult because of fear of retaliation from LF because of hostile work environment (Grievance is being prepared/submitted)

Please attach any and all related documents necessary to the investigation.




EXHIBIT 13
Witness: Olsen
C. EISENBERG, NV CCR 142


7:23 AM
RC
Ryley
Also I did have jen modify my email a bit to be more professional. Cuz my original one sort of drug all the skeletons outta the closet
Good move ! Lol
May 9, 2017, 8:17 AM
And the admin consoling begins....
May 9, 2017, 4:20 PM
iMessage
Ryley
May 9, 2017, 4:20 PM
So I heard the emails have circulated.....
What does that mean?
The email I replied to her. She showed everyone. Anyone's you can focus on the EOC and I'll han- dle Pam.
Oh no. Ok but keep me updated about how you are doing. You know how
RC
Ryley
The email I replied to her. She showed everyone. Anyone's you can focus on the EOC and I'll han- dle Pam.
Oh no. Ok but keep me updated about how you are doing. You know how much I appreciate you
Don't worry. According to rumor I'm getting a silent treatment till the end of the year. Which is fine. Haha! It's the home
RC
Ryley
Don't worry. According to rumor I'm getting a silent treatment till the end of the year. Which is fine. Haha! It's the home stretch I got this
It's just like high school for adults. The "popular" ones running the school and being seen as big

Ryley

It's just like high school for adults. The "popular" ones running the school and being seen as big dogs. But really is the ones who work behind the scenes that are awesome.

That actually brought tears to my eyes. Yes, I'm that much of a wimp😭 thanks Ryley

Ryley

It's all good! But if I follow my contract of 730-3 each day.... I think that'll poke the bear a bit.



Freaking funny. Don't do something crazy like work your scheduled hours or anything!!!

Ryley

I think you all would have an intervention.

May 10, 2017, 12:47 PM

Please ask Pam about seven. Algebra support kids. She doesn't want to sub in your class but we have an overflow room or we can take those kids and less she chooses to keep them please ask her what she wants to do

Ok

Ryley

May 10, 2017

What did she say?

I will talk to her in the morning.

My 7th is with Paul Nolan in C7. If he isn't testing it should be fine. Also... if it's my sub don't I get to choose what we do with them?

Yes. Solved :)

I'm a problem solver

Ryley

I'm a problem solver

May 11, 2017, 5:47 PM

Love to but really want to get sone sleep 😴 how was the joke???

Lol that's is ok

May 12, 2017, 10:08 AM

Here comes another email

So with regards to EOC

Ryley

May 11, 2017, 5:47 PM

Love to but really want to get sone sleep 😴 how was the joke???

Lol that's is ok

May 12, 2017

Here comes another email

So with regards to EOC testing. Do you think that I could steal a regular radio and count the time

Ryley

May 12, 2017

Here comes another email

So with regards to EOC testing. Do you think that I could steal a regular radio and count the time that I'm testing and such as admin hours? Plus that'd be easier to get in touch in case you're gone outta the room and something happens.

Absolutely remind me

Ryley

Absolutely remind me that Am

Soooo I just got an carful from her. I'm assuming she told you to pull me for the rest of the year correct?

May 12, 2017

So did you get approval to do the exit exams? I remember us talking but me not connecting to eoc. We know that she

AT&T 7:26 AM 94%

RC
Ryley



Approval? I just told pam I would not be here because I am doing exit IEPs. The finalized schedule came out for EOC which was yesterday. I stopped asking for permission. So done. She was crying during 4th. So we are on a chopping

iMessage

---

AT&T 7:26 AM 94%

RC
Ryley

May 16, 2017, 5:53 PM

Ummmmm I'm so lost. Everything seemed flawless today

It was the spreadsheet I sent on email last week to staff. It had the UN and PW on it, which risked test security. Seriously I can't wait to sleep. Just hoping I don't lose my job as an AP. 😭

Oh my. This is my excuse when I make mistakes

iMessage

---

RC
Ryley

Oh my. This is my excuse when I make mistakes, I'm new and I'm learning.

Somehow I don't think that's gonna work! I'm definitely going to try!

May 17, 2017, 5:50 AM

Please keep the reason above confidential completely. I found out last night I'm not supposed to talk to anyone about this. Thanks Ryley.

---

AT&T 7:27 AM 93%

RC
Ryley

May 17, 2017, 5:50 AM

Please keep the reason above confidential completely. I found out last night I'm not supposed to talk to anyone about this. Thanks Ryley.

That's fine.

Thank you 😊

Odd question, do you think Pam had to do with any of this with the district finding out?

iMessage

---

AT&T 7:27 AM 93%

RC
Ryley

That's fine.

Thank you 😊

Odd question, do you think Pam had to do with any of this with the district finding out?

No, I think I through myself under the bus by accident when I was getting help

Oh gotcha

iMessage

---

AT&T 7:28 AM 93%

RC
Ryley

Oh gotcha

May 17, 2017, 3:07 PM

Hey just checking in since I only saw you briefly today. How're you doing?

I'm doing just fine.👍I'm not allowed to talk to any hug staff at all effective tomorrow, FYI. I am reassigned. Thanks for caring. Don't worry about me! We'll talk when it's

iMessage

---

AT&T 7:28 AM 93%

RC
Ryley

I'm doing just fine.👍I'm not allowed to talk to any hug staff at all effective tomorrow, FYI. I am reassigned. Thanks for caring. Don't worry about me! We'll talk when it's over. Good will prevail. Hope the kids testing goes well 🙏😊

Whoa!

Alright well maybe there will be some good that comes from this. What-

iMessage

---

AT&T 7:28 AM 93%

RC
Ryley

Alright well maybe there will be some good that comes from this. Whatever that will be. I'm sorry this happened. Whatever caused all of this.

Thank Ryley. TTFN 👌

Jul 17, 2017, 10:01 AM

Hey how're you doing this summer?

Wierd. I was going to call you today. I'm well! Do

iMessage


10:11
Ryley
Jul 17, 2017, 10:01 AM
Hey how're you doing this summer?
Wierd. I was going to call you today. I'm well! Do you have time to talk a little later today for a few?
That's great! I am in a math department meeting. Woooooo! Ya we can talk later today. Are you going to be coming back?
Still not sure. It's nuts. But okay with either way.
iMessage


10:11
Ryley
you have time to talk a little later today for a few?
That's great! I am in a math department meeting. Woooooo! Ya we can talk later today. Are you going to be coming back?
Still not sure. It's nuts. But okay with either way. I'll fill you in a bit later today ;)
You still don't know??? sounds good. I'll talk to you a bit later.
iMessage


10:11
Ryley
You still don't know??? sounds good. I'll talk to you a bit later.
Side note- this math meeting sucks
Jul 17, 2017, 6:02 PM
I'll be home in a bit
Perfect
I have never felt so betrayed in my life. Nothing hurts more that but you just did to me. I will never
iMessage


10:11
Ryley
I have never felt so betrayed in my life. Nothing hurts more that but you just did to me. I will never understand
You should know I defended you all year. Every step of the way. You should know I was your friend. You should know I was new, green, but believed in good. You should know how SHE talked about you and what I did to stand up for you and tell her you were
iMessage


10:11
Ryley
You should know I defended you all year. Every step of the way. You should know I was your friend. You should know I was new, green, but believed in good. You should know how SHE talked about you and what I did to stand up for you and tell her you were a great teacher. Now I just feel sorry for you. I have my family and that's really all that matters. Karma.
Read
iMessage

IDP - TO

ALYSON KENDRICK IDP
UNION PRESIDENT - NOTES

7/26/17
2:15pm ①

Folder D:

- Mireya Castro in IDP - wasn't noted on IDP notice. ??

RG → When was it was brought to your attention regarding MJ + JW.
TO → Middle of may.
RG → What did you do?
TO → Went to Jessica.
TO — • "I only did it because I saw LF do it. I asked again - "our Lauren".
TO — • I believe she felt it was OK. Explained the situation @ the child + they were trying to help.
TO — • You need to call her up here + follow through w/ consequences.
• She immediately got on the phone.

EXHIBIT 14
Witness: Olsen
C. EISENBERG, NV CCR 142

RG - What did you tell your mentor? What was his advice?
TO • I don't know what to do. I don't know how to handle this. I was intimidated to go to her. I spoke to Dave Murdock.
RG · What was his advice?
TO · He said he didn't know. Asked if I could go to RG? Could you call the police? Could you talk to Brad? I decided to go to Brad.
RG · Did he advise you to speak to your principal?
· Yes, I believe he did.
RG · Did you tell DM that Lauren returned drugs to a student?
· I told him what Jessica told me.
RG - What exactly did you tell Dave?
· You told Dave about the marijuana?

Did you tell DM that LF returned drugs to a student? - I think I recall telling him what JMW told me.

OLSEN 000216

·1/?

IDP - TO

7/28/17

(2)

RG · You talked to Brad. What was his advice?
· ~~I told~~ He told me to tell Jessica to self-report.
· "That's easy. Go tell her to self-report".
RG · Did he tell you to go to Lauren?
· You told me he said that, but I don't remember him saying that.
RG What did you do?
· Went to Jessica + told her she needed to self report. She signed.
RG Did you tell this to Lauren?
· No. That was an error.
RG What was your understanding of what happened w/ this kid?
· Didn't have parents.
· No one to call. 3 weeks from grad.
· Being suspended would be hard.
· I didn't tell her how to handle it. I just told her to handled.
RG When you filed the staff complaint, you thought LF had returned marijuana to a student?
· I was concerned this happened.
· I believe I was reporting that JW told me something that I was concerned about.
· I don't know if LF did it.
· I was intimidated reporting it to LF.
TO: I was trying to get help — I didn't mean for the complaint to = these big allegations. I was asked to file a complaint.

RG Can you recall your 40th day?
· Yes, pre-conference
· Teacher cried + complained that my mtg was too intimidating.
- LF said she was going to go w/ me to observation.
- For my post she observed the post w/ the teacher.

IDP - TO

7/26/17

③

RG. Nov. 7th pre-observation?
· No. I don't.
Did you coordinate the Nov. 8th PD?
· Yes.
· I had no formal invitations for 80th + 120th.
RG. Was the coordinating of Nov. 8th PD part of your evaluation?
· Yes. I found that out much later.
RG Did you meet on 4/17 to discuss your evaluation?
· Yes. It wasn't just for that. We had another mtg scheduled for an IDP.
· I think so.
· I said I wanted to talk c my eval.
· Let's meet at the IDP - I can stay for a bit. Can we talk?
· We talked for ~~a~~ bit. I had to leave.
RG Did you attend a mtg on 4/19 for the evaluation?
· I don't have that on my calendar.
· I recall that we talked c trying to meet but I had a jam-packed schedule. I couldn't get there. "Can you swing by?"
· I asked, can I meet at several times + she said no.
· That afternoon I wrote an email to her because I was upset. I wrote her on 4/19 asking to meet.
RG Did you meet on 4/21?
· Yes.
· She texted me on 4/20 to meet w/ her.
· My thought process in the complaint was that my experience re: invitation to discuss my evaluation.
RG What was the overall rating?
· ~~[illegible]~~ Effective.
RG Did you sign off?
· Yes, right there.

IDP - TO

7/26/17

(4)

RG - Did you complete comments in MYPGS?
- Yes, in May.
- I can't remember if it was before or after the complaint.
- I want to be clear that there were no observations. No calendar invites from Lauren.
- She entered dates in MY PGS, but no others.
- Late in the game. I had Mike Paul re-open it. Now, I will have an opportunity to make a response.

RG - Have you talked to Hug staff members about this investigation?
- I don't think it is a yes/NO.
- I spoke to Riley Koren —
  - I'm nearly done w/the process.
- I don't recall
- I did talk to Wendy LaBon - told her I couldn't talk.
- Things aren't over yet.

What information did you share w/ RK? (July 17th).
- I don't recall telling him anything..
- I don't recall telling him anything about the investigation.
  - I do recall saying I was tired of this.
  - I did tell him I didn't like Rhonda.
  - He knew @ the testing irregularity before I was told not to.

Closing statement by TO.

Washoe County School District
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley Clerk * Debra Feemster * Veronica Frenkel * John Mayer * Malena Raymond * Traci Davis, Superintendent

July 27, 2017

**VIA U.S. MAIL AND ELECTRONIC MAIL**

Trina Olsen
1400 Belford Road
Reno, NV 89509

**RE: Notice of Administrative Leave with Pay**

Dear Ms. Olsen:

Based upon the events stated at the IDP meeting on July 26, 2017, and to protect both your rights as well as the District, you are hereby placed on Administrative Leave with Pay effective **July 28, 2017**, pending further resolution of the allegations of misconduct on your part.

Be further advised, you are not allowed on District property for any reason and you must turn over to me all District property in your possession. In the event you believe that you need to come on to District property, you must contact me for approval. While you are on Administrative Leave with Pay you must be available by telephone and available to report to a work site or another location, as you may be directed, during regular business hours in order that the District can contact you, if need be.

You are further directed not to discuss this pending investigation with anyone except your WSPA representative or legal counsel.

Contact me with any questions.

Sincerely,

Roger Gonzalez
Area Superintendent

cc: Dawn Huckaby, Chief Human Resources Officer
Virginia R. Doran, Labor Relations Manager
Zach Lewis, Human Resources Technician

EXHIBIT 15
Witness: Olsen
C. EISENBERG, NV CCR 142

*Washoe County School District*
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley, Clerk * Debra Feemster * Veronica Frenkel * John Mayer * Malena Raymond * Traci Davis, Superintendent

November 14, 2017

Trina Olsen
1400 Belford Road
Reno, NV 89509

RE: ADM G17-18#001 Part 1

Dear Ms. Olsen,

First, thank you for your patience and the acceptance of an extension for your grievance. It took me additional time to thoroughly go through all of the additional documents you submitted during and after your hearing on September 28, 2017. This is to formally notify you that your grievance is denied, and the Letter of Admonition of July 19, 2017 is sustained.

Based on my review of the contract and allegations, and upon review of the information presented by you in the Grievance Appeal Hearing including emails, documents, text messages, etc. held on Thursday, September 28, 2017, I have determined that you did violate the following:

> NRS 391. 750 (a.) Inefficiency; (c) Unprofessional conduct, (d)insubordination, (e)Neglect of duty, (i) Inadequate Performance, (k) Failure to comply with such reasonable requirements as a board may prescribe, (l) Failure to show normal improvement and evidence of professional training and growth and (p) Dishonesty; (t) Gross misconduct and Administrative Regulations 4111.4 ( Ethical Standards; Administrative Procedure 5504 Grading: Incompletes/Appeals; and Administrative Procedure 5502 Academic Grading Policy High School).

I reviewed the above documents, as well as the findings in the Investigatory/Due Process Hearing, and found that you did the behaviors outlined in the Letter of Admonition. I will be providing excerpts of the allegation stated in the LOA dated July 19, 2017 as well as excerpts from your rebuttal comment tied to the specific LOA allegation. I have provided information as to my "Decision Point" within each area.

**Letter of Admonition:** It is alleged that on Friday, April 7, 2017 you sent an email to Wendy Labon, Patrick Rossi and Patricia Newbrough giving directions to issue a final and change a grade for the 14-15 school year violating administrative procedure 5504 and 5502. During the IDP meeting on May 31, 2017 you stated, "The statement you have in the email was not a directive, it was something the principal had stated to you many times". You also stated, "I did not have knowledge of the policy I did not look it up, as a new VP you expected to get guidance from the principal. I could of learned in a conversation when Lauren received this email." You also stated, "I believed I knew the answer, I made the assumption that I believed I knew the answer so I didn't think to copy the principal, I clearly thought it was the correct policy. It was an error." After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval.

EXHIBIT 16
Witness: Olsen
C. EISENBERG, NV CCR 142

It is alleged that you gave Sharon Black a notification of credit form to use to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502. In the IDP meeting you stated, "The principal was in the hallway visibly upset, about a situation I knew nothing about. The principal handed me a stack of forms, that could have been one of them, I do not remember I just got this today in an email. You (Lauren Ford) directed me to go see teachers to change the grades, I took them to the teachers even though I didn't know what was going on and I was uncomfortable." You also stated, "Brad and Tristan can confirm that Lauren handed these to me and said to see if I could talk to teachers to see if this satisfied getting credit for the course." It is so hard for me to answer these questions, I do not know what forms were attached, I didn't follow up or submit forms to issue credits to students, the principal does that, I do not know how many forms the principal signed, but she signs them all". I didn't know what A, B, C, was." After further investigation as to being directed to see teachers to change grades, statements revealed that the directive given was that no students would receive credit and forms were handed to Brad Bodine. Further investigation as to never signing approval for grade changes, I found eight such approval signed by you.

**Rebuttal 1 and 2: Alleged email directive to issue a grade change**

- The email was clearly not a directive
- Mrs. Ford states in her findings, "further investigation as to having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside of the three week grading period window must have principal and district approval. "
    - **This statement about having knowledge of the policy does not match the original allegation and should be expunged.**
    - The email in question stated, "the principal owns the gradebook and the principal can approve the grade change...", clearly showing principal approval was needed
    - The email was a confirmation of what I learned from Mrs. Ford, as evidenced by the comment in the email, "Mrs. Ford fully supports" ...and was parent of the Incomplete Learning Initiative that Mrs. Ford promoted and approved as a whole school initiative.
    - If the grade change form must be approve3d by the principal, Mrs. Ford would receive these forms from the registrar for her approval as a protocol. I am not sure if that occurred or if credit was awarded.

**Decision Points:** *In reviewing the email in question, I did find it to be directive in nature in point of fact coming from an assistant principal sent to staff members as well as the comment, "Let's get him through this". In reviewing statements, it was clear you had been provided information regarding grade change policy as well as who was authorized to approve the grade changes outside of the three-week window. As for your request to have a statement "expunged" because it did not match the original allegation, it is exactly as stated in the IDP process, the investigation process, that is was found you had received information regarding the policy therefore this statement will remain in the LOA. As well through the IDP as well as the documents I reviewed, you in fact did sign grade approval forms.*

**Letter of Admonition:** Excerpts and the entire context may be found in the actual LOA dated July 19 2017

It is alleged that you failed to get my approval prior to putting in Lorrie Foley's evaluation that you recommended her to be placed on a FAP. After reviewing the narrative, you sent me an email on April 8th and I told you that Lorrie could not be placed on a FAP. In an email received on April 20th and in the meeting held on April 27th with Lorrie Foley, Elaine Lancaster, WEA Representative and me you stated that Laura Pincollini gave you guidance and you followed it, to include the FAP. In the IDP meeting you stated, "I was directed by Lauren Ford that I didn't' meet the dead lines from Roger so I could not give Lorrie a minimally effective evaluation." "On April 16th I received an email from Laura stating that Lauren said yes to a FAP." You also stated, "That on April 8th in the hallway that when Lauren stated I did not have enough evidence to do an FAP that I had an abundance of evidence she questioned my due diligence as a VP. I was doing my job. You didn't say now you just said not enough evidence. I felt you were doubting my evidence not the FAP. You (Lauren) did not reply to my emails about putting Lorrie Foley on a FAP." See the rest of the narrative in the actual LOA.

