LUKE A. BUSBY, ESQ.
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com

*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

TRINA OLSEN,

                Plaintiff,

vs.

WASHOE COUNTY SCHOOL
DISTRICT, a political subdivision of the
State of Nevada; Washoe County School
District Superintendent TRACI DAVIS;
and DOES 1 through 10, inclusive,

                Defendants.

_____/

Case No.: 3:19-cv-00665-MMD-WGC

**RESPONSE IN OPPOSITION TO
MOTION FOR SUMMARY
JUDGMENT**

**ORAL ARGUMENT REQUESTED**

        COMES NOW, TRINA OLSEN, ("Olsen" or "Plaintiff"), by and through the undersigned counsel, and files the following Response in Opposition to the Motion for Summary Judgment (Doc. #57) filed by Defendant WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of the State of Nevada ("WCSD") on December 4, 2020 and the Joinder thereto filed by Defendant TRACI DAVIS ("Davis") (Doc. #59) on that same date.

        **MEMORANDUM OF POINTS AND AUTHORITIES**

    ***I. Procedural Background***

        The substance of the issues in WCSD's Motion for Summary Judgment have been briefed and are set forth in Olsen's May 17, 2020 Motion for Partial Summary Judgment (Doc. #37), WCSD's Response thereto (Doc. #41), and Olsen's Reply (Doc. #50).   For the Court's convenience, and for sake of clarity of the record, and

in light of the general policy of this Court disfavoring duplicate exhibits (LSR 3-3), Plaintiff will refer to and incorporate herein by reference the Exhibits already filed in this matter by their CM/ECF document number and only include attachments with new documents for the Court's review.

## II. Standard of Review

When a Rule 56 Motion is filed, the moving party has the burden to show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. See *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).  The Court must view the evidence in the light most favorable to the nonmoving party.  *Block v. City of L.A.*, 253 F.3d 410, 413 (9th Cir. 2001).

## III. Statement of Facts

The Plaintiff hereby restates and incorporates herein by reference the Statement of Facts and exhibits thereto in her Motion for Partial Summary Judgment in Doc. #37 from 3:4 to 14:14 and the Reply to Response to Motion for Summary Judgment in Doc. #50, as well as any exhibits referred to below. Included below are pertinent facts necessary to respond to WCSD's Motion.

Olsen has been an employee of WSCD since 1992.  Olsen became a full-time teacher at WCSD in 1996. *See* Declaration of Trina Olsen, Doc. #37-1. Olsen was a probationary employee for three years until 1999, when she gained post-probationary status because she was deemed to have performed her job satisfactorily. *Id.* After working in various positions as a certificated teacher and dean of students, Olsen was promoted to the position of Assistant Principal at Hug High School of the 2016-2017 school year, where she reported to and was supervised by Hug High Principal Lauren Ford "(Ford)". *Id.*

Ford completed Olsen's yearly Performance Evaluation on or about April 21, 2017, and rated Olsen overall effective. *See* Declaration No. 3 in Exhibit 1.  This

was less than a month before WCSD officials began their campaign to dismantle Olsen's career and reputation after Olsen was told that Ford and Dean of Students Jessica Wilson were catching students with illegal drugs, failing to discipline the students for bringing drugs to school, and allowing the students to keep the drugs.

On May 5, 2017, Olsen was informed by a teacher at Hug High of allegations that illegal drugs may have been returned to students by Wilson. Doc. #37-1. When Olsen confronted Wilson, Wilson admitted that she caught a student with marijuana, but had returned the marijuana to the student, and Wilson stated that she has seen Ford do the same thing. *Id.*

Beginning on May 6, 2017 according to text messages between a Hug High teacher and Wilson from around the time of the marijuana incident at issue in this case, the student in question was caught with marijuana at Hug High by Wilson and Wilson returned the marijuana to the student.  *See* Confidential Doc. #37-2.[1]   After seeking the advice of her mentors and colleagues on how to handle the situation, on May 8, 2017, Olsen directed Wilson to self-report the marijuana incident to Ford. Doc. #37-1.

On May 11, 2017, Wilson self-reported the marijuana incident to Ford. *See* Statement of Wilson in Confidential Doc. #37-5 and Affidavit of Ford Doc. #43 at 3. Shortly thereafter, Olsen's troubles at Hug High began.

Also, on May 11, 2017, Olsen, in her capacity as testing coordinator at Hug High, emailed a document that contained an excel spreadsheet that mistakenly included confidential data.  See Exhibit 1.  Olsen believed the sensitive data was not in the spreadsheet, but it was possible to view the data in the cells in the spreadsheet.  Before sending the email containing the spreadsheet, Olsen sent the email to Ford requesting review and approval.  Ford responded, "Thank you. Please send to staff." See Exhibit 1. Even though Ford had expressly approved the

---

[1] Olsen's Motion for Summary Judgment is accompanied by a motion for leave to file Exhibits 2, 5, and 11 thereto under seal per LR-10-5.

dissemination of the spreadsheet that contained the confidential data, WCSD officials then used the testing incident as a pretext to terminate Olsen, while tacitly admitting that Olsen was being fired for reporting the marijuana incident.

On May 17, 2017, Olsen received a letter from WCSD Area Superintendent Roger Gonzalez (Doc. #37-6 and #48-1) informing Olsen that she was being reassigned to Traner Middle School pending an investigation of allegations of misconduct against Olsen.  Gonzalez's letter states that Olsen is being reassigned for, "protection of your rights as well as the rights of students and staff at Hug High School." *Id.* On May 18, 2017, Olsen responded to Gonzalez in a letter stating, "there is much more to this situation, and I will be defending myself."  Doc. #37-7 page 2 and #48-1.  Gonzalez copied Virginia Doran to his response to Olsen, also in Doc. #37-7, to which Doran responded that Gonzalez should direct Olsen not to discuss the investigation. *Id.*

On May 22, 2017, Ford informed Olsen that Ford was removing positive elements of Olsen's employment evaluation more than a month after it was finalized and filed with WCSD.  Doc. #37-1. Olsen objected to these changes to her evaluation because her evaluation was already complete, but Gonzalez refused to intervene.  Doc. #37-8 at 3.  Gonzalez permitted Ford to retroactively change Olsen's employment evaluation in Exhibit 1 such that positive elements of the evaluation were removed.  *See also* Doc. #37-1, #37-8, and #48-3 at 2.

On May 25, 2017, Olsen wrote another email to Gonzalez in Doc #37-10 and #48-4 page 2 requesting to formally report the marijuana incident and requesting a meeting with Gonzalez.   When Olsen reported the marijuana incident described in the Complaint on May 25 in the email at Doc. #37-10 and #48-4 page 2 at 7:42 am, she did not know that Lauren Ford was going to send the first IDP.  See Exhibit 1. On May 31, 2017, Ford wrote an email to Doran (Confidential Doc. #37-11) in which Ford states that she caught a student with drugs but did not suspend the student, but rather gave the student 2 days in school suspension, because the student

provided the names of her dealer and other students who were dealing on campus.