**Rebuttal 4: Allegation that stated I failed to get approval to put FAP on an evaluation. Excerpts and the entire context can be found within your Rebuttal document.**

- Emails asking Ms. Ford about the inclusion of the FAP as well as my concern for her overall evaluation were not answered
- I was never told by Mrs. Ford not to include a FAP, as confirmed at the IDP hearing. I was only told she was "not sure if I had the evidence", but I showed her that I did have sufficient evidence.
- Mrs. Foley emailed me on 4/8/17 and copied Mrs. Ford asking about the FAP. I responded and copied Mrs. Ford explaining that she would have a FAP. Again, Mrs. Ford did not respond to Mrs. Ford telling me or Mrs. Foley that we would not be doing a FAP. Clearly as evidenced in this email that was copied to Mrs. Ford I felt I had her full support.
- See Your Rebuttal #3 for the remaining three bullet points.

***Decision Points:*** *I find your email on March 4, 2017 to be telling in this instance, understanding that you had attended evaluation trainings. If you knew by March 4th that you were "behind the ball in terms of making this viable on her eval." then that begs the question, why would you believe a FAP is appropriate at this time? Through a review of email correspondence between you and Mrs. Ford, although there was no response, though speaking with Mrs. Ford, it was evident she had spoken to you about not having enough evidence to complete a FAP and you interpreted that to mean she was questioning your evidence. I would argue that you being an assistant principal should have known that you cannot give a teacher a FAP with an effective rating. The entire idea of completing a FAP, would be to support an underperforming teacher, not an effective teacher.*

**Letter of Admonition: Incomplete Learning Initiative (Excerpts and for complete record see LOA)**
We moved to item 4 on the IDP because the first two items related to the 4th. It is alleged that you sent an email, Friday, May 12th to Brad Bodine and Patrick Rossi asking for direction and credit to be issued on an issue that was discussed in a meeting on May 10th with Elaine Lancaster, Wendy Labon and Brad Bodine where I stated that Brad Bodine would view all A+ courses to ensure all policies were followed.

You stated in the meeting on May 10th that you do not know the policy around A+ for AE credits, OLA credits and incomplete learning. You send an email to Brad Bodine on May 12th about Juan. You stated, "He has access to A+. I don't want Juan in any trouble for not being trained. Can you please work with Juan and Patty in making sure that the gets the info he needs to work with A+? He also needs the policies for incomplete learning.

After further investigation as to your understanding of Wendy Labon's errors, emails, meetings and statements indicate that errors were brought to your attention and mistakes can be interpreted from the emails. Statements also conclude that you were explained that the difference between AE/AE OLA credits were explained to you on two occasions by Brad Bodine. Statements and emails also conclude that the Incomplete Learning process was designed by you and your team and vetted through the admin team. In an email to Roger and me dated February 26, 2017 you indicated the team for incomplete learning was Trina Olsen, Patrick Rossi, Patty Newbrough and Wendy Labon. The only staff that did not follow the written guidance give in the power point you created for the incomplete learning process were you and Wendy Labon, an employee you directly supervise. All email correspondence that was sent to teachers containing directions on the incomplete learning process came from you and included the team members, Patrick Rossi, Patty Newbrough and Wendy Labon. You copied me and only the VP evaluator of each content area on the emails. Further demonstrating your leadership of the incomplete Learning Process and failure to follow your own guidance to staff.

**Rebuttal 3: Alleged misconduct regarding incomplete learning.** (Excerpts and entire context can be found in your Rebuttal Statement)

- During this IDP hearing, Mrs. Ford could not answer my question as to what she was specifically addressing as misconduct in this bullet.
- Mrs. Ford seems to be alleging that I was solely responsible for the incomplete learning initiative. I could not have implement3d an initiative as large as incomplete learning without the principal's direct involvement and guidance. Mrs. Ford is the principal and responsible in making sure initiatives follow district guidelines. This initiative was a whole-school presentation and our entire Spring Intersession was developed around this process. I presented this initiative to the admin several times at meetings and by email and Mrs. Ford co-led the presentation to staff.
- It is not misconduct to lead an initiative promoted and approved by my principal. I was acting as her assistant a whole-school initiative is always approved and vetted by the principal.

***Decision Point:** In reviewing documents associated with the Incomplete Learning Initiative, it is clear to me that you were associated as the leader of this initiative along with your team to include three other individuals. You were provided guidance by Brad Bodine on policy and A+ credits, it seems that in reviewing emails, you did not follow this guidance. As early as February 7th, Mrs. Ford expressed her concern to you and your team in regards to sped students and A+ courses. Emails I viewed also included February 20th email from you to Mrs. Ford informing her of a PowerPoint you were to present to admin team. Mrs. Ford in fact also sent an email late in January, 2017 (31st) informing two employees, one in which I understand you directly supervise, to clearly articulate which courses were not credit bearing courses and had you as the contact about how to use a supplemental curriculum. There is also another*

*email dated February 6, 2017 in which Mrs. Ford answers a question from the employee you supervise and writes, "___I think we need to meet about this". There is another email dated May 3, 2017 in which Mrs. Ford clearly tells the employee you supervise she has concerns. All of this evidence leads me to the conclusion, you were accountable for the Incomplete Learning Initiative and should have followed through on your responsibility to the conclusion of the program. Stating that you did not want to continue with the program initiative in an email dated May 17th lacks taking responsibility for the program and its mistakes and implementation errors.*

**Letter of Admonition: Excerpts and the entire context can be found in the LOA dated July 19, 2017** Is alleged you failed to report to me an incident reported to you on May 8th involving a student, staff member and drugs. On May 8th Patrick Rossi reported to you that he was told by Sabrina Cellucci that Jessica Wilson gave drugs back to a student. You stated to Jessica Wilson that you spoke with a trusted mentor/confidant from another school. You did not state this confidant's name. You directed Jessica to self-report what she did to me. You did not report this incident to me, school police or any other administrator on Hug Campus. In the IDP meeting you stated, "Patrick reported Jessica Wilson gave a student back drugs, he was scarred and did not know what to do so he told me what happened. " You also stated, you were scared and worried about Jessica, wanted to talk to her if it was true." You also stated, "You went to Jessica first because it was the professional thing to do. When I did Jessica stated I saw Lauren do the same thing not too long ago, I was taken aback. An allegation against Lauren scared me, it's about my boss I thought about what to do, Roger or administration what do I do it is a sensitive situation involving a supervisor's integrity. "

**Rebuttal 5: Alleges I failed to report an incident regarding a staff member and drugs**

- The allegation was: "you did not report this incident to me, school police or any other administrator on campus"
  - At the IDP meeting, I explained our Dean admitted to me that she gave a student back drugs, and then alleged that did it because she saw Principal Lauren Ford do the same thing. I did not report this incident directly to Mrs. Ford because of this allegation against her. I was intimidated to report an allegation that was against my principal to her directly. This is why I reported to Brad Bodine and Roger Gonzalez instead of Mrs. Ford.
  - At the IDP hearing I provided that I reported this incident to Hug Assistant Principal Brad Bodine. I had also reported the dean's allegation against Mrs. Ford to area superintendent Roger Gonzalez within the timeline for reporting per the WSPA negotiated agreement. I reported this incident using a staff complaint form as guided by Mr. Gonzalez.
- Mrs. Ford makes many other statements in her findings about this allegation regarding the investigation none of which match the original allegations of failure to report. All of these statements should be expunged.

***Decision Point:*** *In reviewing statements it was clear to me you did not follow correct protocols put into place for reporting such incidences. You at no time went to Mrs. Ford to report what had been told to*

*you by Dean Jessica Wilson. You state that you went to Brad Bodine to provide him this information and he told you to go to Mrs. Ford, and you did not. As well, you clearly understood the IDP process as evidenced in your own statement in regards to your evaluation and your request to review "negative elements" in a letter dated April 19th. This is important to me because you should have known not to discuss the issue further with Jessica Wilson and in fact you did. You used poor professional judgement in not going to the principal in regards to this issue and made conclusions without seeking facts in the matter. As for your request to have a statement "expunged" because it did not match the original allegation, it is exactly as stated through the IDP process, the investigation process, that is was found you had demonstrated poor professional judgement in this matter therefore all information will remain in the LOA.*

**Letter of Admonition: Phone incident**
It is alleged that on May 5th you responded to a student issue. It is alleged that while Mary Caraway was on the phone speaking to the 911 Operator you allegedly took the phone out of her hand to speak to the operator. In the IDP meeting you responded, "I put out my hand for the phone when Mary could not answer the paramedics questions on the phone." You also stated "Tristan was in the room and that he could give a statement about what occurred." After further investigation, two statements indicated that you took the phone away from Mary. Tristan could not write a statement about this incident as he did not see the interaction between you and Mary.

**Rebuttal #6: Excerpts see your entire Rebuttal for complete context**

- I waited for the secretary to give the operator information requested and complete the breathing count with the operator
- At the pause, I held out my hand and said, "Mary" I then reached for the phone and she put it in my hand.
- I was the administrator in charge of school safety and code blue.

*Decision Point: I do find that this incident to be unable to corroborated with the evidence I have been provided, therefore I am recommending it be removed from the Letter of Admonition.*

**Letter of Admonition: Excerpts provided for entire context see LOA dated July 19, 2017**
It is alleged that you failed to supervise staff under your required supervision as demonstrated by the list of students that Wendy Labon sent to RISE. Your alleged lack of attendance at Special Education teacher meetings and at the Senior Special Education Action Committee meetings. Your alleged cancelation of meetings with the SPED department leaders from February 14th to the end of the school year because of the 3 weeks of testing. In the IDP meeting you presented a calendar cancellation dated Tuesday, May 9th. You stated, "You had verbal conversations with me about the Rise trip." You also stated that I was copied on an email from Wendy about students signing up to go on the Rise trip." You also stated, "I did not know I was supposed to vet the list. I trusted the teachers whoever are our campus leaders and the lead counselor. I didn't realize you wanted me to vet the list."

**Rebuttal #7 Alleges I failed to supervise staff because of an email list of kids that Wendy Labon sent to Rise; I lacked attendance at sped meetings and senior sped action committee meetings; and I canceled**

**sped department meetings beginning Feb 14th. (Excerpts and the entire context can be found in your Rebuttal)**

- Re: attendance at sped teacher meeting and action committee meetings:
  - I proved I was innocent of all these allegations and attended or organized nearly every meeting all year for both groups. No findings from Mrs. Ford were listed about this allegation.
- Re: cancelation of sped department leader meetings from Feb 14th until the end of the year due to testing: I proved that her allegation was Mrs. Ford's error, as the cancelation noticed was dated the week before EOCS began in May and only canceled two meetings all year due to EOCs, but the email invite was created on Feb 14th and that was the date she was reading. No findings from Mrs. Ford were listed about this allegation.
- Re: supervision of Wendy Labon and list of students sent to Rise:
  - Mrs. Ford's findings indicate I emailed Mr. Sherbondy and stated the students listed were, "struggling and either failing all classes or have vanished. You did not indicated to Victor that the students were signing up by choice." This is out of context. This comment was regarding a list of students that were sent to Victor Sherbondy long after the field trip to Rise in March. This was not a list of students that "signed up". Mrs. Ford believes this quote regards the list of kids that attended the field trip, but it is actually simply a list of candidates that could be a good fit for Rise after graduation and these students were not "sent to Rise"

***Decision Point:** After reviewing several emails as well as Hug High School Administrative Role and Responsibility document, I find this allegation sustained. The most compelling evidence to me were the emails between you and Mr. Sherbondy at RISE; I did not see Mrs. Ford included on any of those emails. This is serious as the principal should have been included in these having to do with seniors and graduation/cohorts. It also lends me to believe you do not have a grasp as to why this issue is serious; sending a list of students enrolled at Hug HS that are in your 2017 cohort to Rise so they can get "over to RISE right away" (email dated April 8, 2017). As well, in reviewing the Role and Responsibility document, it was clear to me that all administrators at Hug HS had responsibilities assigned to them in relation to their position as administrators and that no one had greater duties than others.*

In conclusion, I find the Performance Expectations to be in line with the needed areas of improvement for you as an administrator. I do not recommend any changes as such.

Sincerely,

Kristen McNeill, Ed. D
Deputy Superintendent

Cc: Dawn Huckaby, Chief Human Resources Officer
Roger Gonzalez, Area Superintendent
Christina Oronoz, Principal Hug HS
Virginia R. Doran, Labor Relations Manager

**Washoe County School District**
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Angela Taylor, President * Katy Simon Holland, Vice President * Scott Kelley, Clerk * Debra Feemster * Veronica Frenkel * John Mayer * Malena Raymond * Traci Davis, Superintendent

November 14, 2017

Trina Olsen
1400 Belford Road
Reno, NV 89509

RE: ADM G17-18#001 Part 2

Dear Ms. Olsen,

First, thank you for your patience and the acceptance of an extension for your grievance. As noted in my other correspondence regarding the first LOA, it took me additional time to thoroughly go through all of the additional documents you submitted during and after your hearing on September 28, 2017. This is to formally notify you that your grievance is denied, and the Letter of Admonition of July 19, 2017 is sustained.

Based on my review of the contract and allegations, and upon review of the information presented by you in the Grievance Appeal Hearing including emails, documents, text messages, etc. held on Thursday, September 28, 2017, I have determined that you did violate the following:

> NRS 391. 750 (a.) Inefficiency; (c) Unprofessional conduct, (d)insubordination, (e)Neglect of duty, (i) Inadequate Performance, (k) Failure to comply with such reasonable requirements as a board may prescribe, (l) Failure to show normal improvement and evidence of professional training and growth and (p) Dishonesty; (t) Gross misconduct and Nevada Testing Primer, Nevada Student Assessment Spring 2017 EOC presentation, Email sent on Friday, April 7, 2017, NDE Test Security and Administration training for spring 2017 and HS Deputy Superintendent Weekly email send on April 6, 2017.

I reviewed the above documents, as well as the findings in the Investigatory/Due Process Hearing, and found that you did the behaviors outlined in the Letter of Admonition. I will be providing excerpts of the allegation stated in the LOA dated July 19, 2017 as well as excerpts from your rebuttal comment tied to the specific LOA allegation. I have provided information as to my "Decision Point" within each area.

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**
It is alleged you sent an email to all Hug Staff on May 11, 2017 that included secure testing materials, student identifying information. You state in the email, "Please keep this list confidential as you reference it so sensitive information is not seen by our students". After receiving an email form me at 6:21 am stating that I could not open the excel documents, you sent an email stating that, "This document lists every student test (we have 2400+) and where/when they are testing for each test." During the IDP meeting on June 26, 2017 you stated, "Yes this is true. It slipped my mind I didn't work with those columns. I forgot I had sensitive items in the document, did not occur to me." After further investigation it is confirmed that you sent the email to Hug staff with secure testing materials included. In addition, you were dishonest in your email communication to me on May 11, 2017 when you stated,

EXHIBIT 17
Witness: Olsen
C. EISENBERG, NV CCR 142

that "The document lists every student test (we have 2400+) and where/when they are testing for each test." The document included more than the student, and where and when they were testing.

**Rebuttal 1: Alleges an email was sent to staff that included secure testing information. Excerpts are included. Refer to your Rebuttal for the entire content.**

- I am accountable for accidently sending an email with secure information on the attachment that had 24 total columns. Mrs. Ford vetted and approved this email and attachments and is equally responsible for this error.
- I sent an email asking for Mrs. Ford's testing support and indicating my fear of not being ready for testing. Also, see Mrs. Ford's follow-up to that request for help in attachment #3.

**Decision Point:** *After reviewing several email exchanges between you and Mrs. Ford (May 4, May 5, May 11, 2017) , statements from Hug HS staff members, to include the email in question that was sent on May 11, 2017 to all Hug HS staff, I find this allegation sustained. You, as the Testing Coordinator, should have detailed to your supervisor exactly what information was being sent out in this email and you did not. The fact that you placed in the email to staff, "Please keep this list confidential as you reference it so sensitive information..." leads me to the conclusion that you were aware of the contents and what was being sent to staff or at the very least, you SHOULD have known. As well, when Mrs. Ford on her reply back wrote, "I could not open the 2 excel documents. What's the difference between them", you did not in your reply back state exactly what was included in the 24 columns. As well, in your Rebuttal, you wrote, "Mrs. Ford vetted and approved this email and attachments and is equally responsible for this error." Mrs. Ford was in fact trusting your ability as the Testing Coordinator to provide her accurate information when she DID ask, "What's the difference between them." You also take exception Mrs. Ford in the LOA using the term "dishonesty", however, the fact is that you did not provide Mrs. Ford an honest accounting of what was included the staff email dated May 11, 2017.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**

It is alleged that you failed to provide me with requested information from an email sent to you on Wednesday, May 10, 2017. In the IDP meeting you stated, "I sent Lauren a text message that evening stating I could not get the info to her that night I attended the world language 2 hour event." You also stated, "May 4th I sent an email begging for your help, I was dropping the ball, I didn't' get offered support, it didn't get done because I was drowning." You also stated, "She didn't take anything off my plate, she didn't support me."

Further investigation concludes that you did not provide me with the requested information in the email on May 10, 2017. Further investigation also concludes that you did not take support when it was offered to you. You sent an email on May 4, 2017 at 8:18 am ask for support at 5:50 pm on May 4, 2017 I gave you guidance on how to handle those items. In addition, on Saturday, May 13, 2017, Tristan McElhany was at Hug with you setting up computers to ensure they were ready for testing on Monday.

**Rebuttal 2: Alleges my failure to provide her (Mrs. Ford) with requested information**

- Mrs. Ford states, "further investigation concludes that you did not provide me with the requested information in the email on May 10th, 2017."