On May 25, 2017, Olsen received a Notice of Investigatory/Due Process Meeting and Right to Representation ("IDP No. 1") signed by Ford, alleging various acts of misconduct against Olsen, including an allegation that Olsen engaged in misconduct for failing to report the marijuana incident to Ford: "You allegedly failed to report to me an incident reported to you on May 8th involving a student, staff member and drugs." Doc. #37-9 and #43-3.  Olsen received the IDP at 10:55 am, when she received the email attached to Exhibit 1.  The allegations in IDP No. 1 date back to April 7, 2017, despite the fact that in the Affidavit of Ford at Doc. #43, page 2, Ford states, "I never had any significant issues with Ms. Olsen until May 2017."

In the Affidavit of Roger Gonzalez at Doc. #48 page 4, Gonzalez claims that "…my belief is that she brought these allegations without having a good faith belief that Lauren Ford had returned drugs to a student and in retaliation for Ms. Ford providing Ms. Olsen with an IDP notice."  However, as shown in the Declaration of Olsen in Exhibit 1 and the emails attached thereto, Olsen reported the marijuana incident to Gonzalez before she was provided with IDP No. 1.

On June 1, 2017, Olsen authored an email to Gonzalez requesting a meeting, referring to her earlier email to Gonzalez involving the marijuana incident. See Doc. #37-12.  Gonzalez then wrote an email to Doran, also in Doc. #37-12, and stated:

> I do not want to meet with her at this time. With regard to the marijuana allegation (which was actually about suspension not about returning drugs), it seems she is only going to bury herself deeper. Should I advise her to just use the form?

In the same email chain, Doran responded to Gonzalez: "I concur...let's see where this goes" *Id.*

In another email chain dated June 1, 2017 (Doc. #37-13), shows that rather than looking into whether Olsen's allegations were accurate, the same day Olsen

was looking to Gonzalez for help addressing the issue, Gonzalez and Doran were instead communicating with Ford about the marijuana incident.  On June 2, 2017, in an email exchange between Ford and Doran, Doran describes that the amount of marijuana at issue, that it "wouldn't have even qualified for a police measurement...as I understand it." Doc. #37-4.[2]

On June 22, 2017, Olsen joined the Washoe School Principals' Association, and at all times was governed by the 2017-2019 Negotiated Agreement between WCSD and the Association.[3]  See Doc. #37-40 and Olsen's Third Declaration in Exhibit 1.

On June 26, 2017, Olsen received another IDP ("IDP No. 2"), also signed by Ford, alleging various acts of misconduct against Olsen surrounding her sending an email to Hug Staff that contained confidential materials. Doc. #37-15 and #43-4. What Ford does not mention, is Olsen sent the email in question to Ford for approval before sending it to Hug Staff, which Ford provided.  See Exhibit 1.  This fact was also found by Arbitrator Dooley, who concluded that, "…Ford should bear some responsibility for her oversight, but it was also reasonable of her to expect that Olsen, as the designated test coordinator, had done the job correctly."  Doc. #37-33 page 40.[4]

On July 19, 2017, Olsen received a Letter of Admonition ("LOA"), signed by Ford, in Doc. #37-16 and #43-5.  Also, on July 19, 2017, Olsen received a second

---

[2] NRS 201.090 et seq. makes contributing to the delinquency of a minor a crime, including prohibiting causing a minor to take drugs or alcohol. Presumably WCSD does not dispute the fact that allowing students to keep drugs and/or alcohol at school is unlawful.

[3] See definition of "unit member" or "member" at Article 1, 1.2 in Doc. #37-40 at page 5.

[4] The findings of fact in Arbitrator Dooley's Decision and Award in Doc. #37-33 have been actually litigated and are subject to application of the doctrine of collateral estoppel.  Collateral estoppel should apply where the issue at stake is identical to one alleged in prior litigation and the issue has been actually litigated in prior litigation, and determination of issue in prior litigation was a critical and necessary part of judgment in earlier action. *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 61 USLW 2032, Fed. Sec. L. Rep. P 96821, 1992 WL 126611 (9th Cir. 1992).

LOA, signed by Ford, attached hereto as Doc. #37-17 and #42-6. Both LOAs contain "Performance Expectations" instructing Olsen to, "make these improvements immediately." *Id.*  However, it was never Ford or Gonzalez's intention to allow Olsen to improve, because Olsen had already been transferred to Trainer Middle School and a few days after the LOAs were issued and Olsen was placed on leave with pay for a year days after receiving the LOAs before Gonzalez recommended that she be terminated.

Despite the instructions in the LOA's and the implication from the terms of the LOAs that Olsen would be given an opportunity to improve her performance in accordance with the "Performance Expectations" in the LOAs, on July 19, 2017, the same day the LOAs were issued, Olsen received another IDP ("IDP No. 3") signed by Gonzalez. Doc. #37-18 and #48-6.  In fact, Olsen received IDP #3 from Gonzalez immediately after receiving the LOAs from Ford.  See Deposition of Olsen Doc. #58-1 at 41 of 199, where Olsen describes receiving IDP No. 3 moments after receiving the LOAs.

Article 18 of the Negotiated Agreement in Doc. #37-40 provides that:

> Disciplinary actions, including but not limited to, demotion, suspension, dismissal, and non-renewal actions taken against post-probationary unit members (in accordance with NRS 391), shall be progressive in nature and related to the nature of the infraction. Unit members shall be given reasonable opportunity for improvement.

> The School District shall not discharge, demote, suspend or take any other disciplinary action against a post probationary bargaining unit member of this unit without just cause. *Id.* at 22

In IDP No. 3 in Doc. #37-18 and #48-6, dated July 19, 2019, Gonzalez made three allegations of misconduct against Olsen: Gonzalez alleged: (1) That Olsen brought false claims and allegations against Lauren Ford regarding the marijuana incident; (2) That Olsen brought false claims and allegations against Lauren Ford

regarding following the supervision timeline; (3) That Olsen had discussions with Hug staff about her pending case despite instructions that she not do so.

On July 27, 2017, Olsen received a letter from Gonzalez informing her that she was being placed on Administrative leave with pay pending resolution of the allegations of misconduct against her. Doc. #37-19 and 48-7.  In the letter, Gonzalez also directed Olsen not to discuss the investigation with anyone except counsel or her WSPA representative.  *Id.*

On August 22, 2017, Olsen wrote a letter to Traci Davis (Doc. #37-20) appealing the two LOAs issued on July 19, 2017.  On September 28, 2017, then Deputy Superintendent Kristin McNeil held a hearing on Olsen's appeal of the LOAs.[5]  On November 14, 2017, McNeil issued two letters in Doc. #37-21/#46-1 and Doc. #37-22/46-2 denying Olsen's grievance against WCSD and upholding and dismissing various allegations of misconduct against Olsen. In the Affidavit of Roger Gonzalez at Doc. #48 page 4, Gonzalez states, "Ms. McNeill copied me on her decisions to uphold each of the LOAs."

On November 17, 2017, Olsen wrote to Davis directly requesting a 15-minute meeting to discuss what was happening, but Davis never responded. Doc. #37-23.