  - My email sent to her on May 11th at 4:10 am was within 22 hours of her request and included all requested information. (see attachment email #1)
  - Mrs. Ford also directed me to attend a UNR world language event that evening. I texted her that would have it the next morning so she was aware.
  - I could not finish the requested information during normal school hours because I participated in lengthy remote training an support with assessment leader, Mary Shoemaker, for several hours.
- Mrs. Ford states, "Further investigation also concludes that you did not take support when it was offered to you."
  - This statement was not a part of the original allegation and should be expunged.
  - Mrs. Ford's email in response to my request for help dated May 10th, at 5:50 pm only addressed 4/16 items I had listed and I believe was unsupportive in tone.
  - At the meeting with Sandra Aird when I was told I was being removed as testing coordinator as results of the error listed in the first bullet point of this letter, Mrs. Aird asked Mrs. Ford, "Who was helping Trina? Who can take over her role as testing coordinator?" Mrs. Ford responded, "Nobody. Tristian isn't' trained, Brad isn't trained, Rhonda is new and isn't' trained. "She looked at me and I offered, "Maybe Sal? He helped Susan last year." Mrs. Ford responded, "No, he's only a PIF, he's classified." Mrs. Aird then said, "I guess I'm going back to assessment to work on tomorrow's testing tickets." These comments further indicate the lack of support I had on camps for testing.

***Decision Point:***
*In reviewing emails dated May 10 from Mrs. Ford and your reply, back on May 15 in response to her questions was not within 22 hours. You sent Mrs. Ford as she directed the staff email that was to go out on May 11, but you did not respond to her questions regarding the computers until May 15. It would seem logical to a reasonable person that because of the importance of EOC testing within a high school that you would provide your administrator with a comprehensive update on the status of testing and plans; this statement goes to your third bullet in your Rebuttal regarding you attending "remote training". The training was for several hours and the lack of pre-planning and clear communication on your part led your administrator to question and ask for specific details on the testing that was to occur the following week. As for your statement in your Rebuttal regarding the statement, "Further investigation also concludes that you did not take support when it was offered to you" should be expunged is denied. You sent an email dated May 4th to Mrs. Ford expressing concerns for your workload and you included that in your documentation to be reviewed by me. If you did not want it reviewed, then you should not have included the documents. However, Mrs. Ford did respond to your concerns. You sent the email on May 4th and even you stated in the email, "with everything I have over the next 7 days, can you help me prioritize my duties? While Mrs. Ford did respond to your help for priorities, you indicated in your email "Many of these items will have to wait until after EOCs or I simply won't get it done, as I know the EOCs are the priority." As for your point regarding you being the sole person understanding the testing coordinators duties, that does not indicate to me a lack of support, it does however indicated to me a gap in the system of having a back-up in the event of an emergency and that should be dealt with through administration.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**

It is alleged that you were dishonest with me about meeting with the department leaders to vet the testing schedule. In the IDP meeting you stated, "I met with Keith Roberts and Natalia Calhan on 1-27 and with all departments leaders and key people on 3/3 they were all there." You also stated, "Keith Roberts emailed me, I met with the English department May 1st and met with math on a day, I did everything I could to make everyone happy. I met with Geoff Philips many of times. I'm never dishonest, complete false statement, communication is my strong suit." In addition, you showed us two calendar invites you sent out, one dated 1/27 and one dated 3/3. After further investigation, nine (9) department leaders and one (1) other staff member indicated attending a meeting where a schedule was shown to them and no input was taken from them. Further investigation concludes that you were dishonest during the IDP meeting and with me about holding a department leader meeting to vet the testing schedule.

**Rebuttal 3: (dishonest about department leader meeting)**

- Mrs. Ford states, "further investigation concludes that you were dishonest during the IDP meeting and with me about holding a department leader meeting to vet the testing schedule. "
  - I proved that I met with several department leaders to vet the testing schedule on March 3rd (see photo attachment of calendar invite with verbiage and invitees #1) in what I considered to be as department leader meeting.
  - This allegation in not dishonesty, and there is not misconduct. Mrs. Ford asked if I met with the department leaders in a simple verbal conversation. My answer of "yes" was a true and honest statement given that I believed my March 3rd meeting was considered a department leader meeting and the purpose was to vet the schedule. It is true that not every department was present, but most of them were. Represented at the meeting by an elected department leader were : English, Math, Special Education, Science and the CTE department as well as several other key staff members involved in testing. This is a frivolous allegation from months ago and no intentional dishonesty occurred.
  - I also sent a whole-staff email to vet the testing schedule in March requesting for feedback from all teachers, department leaders, and staff in mid-March.
- Mrs. Ford also alleged, "no input was taken from them"
  - This allegation in not part of the allegation and should be expunged.
  - There are district-wide, severe scheduling impacts in the administration of EOC tests, as other district testing administrators can confirm. During my frequent meetings and conversation with department leaders, many people had different ideas of what the schedule should look like. Some did not understand their request were logistically impossible, with high priority concerns (like special education needs), or that we had double tests we did in the previous year. Keith Roberts (English DL and Natalia Callahan (math DL) can attest to the many times we met to vet the testing schedule and provide the schedule that caused the least possible disruption.

***Decision Point:***

1. *To this allegation, I agree that the word dishonesty should be removed. In reviewing statements from staff, it is clear you did speak to or meet with <u>some</u> staff members in regards to the scheduling of the EOCs at one time or another through the year and closer to the testing period. The original allegation in*

*the notice of IDP dated June 26, 2017 indicated, "Allegedly you were dishonest with me about meeting with the department leaders to **vet** the testing schedule." The term "vet" means to check, examine, scrutinize, inspect, look over, evaluate, appraise. Therefore, the statement stands in the LOA, "no input was taken from them" because it is the same as "vet". In reviewing the statements of staff, while it is clear that you met with some of them, it is equally clear that the majority of staff who you did meet with felt as though you did not take their input regarding the scheduling of testing. Certain staff indicated that they preferred block scheduling and you were not in favor of this scheduling; listing reasons for such. The staff presented you with their concerns as well and it is not clear as to what if any input you did take from staff.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**
It is alleged that on Thursday, May 11 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams explaining that you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017. In the IDP meeting you stated, "That is true I did not verity if they did watch the video. I did the admin training on May 11th informed them about the video, I watched it, I talked about it and used the video to create the EOC training. Nothing says the video is mandatory to watch. I am pretty positive that everything in the video was included in my training. I have the four (4) page document if that is untrue, mistake on my part." At this point in the meeting Sandy Aird showed you an email sent on April 6th and again on April 7th. She showed you that you were sent the email and it states that all proctors must observe the video and sign the verification that they saw video. Sandy Aird also stated that on May 17th the proctors had not viewed the video and that we had them watch the video and sign the form that day before they proctored. You then stated, "I made a mistake to send by email and go over at the meeting. Lauren was there and heard me say that I didn't' have to show it here it was in their box". After further investigation it is evident that you did not show the Test administrator test security NDE spring 2017 video and you did not verify that staff watched the video. (see entire allegation on LOA)
**Rebuttal 4: Alleges I did not verify that staff watched the NDE video**

- Mrs. Ford stated, "you did not show the test administrator testing security NDE spring 2017 video and you did not verify that staff watched the video"
  - I am accountable for this error
  - Mrs. Ford was present at the training and heard me make the statement to access and watch the video in their email. This procedure was not disputed by my supervisor at the training. It was stated on the NDE website the video could be sent via email for viewing. I also provided I had detailed accounting of the video contents at the IDP meeting with a 4 page training handout that was distributed at the proctor training. My error was in not confirming they had watched the video and instead only confirming that they attended the training.

***Decision Point:***
*You did not dispute this allegation and in reviewing correspondence from the Assessment Department, it is clear what the mandates were and what the testing coordinator's responsibilities were in regards to showing the video and having staff acknowledge and verify they watched the video. Again, you were the testing coordinator and as such are responsible for reading and carrying out directives from the Assessment Department.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**
It is alleged that on Tuesday May 16, 2017 after being notified by Sandra Aird that you were removed from testing, you stated upon leaving the office, "What's the big deal it was just an email. " In the IDP meeting you stated, "I don't believe I said that, the look on my face numb I was in a state of shock, I want to apologize to Sandy for the look on face. I didn't say it. " Virginia Doran then asked you, "Which was it, you didn't say it or you don't believe you did?" You then stated, "If these two say I did I don't believe I would just say it, maybe it was misinterpreted." Further investigation could not determine if you made this statement or not.

**Rebuttal 5: Alleges misconduct over a statement after being removed as testing coordinator**

- At the IDP, I stated I did not make this statement and Mrs. Ford's finding confirm that this allegation was untrue. This false allegation is egregious and has the appearance that I was indifferent or aloof to the seriousness of the problem, which I certainly was not.

***Decision Point:***
*This should be removed from the LOA as there is no corroborating evidence or witness to you saying this statement.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**
It is alleged that on the evening of Tuesday, May 16, 2017 you sent a text to Rhonda Clark and Brad Bodine stating, "I have been paper-thin for a while, at least I'll get some rest tonight. I really feel bad they won't let me finish it." In the IDP meeting you stated, "That was before I was told I couldn't talk to them. Yes, I sent that, I was paper thin no one was helping me. I regret saying that." You also stated, "I was exhausted I had the slightest sense of relief that you (Sandy Aird) came and told me. I know it was going to happen. I wish I could help them, it was very hard to ask for help from someone who wouldn't help me." You also stated, "I don't see how it is misconduct to apologize to them. " After further investigation it is determined that, you did send a text to Rhonda and Brad with the above statement. It is also evident by your statements, that you were relieved to be removed from testing. This further demonstrates your willful neglect or failure to observe and carry out the requirements of this title.

**Rebuttal 6: Alleges misconduct over a text to the assistant principals who were taking over my role as testing coordinator.**

- Mrs. Ford states, "It is also evident by your statements that you were relieved to be removed from testing This further demonstrates your willful neglect or failure to observe and carry out the requirements of this title."
  - Although I regret the wording of the text, it is certainly not misconduct. Mrs. Ford makes assumption about how I was feeling and uses this single, brief text as proof of "willful neglect and failure to carry out the requirements of this title." It's an abhorrent allegation that makes assumptions about "being relieved". In reality, I was devastated, in shock, and completely exhausted both physically and mentally and I chose my wording poorly when I texted by co-workers.

***Decision Point:***

*In the review of the email sent to you from Mrs. Ford informing you that you were no longer the testing coordinator per the NDE, on May 16, 2017 at 7:54 pm as well as reviewing the text messages you sent to Rhonda and Brad at 5:37 pm, it would appear that you had not been given direction not to discuss the issue with any WCSD until after the text was sent. This allegation should be removed. I do want to acknowledge however, the statement "at least I'll get some rest tonight. I feel really bad they won't let me finish. This sucks" does put into question if you were in fact willful in your neglect of duties. I am pretty confident that your colleagues who had to take up the responsibilities from you, did not feel as though they were going to "get some rest" and were concerned for the students and the impact this error was going to have on them: Text from Rhonda "Trina this is a big deal. You act as if you are the only one that works hard. How can you rest when kids may have to retest? Maybe its text, buy you sound relieved." Your reply to that text, "Seriously Rhonda."*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**

It is alleged that after reading and sending a confirmation email on Wednesday, May 17, 2017 about being removed as testing coordinator and told you cannot use your office you entered the building and went right into your office to get your radio. In the IDP meeting you stated, "I was supposed to go on duty there was chaos everywhere, my police radio was on my desk. I told Sandra I am not supposed to be in here I don't think I entered for long it was on the corner of my desk." Further investigation revealed that you entered your office to retrieve your radio after being directed by email that you could not use your office.

**Rebuttal 7: Alleges I went right into my office to get my radio after being told I could not use my office**

- At the IDP, I proved that Sandra Feyeringer was in my office when I arrived and my radio was on the corner of my desk, which is accessible from the hallway. I stated that I do not believe I stepped into the office. I believe I leaned, as my radio was sitting on the corner of the desk, which is accessible without entering the office. I would not have even done that if Sandra was not there to witness me taking the radio only.
- This is a frivolous accusation and does not warrant misconduct. At that time, I believed I was still trusted and supported by my principal and I was expected to do my morning duty as usual. Furthermore, Sandra Feysinger is a witness that I did not enter the office, but rather, I leaned in the doorway and grabbed the radio as I passed by.

***Decision Point:***

*This allegation stands. The very fact that you were directed in an email by Mrs. Ford on May 16 at 7:54 pm, "You cannot use your office" does not excuse you just "leaning in the doorway" to grab your radio. If you needed the radio for your duty, you should have asked another individual to go into your office and get the radio. Even in the IDP meeting you stated, "I told Sandra I am not supposed to be in here I don't think I entered for long it was on the corner of my desk." This is in subordination and you should not have placed yourself in this situation given the directive on May 16th.*

**Letter of Admonition: Excerpts to the LOA dated July 19, 2017**

It is alleged that you are unaware of the seriousness around your testing removal by sending a text to me on Wednesday, May 17, 2017 asking for space to work stating, "Also, I don't have a space to work. The therapist is in Tristian's office. She had a student come on so I left to get coffee until this is figured out. Can you help me get testing items out of my office so I can work in my own office? Should I go home and work?

**Rebuttal 8: Alleges I was unaware of "seriousness around testing removal" because of a text (Excerpts only)**

- Mrs. Ford's findings over a single text make an unproven, egregious assumption that I was "unaware of the seriousness around your testing removal"
- Mrs. Ford assumes false intentions by my text to her asking where I should work. I was devastated and emotionally unstable, but I was attempting to be helpful by finding a space where I could forward critical testing emails to the new coordinators, which can be verified in the email I was able to send on the morning I was removed.
- Mrs. Ford states, "Further investigation revealed that you still feel that you were entitled to have access to your office
    - This was not a part of the original allegation and should be expunged
    - It is irresponsible of my supervisor to assume that asking a question where I can work indicated I feel "entitled". I was desperate to help in whatever to help in whatever way I could and I was panicking. I was confused and unsure of what do so I asked in order to find a way to be of service to the problem.

***Decision Point:***
*This allegation stands in the point of fact that there did not seem to be any accepting of responsibility on your part in regards to the potential impact of what this testing violation meant to students. Through all of the documentation that I was provided by you and the district, there is not an acceptance from you on the gravity of the situation and what it meant to the administration, staff and most importantly the students. The administration may in fact not have been in the position to say "you can get through this" or "a scrap" in that they were dealing with the very real implications of a serious testing violation. It would not seem extraordinary to a reasonable person for you to take the initiative and find another location to complete your work while not placing additional conditions on the administration during this serious situation.*

In conclusion, I find the Performance Expectations to be in line with the needed areas of improvement for you as an administrator. I do not recommend any changes as such.

Sincerely,

Kristen McNeill, Ed. D
Deputy Superintendent
Cc Dawn Huckaby, Chief Human Resources Officer
Roger Gonzalez, Area Superintendent
Christina Oronoz, Principal, Hug HS
Virginia Doran, Labor Relations Manager

*Washoe County School District*
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk * Debra Feemster * Veronica Frenkel * Scott Kelley * Angela Taylor * Traci Davis, Superintendent

June 28, 2018

**USMAIL/CERTIFIED #70151660000006352091**

Trina Olsen
[redacted]

**RE: Notice of Recommended Dismissal**

Dear Ms. Olsen:

Be advised that pursuant to NRS 391.317 and the delegation of authority to the Superintendent to make all employee separation decisions from the Board of Trustees on February 14, 2006, I intend to recommend to the Superintendent that you be dismissed. The basis for this action is found in NRS 391.750, specifically:

(d) Insubordination; (c) Unprofessional Conduct; (k) failure to comply with such reasonable requirements as a board may prescribe; (p) Dishonesty; (u) Gross Misconduct; making false accusations toward your immediate supervisor; and Administrative Regulation 4425.

On July 26, 2017, an Investigatory/Due Process (IDP) meeting was held with you to hear your responses to allegations. With you and me at the meeting was Richard Swanberg, Area Superintendent and Alyson Kendrick, WSPA President. After investigating this matter, including hearing your responses, my findings are as follows:

It is alleged that you filed written false claims against your immediate supervisor, Principal Lauren Ford. You were asked specifically if you filed the staff complaint because you believed Principal Ford had returned drugs to a student. You indicated that you were reporting what was reported to you by the Dean of Students. On 6/29/17 when I met with you to discuss the staff complaint you indicated that the Dean said "The only reason I did it was because I saw Lauren do the same thing a while ago". I asked to clarify this meaning and you stated, "returning drugs to a student." In reality, you knew that the dean had returned the wallet to the student but most importantly had not issued a consequence/suspension. The Dean was concerned that this student, three weeks away from graduating, would not graduate. The Dean was referring to issuing a consequence to the student. What the Dean had observed was Principal Ford not issuing a consequence to another student who possessed marijuana as that student had served as an informant and had provided the school with the name of the student who was dealing the drugs on the campus.

In another complaint, you claimed that your immediate supervisor, Principal Lauren Ford, does not have the ability to evaluate an employee following WCSD administrative procedures. You indicated that you did not have a pre-observation meeting, a scheduled observation and no evaluation meeting or

EXHIBIT 18
Witness: olsen
C. EISENBERG, NV CCR 142

discussions leading up to your final evaluation narrative. Additionally, you claim you did not have an opportunity for rebuttal of your evaluation. However, there are dates, observation notes and sign offs for the 40th, 80th and 120th observation cycles. You had the opportunity to discuss your evaluation with your supervisor on April 17, 2017, and following a three-hour meeting on April 21, 2017, both you and your supervisor signed off on your evaluation. You did not exercise your right to provide a response to the evaluation until after filing a staff complaint in June, 2017.

You were directed to not discuss the pending investigative due process meeting with any staff members at Hug HS when you were temporarily reassigned to Traner MS. On July 26, 2017 at the IDP meeting, I asked if you had any conversations with Hug High School staff members about the pending investigation. You indicated that you had spoken with Ryley Coker, but not about the investigation. On July 17, 2017 in a written statement from Ryley Coker, teacher at Hug HS, he indicated that you shared with him that the reason you were no longer at Hug HS was due to a testing violation mistake. Additionally, you told him that you were given more duties as an assistant principal than any other assistant principal in the District. You also told him that should the District demote you, that you had an attorney on retainer. During the IDP, you indicated that you did not recall sharing anything with Ryley Coker, when in fact you had discussed the investigation with him.

In addition, shortly after the IDP meeting on July 26, 2017 you contacted Ryley Coker, again, and made very threatening and unprofessional comments to him about his loyalty and that you were always defending him with Principal Ford.

I find your responses to be less than credible and dishonest and your continued lack of leadership to use best practices with your subordinates and to follow well accepted management techniques is unacceptable for a person in your position.