On Monday May 7, 2018, Dawn Huckaby, Chief Human Resources Officer at WCSD wrote Doran to inquire as to the status of Olsen and when her "letter goes out for separation" because WCSD was looking to fill Olsen's position. Doc. #37-24. Doran responded that it was "Probably going out by Wednesday." *Id.*

On June 28, 2018, Gonzalez authored a letter to Olsen in Doc. #37-25 and #48-8, copied to Davis and other WCSD employees, which recommended that Olsen be dismissed from WCSD.  The letter in Doc. #37-25 and #48-8 states that: "On July 26, 2017, an Investigatory/Due Process (IDP) meeting was held with you

---

[5] Despite the fact that McNeil's hearing took place after IDP No. 3 was issued, Olsen was not permitted by McNeil to address the allegations in IDP No 3.  See Olsen's Declaration in Exhibit 1.  Further, Olsen was not provided with enough time to address the allegations in both IDP Nos. 1 and 2 at the hearing before Ms. McNeil.  *Id.*

1  to hear your responses to allegations. With you and me at the meeting was Richard

2  Swanberg, Area Superintendent and Alyson Kendrick, WSPA President."[6] *Id.*  On

3  page 2, of Doc. #37-25 and #48-8, referencing the marijuana incident, Gonzalez

4  states:

> What the Dean had observed was Principal Ford not issuing a
> consequence to another student who possessed marijuana as
> that student ***had served as an informant and had provided***
> ***the school with the name of the student who was dealing***
> ***the drugs on the campus***.  [***emphasis added***][7]

8  Ms. Kendrick's notes from the July 26, 2017 meeting for IDP No. 3 are

9  attached to Olsen's deposition at Doc. #58-1 at 104-107.  Ms. Kendrick's notes

10  show that the only topics addressed at the July 27, 2017 meeting were the three

11  allegations in IDP No. 3 in Doc. #37-18 and #48-6.[8]

12  Despite the fact that only three allegations were on the IDP No. 3 in Doc.

13  #37-18 and #48-6 and were addressed at the July 26, 2017 meeting, Gonzales

14  listed eight additional allegations in the letter in Doc. #37-25 and #48-8 related to:

15  (1) grade change policies; (2) improperly providing credit forms to teachers; (3)

16  signing evaluations without supervisor approval; (4) failure to supervise staff; (5)

17  sending an email with unredacted secure information; (6) dishonesty during an IDP

18  meeting; (7) failure to verify that staff watched a video; and (8) sending text

19  messages to staff about disciplinary matters. *Id.*  In fact, two of the allegations

20  made against Olsen in Gonzalez's letter in Doc. #37-25 and #48-8 had actually

21  been dismissed by Superintendent McNeil in her findings in Doc. #37-21 and Doc.

---

[6] According to Ms. Kendrick's notes erroneously state the meeting took place on July 27, 2017.

[7] Despite Mr. Gonzalez's plain statement in Doc. #37-25 and #48-8, WCSD later disputed that it used students as criminal informants. See Doc. #37-37 at page 3.  The letter in Doc. #37-37 also states that it would be defamation to suggest that an administrator did not turn drugs over to law enforcement, essentially threating Olsen with a defamation suit. However, Wilson's text messages in Confidential Doc. #37-2 clearly show that Wilson did, in fact, return drugs to a student.

[8] Kendrick's notes in Doc. #58-1 at 104-107 are not offered for the truth of the matters asserted therein, just to show that only topics addressed at the July 26, 2017 meeting were the three allegations in IDP No. 3.

#37-22. For allegation 6, McNeil concluded that Olsen was not dishonest and that the word "dishonest" should be removed from the allegation, but the allegation that Olsen was dishonest also was included in Gonzalez's letter in Doc. #37-25 and #48-8.[9]   For allegation 8, McNeil concludes that the allegation should be removed.[10]   Gonzalez's letter in Doc. #37-25 and #48-8 also contains completely new allegations that were never addressed by McNeil and were not included in IDP No. 3 from Gonzalez, that Olsen, "signed and finalized the evaluation for Lorrie Foley on April 12, 2017 without your supervisor's approval."  Further, by its own terms, Gonzalez's Recommendation for Dismissal contains allegations of misconduct against Olsen that he alleges occurred after the July 26, 2017 hearing resulting from IDP No. 3:

> In addition, shortly after the IDP meeting on July 26, 2017 you contacted Ryley Coker, again, and made very threatening and unprofessional comments to him about his loyalty and that you were always defending him with Principal Ford.

In the Affidavit of Roger Gonzalez at Doc. #48 page 4, Gonzalez repeats this allegation: "In addition, after Ms. Olsen's IDP meeting with me in July 2017, it came to my attention that she had made threatening statements to employee Ryley Coker about his loyalty to her."

Subsequent to issuance of Gonzalez's Recommendation for Dismissal in Doc. #37-35, Olsen was not provided with notice, a hearing, or an opportunity to be heard on the renewed, previously dismissed, or new allegations of misconduct against her before she was terminated.

Attached to Gonzalez's letter in Doc. #37-25 and #48-8 is a copy of the provisions of NRS 391.822 - the letter specifically states that, "If you wish to appeal this action, you will need to follow NRS 391.822 (attached document)."

On July 6, 2018, Olsen's then counsel filed a Request to Arbitrate the matter

---

[9] See Doc. #37-22 at page 5: "I agree that the word dishonesty should be removed."
[10] See Doc. #37-22 at page 8: "This allegation should be removed."

of the recommendation of her firing by Gonzalez which was addressed directly to Davis.  Doc. #37-26.  Also on July 6, 2018, Olsen's then counsel sent a Grievance Protesting Recommendation to Discharge, which was also addressed directly to Davis. See Doc. #37-27.

On July 23, 2018, after not receiving her paycheck, Olsen was informed by WCSD via email that because her status at WCSD was "recommended for dismissal," her pay had been suspended.  See Doc. #37-29.

On July 27, 2018, Olsen was notified by Davis that she was discharged effective (retroactively) July 5, 2018, despite the fact that Davis, by the very terms of the July 27, 2018 letter, was aware that Olsen had elected to arbitrate the matter and that arbitration proceedings were in process.  See Doc. #37-30.   At her Deposition, Davis stated that at the time she issued the letters in Doc. #37-30 that she knew that Olsen requested arbitration.  Doc. #37-31 at 41:23.

Olsen's termination was the subject of arbitration proceedings before Arbitrator Andrea L. Dooley in Case No. LA-627-2018 on November 1st, 2nd, and 28th of 2018, conducted in Reno, Nevada.  Dooley issued a Decision and Award on December 13, 2018 in Doc. #37-33.  Arbitrator Andrea Dooley emphatically found in Olsen's favor, i.e. that Olsen was retaliated against by WCSD for reporting the marijuana allegations, that her termination was arbitrary and capricious, and that WCSD violated applicable law.  *Id.* In addressing the allegations against Olsen, Arbitrator Dooley found that WCSD was piling on accusations against Olsen months after they occurred "to bolster the discipline and not because it was supported by just cause." Doc. #37-33 page 23.