I find that your conduct and actions above violates:
NRS 391.750, specifically: (d) Insubordination; (c) Unprofessional Conduct; (k) failure to comply with such reasonable requirements as a board may prescribe; (p) Dishonesty; (u) Gross Misconduct; making false accusations towards your immediate supervisor; and Administrative Regulation 4425.

Additionally, on July 19, 2017 you were issued a Letter of Admonition for the following specific causes:

It is alleged that you sent an email to all Hug staff on May, 11, 2017 that included secure testing materials, and student identifying information. During the IDP, you stated that "Yes it is true. It slipped my mind...I forgot I had sensitive items in the document." After further investigation, it was confirmed that you sent the email to all Hug staff with secure testing information included.

It is alleged that you were dishonest with your supervisor about meeting with the department leaders to vet the testing schedule. After further investigation, nine (9) department leaders stated that there was not a department lead meeting to discuss the testing schedule. Three (3) department leaders and one (1) other staff member indicated attending a meeting where a schedule was shown to them and no input was taken from them. Further investigation concludes that you were dishonest during the IDP meeting and with your supervisor about holding a department leader meeting to vet the testing schedule.

It is alleged that on Thursday, May 11, 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams explaining that you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017. After further investigation, it is evident that you did not show the Test administrator test security NDE spring 2017 video and you did not verify that staff watched the video by having them complete the required form verifying that they had watched the video.

It is alleged that on the evening of Tuesday, May 16, 2017 you sent a text to Rhonda Clark and Brad Bodine stating, "I have been paper-thin for a while, at least I'll get some rest tonight. I really feel bad they won't let me finish it." After further investigation it was determined that you did send a text to Rhonda and Brad with the above statement. It is also evident by your statements, that you were relieved to be removed from testing. This further demonstrates your willful neglect or failure to observe and carry out the requirements of this title.

On July 19, 2017, you were issued a second Letter of Admonition for the following specific causes:

It is alleged that on Friday, April 7, 2017 you sent an email to Wendy Labon, Patrick Rossi and Patricia Newbrough giving a directive to issue a final and change a grade for the 14-15 school year violating administrative procedure 5504 and 5502. After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval. You even stated in the IDP meeting you understood the protocol.

It is alleged that you gave Sharon Black a notification of credit form to use to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502. After further investigation, regarding your argument that you were directed to see teachers in order to change grades, statements revealed that the directive given to everyone was that no student would receive credit. Principal Ford provided the forms to Brad Bodine with the directive that no student would receive credit. Further investigation as to your statement that you never signed approval for grade changes and only the principal could do so, Ms. Ford found eight such approvals signed by you.

It is alleged that you failed to get your supervisor's approval prior to putting in Lorrie Foley's evaluation that you recommended her to be placed on a Focused Assistance Plan (FAP). After reviewing the narrative, you-sent Ms. Ford an email on April 8th, regarding the FAP. In person and subsequent to your email, Ms. Ford stated that Lorrie Foley could not be placed on an FAP. In an email received on April 20th and in the meeting held on April 27th with Lorrie Foley, Elaine Lancaster, WEA Representative and your supervisor you stated that Laura Pincollini gave you guidance and you followed it, to include the FAP. Further investigation revealed that when your supervisor stated, "you do not have enough evidence to do an FAP." you assumed that this response was not a no to the FAP but questioning your evidence. Further investigation also indicates that you signed and finalized the evaluation for Lorrie Foley on April 12, 2017 without your supervisor's approval and prior to your email correspondence with Laura Pincollini.

It is alleged that you failed to supervise staff under your required supervision as demonstrated by: the list of students that Wendy Labon sent to Rise. After further investigation of your correspondence with Rise, your supervisor was not copied on any of the emails you or Wendy sent to Rise. Your email to Victor on April 7, 2017 indicates that the students listed were, "struggling and either failing all of their classes right now or have vanished." You did not indicate to the Rise principal that students were signing up by choice. It was further alleged your lack of attendance at Special Education teacher meetings and at Senior Special Education Action Committee (SSAC) meetings. You allegedly canceled meetings with the SPED department leaders from February 14th to the end of the school year because of the 3 weeks of testing.

I find that the violations above and your continued demonstration of dishonesty and your actions that fall within the definition of Gross Misconduct (pursuant to NRS 391.750) warrant the recommendation that you be dismissed from service with the District.

My recommendation to the Superintendent is that you be dismissed from service with the District effective **July 5, 2018.** If you wish to appeal this action, you will need to follow NRS 391.822 (attached document).

Sincerely,

Roger J. Gonzalez

Dr. Roger J. Gonzalez
Area Superintendent

cc: Emily Ellison, Chief Human Resources Officer
Virginia R. Doran, Director of Labor Relations
Chris Reich, Deputy General Counsel
Michael Langton, Esquire
Selene Lewis, Human Resources Technician

**NRS 391.822 Written notice of intent to dismiss probationary employee required; contents of notice.**

1. If the superintendent intends to recommend the dismissal of a probationary employee to the board before the end of a contract year, the superintendent must provide written notice to the employee, by registered or certified mail, not less than 15 business days before making the recommendation to the board.

2. The written notice required pursuant to subsection 1 must:

(a) Include a statement of the reasons for the recommendation to dismiss the probationary employee;

(b) Inform the probationary employee that he or she may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization, by filing a written request with the superintendent not later than 10 business days after receiving notice from the superintendent pursuant to subsection 1; and

(c) Include notice of the laws which govern the employment of a probationary employee of a school district which are contained in this chapter.

3. If a written request for an expedited hearing is not filed by the probationary employee pursuant to subsection 2, the superintendent may recommend the dismissal of the probationary employee to the board.

(Added to NRS by 2017, 1190)

*Law Offices of*
**MICHAEL E. LANGTON**
Attorney at Law
801 Riverside Drive
Reno, Nevada 89503

**Michael E. Langton**
**E-Mail: mlangton@sbcglobal.net**

**(775) 329-7557**
**Fax (775) 329-7447**

July 6, 2018

Traci Davis, Superintendent
Washoe County School District
425 E. 9th Street
P.O. Box 30425
Reno, Nevada 89520-3425

***Re: Trina Olsen***

Dear Superintendent Davis:

Please be advised I represent Trina Olsen, and in said capacity hereby file a request for an expedited hearing pursuant to the expedited labor arbitration procedures established by the American Arbitration Association.

This request is filed because former Area Superintendent Gonzales stated in his letter dated June 28, 2018: "If you wish to appeal this action, you will need to follow NRS 391.822 (attached document)." This request for hearing is made with full reservation of rights of Mrs. Olsen with regard to the collective bargaining agreement covering her position as well as the right to challenge the fact that she is a probationary employee subject to the requirements of NRS 391.822. This request is further made with full reservation of rights to challenge the action of notice of recommended dismissal by Mr. Gonzales, including but not limited to, failure of the representatives of the School District to comply with the requirements of NRS 391 and the requirements of the collective bargaining agreement.

EXHIBIT 19
Witness: Olsen
C. EISENBERG, NV CCR 142

---

Please have the appropriate representative of the School District contact me to make arrangements for the hearing.

Very Truly Yours,

Michael E. Langton

Michael E. Langton, Esq.

MEL: mek
cc: Trina Olsen

Chris Reich, Deputy General Counsel
WCSD

Virginia R. Doran, Director
Labor Relations
WCSD

Emily Ellison, Chief Human Resources Officer
WCSD

Selene Lewis, Human Resources Technician
WCSD

*Law Offices of*
**MICHAEL E. LANGTON**
Attorney at Law
801 Riverside Drive
Reno, Nevada 89503

**Michael E. Langton**
**E-Mail: mlangton@sbcglobal.net**

**(775) 329-7557**
**Fax (775) 329-7447**

July 6, 2018

Traci Davis, Superintendent
Washoe County School District
425 E. 9th Street
P.O. Box 30425
Reno, Nevada 89520-3425

***Re: Trina Olsen***
***Grievance Protesting Recommendation To Discharge***

Dear Superintendent Davis:

Please be advised I represent Trina Olsen and in said capacity hereby file a grievance on her behalf protesting the recommendation of dismissal as stated in a letter dated June 28, 2018, from former Area Superintendent Roger Gonzales.

This grievance is filed pursuant to the procedure set forth in Article 18 of the collective bargaining agreement between Washoe County School District and Washoe School Principals' Association currently in effect. This grievance is filed with full reservation of rights to challenge every aspect of the dismissal including, but not limited to the District's failure to follow the procedures in the collective bargaining agreement and in NRS Chapter 391.

Pursuant to Article 18.12(h), Mrs. Olsen is entitled to a predisciplinary hearing before you, as a Superintendent, or your designee as set forth in NRS 391.650 to 391.800, "and in compliance with [the collective bargaining agreement]." Pursuant to the requirements of Article 18.12(h)(2), "the District must hold or schedule the hearing within fifteen (15) days of receipt of the request for hearing.

Pursuant to Subsection 3 of Article 12(h) request is hereby made for a complete copy of the investigation, including any recordings, transcribed copies of interview(s) if available or documents used by the District or any outside source to reach the sustained findings.

EXHIBIT 20
Witness: Olsen
C. EISENBERG, NV CCR 142

Please have your representative contact me immediately to schedule the above-referenced hearing.

Thank you for your cooperation in this matter.

Very Truly Yours,

Michael E. Langton

Michael E. Langton, Esq.

MEL: mek
cc: Trina Olsen

Chris Reich, Deputy General Counsel
WCSD

Virginia R. Doran, Director
Labor Relations
WCSD

Emily Ellison, Chief Human Resources Officer
WCSD

Selene Lewis, Human Resources Technician
WCSD

Washoe County School District
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk * Debra Feemster * Veronica Frenkel * Scott Kelley * Angela Taylor * Traci Davis, Superintendent

July 27, 2018

Trina Olsen
[redacted]

Dear Ms. Olsen:

As you are aware, on June 28, 2018, you were sent a letter from Dr. Roger Gonzalez recommending to me, as Superintendent, that you be dismissed from service with the Washoe County School District. In that letter, it was explained to you that should you desire to appeal this dismissal, you were required to submit your request in writing to me. Your attorney, Michael Langton, sent a letter appealing this recommendation of dismissal. It is my understanding that Mr. Langton and the Department of Labor Relations are in the process of establishing an arbitration hearing on this issue.

For clarification, it is my decision to uphold the recommendation of your dismissal from the Washoe County School District, effective July 5, 2018.

Sincerely,

Traci Davis

Traci Davis
Superintendent WCSD

Cc: Michael Langton, Esquire
Emily Ellison, Chief Human Resources Officer
Virginia R. Doran, Director of Labor Relations

EXHIBIT 21
Witness: Olsen
C. EISENBERG, NV CCR 142

Andrea L. Dooley, Arbitrator
5111 Telegraph Avenue #273
Oakland, CA 94609
(510) 719-3089
andrealdooley@gmail.com

IN THE ARBITRATION PROCEEDINGS

BETWEEN THE PARTIES

| | |
|---|---|
| TRINA OLSEN,<br>Employee,<br>and<br>WASHOE COUNTY SCHOOL DISTRICT,<br>Employer.<br>(Letters of Admonition and Termination) | Case No.: LA-627-2018<br><br>DECISION AND AWARD |

## INTRODUCTION

This dispute involves the grievance of probationary Assistant Principal Trina Olsen ("Employee" or "Olsen") pursuant to Nevada Revised Statutes 391.822 and 391.824. Pursuant to an agreement between the parties, the parties selected the undersigned Arbitrator to serve as the neutral decision-maker in this case. The matter came for hearing in Reno, Nevada, on November 1, 2 and 28, 2018. The parties submitted this matter to the Arbitrator after presentation of evidence and closing written briefs.

## APPEARANCES

| | |
|---|---|
| For the Employee: | Michael Langton, Esq.<br>801 Riverside Drive<br>Reno, NV, 89503 |
| For the Employer: | Virginia R. Doran<br>Director of Labor Relations |



EXHIBIT 22
Witness: Olsen
C. EISENBERG, NV CCR 142

Washoe County School District
425 E. Ninth Street
PO Box 30425
Reno, NV 89520

## ISSUE

The parties have agreed to the following statement of issues:

1. Did the District have just cause to issue two Letters of Admonition to the Grievant? If not, what is the remedy?
2. Did the District have just cause to terminate the Grievant? If not, what is the remedy?

In addition, the Employee raises the following issues:

1. What effect does NRS 391.660 have in this case? Specifically, how does NRS 391.660 affect NRS 391.800, 391.820, 391.822 and 391.824?
2. Did the School District, by and through Superintendent Davis violate NRS 391.824 when she terminated Grievant before receiving a written report from the Arbitrator? If so, what shall the remedy be?
3. Is Trina Olsen entitled to final and binding arbitration and not advisory arbitration?
4. Did the District comply with the requirements of the collective bargaining agreement when it alleged that there was just cause to terminate Grievant? If not, what shall the remedy be?

## RELEVANT LAW

**NRS 391.820 - Probationary employment: Term; notice of reemployment; school district required to offer probationary administrator contract as teacher under certain circumstances; request for expedited hearing if dismissed before completion of current school year.**

Except as otherwise provided in NRS 391.825:

1. A probationary employee is employed on a contract basis for three 1-year periods and has no right to employment after any of the three probationary contract years.

2. The board shall notify each probationary employee in writing during the first, second and third school years of the employee's probationary period whether the employee is to be reemployed for the second or third year of the probationary period or for the fourth school year as a post probationary employee. Such notice must be provided:

(a) On or before May 1; or

(b) On or before May 15 of an odd-numbered year so long as the board notifies the employee of the extension by April 1.

3. Failure of the board to notify the probationary employee in writing on or before May 1 or May 15, as applicable, in the first or second year of the probationary period does not entitle the employee to post probationary status.

. . .

8. A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section.**[1] If:

(a) A post probationary teacher who is an administrator is not reemployed as an administrator after any year of his or her probationary period; and

(b) There is a position as a teacher available for the ensuing school year in the school district in which the person is employed,

(c) the board of trustees of the school district shall, on or before May 1 or May 15, as applicable, offer the person a contract as a teacher for the ensuing school year. The person may accept the contract in writing on or before May 10 or May 25, as applicable. If the person fails to accept the contract as a teacher, the person shall be deemed to have rejected the offer of a contract as a teacher.

**NRS 391.822 Written notice of intent to dismiss probationary employee required; contents of notice.**

1. If the superintendent intends to recommend the dismissal of a probationary employee to the board before the end of a contract year, the superintendent must provide written notice to the employee, by registered or certified mail, not less than 15 business days before making the recommendation to the board.

2. The written notice required pursuant to subsection 1 must:

(a) Include a statement of the reasons for the recommendation to dismiss the probationary employee;

(b) Inform the probationary employee that he or she may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the

[1] Emphasis added.

American Arbitration Association or its successor organization, by filing a written request with the superintendent not later than 10 business days after receiving notice from the superintendent pursuant to subsection 1; and

(c) Include notice of the laws which govern the employment of a probationary employee of a school district which are contained in this chapter.

3. If a written request for an expedited hearing is not filed by the probationary employee pursuant to subsection 2, the superintendent may recommend the dismissal of the probationary employee to the board.

**NRS 391.824 Request and procedures for expedited hearing concerning dismissal of probationary employee; actions of superintendent upon receipt of report from arbitrator.**

1. If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

2. An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The only issues the arbitrator may consider are whether the dismissal of the probationary employee would:

(a) Violate the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b) Be arbitrary or capricious.

3. At the expedited hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee, which must include, without limitation, at least one reason provided in the written notice required pursuant to paragraph (a) of subsection 2 of NRS 391.822. To rebut such evidence, the probationary employee must prove that each reason:

(a) Violates the legal rights of the probationary employee provided by federal law or the laws of this State; or

(b) Is arbitrary or capricious.

4. The written report filed by the arbitrator pursuant to subsection 2 is not binding upon the superintendent or the board.

5. The provisions of NRS 38.206 to 38.248, inclusive, do not apply to an expedited hearing, the written report of an arbitrator or any other portion of an arbitration conducted pursuant to this section.

6. Not later than 5 business days after the superintendent receives the written report from the arbitrator pursuant to subsection 2, the superintendent shall:

(a) If the superintendent intends to recommend the dismissal of the probationary employee, file with the board the report and a written recommendation to dismiss, and provide to the employee, by registered or certified mail, written notice of the filing of the recommendation and the date, time and location of the

next regularly scheduled meeting of the board at which the recommendation to dismiss the employee will be considered; or

(b) If the superintendent does not intend to recommend the dismissal of the probationary employee, provide to the employee, by registered or certified mail, written notice that dismissal of the employee will not be recommended to the board and that no further action will be taken against the employee.

## RELEVANT CONTRACT PROVISIONS

**ARTICLE 1 DEFINITIONS**

1.2 The term "unit member" or "member" as used in this Agreement, shall refer to Principals, Assistant Principals, Specialist, Directors and Assistant Directors, Coordinators 1 and 2, Lead Psychologist, Program Administrator, Site Administrators, Turning Point Administrator and other people who hold administrative credentials and serve in that capacity in WCSD. The exception will be those Administrators who are excluded by NRS 288.

**ARTICLE 18 DISMISSAL AND DISCIPLINARY PROCEDURES INCLUDING GRIEVANCE AND BINDING ARBITRATION**

18.1 Disciplinary action, including but not limited to, demotion, suspension, dismissal, and non-renewal actions taken against post-probationary unit members (in accordance with NRS 391), shall be progressive in nature and related to the nature of the infraction. Unit members shall be given reasonable opportunity for improvement.

The school district shall not be discharged, demote, suspend or take any other disciplinary action against a post probationary bargaining unit member of this unit without just cause.

## STATEMENT OF THE FACTS

Trina Olsen has been an employee of the Washoe County School District since 1992.[2] After many years as a certificated teacher and then Dean of Students, Olsen became a probationary Assistant Principal at Hug High School for the 2016-2017 school year, where she reported to Principal Lauren Ford during the relevant time period. Olsen's area of oversight

[2] The hearings were conducted without a court reporter. Facts which have not been attributed to documents admitted into evidence have been summarized or quoted from the Arbitrator's notes, written at the time of the hearing.

including Multi-Tiered Systems of Support (MTSS) and Special Education. As a part of her responsibilities, Olsen also worked on the Hug Credit Attainment Program, a school-wide effort to help students complete courses and obtain credits toward graduation, as well as acting as the testing coordinator for Hug.[3]

On December 7, 2016, Olsen witnessed a student draw out two knives and begin attacking other students. Olsen used her walkie-talkie radio to call the police, including the School Resource Officer, and to call a Code Red alarm. She worked to evacuate students from the area as the School Resource Officer responded to the incident. During this incident, Olsen witnessed the officer shoot the student with his gun, killing the student.