The Arbitrator's Decision and Award stated that WCSD, "…must reinstate Ms. Olsen and make her whole back to July 5, 2018, the superintendent will then follow the provisions of 391.824(6)." *Id.*  WCSD did not comply with the provisions of NRS 391.824(6) within 5 days of the Decision and Award.  Rather, in the time period following issuance of the Decision and Award, WCSD proposed that Olsen

sign a settlement agreement that contained non-disparagement and confidentiality provisions in exchange for rehiring her and paying Olsen's back pay. *See* Doc. #37-34.  Olsen refused to sign WCSD's proposed settlement agreement because she felt that WCSD was trying to sweep Olsen's allegations under the rug. *See* Doc. #37-1.

On January 9, 2019 Olsen was given her job back and was subsequently provided with backpay from July 5, 2018 to the date of rehire.  *See* Doc. #37-35.

On February 8, 2019, WCSD issued a "Revised Letter of Admonition" to Olsen for various alleged infractions.  This Letter of Admonition was signed by Ford, who had subsequently been promoted to Area Superintendent to an area of WCSD that does not include Hug High, or Wooster High School, where Olsen was rehired by WCSD and where she currently works. See Doc. #37-38.

Davis testified that the decision to fire Olsen was made in conjunction with other officials at WCSD, including the Office of General Counsel at WCSD and "the deputy," meaning then Deputy Superintendent McNeill, and that Davis would receive input and advice from WCSD staff on the issues before making a decision. Doc. #37-31 at 33-36. When presented with the document in Doc. #37-30, which is the letter signed by Davis terminating Olsen's employment, Davis stated that she recalled slightly that the dispute between WCSD and Olsen was going to an arbitrator to decide and that Davis was advised that it was ok that Olsen be fired at that time. *Id.* 41:23. Davis also testified that Olsen was not treated any differently than any other employees at WCSD subject to discipline and as far as she was aware Olsen was treated the same way as similarly situated people at the district. *Id.* 50:4.

On February 3, 2020, 417 days after issuance of the Decision and Award, and only in a response to pending hearing on a Motion for Preliminary Injunction filed in this case by Olsen, then Interim Superintendent McNeill issued a letter to Olsen stating that WCSD does not intent to recommend Olsen's dismissal, "or take

1  any adverse employment action against you based on the facts and circumstances

2  addressed in the Arbitration Recommendation." Doc. #37-39.

3       Olsen suffered more than the injury to her reputation and status within

4  WCSD than was described in Doc #37-1.  Olsen suffered additional pecuniary

5  losses in her dispute with WCSD beyond the loss of her pay for 6 months, including

6  being required to pay her former counsel $27,870 to represent her in the dispute.

7  See Doc #42-2, Plaintiff's Interrogatory Response to Interrogatory No 8.  Olsen was

8  also required to pay Arbitrator Dooley $4,931. See Exhibit 1. This is roughly half of

9  the amount Olsen recovered in back pay before taxes, and as such, any intimation

10  that Olsen did not suffer any pecuniary loss is simply false.

11       However, to date, and despite WCSD's assurances, Olsen is still dealing with

12  the fallout from the marijuana incident.  For example, the three-year probationary

13  period that Administrators are required to serve under NRS 391.820(8), should

14  have expired because Olsen was hired as an Assistant Principal at Hug High in

15  2016.  Despite this, WCSD still considers Olsen to be a probationary employee

16  because of the time she spent on leave with pay.  See Exhibit 1.  On August 4,

17  2020, Olsen received the letter in Doc. #56-1 informing Olsen that the February 8,

18  2019 LOA was being removed from her file.

19      ***IV. Argument***

20      **i. Olsen was a postprobationary employee with a protected property**

21  **interest in her employment with WCSD**

22      WCSD argues that Olsen had no property right in her position at WCSD

23  because she was a "probationary" employee.  Motion at 15:10. Whether Olsen had

24  a property interest in her "position" is not the issue, rather, the issue is whether

25  Olsen had a property interest in her continued employment with WCSD.  In

26  WCSD's statement of facts it acknowledges that Olsen was a "postprobationary"

27  teacher.  *Id.* at 2:21. "Postprobationary" means that the employee has a right to

28  continued employment with the district. See NRS 391.810 and *Nissen v. Churchill*

*Cty. Sch. Dist.,* No. 95-15802, 1996 U.S. App. LEXIS 14561, at *3 (9th Cir. May 31, 1996).  Once conferred, a property interest may not be deprived without "appropriate procedural safeguards." *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)

Under NRS 391.820(8)(a) and (b), a post-probationary teacher who is employed as an administrator and then not offered reemployment, may accept a position as a teacher - WCSD was required to, "…offer the person a contract as a teacher for the ensuing school year."  This provision is clearly intended to protect the vested property interest that a postprobationary employee enjoys under law.  In Olsen's case, although WCSD made an offer to demote Olsen to a teaching position, no such contract was offered (See Olsen's declaration at Exhibit 1 par. 8).  The substantial evidence in this case shows that Olsen was not simply, "not offered reemployment" as the term is contemplated under NRS 391.820(8).  Instead, the record shows clearly that it was WCSD's objective to terminate Olsen for cause no matter the facts, which Gonzalez recommended in Doc. #37-25 and WCSD ultimately did when Davis fired Olsen, effective July 5, 2018. See Doc. #37-30.  See *Cain v. McQueen*, 580 F.2d 1001 (9th Cir. 1978)- even probationary teachers have some property interest in their employment under NRS Chapter 391.

In *Palm v. Los Angeles Department of Water and Power*, 889 F.3d 1081 (9th Cir. 2018), the court found that a permanent employee, serving in a probationary position lacked a protected property interest in the position, but not in his overall employment.  Because Olsen was a post-probationary employee, Article 18 of the Negotiated Agreement in Doc. #37-40 required that Olsen could only be fired for just cause.  "If discharge can only be for just cause, an employee has a right to continued employment until there is just cause to dismiss him." *Palm v. L.A. Dep't of Water & Power*, 889 F.3d 1081, 1083 (9th Cir. 2018).  Further, at the arbitration conducted before Dooley, WCSD and Olsen agreed that "just cause" was required before Olsen could be disciplined:

> "Regardless of whether this case is properly subject to NRS 391.822 and 391.824 or is subject to the Negotiated Agreement's binding arbitration procedure, the parties agree that the Employer bears the burden to demonstrate that just cause exists for the discipline imposed on the grievant, Trina Olsen."