Hug Credit Attainment Plan

Hug uses several on-line programs, including the A+ on-line program, to provide curriculum to students. The A+ Program includes the ABC Curriculum, which is a supplemental curriculum that can be used within a course if a student needs remedial assistance but does not qualify for course credit. Brad Bodine, another Assistant Principal, is the Curriculum vice principal who oversees credit questions.

A+ courses can qualify for credit towards graduation. However, during the winter break in 2016, Ford learned from the District that there were problems in issuing credits for A+ courses, because Hug was incorrectly providing students with credit for the ABC Curriculum. When Ford raised the issue to the assistant principals, including Olsen and Bodine, Olsen said she would take care of it.[4]

---

[3] District Exhibit 13. Hereafter, District Exhibit will be abbreviated DX.

[4] DX 19, email from Bodine to Ford.

Patty Newbrough, an A+ teacher, proposed that they develop a program for students who were failing courses and who were missing blocks of time from school. Per Ford, Newbrough thought the school was under-utilizing the A+ credit recovery program. After meeting with Ford and the Assistant Principals, Olsen took the lead on the pilot program called Hugs Credit Attainment Program. With the permission of the District, the pilot would apply only to the prior semester. The intent of the program was to give students assignments in A+ to recover grades from classes they had failed the prior semester. This program was separate from the other on-line learning programs OLA and AE-OLA.[5]

In the spring of 2017, Bodine reported to Ford that there was a problem with the pilot program. Newbrough worked in the same classroom as teacher Wendy Labon. Bodine had explained the difference between the pilot program, OLA and EA-OLA to both teachers, but both teachers kept using the ABC curriculum to give credit to students. When Ford brought the problem to Olsen's attention, Olsen told Ford that she didn't know what OLA or EA-OLA is. Ford believed that either Olsen had directed Wendy to give the credit inappropriately or that Wendy was lying to Olson about the matter.

Sometime in the 2016-2017 school year, Sharon Black, a Hug English teacher, reported to Ford that Olsen had directed Black to "give out credits I shouldn't hand out."[6] Specifically, Black alleged that Olsen had told her to give credit for "ABC curriculum" that a student had completed two years earlier. Black notified Ford that she did not sign the forms assigning the credit.

---

[5] Testimony of L. Ford.
[6] Testimony of L. Ford.

Bodine testified that he spoke with teachers about how far back they could go to recover credit for students, and that he spoke to one teacher who had talked to Olsen and wanted to make sure he was doing it right. Bodine reported, "(the teacher) didn't say Trina told him to change it."

Performance Evaluations

Ford conducted a 40th Day Observation of Olsen on September 27, 2016 and deemed Olsen to be "Level 3 effective."[7] Ford conducted an 80th Day Observation on November 8, 2016 during a Professional Development program Olsen had organized.[8] Ford rated Olsen "effective," and commended her efforts while providing recommendations for improvement.[9] Ford conducted a 120th Day Observation of Olsen on January 31, 2017 and signed off on it on April 15, 2017.[10] Ford completed Olsen's Performance Evaluation on or about April 21, 2017, and rated Olsen as Effective.[11] As a result of the shooting, District Administrator Mike Paul extended the deadline for completing evaluations. Ford cut and pasted Olsen's comments into Olsen's evaluation document, which Ford later removed at the direction of Mike Paul.

According to Ford, all new administrators have training on the evaluation process, and that all teachers who have been identified as "minimally effective" need to be reported to the Area Superintendent. Those teachers are entitled to notice of their rating in February so that they can have two more evaluations before the April final evaluation. Teachers who are rated "minimally effective" are placed on a Focused Assistance Program (FAP).

---

[7] DX 9.
[8] DX 10.
[9] Id.
[10] DX 11.
[11] DX 12.

Olsen was responsible for evaluating teachers, including Lorrie Foley. It was Olsen's opinion that Foley be placed on an FAP. Olsen notified Ford on March 5, March 7, April 8, April 17 and April 20 that she wanted to discuss Foley's performance.[12] Olsen testified that she was not able to consult with Ford during that time because of Ford's absences from the high school.

Olsen discussed Foley's performance with Laura Pincollini, a teacher-mentor, who told Olsen that "the decision to do a FAP rests only with the principal."[13] Olsen was not able to observe Foley because she had changed classrooms several times. Ultimately, Foley's evaluation was rated "effective," and in Ford's opinion, Olsen had waited too long to request a FAP and therefore needed to wait until the next year. There is no evidence that Olsen knew the deadline for notifying Roger Gonzalez about "minimally effective" teachers or that Ford ever discussed a plan with Olsen for managing Foley's evaluation process. When Olsen submitted an FAP for Foley, Mike Paul told her she could not do so.[14] Olsen again asked Ford for direction about Foley's evaluation on May 1, 2017, but there's no evidence she received a response.[15] Ford's recollection is that she repeatedly told Olsen not to put Foley on an FAP.

<u>RISE Field Trip</u>

In March and April 2017, Olsen arranged for students from two different programs to attend a field trip at RISE, the District's adult education program. Olsen notified Ford on March 6, 2017 that the SPED Action Team and the Senior MTSS team were collaborating to take

---

[12] EX 62, 63, 66-68
[13] DX 68.
[14] EX 70.
[15] DX 71.

students on a field trip to introduce them to RISE. The trip was approved by Tristan McElhaney, another Assistant Principal, as well as Victor at RISE.

Ford felt that she did not have clarity about why the students were taking the field trip or how students had been chosen to attend. At a Saturday retreat for the administration team, Ford asked Olsen how kids got on the list.

According to Ford, Olsen responded, "The Committee worked hard to do a good job."

In her testimony, Ford reported that she responded, "You don't fucking get it. How did the names get on this list?" and that she "lost (her) cool."

Marijuana Incident

On or about May 8 or 9, 2017, teacher Patrick Rossi told Olsen that another teacher had told him that Dean of Students Jessica Wilson had given drugs back to a student.[16] Patrick Rossi learned this information from Sabrina Cellucci.

Jessica Wilson wrote a statement about the incident and testified about it at the hearing. According to Wilson, Sabrina Cellucci brought her a wallet that belonged to a student which had marijuana in it. When the student asked for the wallet, Wilson asked her if she knew what was in the wallet. The student told Wilson that it belonged to her boyfriend and that she didn't smoke because she gets drug tested for work and in anticipation of taking college courses. Wilson "tossed the marijuana and told her that I never wanted to see it on campus again."[17] Wilson elected not to discipline the student at that time.

---

[16] EX 57.
[17] EX 9.

Upon learning the story third hand from Rossi, Olsen conferred with her mentor Dave Murdock, who said she should reach out to Wilson about the matter.

On May 8, Olsen went to Wilson's office to talk to Wilson about the allegation that she had given marijuana back to a student. Olsen asked Wilson, "if I had handed drugs back to a student on Friday."[18] According to Olsen, Wilson admitted that she had given the wallet back to the student because she had seen Lauren Ford do the same thing." Wilson reported "I explained the situation" in her written statement but did not describe what she meant by "the situation" in her written statement.

While Wilson testified that she meant that she had seen Laura give a student no discipline in a similar situation, her comment at the time she spoke to Olsen was vague as to what "same thing" meant. Ford later documented that Wilson told her "that she could see that Trina mis-interpreted the comment" and that Trina did not ask any clarifying questions.[19]

Wilson said that Olsen told her, "I needed to protect myself and suspend the student." After that time, Wilson contacted the student and suspended the student for three days. The student did not return to school ever again.

Olsen also conferred with Brad Bodine, who related in a June 2, 2017, statement to Ford that, "On Monday May 8 Trina Olsen came into my office to speak with me regarding" Jessica Wilson and said, "(Olsen) asked Ms. Wilson if she did return the wallet with drugs in it. Ms. Olsen said that Jessica said, 'yes and Lauren has done the same thing.'"[20] In his statement,

---

[18] EX 9.
[19] EX 14.
[20] EX 61.

Bodine says that he told Olsen to tell Ford about the incident. Olsen recalled that Bodine told her to talk to Wilson about the incident.

On May 10, Olsen again reached out to Wilson, still concerned about the incident. Olsen "strongly suggested (Wilson) tell Ms. Ford about the situation."[21] On May 11, Wilson reported the incident to Ms. Ford.[22]

Ford believed that Olsen should have notified her of the allegations that Wilson gave drugs to a student rather than talking to Wilson about it. On a prior occasion, Ford had, for the safety of a student and to aid an ongoing investigation, returned a quantity of drugs to a student rather than take disciplinary action. That decision was made in concert with the campus police officer.

No other employees, including AP Brad Bodine, Dean of Students Jessica Wilson and teachers Patrick Rossi and Sabrina Cellucci, were disciplined for failing to report the incident to Ford.

<u>Testing Issues</u>

Olsen was the designated test coordinator for Hug High School. District trainings for test coordinators were conducted in the fall 2016 and spring 2017. Training coordinators at each school train the staff who will be handling the test materials and administering the tests.

On May 4, 2017, Olsen told Ford, "I'm dropping the ball with my workload . . .With everything I have over the next 7 days, can you help me prioritize my duties? . . . I don't know

[21] Testimony of J. Wilson.
[22] Id.

what else to do, I need your help."[23] Ford responded that "testing is our priority" but did not address Olsen's overall organizational difficulties at that time.[24]

On or about May 15, 2017, Sandy Aird, District Director of Assessment, notified Ford that she had received a tip about a test discrepancy or irregularity at Hug. Specifically, Olsen had sent out confidential information to the entire Hug staff by forwarding a spreadsheet that contained user IDs and passwords in "hidden" columns. Olsen had created the spreadsheet with the assistance of staff in the District office by downloading the information from the District platform. She "hid" the confidential columns before distributing the material. Ford had not been able to open the document when she approved its distribution, but Olsen was responsible for the distribution.[25] Aird directed Ford to remove Olsen as the test administrator. Aird admitted that the ability to keep confidential information in the spreadsheet was "a learning on our part."

Ford and two other Assistant Principals took over test coordination. In the course of taking over, Ford determined that Olsen did not have verification that every proctor had watched a video that was required by the State of Nevada Department of Education. As a result of the Testing Irregularity, the District notified Ford that Olsen could not be involved with testing, near test materials, have computer access or schedules. None of the tests were invalidated.

On May 17, 2017, Olsen was reassigned to Traner Middle School.[26]

On May 23, 2017, Olsen notified Roger Gonzalez that she wanted to file a complaint against Ford for changing her performance evaluation.[27] On May 24, 2017, Olsen received a

---

[23] EX 7.
[24] Id.
[25] EX 74.
[26] EX 83.
[27] EX 11.

notice of IDP for alleged misconduct in the period of April 7-May 15.[28] On May 25, Olsen notified Gonzalez that she wanted to report an incident involving marijuana on campus.[29] Gonzalez provided Olsen with the formal staff complaint form.[30]

On May 31, 2017, Olsen attended an Investigatory Due Process meeting with Ford and Labor Relations Manager Virginia Doran to discuss allegations of misconduct that had occurred during the 2016-17 school year.

On June 4, 2017, Olsen filed a Staff Complaint Form against Lauren Ford, reporting that, "Patrick Rossi reported to me that Jessica Wilson (dean of students) had given a student back marijuana after it was turned in by a teacher. I went to Jessica Wilson and asked her if it was true, and she replied, 'yes, But I only did it because I saw Lauren (Ford) do it not too long ago.'"[31]

On or about June 19, 2017, but dated June 8, 2017, Olsen filed another Staff Complaint Form about Ford on the basis that Ford had not correctly conducted Olsen's evaluation and had changed the narrative portion of the evaluation in violation of District policy.[32]

Ford conducted an investigation into the allegations discussed in the IPD meeting and on July 19, 2017, issued a Letter of Admonition ("the First LOA") about the following alleged misconduct[33]:

---

[28] EX 12.
[29] EX 13.
[30] EX 15.
[31] EX 16.
[32] EX 23.
[33] DX 4.

1. That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.
2. That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.
3. That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's performance evaluation without permission to do so and did so at the direction of teacher-mentor Laura Pincollini, who did not have the authority to direct Olsen to do so.
4. That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.
5. That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.

In the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal.

On July 19, 2017, Olsen received a second Letter of Admonition ("the Second LOA") about the following alleged misconduct[34]:

1. That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

---

[34] DX 5.

2. That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.
3. That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.
4. That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.
5. That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."
6. That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School.

On July 19, 2017, Dr. Roger Gonzalez, Area Superintendent, directed Olsen to participate in an Investigatory/Due Process meeting on July 26, 2017 to discuss the following allegations:

1. That Olsen brought false claims and allegations against Lauren Ford when she reported a case involving marijuana on Hug's campus, when she said that "Jessica Wilson had returned marijuana to a student because she had seen Lauren Ford do the same thing."
2. That Olsen brought false claims and allegations against Ford regarding the supervision timeline.

3. That Olsen discussed personnel matters with Hug staff members against the direction of management.[35]

After meeting with Gonzalez as directed on July 26, 2017, Gonzalez issued a Notice of Recommended Dismissal on June 28, 2018.[36] The recommended dismissal was based on the first and second Letters of Admonition, the allegations in the July 19 IDP Letter, and the allegation that after the IDP Meeting, Olsen contacted Ryley Coker and "made very threatening and unprofessional comments to him about his loyalty."[37]

Olsen was notified that she was discharged effective July 5, 2018.[38]

**POSITIONS OF THE PARTIES**

DISTRICT'S POSITION

Trina Olsen was a probationary employee who is only entitled to the protections afforded by NRS 391.824 and is not entitled to final and binding arbitration under the Negotiated Agreement between the District and Washoe School Principals' Association.[39] Even if the terms of the agreement do apply, the Nevada Supreme Court recently held in *Washoe County School District v. White*, 133 Nev. Advance Opinion 43, (2017) that "Article 18.1 serves to preclude the District from choosing disciplinary actions that are clearly disproportionate to the proscribed conduct, while permitting the District to impose more severe penalties for repeated infractions."

Based on this standard, the District contends that the manifest weight of the evidence demonstrates that the two Letters of Admonition and the Discharge were warranted under the

---

[35] DX 7.
[36] DX 8.
[37] Id.
[38] EX 28.
[39] DX 1.

circumstances. Olsen engaged in dishonesty by making false allegations against her Principal and discussed her personnel actions with other District employees in contravention of a direct order.

For these reasons, the District asks the Arbitrator to deny the grievance and to recommend upholding the Recommended Discipline and Discharge.

EMPLOYEE'S POSITION

Trina Olsen was a 21-year veteran of the District, and therefore not a "probationary employee" subject to NRS 391.822 or 391.824. She should be afforded the protections of progressive discipline and binding arbitration contained in the Agreement between the District and the Washoe School Principals' Association. Under that standard, the District did not demonstrate just cause for the Letters of Admonition and the Discharge effective July 5, 2018.[40]

According to Olsen, if she is subject to the provisions of NRS 391.822 and 391.824, then the discharge is not final until the arbitrator's recommendations (if they uphold discharge) are adopted by the District and at a minimum, Olsen is entitled to back pay and benefits if and until the district superintendent recommends discharge to the School Board.

The District also withheld notes taken by Gonzalez and Ford during the course of their investigations. Olsen is entitled to review these notes, and they should be presumed to be adverse to the District's position because Olsen was denied her due process right to review the documents.

[40] EX 28.

The District has engaged in disparate treatment for disciplining Olsen for her failure to report the marijuana incident but not disciplining other employees for engaging in the same alleged misconduct.

Regardless of what standard the Arbitrator applies, the District has failed to provide evidence that they had just cause to terminate Olsen. For these reasons, Olson asks the Arbitrator assert contractual jurisdiction over this case, sustain the grievance and reinstate Ms. Olson with a make whole remedy.

## DISCUSSION

Regardless of whether this case is properly subject to NRS 391.822 and 391.824 or is subject to the Negotiated Agreement's binding arbitration procedure, the parties agree that the Employer bears the burden to demonstrate that just cause exists for the discipline imposed on the grievant, Trina Olsen. The District has presented evidence about three disciplinary matters, and each will be considered in turn.

The just cause standard typically requires progressive discipline when appropriate, and it is expected that discipline will be corrective in nature as well, if the circumstances warrant it. An employer need not impose progressive discipline where the conduct is more serious. However, when a serious charge is made against an employee, it should be narrowly construed, because of the long-lasting effects of such an accusation on an employee's career.[41]

---

[41] Bornstein, Labor and Employment Arbitration (2011), §20.01

## I. DOES THE EMPLOYER HAVE JUST CAUSE FOR DISCIPLINE?

**First Letter of Admonition**

The First Letter of Admonition (LOA 1) contained five allegations about which the parties provided evidence.

Allegation 1: That, on April 7, 2017, Olsen directed teachers Wendy Labon, Patrick Rossi and Patricia Newbrough to change a student's grade for the 2014-15 school year in violation of Administrative Procedure 5504 and 5502.

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen had directed other teachers via email to change a student's grade.[42] The First LOA references an email, but no email was provided at the hearing to the Arbitrator, and there is no directive email in the record. The First LOA instead states: "After further investigation as to you not having knowledge of the policy, statements reveal that you were informed that any grade change occurring outside the three week grading window must have principal and District approval."[43]

This statement is undisputed by Olsen. Olson, Ford and Bodine each repeatedly testified that "the teacher owns the gradebook" and would be responsible for changes which would be approved by the AP for Curriculum (Bodine) and Ford. While Olsen had some confusion about whether she was permitted to sign off on a grade change, she was informally counseled on that issue, and never changed any grades or directed others to change grades without the express agreement of Ford. There was no evidence that Olsen ever directed via email or in person that the three teachers change a grade outside the three-week grading period.

---

[42] EX 12.
[43] DX 4.

Olsen was responsible for the Hug Credit Attainment Plan, a pilot program expressly created at the direction of Principal Ford for the purpose of finding permissible ways for students to complete classes and repair grades in order to graduate. That Ms. Olsen would be disciplined beyond the counseling she received is contrary to the goals of the program, which was to encourage teachers to support students to graduate.