Doc. #37-33 at 20

**ii. The deprivation of Olsen's rights were not *de minimus***

WCSD also argues that the deprivation that Olsen suffered was *de minimus*. Motion at 16:20, and that Olsen suffered no economic loss due to being fired, because she received back-pay, citing *Bordelon v. Chicago School Reform Bd. Of Trustees*, 233 F.3d 524, 530 (7th Cir. 2000). This is simply a false assertion. Olsen was deprived of her income for six months, was required to pay attorney's fees and costs associated with WCSD's allegations and has suffered continuing and irreparable harm to her reputation and career. See Doc. #37-1 and Response to Interrogatory No. 8 at Doc. #58-1 page 5. WCSD only provided back-pay for the time that Olsen was terminated, it has not made Olsen "whole" as described in arbitrator Dooley's award. Under Section 1983, if successful, Olsen is entitled to recover damages typically available in tort cases, as Section 1983 actions are "[A] species of tort liability." *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988 (1976). "[M]ental and emotional distress caused by the denial of procedural due process itself is compensable under 42 U.S.C.S. § 1983." *Carey v. Piphus*, 435 U.S. 247, 248, 98 S. Ct. 1042, 1044 (1978). As indicated in Olsen's response to WCSD's Interrogatory No. 9 at Doc. #58-3 at page 5 makes the emotional toll Olsen suffered clear: "This entire process has been extraordinarily emotionally taxing and humiliating because WCSD has been trying to gaslight me from the beginning when I knew what I did was right."

WCSD cites *Head v. Chicago School Reform Bd. Of Trustees*, 225 F.3d 794, 803 (7th Cir. 2000), in support of the claim that if backpay is provided, that a *de minimus* deprivation occurred. In *Head,* the 7th Circuit found that a school

15

principal that was provided adequate process, and as such, the Court did not reach the question as to whether the deprivation in that case was *de minimus*. The word, "backpay" does not appear in the Head decision and WCSD's reading of that case does not follow from the facts contained therein – i.e. its clear that in *Head* the fired principal continued to get paid until the dispute was resolved, unlike Olsen who was terminated for 6 months without pay despite a clear prohibition in the law stating that she could not be fired or have any further action taken against her until after arbitration occurred, i.e. NRS 391.824(1).

Even a 16-day suspension without pay is a deprivation of employment that implicates the protections of due process.  *Eldridge-Murphy v. Clark Cty. Sch. Dist.,* No. 2:13-cv-02175-JCM-GWF, 2015 U.S. Dist. LEXIS 5621, at *9 (D. Nev. Jan. 14, 2015) citing *Assoc. for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).  Further, pursuant to Olsen's Amended Complaint in this matter, Olsen is not only seeking to recover compensatory and punitive damages from WCSD and Davis, she is seeking a declaratory judgment pursuant to NRS 30.030 that the actions of WCSD and Davis were unlawful and violate the US Constitution and the Nevada constitution.

**iii. Olsen was entitled to a pre-deprivation due process under all applicable laws and the 14th Amendment to the Constitution[11]**

WCSD argues that Olsen was afforded due process before and after the deprivation. Motion at 18:13. The Due Process clause of the 14th Amendment protects public employees "from erroneous or unjustified deprivations of life, liberty, or property, and assures them that the government deals with them fairly." *Knudson v. Ellensburg*, 832 F.2d 1142, 1144 (9th Cir. 1987) citing *Carey v. Piphus*,

---

[11] This matter was filed by Olsen in the Second Judicial District Court in Washoe County, but was removed to this Court by WCSD on November 1, 2019. See ECF Doc #1.  The State of Nevada waives 11th Amendment sovereign immunity when it voluntarily removes a case to Federal Court.  *Embury v. King*, 361 F.3d 562 (9th Cir. 2004) and *Walden v. Nevada*, 945 F.3d 1088, 1091 (9th Cir. 2019).

435 U.S. 247, 259, 262, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978).

Before Olsen discovered and reported the marijuana incident, her career had been discipline free.  Doc. #37-1.  What followed her discovery of these facts was a sham attempt to show that Olsen was provided with due process, and sham hearings by the person she had accused of misconduct, Ford, and by Gonzalez, who, after refusing to meet with Olsen after she reported the marijuana allegation, inquired as to whether, "…she is only going to bury herself deeper," (See Doc. #37-12) with Gonzales ultimately recommending that Olsen be dismissed from WCSD.  See Doc. #37-25 and #48-8.   Cleary, Ford and Gonzalez were not impartial parties.  WCSD argues that am employee is only entitled to an impartial decision maker at a post-deprivation hearing, citing to *Walker v. Berkeley*, 951 F.2d 182, 183 (9th Cir. 1991) and *Clements v. Airport Auth.*, 69 F.3d 321, 333 (9th Cir. 1995).  However, the provision of a post deprivation process does not excuse WCSD's failure to provide the required pre-deprivation due process.

Due Process requires: (1) notice of the charges (2) an explanation of the evidence against the employee, and (3) an opportunity for the employee to present her side of the story.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).   A pre-termination notice must include specific notice of the charges and grounds for the proposed action, an explanation of the evidence and witnesses, notice of the opportunity to be heard to present responses and defenses to the decision maker. *Gilbert v. Homar*, 520 U.S. 924, 929, 117 S. Ct. 1807, 1811 (1997).  The facts show that in Gonzalez's Recommendation for Dismissal in Doc. #37-25 and #48-8, additional allegations of misconduct and allegations that were dismissed by McNeil were made against Olsen that she never was given notice of, a hearing for, and an opportunity to be heard about until the post-deprivation arbitration proceeding took place.  See Doc. #37-33.  Because Olsen only had notice of certain charges or portions of the evidence, and Tracy Davis considered the new and material information in Gonzalez's Recommendation for Dismissal

when she upheld the recommendation for dismissal (Doc. #37-30) that was not disclosed to Olsen, Olsen's right to due process was violated. *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1376 (Fed. Cir. 1999).[12]

The denial of a pre-termination hearing is a constitutional violation sufficient to support damages. *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1149 (9th Cir. 1987).  To satisfy the requirements of due process under Federal Law, employees with a protected property interest in their employment need to receive notice and an opportunity for a hearing **before** being deprived of that property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 535 (1985).  "Affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays." *Id.* at 535.   While state law does not determine whether federal due process requirements were violated, "The essential requirements of due process…are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Id.* at 546.  Even if extensive post-termination proceedings take place, they do not eliminate the requirement for pre-termination due process. *Id.*  Here, the evidence shows that Olsen was subjected to an ever-shifting landscape of vague and ill-defined allegations of misconduct and was denied any opportunity to respond to the new and renewed allegations against her in the Recommendation for Dismissal in Doc. #37-25 and #48-8.

In determining what process is due, courts balance: (1) the private interest that will be affected, (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedures, and (3) the government's interest, including the functions involved and

---

[12] "An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings." *Stone v. FDIC*, 179 F.3d 1368, 1376 (Fed. Cir. 1999).

the burdens of additional or substitute procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976). Applying these factors to Olsen's case, Denial of a person's income for a period of approximately six months is a devastating loss, requiring the pre-deprivation protections of due process. *Goldberg v. Kelly*, 397 U.S. 254, 270, 90 S. Ct. 1011, 1021 (1970).   Based on the ultimate outcome before the arbitrator on Doc. #37-33, the risk of erroneous deprivation was high and had WCSD follows the procedures prescribed in NRS 391.824 the deprivation could have been completely avoided.  At the time Olsen was fired, she had been on leave with pay for just under a year, (See Doc #37-19 and #37-30) there was no government interest or need to fire Olsen her prior to holding a predeprivation hearing after issuance of the Recommendation for Dismissal in Doc. #37-25 and #48-8.  Olsen's protected property interest clearly outweighed any rush to fire her without a full and fair hearing – especially when an applicable statute, NRS 391.824(1) required such a hearing before termination could lawfully occur.  For over forty years Courts have been crystal clear that a predeprivation hearing must occur before employees are finally deprived of their property interest. *Mathews v. Eldridge*, 424 U.S. 319, 347, 96 S. Ct. 893, 909 (1976).  This was not a case where there was any need to act quickly that would make a predeprivation hearing impractical. See *Gilbert v. Homar*, 520 U.S. 924, 932 (1997).