The only relevant evidence provided was an email dated April 4, 2017, from Olsen to Labon, Rossi and Newbrough which stated, "The teacher owns the grade book and the principal can approve the grade change at any time. If Sharon can get Wendy the final to administer the test or if she wants to do it on her own, (student) will get the credit as soon as Sharon submits the grade change form. It's definitely a procedure that Lauren fully supports."[44] This email corroborates Olsen's defense that she was only informing teachers of the process of recovering credit, not directing grade changes.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

Allegation 2: That Olsen directed Sharon Black to change a student's grade for the 2015-16 school year, and signed approval for grade changes without the authority to do so.

In the May 24, 2017 Notice of IDP, Ford alleged that Olsen gave Sharon Black a notification of credit form to change a grade for the 15-16 school year, violating administrative procedure 5504 and 5502.[45] In the First LOA, Ford expands on a larger issue related to grade change forms which Olsen took responsibility for handling, but which Ford did not believe were

[44] EX 85.
[45] EX 12.

handled correctly.[46] The grade change forms issue arose in March 2017 after Olsen had started implementation of the Hug Credit Attainment Program. Despite accusations that Olsen had mishandled grade change forms, there was no evidence at hearing that any grade change forms were improperly handled, or that any discrepancies occurred at Olsen's direction.

Specifically, Ford did not provide the email from Sharon Black that she claimed demonstrated that Olsen had given a directive. If the email is the same one referenced above (EX 85), it is clear that Olsen was explaining the process, not directing any policy violation. It was also not clear, prior to receiving notification from the District, that there was a problem with the way that A+ course credit was being handled. Once Hug administration was notified of the problem, they seemed to work diligently to fix it while still focusing on supporting students to graduation.

This allegation occurred early in the school year, and there was ample time to counsel Olsen about problems relating to the Hug Credit Attainment Plan, yet Ford did not issue an IDP until late May and did not raise the issue in Olsen's performance evaluation. The confusion and delay around this issue, in addition to the lack of clear evidence of misconduct, suggest that the Employer was adding the issue to the LOA in order to bolster the discipline, and not because it was supported by just cause.

The Employer failed to provide evidence to support just cause for imposing discipline for this allegation.

---

[46] DX 4.

Allegation 3: That Olsen recommended teacher Lorrie Foley be placed on a FAP in Foley's performance evaluation without permission to do so and did so at the direction of teacher-mentor Laura Pincollini, who did not have the authority to direct Olsen to do so.

It is undisputed that Olsen wanted to place Lorrie Foley on a Focused Assistance Plan and made repeated efforts to get Ford's support and direction to do so. On at least five occasions in March and April 2017, Olsen emailed Ford to initiate a discussion about putting Foley on an FAP. It is Ford's recollection that she told Olsen that it was too late to do so, because the deadline for notifying Roger Gonzalez that a FAP was needed had passed. There is no evidence when that deadline was, or whether Olsen was ever notified about that deadline. Despite Ford's testimony, it is clear that Olsen did not feel like she had received clear or timely advice from her principal and sought advice elsewhere.

Ford contends that Olsen inappropriately took direction from Pincollini, who is a teacher-mentor and not an administrator. It is the case that Olsen discussed Lorrie Foley with Laura Pincollini, but the evidence indicates that Olsen was doing just that: discussing the matter. Olsen consulted a veteran teacher-mentor with questions about how to handle what she perceived as a low-performing teacher situation because she was not getting a response from Ford. Pincollini did not direct Olsen's actions; she gave her advice as a long-time, experienced teacher familiar with the performance evaluation process.[47]

Olsen proceeded to put Foley on a FAP without Ford's permission, which she knew or should have known was not correct, since she would have needed Ford's permission to do so. However, Ford's lack of responsiveness to Olsen's requests for help, coupled with Ford's own

---

[47] EX 86.

failure to follow performance evaluation timelines (see EX 5) strongly suggest that the District does not typically consider this to be a discipline-worthy offense. It constitutes a form of disparate treatment to discipline Olsen for this issue when Ford shares responsibility for evaluation timeline issues. To the extent that any just cause might exist for discipline in this case, it warrants, at most, a verbal warning.

Allegation 4: That, on May 8, 2017, Olsen failed to report to Ford an incident where Dean of Students Jessica Wilson was rumored to have returned drugs to a student, and instead discussed the matter directly with Wilson.

It is undisputed that Olsen did not report the "marijuana incident" involving Wilson to Principal Ford, and instead directed Wilson to report it Ford herself. However, Cellucci, Rossi and Bodine also failed to report the incident to Ford or the District, and Wilson only reported the matter to Ford after being directed to do so by Olsen. This is a glaring example of disparate treatment, in that one employee is being disciplined for an action that four other people engaged in and were not disciplined for.

In reality, the decision to handle the matter as they did was one in which both Wilson and Olsen likely had the discretion to handle in a manner best suited to the student's needs. The real tragedy of this incident is that a young woman who was very close to graduation never returned to school because of Olsen's reaction. Wilson made the well-considered decision to let the "marijuana flakes" slide because she knew the student had a precarious living situation and a strong need to stay in school. Olsen disrupted that by substituting her judgment and failing to ask follow-up questions about Wilson's decision. At the same time, drugs in school is a serious issue about which reasonable minds can disagree, and while Olsen may bear responsibility for the student outcome related to the marijuana incident by telling Wilson she had to suspend the

student, failing to report it to Ford is not a reasonable cause for discipline, given that no one else reported it either.

Allegation 5: That Olsen failed to supervise staff when she failed to provide an explanation for how students were chosen to attend a field trip to Rise.

The evidence in the record is clear on this issue: Olsen and two other Assistant Principals organized a field trip for students from at least two separate programs to visit RISE, the adult learning academy in the District, in collaboration with one another and the RISE leadership. Olsen notified Ford of this field trip and got appropriate sign-off from RISE and from Tristan McElhaney for transportation.

For some reason, Ford questioned which students had been selected to attend the field trip. It's unclear why she wanted to know, and why Olsen's explanation that students from both programs were included was unsatisfactory. By Ford's own admission, she "lost her cool" and swore at Olsen about this matter. Based on the evidence, it's very hard to understand how this supports just cause for discipline against Olsen. The trip was authorized and appropriate and focused on students who would benefit from the visit. To discipline Olsen for not answering her question in the manner Ford wanted is unnecessarily punitive.

***

Finally, in the First LOA, Ford established performance expectations for Olson to meet with the new Hug High School principal. Olsen was on leave and not given an opportunity to meet these performance expectations. **In summary, based on the evidence, the Arbitrator cannot conclude that the District had just cause to impose the First LOA on Olsen, and does not believe that the District did so with the intent of correcting Olsen's performance. The Arbitrator recommends that the First LOA be removed from Olsen's record.**

**Second Letter of Admonition**

The Second Letter of Admonition (LOA 2) contained six allegations about which the parties provided evidence.[48]

Allegation 1: That on May 11, 2017, Olsen sent secure testing materials to all Hug Staff in a spreadsheet which included confidential information which was "hidden" but accessible to any recipient.

This allegation is undisputed. Olsen admits that, as the testing coordinator, she created a spreadsheet from District sources which contained both confidential and non-confidential information, that she "hid" the columns which had confidential information but did not secure them in any other way (such as in a new book or using password protection), and then distributed the spreadsheet to every faculty and staff email address at Hug High School. This breach of confidentiality was discovered by a District employee, who reported it to the Director of Assessment, who in turn reported it to the Nevada State Department of Education.

This breach of confidential information was a serious testing violation which resulted in the District and Hug administration taking active measures to remedy the breach and monitor the tests to ensure that no further violations occurred. Olsen was removed from her responsibilities as the testing coordinator and reassigned to Traner Middle School.

Olsen raised several defenses. First, the data was provided by the District, which had not taken measures to secure the data beyond telling test coordinators that the data was confidential. While this is true, and Aird admitted that this was "a learning" for the District, Olsen knew

---

[48] DX 5.

enough about Excel documents to know that "hidden" data isn't really hidden, and she bears some responsibility for the breach.

Second, Olsen argues that she sent a copy of the message to Ford prior to distributing it to the Hug staff and faculty. Ford could not open the document but "trusted Olsen" and didn't double-check the document at any time. Again, Ford should bear some responsibility for her oversight, but it was also reasonable of her to expect that Olsen, as the designated test coordinator, had done the job correctly, and the message was time-sensitive.

Finally, Olsen claims that she was overwhelmed and stressed out at the time this occurred and that she didn't realize, in her hasty and upset state of mind, that the information was not truly secure from every recipient. This may be an accurate description of Olsen's mindset, but it isn't a defense to the allegation. Under the circumstances, the Employer has just cause to discipline Olsen for the distribution of confidential information to non-qualified recipients.

Allegation 2: That on May 10, 2017, Olsen failed to provide Ford with information that had been requested on May 4, 2017.

This allegation seems to be related to the prior issue, where Ford alleges that she requested that Olsen provide her with information on May 4, but Olsen did not do so. However, the only May 4 correspondence in the record between Ford and Olsen is an email chain called "guidance" wherein Olsen states, "I'm dropping the ball with my workload . . . can you help me prioritize my duties. . . I don't know what else to do, I need your help."[49] Ford responded to this email by telling Olsen to prioritize testing; the only question she asks Olsen is, "Why and whose classes do you need to attend?" There's no other evidence in the record that supports that Ford

---

[49] EX 7.

requested information on May 4 that was not provided on May 10. Olsen did send the test coordinator email to Ford on May 11, 2017 at 6:34 a.m. and was promptly directed to send it to staff at 6:46 am. [50]

The evidence presented at the hearing does not support this allegation.

Allegation 3: That Olsen failed to direct test proctors to watch a required video prior to testing and failed to verify that the proctors had watched the video, as required, prior to testing.

Once Olsen was relieved of her test coordinator responsibilities, Hug and District administrators took over the tests. In that process, Aird determined that not every proctor had watched a video required by the state and completed an affidavit affirming that they'd watched it. Olsen was responsible for staff training and for ensuring that every proctor watched the video.

Olsen admitted that she did not show the video at her staff training, and that, to save time, she told people what was in the video and decided to send them the link to watch it on their own time. She claimed to be confused as to whether the video was required.

Olsen's testimony was, "I had a proctor training and was going to show the video, and I was gathering information from the NV website that I didn't actually have to show it, I could email it to them. I also showed during the IDP that during the training that we went through step by step and told them they would get the video. I also told them what was in the video. I was trying to get people to sign it. Running around like crazy to get the signatures. I said, 'you have to watch this.' I had every intention that they see it, but I hadn't gotten all the signatures. 'So overwhelmed. Couldn't keep my head above water.'"

---

[50] EX 8.

As with the breach of confidentiality, Olsen describes her mindset and believes it is a defense. Instead, it's an explanation that she was not doing her job duties as assigned and was creating testing irregularities that put Hug and District into a difficult position with the State Department of Education. The District demonstrated that there was just cause for discipline under these circumstances.

Allegation 4: That on May 16, 2017, Olsen discussed her removal as the test coordinator with two other employees.

In the Second LOA, Ford alleges that Olsen emailed Rhonda Clarke and Brad Bodine with statements concerning her removal as test coordinator. Those emails were not in evidence at the hearing. It is undisputed that Olsen texted her friend and co-worker Ryley Coker before being admonished not to discuss the matter with co-workers. Once Olson had been so admonished, she let Coker know she shouldn't have been discussing the matter with him.

It is unclear from the record whether Olsen knew that she was not permitted to discuss her removal at the time that she communicated with her friend.[51] In any case, the Employer did not demonstrate that there is just cause to discipline Olsen for this allegation.

Allegation 5: That Olsen's statements to two other employees about "being relieved" about being removed as test coordinator demonstrated "willful neglect or failure to observe and carry out the requirements of this title."

Olsen's description of "being relieved" is an extension of her self-assessment that she was overwhelmed and needed help, and not itself "willful neglect or failure to observe and carry out the requirements" of the test coordinator role. She had already been removed from the role

---

[51] It's also unclear whether the Employer can direct a public employee not to discuss their own personnel matters with a friend. While neither party raised the issue, it is questionable whether any employer can restrain employees from discussing their terms and conditions of employment with co-workers.

and she was only stating her feelings about the pressure of the position being removed from her. Since her statements were made after removal, and do not relate in any way to misconduct, this allegation, even if true, could not be the basis for discipline.

Allegation 6: That Olsen returned to her office on May 17, 2017, to retrieve a radio after being directed not to enter her office because test materials were in that office.

This allegation is undisputed. Olsen was directed by email not to use her office. She entered her office for the purpose of retrieving her radio so that she could perform her other duties as an AP. She told Aird that she could not remain in the office and left promptly after getting the radio. This does not constitute "use" of the office and doesn't warrant discipline.

In the Second LOA, Ford set performance expectations for Olsen, including that she not be involved in testing for three years, to meet with the new principal of Hug High School. By the date of the letter, Ford had become an Area Superintendent and was no longer the principal at Hug High School. Olsen did not have an opportunity to meet these expectations because she was on paid administrative leave.[52] **In summary, based on the evidence, the Arbitrator concludes that the District had just cause to impose the Second LOA on Olsen because of Allegations 1 and 3 relating to test irregularities that occurred because she was testing coordinator.**

---

[52] EX 29.

**Discharge Letter**

On the same day that Ford sent Olsen the two LOAs (July 19, 2017), Area Superintendent Roger Gonzalez sent Olsen an IDP letter alleging three separate issues.[53] An IDP meeting was held on July 26, 2017. Thereafter, Gonzalez took a leave of absence and Olsen was placed on paid administrative leave. Gonzalez issued a Notice of Recommended Dismissal on June 28, 2018.[54]

Allegation 1: That Olsen filed written false claims against Principal Lauren Ford regarding the incident where Wilson returned marijuana to a student because she had witnessed Ford "do the same thing a while ago."

In her Staff Complaint, Olsen asserted that Wilson had told her that she had returned drugs to a student because she "saw Ford do the same thing a while ago." This was a hearsay statement by Wilson which Olsen believed should be investigated by Ford's superiors. In her view, if Ford had given drugs to a student, it was a serious matter which should be handled at the District level. Olsen did not weigh in on the truth of the statement, merely that the appropriate investigator was Ford's supervisor.

In Gonzalez's view, Olsen knew that the reference to "the same thing" meant Ford had not suspended a student, not that Ford had returned a student's drugs. Ford and Wilson testified about a separate incident where Ford declined to suspend a student after conferring with the school police officer because doing so would endanger the student and an ongoing investigation. However, there was no evidence that Olsen knew about that case, or knew what Wilson was

[53] DX 7.
[54] DX 8.

referring to when she heard "the same thing." Gonzalez did not say why he believed that Olsen was willfully lying.

Olsen's misunderstanding was mistaken but made in good faith. There's no evidence to support Gonzalez's conclusion that she was willfully dishonest with the intent to harm Ford. Rather, she was passing along to the District what would be a serious allegation if true and expecting a full and fair investigation.

Even if Olsen was being negligent in making the complaint (she could have asked Wilson to clarify the comment), taking disciplinary action against someone for making a complaint of alleged misconduct is retaliatory and has the effect of inhibiting people from coming forward with other allegations of misconduct. There is genuine uncertainty about what Wilson's statement meant. In the third hand account Olsen received, Wilson had found drugs in a student's wallet and then returned the drugs to the student. When asked about it, Wilson said that "Lauren had done the same thing." It's not unreasonable to find that statement shocking to hear about one's superior and to believe that the District should take steps to investigate the matter.

The evidence presented by the District did not support the allegation that Olsen made false allegations or was dishonest. Olsen reported a hearsay statement and expected a fair investigation, and instead was terminated. This discipline is retaliatory and overly punitive. The evidence on this allegation does not support discharge.

<u>Allegation 2: That Olsen brought false claims and allegations against Ford regarding the supervision timeline and evaluation process.</u>

Olsen filed a separate complaint against Ford alleging problems with the way Ford conducted Olsen's performance evaluation. There were several specific problems: that Ford hadn't followed the proper timeline, that Ford hadn't given her notice of her second observation,

that Ford had removed positive statements from Olsen's performance evaluation and that Olsen was not permitted to submit a rebuttal statement.

It is true that Ford did not follow the evaluation timeline. First, the December 7 school shooting was disruptive to operations and the District gave Hug extra time to complete certain paperwork because of that incident. Second, Ford, for reasons that she didn't explain, did not complete the evaluations of her subordinate staff on the schedule required by the District. Therefore, Olsen's 120th day observation and her evaluation were completed late by Ford.

After their April 21 evaluation meeting, Ford added Olsen's rebuttal comments into the narrative of the final performance evaluation. When Mike Paul notified Ford that the "artifact" should not be in the narrative, Ford removed it, as Olsen alleged, but was required to do so by the District and not in retaliation against Olsen.

At the point at which Olsen filed this Staff Complaint, she was very concerned that her performance evaluation would not be considered on its positive merits because of the testing irregularities issue. She had been reassigned to Traner and was very concerned that she was being disciplined for performance issues which she believed Ford had also committed and wanted to bring that to the District's attention.

Olsen's actions in filing this Complaint were "CYA" and self-protective, but they weren't false. Ford had not followed the timelines and had altered Olsen's evaluation, even if it was at Mike Paul's direction. Therefore, the facts do not support the allegation that Olsen filed a false claim against Ford for supervision and performance evaluation issues. The District does not have just cause to terminate Ms. Olsen on this basis.

Allegation 3: That Olsen discussed personnel matters with Hug staff members against the direction of management.

As with Allegation 5 in the Second LOA, it's unclear that Olsen was aware that she couldn't discuss her own personnel matters with people she believed were her friends after the IDP meeting. It's strains credibility that she would not be able to exercise her own judgment in sharing details about her own case with friends of her choosing, and the Arbitrator again questions whether the Employer even has the authority to restrain the speech of a public employee who wants to discuss the terms and conditions of their employment with their co-workers. Even if the Employer has the authority, the violation of this rule should not, under these circumstances, be the basis for discharge, where the Employer held open the case from June 2017 until July 2018. The evidence in the hearing does not demonstrate that the Employer has just cause to discipline for this allegation.

**For these reasons, the Arbitrator concludes that the Employer did not meet their burden of proof that the alleged actions constituted misconduct. The District does not have just cause for termination of Trina Olson.**

## II. WHAT IS THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

As stated above, the District contends that this case is governed by NRS 391.822 and 391.824, the non-binding arbitration procedures which govern the dismissal of probationary employees. The Grievant contends that she should be afforded the binding arbitration process set forth in the Grievance Procedure in the Negotiated Agreement. The resolution of this question hinges on whether Olsen was a probationary employee at the time she was removed from her position as an Assistant Principal.

While Olsen is a long-time employee of the District, she was a probationary employee in the position of AP. It is undisputed that she was in a probationary period in the 2016-2017 school year, when all these issues arose.