Olsen was removed from her job at Hug High on May 17, 2017. See Doc. #37-6.  Olsen was terminated "effective July 5, 2018." Doc. #37-30.  Olsen was rehired after arbitration on July 9, 2019.  Doc. #37-35.  It took Olsen six-hundred and two days from the date she was removed from her job at Hug High until she was vindicated in part by being reemployed as an assistant principal at Wooster.  Post-termination remedies should be prompt and return the plaintiff to her rightful position. *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004).  WCSD's argument that its failure to comply with pre-deprivation procedures should be excused by post deprivation procures is belied by

the fact that lack of speedy resolution of Olsen's dispute resulted in further denial of due process, especially considering that the applicable statute requiring a post deprivation hearing, NRS 391.824, is designed to be a pre-deprivation remedy.

WCSD cites a recent decision from this Court in a *Enos v. Douglas Cty.*, No. 3:17-cv-00095-MMD-CBC, 2020 U.S. Dist. LEXIS 49073, at *21 (D. Nev. Mar. 20, 2020) for the proposition that the minimum due process required under the 14 Amendment is not defined in state law.  Irrespective of the protections of the 14th Amendment, teachers are at least entitled to the procedural protections afforded to them by statute.  *Cain v. McQueen,* 580 F.2d 1001, 1004 (9th Cir. 1978).  Further, WCSD fell far short of meeting the minimal due process guarantees of the 14th Amendment in its treatment of Olsen, much less the fact that it straightforwardly and knowingly violated NRS 391.824(1).

### iv. The actions of Davis are a policy of WCSD

Davis' firing of Olsen occurred under color of Nevada law and the action resulted in the deprivation of Olsen's constitutional rights.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988).  "A public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).  Because Davis fired Olsen, Davis' conduct was the actionable cause of Olsen's claimed injury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008).  WCSD argues that it is not independently liable under *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2035-2036 (1978), because Olsen has not suffered a deprivation of a constitutional right and her firing was not the result of a policy of WCSD.  Motion at 25.

Actions of Davis are a policy or custom of WCSD.  See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or

body with final policymaking authority over the subject matter of the offending policy.  Local governments are liable for underlying 42 U.S.C. 1983 claims if the deprivation is the result of the agency's custom, policy, or practice. *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). See also *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006).  Davis, as superintendent of WCSD, deprived Olsen of her rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within WCSD, including over the decision to fire Olsen.  *Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir.2013).

Whether an official is a policymaker for *Monell* purposes is a question of state law for the court. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); see *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir.2013).  The determination is made on a function-by-function approach analyzed under the state organizational structure. *Goldstein*, 715 F.3d at 753.  A "policy" is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy. *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir.2008).  From the statutory scheme in NRS 391.210 *et seq.*, and WCSD's policies, the superintendent of WCSD has the policymaking authority to terminate WCSD employees.  WCSD Board Policy 4105[13] states in pertinent part, "Authority is delegated by the Board of Trustees to the Superintendent to implement the employment procedures of the District."  WCSD Board Policy 9085(a) "Delegation to Superintendent" states in pertinent part that:

> …the superintendent is authorized, within the powers and authority of the Board of Trustees, to make all decisions, take actions, establish practices, develop activities, and **generate further policies, rules or procedures as**

---

[13] WCSD Board Policies are available at https://www.wcsdpolicy.net/searchboardpolicy.php

*necessary and/or desired*…"  [*emphasis added*]

(See Exhibit 2)

WCSD Board Policy 9085(f) states in pertinent part: "…the Superintendent is authorized to establish all further procedures, make all decisions, take all actions, establish all practices, and develop all activities."  WCSD Board Policy 9088 "Trustee/Superintendent Relations" states in pertinent part that: "…all authority and accountability of staff, as far as the Board is concerned, is considered the authority and accountability of the Superintendent." The "function" of firing Olsen was carried out by Davis (Doc. #37-30) and was done in coordination with her team at WCSD, including WCSD's Office of General Counsel.  Doc. #37-31 at 11:4, 24:19, and 35:3.  The idea that Davis was acting beyond the scope of her policymaking authority at WCSD or in a vacuum as a rouge employee at WCSD for purposes of evaluating *Monell* liability is inconsistent with the undisputed facts and Davis' testimony in #37-31.

WCSD is liable for the acts of Davis if these acts caused a constitutional violation, even if the constitutional violation occurs only once. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 & n.6 (1986).  Olsen was terminated by Davis with the full knowledge that Olsen had opted to arbitrate her dispute with WCSD in accordance with NRS 391.824, of WCSD administration and the Board of Trustees, and the current Superintendent at WCSD, Kristin McNeill, as shown by Doc. #37-21, #37-22, #37-25, #37-#37-26, #37-27, and #37-28.

As the letter in Doc. #37-30 shows, Davis knew that Olsen's case was subject to arbitration, but Davis was indifferent to Olsen's due process rights and fired Olsen anyway.  Davis's action in terminating Olsen with deliberate indifference to her rights was a policy of WCSD.  Olsen's firing was a violation of the statutory provisions applicable to WCSD governing the dispute between Olsen and WCSD, and Olsen's underlying Constitutional Due Process protections, the provisions of which Davis and WCSD deliberately ignored in their effort to pressure Olsen to stop

22

speaking publicly about what had occurred at Hug High. Davis testified at her deposition in Doc. #37-31 that Olsen was not treated any differently than any other employee at WCSD subject to discipline and as far as she was aware Olsen was treated the same way as similarly situated people at the district. *Id.* 50:4. Davis' own statements make clear that WCSD has a pattern and practice of ignoring the law when it handles disputes with employees.

At her deposition, when asked whether WCSD had a policy in effect in Washoe County School District of disciplining or terminating employees who reported allegedly unlawful activity, Davis answered, "I don't recall the policy, but I'm sure there is a policy. There are thousands of policies." *Id.* at 72:22. Davis also asserted that the decision to fire Olsen was made by "The Team" (Id. at 41:15), including WCSD's counsel. *Id.* at 66:16. Officials such as Davis, "…cannot cloak themselves in immunity simply by delegating their termination procedure decisions to their legal department, as the availability of such a defense would invite all government actors to shield themselves from § 1983 suits by first seeking self-serving legal memoranda before taking action that may violate a constitutional right." *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006) citing *V-1 Oil Co. v. Wy. Dept. of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990).  The moving force behind Olsen's premature and unlawful dismissal was the policy of Davis and WCSD to disregard the law governing due process.