NRS 391.820(8) states: "A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a **post probationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section**." This clearly defines the probationary status of a post-probationary teacher who is employed as an administrator. This section applied to Olsen, despite her many years of service.

Probationary employees are considered to be working in a trial period. "The purpose of a trial period is to afford an employee the opportunity to demonstrate that he has the ability for the job in question or can with some familiarization therewith achieve the necessary skills within a reasonable period of time to perform the job in an acceptable manner."[55]

Non-probationary APs are indisputably covered by the Negotiated Agreement, and by the clear language of the grievance procedure are protected by binding arbitration. By virtue of the fact that the term "non-probationary" is used repeatedly in that section, the reader of the contract

---

[5555] Elkouri & Elkouri, "How Arbitration Works," 6th edition, p. 892, citing *American Welding & Mfg. Co.*, 52 LA 889, 893 (Stouffer 1969).

can conclude that "probationary" employees are not covered by binding arbitration. The process for removing probationary employees is governed by NRS 391.822 and 391.824.

The record is silent about what rights Ms. Olsen may have as a senior member of another bargaining unit, such as a certificated teachers unit or a unit that covers Deans of Students. It is clear that she was still in her trial period as a probationary AP pursuant to NRS 391.820(8) and is therefore subject to the state law governing her removal.

## III. HAS THE DISTRICT MET THE LEGAL STANDARD THAT APPLIES IN THIS CASE?

NRS 391.824 defines the procedure for a hearing concerning dismissal of a probationary employee. It says in pertinent part:

> (1) If a timely request for an expedited hearing is made pursuant to NRS 391.822, the superintendent must not take any further action relating to the recommendation to dismiss the probationary employee until the written report from the arbitrator is filed with the superintendent and the probationary employee pursuant to subsection 2.

The District violated this section of NRS 391.822 when it terminated Olsen on July 5, 2018 without waiting for the final report from the Arbitrator. While an extensive amount of time had passed since the events in question, likely at great financial cost to the District, the delay was entirely due to the District's failure to follow up on the IDP meeting of July 26, 2017 in a timely fashion. The statute is clear that the superintendent must not take action until receipt of the written report of the arbitrator, and in this case, they acted prematurely by ending Ms. Olsen's employment before a hearing could be conducted.

The statute also states:

> (2) An arbitrator shall hold an expedited hearing and file a written report with the superintendent and the probationary employee who requested the hearing pursuant to NRS 391.822 in the manner prescribed by the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. The

> only issues the arbitrator may consider are whether the dismissal of the probationary employee would:
>
> (a) violate the legal rights of the probationary employee provided by federal law or the laws of this State; or
>
> (b) be arbitrary or capricious.
>
> (3) At the evidentiary hearing, the superintendent must provide evidence of at least one reason to recommend the dismissal of the probationary employee.

At the hearing in this matter, the District stated three reasons for the dismissal of Ms. Olsen. As stated above, the evidence provided by the District did not support the conclusion that dismissal is warranted. Olsen did not knowingly file false claims against Principal Lauren Ford, and, if she did discuss her employment action with co-workers, it was not knowingly in violation of a rule, nor did it warrant dismissal. Because of the retaliatory nature of the recommendation of dismissal, the Employer's lack of just cause for discharge is arbitrary and capricious.

There are two other areas that warrant discussion. First of all, the December 7 shooting that was witnessed by Ms. Olsen was a significant event in the life of Hug High School, its community and Ms. Olsen in particular. There was no evidence that the trauma of this event was addressed. Ms. Olsen must have had great personal courage and a deep reserve of competence to respond in the way she did. The fact that she later felt like she was overwhelmed, under water and needed help seems like an obvious and unfortunate consequence of witnessing a knife attack on students and the subsequent shooting death of the student who initiated the attack.

Given that Ms. Olsen had a stellar track record as a teacher and Dean of Students, it was reasonable to expect that she would excel as an AP. Based on feedback from her peers and principal, it sounds as though she struggled in the role. While the shooting may not have been the cause of that, Ms. Olsen's bravery and trauma should have been handled in a more sensitive manner than her prolonged and painful dismissal suggests.

The second thing that warrants discussion springs from that issue. As a probationary employee who had completed one year but who had a testing irregularity did not need to be dismissed. NRS 391.750 lays out a number of options which would have addressed the issue in a less punitive fashion. For example, the District could have returned Olsen to a Dean of Students position, where she was last successful, or they could have decided to otherwise not reemploy her as an administrator and offered to return her to the classroom, per 391.820. The decision to move forward with dismissal seems to have prolonged the cost and pain to both Ms. Olsen and the District, which is particularly unfortunate, given that dismissal was not warranted.

**DECISION AND AWARD**

For the foregoing reasons, the Arbitrator finds that the grievance is sustained in part and denied in part. The District has met their burden of showing there was just cause for the first and third allegations in the Second Letter of Admonition but has failed to show that there was just cause for the First Letter of Admonition and the Notice of Dismissal.

Because the Dismissal should not have been implemented until after receipt of this written report, the Employer must reinstate Ms. Olsen and make her whole back to July 5, 2018. Upon receipt of this written report, the superintendent will then follow the provisions of 391.824(6). It is the opinion of the Arbitrator that the District has been arbitrary and capricious in its decision to dismiss Ms. Olsen and recommend that the superintendent review Ms. Olsen's file to determine whether she is eligible for placement as an AP or for some other position.

Because the allegations concerning testing irregularities were the basis for the LOA, they can be considered as part of Ms. Olsen's job record but should not be the basis for dismissal, as

that would violate principles of double jeopardy which are commonly applied in labor arbitration matters.

Dated: December 13, 2018.

Andrea L. Dooley, Arbitrator

**Bailey Twitchell**

**From:** Reich, Chris <CReich@washoeschools.net>
**Sent:** Thursday, December 20, 2018 1:52 PM
**To:** Michael Langton
**Cc:** Merri Kirk; Read, Breanne
**Subject:** Your Client Olsen
**Attachments:** SETTLEMENT AGREEMENT - Template.docx

Hello Mike.

Attached is a template settlement agreement with terms the District generally use. Let me know how your client responds after your discussion tomorrow. I also want to memorialize that you agree to waive the 5-day time limit for the Superintendent's response time due to settlement discussions.

Also, my cell phone number is 775-690-2349, if you need call me.

Best,

Christopher B. Reich
Deputy Chief General Counsel
Washoe County School District
425 East Ninth Street
PO Box 30425
Reno, NV 89520-3425
Office Telephone (775) 348-0300; Fax (775) 333-6010

Email
creich@washoeschools.net

**PERSONAL AND CONFIDENTIAL:** This message originates from the Washoe County School District Office of the General Counsel. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient, and may contain information that is a trade secret, proprietary, protected by the attorney work product doctrine, subject to the attorney-client privilege, or is otherwise protected against unauthorized use or disclosure. This message and any file(s) or attachment(s) transmitted with it are transmitted based on a reasonable expectation of privacy consistent with ABA Formal Opinion No. 99-413. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message. Personal messages express only the view of the sender and are not attributable to Washoe County School District Office of the General Counsel.

EXHIBIT 23
Witness: Olsen
C. EISENBERG, NV CCR 142

# Office of the General Counsel

Washoe County School District
Every Child, By Name And Face, To Graduation

Neil A. Rombardo, Esq., Chief General Counsel
Christopher B. Reich, Esq., Deputy Chief General Counsel
Sara K. Montalvo, Esq., General Counsel
P.O. Box 30425, Reno, NV 89520-3425
Phone (775) 348-0300 / Fax (775) 333-6010
legal@washoeschools.net

January 9, 2019

**Delivered via United States First Class Mail and email to mlangton@sbcglobal.net**

Michael Langton, Esq.
801 Riverside Drive
Reno, NV 89503

**RE: Trina Olsen**

Dear Mr. Langton:

You and I discussed and negotiated to resolve the employment issues between the Washoe County School District (District) and your client, Ms. Trina Olsen, since receiving Arbitrator Andrea L. Dooley's Decision and Award dated December 13, 2018 (Dooley Award).

While the District disagrees with the analysis and findings of the Arbitrator in this matter and supports the actions of the District Administrators, Superintendent Traci Davis and the District respect the arbitration process. Therefore, Superintendent Davis and the District accept the remedy contained in the Dooley Award and will: reinstate Ms. Olsen's employment with the District; place Ms. Olsen in a position as an Assistant Principal or other position; pay Ms. Olsen back pay and benefits from July 5, 2018; remove the July 19, 2017 Letter of Admonition (First LOA) and all vestiges of it from Ms. Olsen's personnel file; and, revise the July 19, 2017 Letter of Admonition (Second LOA) so it contains only Allegations 1 and 3.

Staff from the District Office of Human Resources and Office of School Leadership will contact Ms. Olsen directly regarding the implementation of the above remedy.

Please notify Ms. Olsen of the above as soon as you are able. Contact me with any questions or concerns.

Sincerely,

Christopher B. Reich
Deputy Chief General Counsel

cc: Traci Davis, Superintendent of Schools, via email
Dr. Kristen McNeill, Deputy Superintendent, via email
Emily Ellison, Chief Human Resources Officer, via email
Dr. Troy Parks, Lead Area Superintendent, via email

EXHIBIT 24
Witness: Olsen
C. EISENBERG, NV CCR 142

Board of Trustees: Katy Simon Holland, President * Malena Raymond, Vice President * John Mayer, Clerk
Debra Feemster, Member * Veronica Frenkel, Member * Scott Kelley, Member * Angela Taylor, Member * Traci Davis, Superintendent

**Washoe County School District**
425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0200 * (775) 348-0304 * www.washoeschools.net

Board of Trustees: Katy Simon Holland, President * Malena Raymond, Vice President * Angela Taylor, Clerk * Jacqueline Calvert * Andrew Caudill * Scott Kelley * Ellen Minetto * Traci Davis, Superintendent

**REVISED LETTER OF ADMONITION**
HAND DELIVERED

February 8, 2019

Trina Olsen
1400 Belford Road
Reno, NV 89509

Dear Mrs. Olsen:

I am providing you this written notice that your performance and conduct constitutes cause for potential disciplinary action under NRS 391.750 a. Inefficiency, c. Unprofessional conduct; d. Insubordination; e. Neglect of duty; i. Inadequate performance; k. Failure to comply with such reasonable requirements as a board may prescribe; o. Willful neglect or failure to observe and carry out the requirements of the title; p. Dishonesty; q. Intentional failure to observe and carry out the requirements of a plan to ensure the security of examinations and assessments adopted pursuant to NRS 390.270 or 390.275; t. Gross misconduct; and

Nevada Testing Primer, Nevada Student Assessments Spring 2017 EOC presentation, February 2017, Email sent on Friday, April 7, 2017 new! NDE test security and administration training for spring 2017,
HS Weekly Principal Email April 6, 2017,

and to give you an opportunity to correct your performance and conduct.

Pursuant to a decision by Arbitrator Andrea Dooley on December 13, 2018, this Letter of Admonition has been revised and is being reissued with the revisions below.

The specific causes are as follows:

It is alleged you sent an email to all Hug Staff on May 11, 2017 that included secure testing materials, student identifying information. You state in the email, "Please keep this list confidential as you reference it so sensitive information is not seen by our students." After receiving an email from me at 6:21 am stating that I could not open the excel documents, you sent an email stating that, "This document lists every student test, (we have 2400+) and where/when they are testing for each test." During the IDP meeting on June 26, 2017 you stated, "Yes this is true. It slipped my mind I didn't work with those columns. I forgot I had sensitive items in the document, did not occur to me." After further investigation it is confirmed that you sent the email to Hug Staff with secure testing materials included. In addition you were dishonest in your email communication to me on May 11, 2017 when you stated that, "This document lists every student test (we have 2400+) and where/when they are testing for each test." The document included more than the student, and where and when they were testing.

EXHIBIT 25
Witness: Olsen
C. EISENBERG, NV CCR 142

It is alleged that on Thursday, May 11, 2017 at 2:00 pm, you sent an email to only staff involved in proctoring the EOC exams explaining that you did not have to show the Test administrator test security NDE spring 2017 video to them in your meeting and that they could watch it on their own. It is alleged that you did not verify with staff if they watched the video prior to proctoring the EOC exams on Monday, May 15, 2017. In the IDP meeting you stated, "That is true I did not verify if they did watch the video. I did the admin training on May 11th informed them about the video, I watched it, I talked about it and used the video to create the EOC training. Nothing says the video is mandatory to watch. I am pretty positive that everything in the video was included in my training, I have the four (4) page document if that is untrue, mistake on my part." At this point in the meeting Sandy Aird showed you an email sent on April 6th and again on April 7th. She showed you that you were sent the email and it states that all proctors must observe the video and sign the verification that they saw the video. Sandy Aird also stated that on May 17th the proctors had not viewed the video and that we had them watch the video and sign the form that day before they proctored. You then stated, "I made a mistake to send by email and go over at the meeting. Lauren was there and heard me say that I didn't have to show it here it was in their in box." After further investigation, it is evident that you did not show the Test administrator test security NDE spring 2017 video and you did not verify that staff watched the video. At the testing meeting you did state that you did not have to show the video. Sandy showing you the emails and showing you where the statements were about the video also indicate that you did not thoroughly read the emails you received on April 6th and April 7th. As the testing coordinator for Hug HS it is your responsibility to implement all directives given to you by the Assessment department.

Performance Expectations

I expect you to:

1. Refrain from being involved in testing for the next 3 years, and not be placed in the role of testing coordinator for those same 3 years.
2. Attend a weekly meeting with your principal where you will submit and review all agendas prior to holding meetings with staff. These meetings will be on a designated day that is convenient to the principal.
3. Submit minutes from all meetings you are holding and review them with your principal at the designated meetings.

You must make these improvements immediately.

Assistance

In order to assist you in meeting these expectations, your principal will:

1. Not assign you to the role of testing coordinator.
2. Not assign any testing, proctoring or administration of tests to you.
3. Set up the weekly calendar invite for 1:1 meeting beginning in February.

In addition, I strongly encourage you to:

1. Review all emails in their entirety and well in advance of work you must complete.
2. After reviewing documents from the District or the state, set up a meeting with the admin team to discuss the information and be open to support when it is offered.

This is a serious situation. Because you were in the role of testing coordinator for Hug High School when this violation occurred this revised Letter of Admonition will remain in your personal file for 3 years from the original issue date of July 19, 2017.

Continuation or repetition of the deficiencies as stated in this document may result in suspension, demotion, dismissal, or a recommendation not to reemploy.

Sincerely,

Lauren Ford
Area Superintendent
(Former Principal, Hug HS)

cc: Emily Ellison, Chief Human Resources Officer
Virginia R. Doran, Director of Labor Relations
Aliena Anderson, Human Resources Technician

I acknowledge receipt of this letter of admonition.

Employee signature Date

Gmail Trina Olsen <trinaraeolsen@gmail.com>

# FW: Revised Letter of Admonition per Arbitrator Dooley's Award

11 messages

**Olsen, Trina** <TOlsen@washoeschools.net> Fri, Feb 8, 2019 at 9:09 AM
To: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

EXHIBIT 26
Witness: Olsen
C. EISENBERG, NV CCR 142

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Friday, February 8, 2019 7:48 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** Revised Letter of Admonition per Arbitrator Dooley's Award

Good morning Mrs. Olsen,

In accordance with Arbitrator Andrea Dooley's decision on December 13, 2018, the District has revised the July 19, 2017 Letter of Admonition to reflect the content Arbitrator Dooley determined was permissible to retain within your personnel file. Attached to this e-mail is a signed copy of this revised Letter of Admonition. To facilitate the process of receiving a signed copy acknowledging your receipt, we can move forward in one of the following three ways:

1) You may print out the copy attached to this e-mail, sign it, re-scan it, and return it to me via e-mail.

2) You may print out the copy attached to this e-mail, sign it, and then e-mail me to pick it up at Wooster HS. I will then make arrangements to go to the school site and pick it up.

3) You may come to the District Office at 425 E. Ninth Street during regular business hours, go to the Welcome Center, and ask the receptionist that you are here to see me. I will then come down with a printed copy for your signature.

OLSEN 000225

**Olsen Revised LOA.pdf**
179K

**Olsen, Trina** <TOlsen@washoeschools.net> Wed, Feb 20, 2019 at 11:15 AM
To: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Wednesday, February 20, 2019 9:33 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good morning Mrs. Olsen,

In response to your correspondence below, please see our answers:

1) The letter conforms specifically to the statements Arbitrator Dooley stated the District could maintain in the letter. One of those statements (Formerly Allegation #3, now identified as Allegation #2 in the revised Letter of Admonition) includes evidence that substantiates the charge of dishonesty in that you stated that no one told you that it was mandatory for proctors to watch the video when in fact you received two e-mails stating they must watch the video and acknowledge that they did.

2) Your current administrator, Leah Keuscher, will be provided a copy of this Letter of Admonition. The expectations are in regard to items related to testing and communicating expectations to staff in meetings, both items Arbitrator Dooley concluded were areas that the District has concerns about.

3) You may attach a written response to this Letter of Admonition. It will be appended to the copy placed in your personnel file.

4) As Lauren Ford was the Administrator of record and your supervising administrator at the time, she is still the one who is authorized to sign this document. Also, personnel matters involving other employees are confidential – the District does not disclose to third parties what, if any, discipline an employee may or may not have received.

Further, your signature on this document acknowledges receipt. It does not acknowledge agreement. If you choose not to sign the document as provided, the District will place the Letter of Admonition, a copy of the e-mail from my office on February 8, 2019 showing that you read the e-mail to which the letter was attached, and a memo stating that you have received it and have refused to sign it in your personnel file and forward said copies to Ms. Keuscher.

Anthony Spotts

Labor Relations Specialist

Department of Labor Relations

ASpotts@Washoeschools.net

(775) 348-3843 (office)

(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Friday, February 15, 2019 3:10 PM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** Re: Revised Letter of Admonition per Arbitrator Dooley's Award

Here are my issues with this letter being in my personnel file:

1. As determined by the arbitrator, I was not dishonest in my email on May 11th. I do not want "dishonesty" in this letter.
2. Do I still have to do the things Lauren Ford said were expected of me? If so, have you communicated with my new principal about these expectations, especially weekly meetings? I believe she should be involved if her time is impacted.

3. I believe I have the right to respond to this letter before being placed in my personnel file. Please advise as to where I can do that.