It is well established that a choice among alternatives by a municipal official with final decision-making authority may also serve as the sole basis of *Monell* liability.  See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986); *Brown v. Lynch*, 831 F.3d 1146, 1152 (9th Cir. 2016).  A Section 1983 authorizes suit against entities for damages if the enforcement of a policy or practice, or the decision of a final policymaker, caused the violation. *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). Ratification of the decisions of other WCSD officials by Davis, an official with final decision-making authority, can also be a

policy for purposes of municipal liability under § 1983. *Trevino v. Gates*, 99 F.3d 911, 920–21 (9th Cir. 1996) and *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).  Davis' letter in Doc. #37-30 specifically states that she is upholding the recommendation of Gonzalez to dismiss Olsen.

### v. WCSD violated Olsen's rights under Nevada's Due Process Clause

WCSD argues that the Court should enter summary judgment as to Olsen's Due Process claim under the Nevada Constitution because Olsen received due process before and after her termination.  Motion at 27.  The Nevada Constitution provides that, "No person shall be deprived of life, liberty, or property, without due process of law."  Nev. Const. Art. 1, § 8(2). The questions are, what process was due, and did Olsen receive such process before she was terminated by Davis?

Nevada's due process requirements are largely coextensive with that of the 14th Amendment, requiring notice, a hearing, and an opportunity to be heard before a person may be deprived of a property interest.  *Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007).  A violation of the Due Process Clause occurs when a state actor deprives a person of a property right granted by the state. *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortg.*, 133 Nev. Adv. Rep. 5, 388 P.3d 970, 971 (Nev. 2017).  "The Supreme Court of Nevada has relied on federal precedent in determining the scope of Nevada's Due Process clause. Therefore, the analysis for both counts is the same." *Armstrong v. Reynolds*, No. 2:17-cv-02528-APG-CWH, 2019 U.S. Dist. LEXIS 36058, at *4 n.16 (D. Nev. Mar. 6, 2019) citing *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortgage*, 388 P.3d at n.3 (Nev. 2017).

There is no genuine issue of fact as to whether WCSD deprived Olsen of a statutorily granted property interest in her employment at WCSD in violation of its own procedural safeguards, i.e. the right for a postprobationary employee to seek to arbitrate the recommendation that she be terminated in accordance with NRS 391.822, and the prohibition in NRS 391.824(1) on taking any further action relating

24

1  to the recommendation to dismiss the Olsen until the written report of the arbitrator

2  was filed.  Davis fired Olsen and cut off her pay effective July 5, 2018 (Doc. #37-

3  30), and the Decision and Award was issued on December 13, 2018.  Doc. #37-33.

4  WCSD admits that it failed to comply with the express provisions of Nevada

5  law. See Motion at 22:4: "Frankly, though the process may not have strictly

6  followed certain Nevada statutes…"  Firstly, Olsen's case was not an inadvertent

7  failure to strictly comply with an unclear or difficult provision of Nevada law.  The

8  facts show that WCSD was made aware of the requirement that it await the

9  outcome of arbitration, but it chose to simply disregard the law and to fire Olsen

10  despite the law.  *See* Doc. #37-26 Notice of Intent to Arbitrate, and Doc. #37-30,

11  Termination Letter from Davis acknowledging that arbitration was requested.

12  In Nevada, public employees who may be terminated only for cause have a

13  constitutionally protected property interest and are entitled to due process **before**

14  being deprived of that interest.  *Pressler v. City of Reno*, 118 Nev. 506, 511, 50

15  P.3d 1096, 1098 (2002).  Because Olsen was a postprobationary employee as

16  described above who could only be fired for just cause, WCSD violated the Due

17  Process Clause of the Nevada Constitution when it fired Olsen in violation of the

18  procedural requirements of NRS Chapter 391 and where its firing Olsen was

19  retaliatory, was arbitrary and capricious, and without just cause as found by

20  Arbitrator Dooley. Doc. #37-33.

21  Olsen also had the right, subsequent to the arbitration process described in

22  NRS 391.822 et seq, to be affirmatively informed, "that dismissal of the employee

23  will not be recommended to the board and that no further action will be taken

24  against the employee."  *See* NRS 391.824(6)(b).  WCSD did not even attempt to

25  comply with this provision until it faced a Motion for Preliminary Injunction in this

26  case, when it issued the letter in Doc. #37-39 attached to its opposition to Olsen's

27  Motion on February 2, 2020 stating that WCSD would not take any further adverse

28

1   employment action against Olsen.[14]

2       Davis' firing Olsen despite the prohibition from any such action until a neutral

3   third party had heard Olsen's case as provided in NRS 391.824(1) was

4   fundamentally unfair and shocking to the universal sense of justice.  WCSD simply

5   tossed aside protections provided to Olsen in Nevada law, and adopted a "so sue

6   me" approach to dealing with Olsen, and then attempts to walk back its clearly

7   unlawful actions when confronted with potential consequences from the Court.

8   Nevada's Due Process Clause forbids action which is fundamentally unfair and

9   shocking to the universal sense of justice. *Summers v. Warden Nev. State Prison*,

10  84 Nev. 326, 327, 440 P.2d 388, 388 (1968).  Brazenly ignoring the law and illegally

11  firing a public employee despite her clear rights to gain advantage in a dispute with

12  that employee is shocking to the universal sense of justice, especially where there

13  is no dispute as to the fact that the employee was being fired for reporting the illegal

14  conduct of her co-workers.

15      **vi. Olsen reported Wilson and Ford's actions to the appropriate**

16      **authority and was disciplined and fired for doing do**

17      WCSD also argues that, "Plaintiff is not entitled to summary judgment on her

18  tortious discharge claim." Motion at 27:22.   Nevada has a public policy exception

19  to the at-will employment doctrine where employers are liable if they terminate an

20  employee for the reporting of unlawful activity.  *Allum v. Valley Bank of Nevada*,

21  114 Nev. 1313, 1319-20, 970 P.2d 1062, 1065-66 (1998); *Wiltsie v. Baby Grand*

22  *Corp.*, 105 Nev. 291, 293, 774 P.2d 432, 433-34 (1989). Olsen reported the

23  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [14] This "walk-back" strategy is becoming common with state litigants in Federal Courts
24  faced with civil rights suits.  See *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.,* 140 S. Ct.
    1525, 1526 (2020), where a suit involving second amendment rights was rendered moot
25  when the subject statute was amended, seemingly to avoid a ruling from the Supreme
    Court on the issue.  See Dissent by Justice Alito, joined by Justice Gorsuch and Justice
26  Thomas: "By incorrectly dismissing this case as moot, the Court permits our docket to
    be manipulated in a way that should not be countenanced."  *Id.*
27

28

allegedly illegal conduct to an appropriate authority other than her supervisor as required by *Wiltsie v. Baby Grand Corp.*, 774 P.2d at 433 (Nev.1989).  Olsen worked at Hug High School where her immediate supervisor was Ford.  Under *Wiltsie*, where an employee "report[s] the activity to his supervisor rather than the appropriate authorities," the employee is "merely acting in a private or proprietary manner" and is not eligible for whistleblower protection. *Id.* at 433–34.  Olsen did not report the alleged misconduct at issue to her "supervisor" Ford in a private or proprietary manner, but rather to Gonzalez, a public official and the Area Superintendent for WCSD.  Here, there is a "strong and compelling" public policy that teachers and school administrators be free to report allegations of misconduct or illegal conduct of their coworkers without fear of punishment or retaliation.[15] [T]his court "'believe[s] that whistleblowing activity which serves a public purpose should be protected. So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged.'" *Ainsworth v. Newmont Mining Corp.*, No. 56250, 2012 Nev. Unpub. LEXIS 435, at *5 (Mar. 20, 2012) quoting *Wiltsie*, 105 Nev. at 293, 774 P.2d at 433 (quoting *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250, 257 (Ariz. 1986), overruled on other grounds by *DeMasse v. ITT Corp.*, 194 Ariz. 500, 984 P.2d 1138 (Ariz. 1999)).