4. This discipline letter is written by Lauren Ford, whom the arbitrator stated should also "bear responsibility" for the testing error. It is preposterous to me how Lauren Ford is now issuing discipline in my personnel file but was never held accountable for her own part in this very error. It's shockingly appalling, actually, and in my mind amounts to nothing less than exposure of Lauren Ford's assigned blame and cover-up of her part in this error and the district's continued disparate treatment. I do not believe I should have discipline placed in my file for this event unless Lauren Ford is also held accountable.

Please advise. Trina Olsen

---

[Quoted text hidden]

---

**Olsen, Trina** <TOlsen@washoeschools.net> Thu, Feb 28, 2019 at 1:27 PM
To: "Spotts, Anthony" <ASpotts@washoeschools.net>
Cc: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

I think that will work. Thanks.

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Thursday, February 28, 2019 1:07 PM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Would until Friday, March 8 be enough time?

Anthony Spotts

Labor Relations Specialist

Department of Labor Relations

ASpotts@Washoeschools.net

(775) 348-3843 (office)

(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Thursday, February 28, 2019 10:33 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Still working with my lawyer. Can I have a few more days?

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Wednesday, February 27, 2019 4:28 PM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good afternoon Mrs. Olsen,

This is just a follow-up to ensure you had received my correspondence below. I had not heard from you in regards to this e-mail and was not sure it had gone through.

Anthony Spotts

Labor Relations Specialist

Department of Labor Relations

ASpotts@Washoeschools.net

(775) 348-3843 (office)

(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

[Quoted text hidden]

---

**Olsen, Trina** <TOlsen@washoeschools.net> Tue, Mar 19, 2019 at 7:37 AM
To: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

[Quoted text hidden]

---

**Olsen, Trina** <TOlsen@washoeschools.net> Mon, Mar 25, 2019 at 11:58 AM
To: "Spotts, Anthony" <ASpotts@washoeschools.net>
Cc: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

I will do that today.

I was working on my taxes this weekend discovered a problem. The district paid my back pay in 2019, not 2018. This will create a large problem with my 2019 future tax liability, as this additional income will bump us into a higher tax bracket ($315,000 and more). That means that we will be paying an extra 2% taxes this year that we should not have to pay, totaling more than $6,000.

Please let me know what the district will do about this problem.

Trina Olsen

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Monday, March 25, 2019 9:29 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

You can print out the LOA, sign at the bottom and then scan it back to me with your response. Or if you prefer I can come there to Wooster HS if you are on site with a paper copy for your signature and take your written response then.

Anthony Spotts

Labor Relations Specialist

Department of Labor Relations

ASpotts@Washoeschools.net

(775) 348-3843 (office)

(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Monday, March 25, 2019 9:28 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

I will sign it and attach a response.

How do I sign it? I'll prepare the attachment. Trina

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Monday, March 25, 2019 8:04 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good morning Mrs. Olsen,

I received your correspondence on March 7, 2019 requesting additional time to review the revised Letter of Admonition that was sent to you on February 8, 2019. You requested an extension until March 15, 2019. It is now March 25, 2019 and the District must move forward to resolve this outstanding issue.

The District again presents you with these 2 options:

1. You may sign acknowledging <u>receipt</u> (not agreement) of the Letter of Admonition, attach whatever response you deem necessary to the letter, and send it back to me. I will then send copies of both the LOA and your response to your current supervisor and to Human Resources for placement in your personnel file.

2. You may choose not to sign for <u>receipt</u> (not agreement) of the Letter of Admonition, in which case the Letter of Admonition, a copy of this e-mail string, and a memorandum stating that you refused to sign the document will be sent to your current supervisor and to HR for placement in your personnel file.

If you choose not to respond to this request, the District will proceed under option #2.

In order to expedite this, I need your stated intention no later than the close of business on **March 26, 2019**.

Anthony Spotts

Labor Relations Specialist

Department of Labor Relations

ASpotts@Washoeschools.net

(775) 348-3843 (office)

(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Thursday, March 7, 2019 8:15 AM

**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

I need one more week, please. My lawyer is still reviewing. Trina

[Quoted text hidden]

---

**Spotts, Anthony** <ASpotts@washoeschools.net> Mon, Mar 25, 2019 at 11:59 AM
To: "Olsen, Trina" <TOlsen@washoeschools.net>
Cc: "trinaraeolsen@gmail.com" <trinaraeolsen@gmail.com>

I will pass this on to Legal Counsel.

[Quoted text hidden]

---

**Trina Olsen** <trinaraeolsen@gmail.com> Tue, Mar 26, 2019 at 6:31 AM
To: Michael Langton <mlangton@sbcglobal.net>

---------- Forwarded message ---------
From: **Olsen, Trina** <TOlsen@washoeschools.net>
[Quoted text hidden]
[Quoted text hidden]

**Olsen Revised LOA.pdf**
179K

---

**Olsen, Trina** <TOlsen@washoeschools.net> Sun, Feb 2, 2020 at 7:42 AM
To: Trina Olsen <trinaraeolsen@gmail.com>

---

**From:** Olsen, Trina
**Sent:** Tuesday, March 26, 2019 6:45 AM
**To:** Michael Langton <mlangton@sbcglobal.net>
**Subject:** FW: Revised Letter of Admonition per Arbitrator Dooley's Award

This is the newest response to the LOA that came in yesterday. It talks about talking to arbitrator dooley.

**From:** Spotts, Anthony
**Sent:** Monday, March 25, 2019 12:19 PM
**To:** Olsen, Trina <TOlsen@washoeschools.net>

**Cc:** Reich, Chris <CReich@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

The language in the letter is not negotiable.

When we state "continuation or repetition of the deficiencies", it means that if a same or similar incident happens again the District has the right to elevate the potential disciplinary action to the next step in the progressive discipline process based on the new incident. We would not re-litigate the previous incident, only reference that you received a Letter of Admonition.

As for the assistance piece, the language is the same language as in the original document are the District is not inclined to change it at this time.

If you want to take the matter to Arbitrator Dooley for clarification of her ruling, we would be willing to do so.

I also spoke with Legal Counsel, and you can contact the District payroll department or speak to a tax attorney regarding the tax liability issue. But as that is not within my department's scope I cannot provide any assistance.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Monday, March 25, 2019 12:10 PM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Anthony,

The District's revised letter states: "continuation or repetition of the deficiencies as states in this document may result in suspension, demotion, dismissal, or a recommendation not to reemploy."

The arbitrator's ruling said on P. 38 lines 24-26 and page 39 lines 1-2 said that these items could not be the basis for future dismissal because it would violate the principles of double jeopardy.

Please remove this part of the letter and send a new copy.

I also feel the requirements on my principal to hold a weekly meeting about my staff meetings is arbitrary to the original infraction and is overly time-consuming to my supervisor. It also does not designate a beginning or end to that requirement. Please advise.

Trina Olsen

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Monday, March 25, 2019 9:31 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Please see attached, per your request.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Monday, March 25, 2019 9:30 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

I'll print it. Can you sent it please?

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Monday, March 25, 2019 9:29 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

You can print out the LOA, sign at the bottom and then scan it back to me with your response. Or if you prefer I can come there to Wooster HS if you are on site with a paper copy for your signature and take your written response then.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Monday, March 25, 2019 9:28 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

I will sign it and attach a response.
How do I sign it? I'll prepare the attachment. Trina

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Monday, March 25, 2019 8:04 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good morning Mrs. Olsen,

I received your correspondence on March 7, 2019 requesting additional time to review the revised Letter of Admonition that was sent to you on February 8, 2019. You requested an extension until March 15, 2019. It is now March 25, 2019 and the District must move forward to resolve this outstanding issue.

The District again presents you with these 2 options:

1. You may sign acknowledging receipt (not agreement) of the Letter of Admonition, attach whatever response you deem necessary to the letter, and send it back to me. I will then send copies of both the LOA and your response to your current supervisor and to Human Resources for placement in your personnel file.
2. You may choose not to sign for receipt (not agreement) of the Letter of Admonition, in which case the Letter of Admonition, a copy of this e-mail string, and a memorandum stating that you refused to sign the document will be sent to your current supervisor and to HR for placement in your personnel file.

If you choose not to respond to this request, the District will proceed under option #2.

In order to expedite this, I need your stated intention no later than the close of business on **March 26, 2019**.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Thursday, March 7, 2019 8:15 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

I need one more week, please. My lawyer is still reviewing. Trina

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Thursday, February 28, 2019 1:07 PM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Would until Friday, March 8 be enough time?

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Thursday, February 28, 2019 10:33 AM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Still working with my lawyer. Can I have a few more days?

**From:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Sent:** Wednesday, February 27, 2019 4:28 PM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good afternoon Mrs. Olsen,

This is just a follow-up to ensure you had received my correspondence below. I had not heard from you in regards to this e-mail and was not sure it had gone through.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Spotts, Anthony
**Sent:** Wednesday, February 20, 2019 9:33 AM
**To:** Olsen, Trina <TOlsen@washoeschools.net>
**Subject:** RE: Revised Letter of Admonition per Arbitrator Dooley's Award

Good morning Mrs. Olsen,

In response to your correspondence below, please see our answers:

1) The letter conforms specifically to the statements Arbitrator Dooley stated the District could maintain in the letter. One of those statements (Formerly Allegation #3, now identified as Allegation #2 in the revised Letter of Admonition) includes evidence that substantiates the charge of dishonesty in that you stated that no one told you that it was mandatory for proctors to watch the video when in fact you received two e-mails stating they must watch the video and acknowledge that they did.
2) Your current administrator, Leah Keuscher, will be provided a copy of this Letter of Admonition. The expectations are in regard to items related to testing and communicating expectations to staff in meetings, both items Arbitrator Dooley concluded were areas that the District has concerns about.
3) You may attach a written response to this Letter of Admonition. It will be appended to the copy placed in your personnel file.
4) As Lauren Ford was the Administrator of record and your supervising administrator at the time, she is still the one who is authorized to sign this document. Also, personnel matters involving other employees are confidential – the District does not disclose to third parties what, if any, discipline an employee may or may not have received.

Further, your signature on this document acknowledges <u>receipt</u>. It does not acknowledge <u>agreement</u>. If you choose not to sign the document as provided, the District will place the Letter of Admonition, a copy of the e-mail from my office on February 8, 2019 showing that you read the e-mail to which the letter was attached,

OLSEN 000239

and a memo stating that you have received it and have refused to sign it in your personnel file and forward said copies to Ms. Keuscher.

Anthony Spotts
Labor Relations Specialist
Department of Labor Relations
ASpotts@Washoeschools.net
(775) 348-3843 (office)
(775) 750-0318 (cell)

"There are three things you can do in a baseball game. You can win, or you can lose, or it can rain." – Casey Stengel

**From:** Olsen, Trina
**Sent:** Friday, February 15, 2019 3:10 PM
**To:** Spotts, Anthony <ASpotts@WashoeSchools.net>
**Subject:** Re: Revised Letter of Admonition per Arbitrator Dooley's Award

Here are my issues with this letter being in my personnel file:

1. As determined by the arbitrator, I was not dishonest in my email on May 11th. I do not want "dishonesty" in this letter.
2. Do I still have to do the things Lauren Ford said were expected of me? If so, have you communicated with my new principal about these expectations, especially weekly meetings? I believe she should be involved if her time is impacted.
3. I believe I have the right to respond to this letter before being placed in my personnel file. Please advise as to where I can do that.
4. This discipline letter is written by Lauren Ford, whom the arbitrator stated should also "bear responsibility" for the testing error. It is preposterous to me how Lauren Ford is now issuing discipline in my personnel file but was never held accountable for her own part in this very error. It's shockingly appalling, actually, and in my mind amounts to nothing less than exposure of Lauren Ford's assigned blame and cover-up of her part in this error and the district's continued disparate treatment. I do not believe I should have discipline placed in my file for this event unless Lauren Ford is also held accountable.

Please advise. Trina Olsen

---

**From:** Spotts, Anthony
**Sent:** Friday, February 8, 2019 7:47 AM
**To:** Olsen, Trina
**Subject:** Revised Letter of Admonition per Arbitrator Dooley's Award

[Quoted text hidden]

## DECLARATION OF TRINA OLSEN

I, Trina Olsen, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am the Plaintiff in the lawsuit Trina Olsen v. Washoe County School District ("WCSD") and Traci Davis, former Superintendent at WCSD, currently pending before the Federal District Court in Northern Nevada.

2. Since 1992, I have worked in various positions at WCSD including as a certificated teacher and then Dean of Students.

3. I became a full-time teacher at WCSD in 1996. I was a probationary employee for three years until 1999, when I gained post-probationary status due to the fact that I was deemed to have performed my job satisfactorily.

4. I am currently an Assistant Principal at Wooster High School in Reno.

5. For the 2016-2017 school year, I was Assistant Principal at Hug High School, where I reported to and was supervised by Hug High Principal Lauren Ford ("Ford"). In my capacity as Assistant Principal at Hug High, I was part of the administrative team that was in charge of running Hug High.

6. I was issued a "Professional – Special" license by the State of Nevada in 2013 as a "School Administrator," which I renewed in December of 2016, and which allowed me to work in an administrative capacity for WCSD. A record of my license is attached hereto as Exhibit A.

7. In May of 2017, I was informed by a teacher at Hug High of allegations that illegal drugs may have been provided to students by Jessica Wilson, Dean of Students at Hug High, and by Ford.

8. I then reported these allegations to WCSD Area Superintendent Roger Gonzalez.

9. However, rather than investigate Wilson and Ford regarding allegations that they gave drugs to students, Gonzalez and other WCSD employees began a campaign of character assassination and retaliation against me, which led to my being fired in early July

EXHIBIT 27
Witness: olsen
C. EISENBERG, NV CCR 142

of 2018.

10. When I was fired, I lost my grandfathered riders on my health insurance, which now cost twice as much because the riders were not paid during the time I was fired.

11. Before I was fired, I requested that the dispute between WCSD and myself be subject to arbitration.

12. Even though I prevailed in the Arbitration against the District, I still believe that I am at risk of being fired for reporting Ford and Wilson.

13. Even though Traci Davis was also fired by the WCSD School Board around July 1, 2018, the same basic School Board and leadership at WCSD is still in place. For example, Lauren Ford was promoted to the position of Area Superintendent at WCSD three weeks after I made my complaint to Roger Gonzalez.

14. I fear that further retaliatory actions may be taken against me by WCSD as a result of my instituting this case because in July of 2018 I was fired after reporting alleged illegal conduct and after I requested arbitration.

15. If I am again dismissed from my job at WCSD, I will suffer the following harm:

a. I will lose my income that I rely on for the necessities of life;

b. I will lose my health insurance;

c. I will suffer further irreparable harm to my professional reputation by being terminated a second time;

d. I would lose credit toward retirement from PERS so I could not retire at the time and income level that I was promised by the system;

e. I will not be able to avail myself of the arbitration process again; and

f. I will suffer further delay in my ability to seek a position as a principal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: Nov 13, 2019 in Reno, Nevada.

By: [signature]

Trina Olsen

# Attachment A

Attachment A

# *State of Nevada*

## *License for Educational Personnel*

***License No. 45778***

*This License Certifies That*

***Trina Olsen***

Has complied with the prescribed rules and regulations of the Commission on Professional Standards in Education and that the Superintendent of Public Instruction has granted this license which authorizes the holder to provide service in the schools of the State of Nevada in the following areas :

| License | Grade Level | Original Endorsement Issue Date | Endorsements | License Issue Date | Expiration Date |
|---|---|---|---|---|---|
| Professional - Secondary | 7-12 | 06/17/1996 | Physical Education | 12/09/2016 | 12/13/2026 |
| Professional - Secondary | 7-12 | 06/22/1998 | Physical Education and Health | 12/09/2016 | 12/13/2026 |
| Professional - Special | K-12 | 12/06/2013 | School Administrator | 12/09/2016 | 12/13/2026 |

### *Provisions to be satisfied*

| Provisions | Required Due Date |
|---|---|

All provisions have been satisfied.

### *Renewal Requirements*

| Renewal Requirements | Required Due Date |
|---|---|

Washoe County School District
DEPARTMENT OF HUMAN RESOURCES
Emily Ellison, Chief Human Resources Officer

425 East Ninth Street * P.O. Box 30425 * Reno, NV 89520-3425
Phone (775) 348-0231* www.washoeschools.net

August 4, 2020

Trina Olsen
1400 Belford Road
Reno, Nevada 89509

Dear Ms. Olsen:

As you are aware, the Letter of Admonition initially provided to you on July 19, 2017 and revised on February 8, 2019, was to be removed three years from the initial letter being provided to you. The date that it should be removed was July 19, 2020.

This communication is to inform you that the Letter of Admonition has been removed from your file.

Wishing you much success in the upcoming school year.

Sincerely,

Emily Ellison
Chief Human Resources Officer

cc: Lauren Ford, Area Superintendent
Virginia R. Doran, Director of Labor Relations

EXHIBIT 28
Witness: Olsen
C. EISENBERG, NV CCR 142

# DECLARATION NO. 2 OF TRINA OLSEN

I, Trina Olsen, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am the Plaintiff in the lawsuit Trina Olsen v. Washoe County School District ("WCSD") and Traci Davis, former Superintendent at WCSD, currently pending before the Federal District Court in Northern Nevada.

2. After being fired in July of 2018, I requested arbitration, which was supposed to occur within a few weeks after the request. WCSD kept delaying the arbitration, which finally occurred in late November of 2018.

3. On December 13th 2018, Arbitrator Andrea Dooley issued her Decision and Award following the complaints against me by WCSD officials and my firing by Traci Davis.

4. Based on the Decision and Award, I was under the impression that I would finally get my job back and would receive some compensation, or that I would get a hearing before the school board about what happened in the 5 days required by the rules.

5. Instead, around December 27th 2018, attorneys from WCSD sent my attorney a settlement agreement, which included provisions saying I would not talk about what had happened between me and WCSD and that I would drop any potential lawsuits against WCSD. I felt like WCSD was holding my award hostage and I refused to sign any settlement agreement that contained these provisions.

6. I felt like despite showing the arbitrator that WCSD had fired me illegally that WCSD was going to continue to fight to get concessions from me in order to get my job back.

7. At this time my husband and I were living off of our savings and credit cards because I did not receive a paycheck since around June of 2018.

///

///

EXHIBIT 29
Witness: Olsen
C. EISENBERG, NV CCR 142

8. I felt like WCSD was intentionally trying to financially drain me and bully me to the point where I couldn't defend myself even though I had won the decision and award.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: Dec. 1, 2019 in Reno, Nevada.

By: Trina Olsen

Trina Olsen