Although the *Colagiovanni v. CH2M Hill, Inc.*, 2015 WL 1334900, at *9 (D. Nev. Mar. 20, 2015) states that reports of illegal activity must be made "outside of the company," the Nevada Supreme Court has not drawn this same conclusion in a

---

[15] WCSD recognizes this policy in its Board Policy 4505. Section 2(a)(vii) states that employees are expected to, "Report to management circumstances or concerns that may affect satisfactory work performance, including any inappropriate (fraudulent, illegal, unethical) activities of other employees, or misconduct toward a student.  Section 2(d)(i) states, "The District shall not suspend or terminate the employment of, or take other adverse personnel action against, an employee who in good faith reports a violation of law by the District or District employee to an appropriate authority, including school police or other law enforcement agency or through established District complaint processes.  See Exhibit 3, attached hereto.

1   case where a government agency or a government employee is at issue.  The

2   *Wiltsie* decision states that reporting illegal activity to one's supervisor in a private

3   company is not sufficient and that one must report illegal activity to the "appropriate

4   authorities."  *Wiltsie v. Baby Grand Corp.*, 774 P.2d at 433 (1989).  For example, a

5   City of Reno police officer who witnesses another City of Reno police officer

6   committing a crime within the City of Reno would report the crime to the City of

7   Reno's Police Department, because the Police Department would be the

8   "appropriate authority" to whom to report the crime.  The reporting police officer

9   should not be deemed to have waived a tortious discharge claim against the Reno

10  Police Department if he were subsequently fired by the Reno Police Department for

11  reporting the crime because he failed to report the illegal activity to an outside

12  agency.

13       In this case, Roger Gonzalez was the appropriate authority, i.e. a public

14  official outside of Olsen's place of work, i.e. Hug High, to whom to report the

15  allegations and because he was the Area Superintendent who oversaw Ford.

16  WCSD expressly claimed that Olsen was subject to discipline ***because*** she

17  reported the allegations to Gonzalez and not Ford.  See Doc. #37-21, #37-22, and

18  #37-25.  Couching the issue as a failure on Olsen's part to report the marijuana

19  incident to Ford is the same as punishing Olsen for her actual reporting of the

20  incident to Gonzalez.  In effect, Olsen was simultaneously punished by WCSD for

21  reporting and not reporting the marijuana incident.

22       As to any "mixed-motives" argument, i.e. that under *Allum v. Valley Bank of*

23  *Nevada*, 114 Nev. 1313, 1319-20, 970 P.2d 1062, 1066 (1998) a party must show

24  that their firing was proximately caused by the whistleblowing activity.  Issues of

25  proximate cause are considered issues of fact and not of law, and thus they are for

26  the jury to resolve. *Nehls v. Leonard*, 97 Nev. 325, 328, 630 P.2d 258, 260 (1981).

27  In addressing the incident involving the marijuana at issue, the Arbitrator's decision

28  made plain that WCSD retaliated against Olsen and fired her for reporting that she

had been made aware that WCSD employees were allegedly engaged in inappropriate activities involving drugs at school: Doc. #37-33 at 32: "Olsen reported a hearsay statement and expected a fair investigation, and instead was terminated. This discipline is retaliatory and overly punitive." Further, it's clear from the record that the proximate cause of Olsen's firing was the marijuana incident, because: (1) the timing of Olsen's discovery of the incident and the subsequent disciple, especially in light of her positive evaluation from Ford weeks before the marijuana incident: (2) the fact that WCSD expressly included the marijuana incident in its reasons for terminating Olsen in IDP Nos. 1 and 3, and in the Recommendation for Dismissal; (3) Arbitrator Dooley expressly found that WCSD otherwise lacked "just cause" to terminate Olsen (Doc #37-33); and (4) Arbitrator Dooley also found that WCSD was piling on accusations against Olsen months after they occurred "to bolster the discipline and not because it was supported by just cause." Doc. #37-33 page 23. Further, while Dooley found that Olsen was in part responsible for testing irregularities, that WCSD lacked just cause to terminate Olsen and that Olsen did not engage in misconduct, she simply made an inadvertent error, for which she accepted responsibility. Doc. #37-10 and #37-33 at 35. At minimum, there is a genuine issue of material fact as to whether WCSD's reasons for its actions other than the marijuana incident were merely a pretext for terminating Olsen. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

WHEREFORE, Olsen requests that the Court deny WCSD's Motion for Summary Judgment.

**DATED** this Tuesday, December 15, 2020:

By:_____

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE.
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM

**<u>Exhibit List</u>**

1.  Declaration No. 3 of Trina Olsen
    a.  Performance Evaluation
    b.  IDP No. 1 email
    c.  Email from Ford Approving Excel Spreadsheet
    d.  Dooley invoice
2.  WCSD Board Policy 9085 Delegation to Superintendent
3.  WCSD Board Policy 4505 Standards of Professional Conduct

1

2

### CERTIFICATE OF SERVICE

3

4

       Pursuant to FRCP 5, I certify that on the date shown below, I caused service to

5

be completed of a true and correct copy of the foregoing pleading by:

6

_____         personally delivering;

7

_____         delivery via Reno/Carson Messenger Service;

8

_____         sending via Federal Express (or other overnight delivery service);

9

_____         depositing for mailing in the U.S. mail, with sufficient postage affixed

10

                  thereto; or,

11

  X        delivery via electronic means (fax, eflex, NEF, etc.) to:

12

13              ROBERT A. DOTSON, ESQ.
                JUSTIN C. VANCE, ESQ,

14              5355 Reno Corporate Dr., Ste 100
                Reno, Nevada 89511

15              (775) 501-9400

16              *Attorneys for Washoe County School District*

17

18              KATHERINE F. PARKS, ESQ.
                Thorndal Armstrong Delk Balkenbush & Eisinger

19              6590 S. McCarran Blvd., Suite B
                Reno, NV  89509

20              *Attorney for Traci Davis*

21         **DATED** this Tuesday, December 15, 2020

22                  By:_____

23              LUKE BUSBY, ESQ.
                NEVADA STATE BAR NO. 10319

24              316 CALIFORNIA AVE.

25              RENO, NV 89509
                775-453-0112

26              LUKE@LUKEANDREWBUSBYLTD.COM

27              *ATTORNEY FOR PLAINTIFF*

28